**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **LL FLOORING HOLDINGS, INC.,** *et al.*, | **Case No. 24-11680 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

**DECLARATION OF HOLLY ETLIN IN SUPPORT**
**OF CHAPTER 11 PETITIONS AND FIRST DAY PAPERS**

I, Holly Etlin, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Restructuring Officer ("CRO") for the above-captioned debtors and debtors in possession (collectively, the "Debtors" and, together with their non-Debtor affiliates, the "Company"), having served in that role since August 2024.

2.      I am also a Partner and Managing Director of the Debtors' proposed financial advisor, AlixPartners, LLP ("AlixPartners"), where I have worked in various positions since 2007. I have more than thirty (30) years of experience in providing turnaround services for companies, including in the retail industry, and have frequently been appointed as Interim CEO, Interim CFO, and Chief Restructuring Officer of these businesses. I am admitted to the American College of Bankruptcy and the International Insolvency Institute and am a Certified Turnaround Professional.

---

[1]      The Debtors in these chapter 11 cases, along with the last four (4) digits of their respective tax identification numbers, are as follows: LL Flooring Holdings, Inc. (0817); LL Flooring, Inc. (9199); Lumber Liquidators Leasing, LLC (N/A); LL Flooring Services, LLC (5960); and Lumber Liquidators Foreign Holdings, LLC (4568). The address of the Debtors' corporate headquarters is 4901 Bakers Mill Lane, Richmond, VA 23230.

3.      As Managing Director at AlixPartners, I have served as a restructuring advisor to the Debtors since January 2024.  I have overseen (and continue to oversee) the services provided by AlixPartners, which include: designing and implementing a restructuring strategy designed to maximize the Company's enterprise value; evaluating the Debtors' cash flow projections and identifying liquidity-enhancing opportunities; contingency planning; developing various forecasts and financial analysis; coordinating and providing administrative support for the Debtors' bankruptcy proceedings and emergence from chapter 11; assisting with data collection; and assisting with vendor payments.

4.      On the date hereof (the "Petition Date"), the Debtors each commenced with this Court a voluntary case (these "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the District of Delaware (the "Court").  The Debtors intend to continue in the possession of their respective properties and the management of their business as debtors in possession. To minimize any business disruption caused by the commencement of the Chapter 11 Cases, the Debtors seek various types of relief through "first day" applications and motions filed contemporaneously herewith (collectively, the "First Day Papers").

5.      I submit this declaration (this "Declaration") in support of the Debtors' (i) voluntary petitions for relief under the Bankruptcy Code; and (ii)  the First Day Papers.  I am over the age of eighteen (18), competent to testify, and authorized to submit this Declaration on behalf of the Debtors.  In my capacity as CRO of the Debtors and as a result of my time with the Debtors, my review of relevant documents, and my discussions with other members of the Debtors' management team (the "Management Team"), I am generally familiar with the Debtors'

day-to-day operations, business affairs, books and records, the circumstances leading to the commencement of these Chapter 11 Cases, and the information in the First Day Papers.

6.      The statements in this Declaration are, except where specifically noted, based on (i) my personal knowledge of the Debtors' operations and finances based on information provided by the Debtors; (ii) my review of relevant documents, including information provided by other parties; (iii) information provided to me by, or discussions with, the members of the Management Team or their advisors; and/or (iv) my opinion based upon my experience.  If called upon to testify, I would testify competently to the facts as set forth in this Declaration.

7.      This Declaration is divided into three (3) parts. ***Part I*** provides background information about the Debtors, their business operations, and their corporate and capital structures; ***Part II*** describes the circumstances surrounding the commencement of the Chapter 11 Cases and the Debtors' prepetition sale and contingency planning efforts; and ***Part III*** sets forth the relevant facts in support of each of the First Day Papers.

## PRELIMINARY STATEMENT

8.      LL Flooring, a flooring retailer, has been providing flooring and related services to customers since 1994. The Company has been historically successful; however, as further discussed below, given a changing market characterized by lower levels of home improvements, depressed discretionary spending, and the subsiding of the COVID-19 demand bubble for home renovation projects, LL Flooring has suffered multiple setbacks, ultimately constraining its liquidity to unsustainable levels and leading the Company to commence these Chapter 11 Cases.

9.      As described below, the Company engaged in extensive prepetition marketing and refinancing processes and implemented various cost-cutting measures in attempts to delay and counteract the Company's liquidity crisis.  The Company also engaged JLL (as defined below) to market the Sandston DC (each as defined below), a material asset of the Debtors, in an effort to

3

inject liquidity into the Company and delay impending defaults under the Prepetition ABL Agreement (as defined below). However, those efforts were insufficient to overcome the difficulties LL Flooring faced, which peaked in June and July 2024 in light of a reduction in their borrowing base under the Prepetition ABL Facility following public disclosure of the Company's financial distress, which also prompted the majority of the Company's vendors and suppliers to limit or stop shipments altogether. The Debtors ultimately recognized that it was in the best interests of the Debtors and their estates to seek the protections afforded debtors in chapter 11 under the Bankruptcy Code as they continue exploring potential sale opportunities for the Debtors' business, right-size their store footprint through closures of underperforming store locations that would not be desirable for potential buyers, and liquidate certain store-level inventory and assets to alleviate their liquidity constraints in the process.

10.     Following a prepetition marketing process that spanned over a year, in the weeks leading up to the Petition Date, the Debtors engaged in advanced discussions with a potential buyer for the Sandston DC, and anticipate finalizing a purchase agreement that the Debtors will seek authorization from the Court to enter into in the next several weeks, and focused on soliciting two (2) types of proposals from potential bidders with respect to the Debtors' overall business: (i) bids to purchase the Debtors' business (including, at the potential purchaser's option, the Sandston DC) at a going concern value; and (ii) alternatively, bids from third party agents to wind down, close, and liquidate all of the Debtors' retail stores and store-level assets should the Debtors be unable to find a viable buyer for the Debtors' going concern business.

11.     The Debtors' prepetition marketing processes yielded significant interest in the Debtors' business. However, due to liquidity constraints, the Debtors did not have sufficient time to reach a deal. The Debtors have thus commenced these Chapter 11 Cases to provide the Debtors

with time and resources to allow all parties interested in purchasing the Debtors' business to continue engaging with the Debtors, with the goal of finding a stalking horse bidder in the first few weeks of these Chapter 11 Cases and ultimately paving a path forward for a sale of the Debtors' business for the benefit of all stakeholders. The Debtors are currently engaged in active discussions with multiple bidders, and the Debtors have simultaneously filed a motion seeking approval of bidding procedures (the "Bidding Procedures" and such motion, the "Bidding Procedures Motion") and reserving the right to name a stalking horse bidder in advance of a hearing on the Bidding Procedures Motion. The Debtors' postpetition sale strategy (the "Going Concern Sale Process" and, together with the Store Closing Sales (as defined below), the "Sale Processes") will be the foundation of these Chapter 11 Cases and will be critical to maximizing recoveries for all creditors.

12.    To provide sufficient liquidity to administer these Chapter 11 Cases, the Debtors have obtained a commitment from the DIP Lenders (as defined below) to provide a debtor in possession financing facility (the "DIP Facility") to alleviate the Debtors' short-term liquidity issues and allow flexibility as the Debtors pursue the Going Concern Sale Process. While the Debtors expect to have additional liquidity under the DIP Facility, it is imperative that the Debtors move expeditiously through these Chapter 11 Cases and utilize the liquidity available to them to consummate a value-maximizing transaction. To that end, the Debtors have agreed to the milestones set forth in the DIP Motion (as defined below).

13.    To further bolster their liquidity position as they navigate the Going Concern Sale Process, the Debtors will conduct store closing sales at certain underperforming stores. On August 9, 2024, the Debtors entered into that certain Letter Agreement Governing Inventory Disposition (the "Agency Agreement"), by and between Debtor LL Flooring Holdings, Inc. and

Hilco Merchant Resources, LLC ( "<u>Hilco</u>" or the "<u>Agent</u>"), pursuant to which Hilco will assist the Debtors in evaluating and conducting large-scale store closing sales (the "<u>Store Closing Sales</u>") with respect to such underperforming stores (the "<u>Closing Stores</u>") and preparing each Closing Store for turnover to the applicable landlords.  Should the Going Concern Sale Process ultimately not yield a viable buyer for the Debtors' business, the Debtors will be able to utilize the Agent, subject to higher or otherwise better bids from other liquidators, and the Store Closing Sales process set forth in the Agency Agreement to implement an orderly wind-down of the Debtors' remaining stores to maximize recoveries for their stakeholders.

14.     While the Debtors' decision to commence these Chapter 11 Cases and pursue the Sales Processes is informed by the difficult challenges they currently face and the timing and speed of a liquidity crisis that ruled out the viability of any out-of-court option, the Debtors' significant efforts to right-size their business prior to the Petition Date, coupled with careful deliberations by the board of directors of LL Flooring (the "<u>Board</u>"), the Restructuring Committee (as defined below), the Management Team, and the Debtors' advisors, cleared a path to achieving a value-maximizing transaction in chapter 11 for the benefit of their stakeholders, and the Debtors are committed to an efficient chapter 11 process and quick exit from bankruptcy.

<b><u>PART I: BACKGROUND</u></b>

**I.      The Debtors' Business**

**A.      Business Overview**

15.     LL Flooring is one of North America's leading specialty retailers of flooring.  LL Flooring was founded by Thomas Sullivan in 1994 as Lumber Liquidators Holdings, Inc. and changed its corporate name to LL Flooring Holdings, Inc. effective January 1, 2022.  After being acquired in 2005 by TA Associates, a Boston-based private equity firm, the Company completed its initial public offering in November 2007.  The Company offers flooring primarily

6

to consumers and flooring professionals like flooring installers, remodelers, and homebuilders on behalf of consumers.  The Company also provides in-home delivery and installation services.

16.     The Company offers more than 500 varieties of hard surface flooring—including waterproof hybrid resilient, waterproof vinyl plank, solid and engineered hardwood, laminate, bamboo, tile, and cork—under more than fifteen (15) private brands, including the Company's flagship brands: Bellawood®, Coreluxe®, ReNature by Coreluxe®, and Duravana®.



17.     The Company also offers an assortment of installation services and accessories, including moldings, underlayment, adhesives, and tools.  In addition to its hard surface flooring product assortment, the Company expanded into soft surface flooring and began offering carpet products in 2023.  As of July 31, 2024, 263 of the Company's store locations offered carpet.

18.     The Company operates approximately 430 retail stores across forty-six (46) states in the United States.[2] Stores are typically 6,500 to 7,500 square feet and subject to leases, generally for a base term of five (5) to seven (7) years with renewal options; the Company's 53,000 square foot corporate headquarters in Richmond, Virginia is also leased, with base terms running through 2029. All stores offer customers the opportunity to purchase professional installation services, which are performed by third party installation professionals.[3]

19.     In addition to the store locations, the Company's products may be ordered, and customer questions or concerns addressed, through both its customer contact center in Richmond, Virginia, and its website, https://www.llflooring.com/. The Company's website showcases a broad range of information on its products and services, and customers can chat live with a flooring expert regarding questions about a flooring purchase or installation. The Company has historically developed new features and functionality to assist customers on an ongoing basis, such as the Customer Relationship Management system implemented in 2023 to help improve functionality, capability, and information flow as well as increase automation in servicing customers. There are also certain online ordering options tailored to flooring professionals.

**B.      Supply Chain and Distribution**

20.     The Company sources its hard surface products directly from flooring and other vendors, both domestic and internationally. In 2023, approximately forty-seven percent (47%) of its product was sourced in North America, twenty-two percent (22%) was sourced from Asian countries other than China, sixteen percent (16%) was sourced from Europe, eleven percent (11%)

---

[2]     The Debtors expect to close ninety-four (94) of these stores in the Store Closing Sales, fifty-five (55) of which offer carpet.

[3]     As of August 9, 2024, the Debtors no longer offer installation services at the ninety-four (94) Closing Stores.

was sourced from China, and four percent (4%) was sourced from South America. For carpet offerings, the Debtors rely on one (1) domestic supplier.

21.     LL Flooring's supply chain relies on three (3) distribution centers: (1) a one million square foot distribution center on approximately 100 acres of land in Henrico County, Virginia, which serves the stores located in the eastern United States and is owned by the Company (the "Sandston DC"); (2) a 500,000 square foot leased distribution center in Pomona, California, the Company's primary distribution center for the stores located in the western United States; and (3) a 450,000 square foot space in Dallas, Texas, leased in 2023, which was built to service regional stores in the central United States to decrease product transport distances to stores and reduce transportation costs over time.



*The Company's distribution center in Dallas, Texas*

22.     The Sandston DC houses a 1,500 square foot laboratory maintained and operated by the Company. The laboratory features two (2) temperature and humidity controlled conditioning rooms and two (2) emission chambers correlated to Third-Party Certifier standards approved by the State of California Air Resources Board ("CARB") regulations and the United

States Environmental Protection Agency ("EPA") which, in addition to certain third party providers, supports the Company's compliance with CARB and EPA regulations. As further described herein, the Debtors are in active negotiations with a potential buyer regarding the Sandston DC and may come before the Court in the near future to request authority to effectuate a sale thereof.

23.    The Company, through non-Debtor affiliate America Lumber Liquidators Leasing LLC Shanghai Representative Office (the "Shanghai Affiliate"), also maintains a laboratory in Shanghai, China, which is used by the Company's sourcing, compliance, and quality assurance team to work with its vendors in Asia to ensure compliance with applicable regulatory requirements and Company quality standards.

### C.    Employees

24.    The Company employs approximately 1,960 associates, ninety-nine percent (99%) of whom are full-time, one percent (1%) of whom are part-time, and none of whom are represented by a union. Of these associates, seventy-one percent (71%) work in retail stores, twenty-two percent (22%) work in corporate store support infrastructure or similar functions (including call center associates), and seven percent (7%) work in distribution centers. Employees have the option to participate in certain benefits programs and the opportunity to participate in various charitable and educational programs through the Company.

25.    The Company also employs approximately twenty (20) individuals indirectly through the Shanghai Affiliate. The Shanghai Affiliate has an agreement with a Shanghai government-affiliated management and employment agency ("FESCO") which provides the Shanghai Affiliate with a consistent workforce. The Shanghai Affiliate makes payments to FESCO and FESCO pays the Shanghai Affiliate's employees directly.  Payments to FESCO also cover certain benefits in compliance with applicable Chinese labor laws.

D.        **Market and Competition**

26.        The Debtors operate in a large, highly fragmented hard and soft surface flooring market in the United States.  Based on internal estimates as well as external reports, such as the December 2023 issue of *Floor Covering Quarterly* and Catalina Research, Inc.'s *Report on Floor Coverings*, *Industry Trends 2022*, the Debtors estimate total U.S. flooring retail sales (including soft and hard surface flooring and excluding installation labor and non-flooring accessory products) were $36 billion industry-wide in 2022.  Total hard surface flooring retail sales were approximately $23 billion industry-wide in 2022, not including installation labor and non-flooring accessory products.  Total soft surface flooring retail sales in the industry were approximately $13 billion in 2022.

27.        The largest segment of this highly-fragmented market is represented by independent specialty retailers comprised of local one-store flooring retailers, small chains of stores that may specialize in one (1) or two (2) flooring categories, and a limited number of regional chains. The Company faces significant competition from national and regional home improvement chains, national and regional specialty flooring chains, internet-based companies, and privately owned single-site enterprises.  It competes on the basis of price, customer service, and store location, and the range, quality, and availability of the hard and soft surface flooring offerings.  The Company aims to offer a compelling value proposition to customers by providing a wide selection of high-quality, stocked products and the accessible flooring expertise and service of a local store, with the scale, omnichannel convenience and value of a national chain.

E.     **Marketing and Publicity**

(i)     *Marketing Strategies*

28.     The Company utilizes a mix of digital and traditional media, email, and direct mail to balance product, service, and value messaging.  It also leverages its investments in paid, owned, and earned media to build brand consideration and to educate customers on the flooring category.

29.     Historically, the Company used extensive advertising to encourage customers to drive to its stores, which were, at times, located some distance from population centers in areas that have lower rents than traditional retail locations. Initially, a significant portion of the Company's advertising was directed only to consumers, whose needs with respect to their flooring purchases vary from professionals such as flooring installers, remodelers, and home builders.  Advertising content has since broadened to focus on what the Company views as great value, superior service, and broad selection of high-quality hard and soft surface flooring product offerings to its professional customers based on those customers' specific needs.

(ii)     *Rebranding*

30.     In 2015, the Company was the subject of a televised 60 Minutes exposé regarding claims that the laminate flooring imported by the Company from China had unsafe levels of formaldehyde. The exposé coincided with a class action lawsuit against the Company and a governmental investigation into violations of CARB regulations, each relating to levels of formaldehyde in the Company's wood flooring products.  In October 2015, the Company pleaded guilty in federal court to charges of environmental crimes prohibited by the Lacey Act related to illegal importation of hardwood flooring from Far East Russia, as well as false statements on Lacey Act declarations which concealed the true species and source of the timber.

31.     In March 2016, the Company reached a settlement agreement with CARB regarding taking precautions to ensure laminate products complied with the Emission Standards

for Formaldehyde in California.  In June 2016, the Company agreed to a Corrective Action Plan with the Consumer Product Safety Commission with respect to laminate flooring products manufactured in and imported from China to help provide reassurance regarding formaldehyde emissions.  In May 2019, the Company entered into a Deferred Prosecution Agreement with the U.S. Department of Justice and the U.S. Securities and Exchange Commission, pursuant to which the Company agreed to accept responsibility for certain conduct and facts related to securities law violations following the 60 Minutes episode.  In addition, the Company settled consumer class action lawsuits related to the formaldehyde allegations in 2018, and in 2019, the Company settled an unrelated consumer class action lawsuit to resolve products liability claims related to certain of its bamboo flooring products.

32.    The foregoing series of events had a significant negative impact on the Company's reputation. After satisfying its obligations under applicable settlement agreements and implementing various quality controls systems designed to avoid similar issues in the future, the Company sought to revive its reputation, in part by officially changing its name from Lumber Liquidators Holdings, Inc. to LL Flooring Holdings, Inc. The Company completed a physical rebranding of its stores in 2022.  This physical rebranding was part of a marketing campaign to raise brand awareness after the name change, and awareness has risen sixteen percent (16%) since the campaign began in 2021, though low brand awareness following the rebranding has been a limiting factor in driving sales, further exasperating the Company's recent financial difficulties.





## II.    The Debtors' Corporate and Capital Structure

33.    The Company operates in a holding company structure, with LL Flooring Holdings, Inc. at the top and certain direct and indirect subsidiaries, including LL Flooring, Inc. and LL Flooring Services, LLC conducting operations.  An organizational chart showing the Company's corporate structure as of the Petition Date is below:



### A.    Board of Directors and the Management Team

34.    As of the Petition Date, the Board is comprised of the following individuals:

| Director | Class[4] |
|---|---|
| Terri Funk Graham | Class I |

---

[4]    The Board is currently classified into three (3) classes.  Class I serves a term expiring in 2025; Class II serves a term expiring in 2026; and Class III serves a term expiring in 2027. On July 10, 2024, the Company's stockholders voted to approve an amendment to declassify the Board, which became effective on July 12, 2024.  The declassification will be phased in so that, beginning with the class of directors standing for election in 2025 Annual Meeting, directors will be elected for shorter terms (*i.e.*, two (2) years for directors elected in 2025

| Director | Class[4] |
|---|---|
| Famous P. Rhodes | Class I |
| Joseph M. Nowicki | Class I |
| David A. Levin (Chairperson) | Class II |
| Martin F. Roper | Class II |
| Charles E. Tyson (CEO) | Class II |

35.     Other than the Chief Executive Officer, all of the directors currently on the Board are independent as determined by the Board in its business judgment based on the applicable independence standards contained in the rules of the New York Stock Exchange ("NYSE").

36.     The members of the Management Team are set forth below:

| Name | Title |
|---|---|
| Charles E. Tyson | President; Chief Executive Officer |
| Susan Bryan | Interim Executive Vice President; Interim Chief Financial Officer[5] |
| Laura Massaro | Senior Vice President, Chief Marketing Officer |
| Douglas S. Clark | Senior Vice President, Merchandising and Supply Chain |
| Andrew Wadhams | Senior Vice President, Retail and Commercial Sales |
| Lisa Robinson-Davis | Senior Vice President, Enterprise Quality, Product Compliance, and Customer Care |
| Alice G. Givens | Senior Vice President; Chief Legal, Ethics and Compliance Officer; Corporate Secretary |
| Kristian B. Lesher | Senior Vice President; Chief Technology Officer |

---

and one (1) year for directors elected in 2026) until the Board is declassified as of its 2027 Annual Meeting.  At the Company's 2024 annual meeting of shareholders, the F9 Nominees (as defined below) were elected as Class III directors, replacing the then-incumbent Class III directors. On August 8, 2024, the F9 Nominees resigned from the Board.  Accordingly, the size of the Board was reduced from nine (9) members to five (5), and no directors are currently appointed to Class III.

[5]     On August 7, 2024, Robert L. Madore informed the Company that he was resigning from his position as Executive Vice President and Chief Financial Officer, effective immediately.  The Company appointed Susan Brian, Vice President of Finance of LL Flooring, as Interim Chief Financial Officer to replace Mr. Madore.

### B.    Funded Indebtedness

37.    As of the Petition Date, the Debtors have approximately $109.6 million in total funded indebtedness, consisting of (i) not less than $99 million in outstanding principal amount under the Prepetition ABL Facility (as defined below); and (ii) $10.6 million in Letters of Credit (each as defined below) issued and outstanding under the Prepetition ABL Agreement.

| Funded Debt | Maturity | Principal |
|---|---|---|
| Prepetition ABL Facility | April 30, 2026 | $99 million |
| Letters of Credit | April 30, 2026 | $10.6 million |
| **Total Funded Debt** | | **$109.6 million** |

### *(i)    The Prepetition ABL Facility*

38.    On March 29, 2019, LL Flooring, Inc. entered into that certain Fourth Amended and Restated Credit Agreement (as amended by the First Amendment (as defined below), dated as of April 17, 2020, the Second Amendment (as defined below), dated as of April 30, 2021, and the Third Amendment (as defined below), dated as of December 27, 2022, the "Prepetition ABL Agreement") by and among LL Flooring, Inc., as borrower (the "Company Borrower"), and LL Flooring Services, LLC as additional borrower (together with the Company Borrower, the "ABL Borrowers"), LL Flooring Holdings, Inc., Lumber Liquidators Foreign Holdings, LLC, and Lumber Liquidators Leasing, LLC as guarantors (collectively, and together with the ABL Borrowers, the "ABL Loan Parties"), Bank of America, N.A., as administrative agent and collateral agent (in such capacities, the "Prepetition ABL Agent"), and the lenders party thereto (the "Prepetition ABL Lenders"), pursuant to which the Prepetition ABL Lenders provided revolving loan commitments, letters of credit, and other financial accommodations to the ABL Loan Parties (the "Prepetition ABL Facility").

39.     The Prepetition ABL Facility consists of an up to $200 million asset-based revolving credit facility,[6] subject to a borrowing base, with the option of the ABL Borrowers to increase the facility to a maximum total amount of $250 million, and is secured by a security interest in and lien on substantially all of the ABL Loan Parties' assets, subject to certain exclusions (the "Collateral").  The Collateral includes, among other things, inventory, accounts receivable, and the Sandston DC.

40.     The Prepetition ABL Facility matures on April 30, 2026, and bears interest at a rate per annum equal to, at the ABL Borrowers' option, (i) the Term SOFR Rate (as defined in the Prepetition ABL Agreement), *plus* an applicable margin ranging from 1.25% to 1.75%; or (ii) the Base Rate (as defined in the Prepetition ABL Agreement), *plus* an applicable margin ranging from 0.25% to 0.75%.  Interest on the Prepetition ABL Facility is payable, in the case of any Term SOFR Rate loan, on the last day of each interest period (which may be one (1), three (3), or six (6) months at the Company Borrower's election) and, in the case of any Base Rate Loan (as defined in the Prepetition ABL Agreement), the first calendar date of each calendar quarter.  The ABL Borrowers pay a commitment fee of 0.25% per annum based on the average daily unused amount of the Prepetition ABL Facility during the most recently completed calendar quarter. The Prepetition ABL Agreement grants the Prepetition ABL Agent discretion to reduce the availability of funds under the Prepetition ABL Facility by increasing the Company Borrowers' required reserves.

---

[6]     The ABL Facility originally also included a first in-last out $25 million term loan, but on April 30, 2021, the term loans were terminated and converted into revolving commitments, increasing the revolving facility size from $175 million to $200 million, as discussed further below.

### *(ii)* *Amendments to the Prepetition ABL Agreement*

41.     On April 17, 2020, the ABL Borrowers entered into a first amendment to the Prepetition ABL Agreement (the "First Amendment"), which, among other things, temporarily increased the maximum amount of borrowings under the Prepetition ABL Facility from $175 million to $212.5 million until August 30, 2020, subject to the applicable borrowing base. The aggregate commitments under the Prepetition ABL Agreement temporarily increased to $237.5 million, which was inclusive of a first in-last out $25 million term loan (the "FILO Term Loan Facility").

42.     On April 30, 2021, the ABL Borrowers entered into a second amendment to the Prepetition ABL Agreement (the "Second Amendment") in order to, among other things, extend the maturity date of the commitments thereunder to April 30, 2026, decrease the unused commitment fee from 0.50% to 0.25%, and convert the FILO Term Loan Facility into the Prepetition ABL Facility. The term loans under the FILO Term Loan Facility were terminated and converted to revolving commitments under the Prepetition ABL Facility. Following execution of the Second Amendment, the aggregate size of the Prepetition ABL Facility was $200 million.

43.     On December 27, 2022, the ABL Borrowers entered into a waiver and third amendment to the Prepetition ABL Agreement (the "Third Amendment"). The Third Amendment, among other things, (i) changed the interest rate under the Prepetition ABL Agreement for borrowings from a LIBOR-based rate to a Term SOFR Rate, subject to certain adjustments specified in the Third Amendment; and (ii) provided a waiver of a technical event of default under the Prepetition ABL Agreement related to providing notice to the Prepetition ABL Lenders of the Company's name change from Lumber Liquidators Holdings, Inc. to LL Flooring Holdings, Inc.

### *(iii)*    *Letters of Credit*

44.     The Prepetition ABL Facility also includes a $20 million sublimit for the issuance of letters of credit (the "Letters of Credit"), with Bank of America, N.A, as issuer. As of the Petition Date, seven (7) Letters of Credit are issued and outstanding, which cover a range of obligations, including but not limited to, securing bonds related to U.S. customs requirements, self-insured workers' compensation policies, contractor performance bonds, and vendor accounts payable.

### C.    Equity

45.     LL Flooring conducted its initial public offering in November 2007. Since then, common stock in LL Parent ("LL Common Stock") has traded on the NYSE under the trading symbol "LL."

46.     Under its Certificate of Incorporation, the Company is authorized to issue a total of 35 million shares of LL Common Stock, $0.001 par value, and eight million shares of preferred stock, $0.01 par value. As of August 6, 2024, there were 31,776,089 shares of LL Common Stock outstanding, inclusive of 2,462,369 unvested shares of restricted stock with voting rights granted to employees. There is no preferred stock issued or outstanding.

### *(i)*    *Share Repurchases Authorization*

47.     In February 2012, the Board adopted an authorization for the repurchase of up to a total of $50 million of LL Common Stock, which it increased by $50 million in each of November 2012 and January 2014, totaling $150 million in the aggregate. As of February 2022, the Company had repurchased approximately $135.3 million of LL Common Stock, and the Board increased the authorization for the remaining $14.7 million of LL Common Stock by $35.3 million, such that as of February 2022, there were again $50 million in authorized repurchases of LL Common Stock outstanding, which could be effectuated on the open market or in private transactions. As of

March 31, 2024, there was $43 million outstanding under the share repurchase authorization, which does not have an expiration date. The Company did not repurchase any shares under the authorization during the three (3) months ended March 31, 2024, or March 31, 2023.

### (ii)    Restricted Stock

48.    Historically, LL Flooring issued annual equity awards using a mix of fifty percent (50%) performance-based restricted stock, twenty-five percent (25%) time-based restricted stock (which vest ratably over four (4) years), and twenty-five percent (25%) stock options (which vest ratably over four (4) years). In March 2023, based on an analysis of the market practices among the Company's peer group with respect to short- and long-term incentive plan practices, the Company issued annual equity awards using a mix of fifty percent (50%) performance-based restricted stock and fifty percent (50%) time-based restricted stock (which vest ratably over three (3) years).

49.    In 2023, the compensation committee of the Board discontinued the use of stock options and moved to a mix of time-based restricted stock and performance-based restricted stock.

50.    The performance-based restricted stock granted historically vested based on obtaining an adjusted EBITDA goal. For the 2023 performance-based restricted stock grant, the compensation committee determined it would use a three-year relative total shareholder return compared to the S&P 600 Retailing Industry Group as the performance measure. This decision was based on the economic uncertainty, headwinds from customs issues related to vinyl flooring and challenges with historic plan performance. Because of the financial difficulties the Company faced, the applicable thresholds were not achieved and none of these shares vested.

### (iii)    Deferral Plan

51.    In November 2008, the Board adopted a plan under which each non-employee director could defer receipt of all or a portion of such director's fees until such director's departure

from the Board (the "Deferral Plan") to more closely align the interests of non-employee directors with the interests of the Company's shareholder. Under the Deferral Plan, non-employee directors could elect to defer up to 100% of their compensation in twenty-five percent (25%) increments and have such compensation invested in deferred stock units. In September 2022, the Board amended and restated the Deferral Plan to provide that directors may elect to have their deferred stock units settled in LL Common Stock in one of three (3) timeframes upon the director's departure from the Board: (i) in one (1) lump-sum payment sixty (60) days following such director's separation from service on the Board; (ii) in annual distributions over a three (3) year period beginning sixty (60) days following their separation from service on the Board; or (iii) in annual distributions over a five (5) year period beginning sixty (60) days following their separation from service on the Board.

### PART II: CIRCUMSTANCES LEADING TO THESE CHAPTER 11 CASES

**I.     Events Precipitating These Chapter 11 Cases.**

**A.     Challenging Macroeconomic Environment**

52.    From January 2017 through June 2022, the Company's financial performance was consistent and was primarily driven by (i) strength in the U.S. housing and repair and remodeling markets; (ii) strong store sales growth in both quantity of goods sold and price per order; (iii) increased gross profit margins due to the Company's shift toward more popular vinyl and engineered products; and (iv) more efficient Company operations. But 2022 through 2024 brought particular challenges for the flooring sector. Shortly following the onset of the COVID-19 pandemic, the U.S. housing market went into overdrive, with sales of existing homes increasing as consumers moved out of urban environments and into areas with more access to green spaces and nature. With more consumers forced to stay at home due to government-mandated lockdowns, consumers used this time to invest in home improvement projects with the excess cash flow

typically spent on entertainment and travel, driving a meaningful increase in demand for flooring and flooring-related products.

53.    The unprecedented surge in demand following the COVID-19 pandemic was quickly followed by broad headwinds in the housing, repair, and remodeling markets, primarily driven by (i) a decrease in existing home sales; (ii) elevated interest rates; and (iii) an inflationary environment, all of which drove down home improvement spending and big-ticket discretionary spending, causing a decline in LL Flooring's volume of transactions and average order size.  While the Company believes the fundamentals of its business are strong due to aging house stock (*i.e.*, a larger number of homes are outdated and will need remodels and repairs), increased household formation, and rising home values, home improvement spending has continued to be challenged through the first half of 2024.

### B.    Operational Challenges

54.    In addition to changes in the general macroeconomic environment and the home improvement and flooring industries, regulatory actions and uncertainty and related operational challenges relating to the Company's products have increased costs for the Company.  As a result, beginning in 2020, the Company began to struggle to maintain historic levels of liquidity.

### (i)    *Supply Chain Disruptions and Low Inventory*

55.    Despite its relatively consistent performance at the time, the Company faced operational complications during the second half of 2020 as a result of the global supply chain disruptions, consumer spending, inflation, and a challenging labor market resulting from the COVID-19 pandemic. The Company limited its inventory purchases as a direct result of the COVID-19 pandemic, and the aforementioned disruptions forced the Company to remain below targeted inventory levels during the second half of 2020 and 2021.

56.     In addition, labor shortages and rising labor costs generally affected the Company's ability to source and transport its products through 2022.  Suppliers were forced to downsize their workforces and the transportation industry suffered from a decline in available workers, both of which resulted in increased costs, delays, and difficulties in obtaining products through the Company's typical channels.  While certain supply chain pressures have alleviated, the Debtors' operations require significantly more knowledge and training for sales associates given the specific nature of the Debtors' products.  Since 2022, the Company has struggled to retain sales associates as a result of labor shortages, high turnover, and rising labor costs, particularly given hiring competition from larger general retail chains in the Debtors' industry.

*(ii)*     ***Section 301 Tariffs***

57.     In addition, since September 2018, pursuant to Section 301 of the Trade Act of 1974, the United States Trade Representative ("USTR") has imposed tariffs (the "Section 301 Tariffs") on certain goods imported from China.  Tariffs on products imported by the Company range from ten percent (10%) to twenty-five percent (25%).  On September 10, 2020, several importers of vinyl flooring filed a lawsuit with the Court of International Trade ("CIT") challenging the Section 301 Tariffs applicable to the Company and the USTR's actions.  On March 17, 2023, the CIT issued a decision sustaining the 301 Tariffs.  The CIT's decision was appealed by the plaintiffs to the Court of Appeals for the Federal Circuit ("CAFC") on May 13, 2023.  If the appeals are successful, LL Flooring may qualify for refunds on these Section 301 Tariffs; however, given the Company is unable to predict the timing or outcome of the ruling by the CAFC, the Company has reduced the percentage of merchandise receipts subject to Section 301 Tariffs by three percent (3%), affecting its ability to maintain historic inventory levels.

### (iii)    *Vinyl*

58.     Beginning in 2020, the U.S. government took significant steps to address the forced labor concerns in the Xinjiang Uyghur Autonomous Region of China, including withhold release orders issued by United States Customs and Border Protection ("CBP"), allowing CBP to detain and deny entry of imports suspected of containing raw materials from Xinjiang, affecting global supply chains.  In June 2022, the Uyghur Forced Labor Prevention Act went into effect and, in February 2023, the Company began to receive detention notices from CBP related to flooring products produced by certain suppliers that contain polyvinyl chloride.  The Company worked with affected vendors to provide the requested documentation to CBP, which required the Company to incur costs related to storage, transportation, extra handling, and legal expenses in responding to CBP's information requests.  To avoid incurring additional costs, the Company opted to return certain shipments to vendors.  This process adversely impacted the Company's ability to obtain adequate inventory in the vinyl product category on a timely basis, which resulted in lost sales, increased costs, and an overall decrease in profits.

### C.    Restructuring Efforts and Initiatives

59.     While the Company's financial outlook seemed positive during the COVID-19 pandemic, the Company struggled in the aftermath of the pandemic.  In addition, the regulatory and operational setbacks described above compounded supply chain problems and residual reputational harm.  Beyond problems particular to the Debtors, the elevated costs of materials, inventory, and labor resulting from inflation have increased pressure on the Company without a corresponding meaningful ability of the Company to raise prices sufficiently to combat those inflationary pressures.  Looking to increase a tightening liquidity cushion, the Company began exploring potential financial and strategic transactions in 2022.

(i)      *2022-2023 Marketing Efforts*

60.    On November 18, 2022, the Company engaged J.P. Morgan Securities LLC ("JPM") as financial advisor in connection with potential sale scenarios and related considerations. Throughout late fall 2022 and early January 2023, the Company engaged with various parties, including private equity sponsors and strategic buyers, which had expressed interest in a transaction with the Company. The Company entered into a confidentiality agreement with a potential strategic buyer in May 2023, which contained a five-month standstill provision, but the potential transaction did not materialize.

61.    In May 2023, LL Flooring also received an unsolicited, non-binding indication of interest from F9 Investments, LLC ("F9"), an entity founded and controlled by Thomas D. Sullivan, founder of Lumber Liquidators. F9 is also currently the Company's largest shareholder, holding an 8.83% ownership stake in the Company. Between June and November 2023, the Company considered various potential transactions and strategic alternatives involving F9, some involving multiple transaction counterparties but none were actionable.

62.    On August 14, 2023, in response to receipt of multiple inbound expressions of interest regarding a potential acquisition of the Company, the Company publicly announced that it had initiated an exploration of strategic alternatives, including, among other things, a potential sale, merger or other strategic transaction. In August 2023, JPM again initiated outreach to twenty-one (21) prospective strategic and financial buyers regarding potential interest in an acquisition of the Company. The Management Team and JPM engaged with multiple such prospective transaction counterparties, including conducting management presentations and providing potential buyers with access to a confidential dataroom.

63.    The Company ultimately received two (2) indications of interest in September and, in October 2023, the Company received a non-binding indication of interest from Live Ventures

Incorporated ("Live Ventures").  The Company actively engaged with these parties on their offers, but, ultimately, all prospective bidders other than Live Ventures indicated that they did not desire to pursue a strategic transaction involving the Company at that time.  Initial discussions with Live Ventures did not culminate in an actionable transaction given, among other things, concerns about Live Ventures' ability to finance such a transaction at that time. Given no other actionable potential transactions had materialized, the Company pivoted to focus on cost-saving initiatives and alternative transactions.

### (ii)      Cost-Saving Initiatives

64.      In addition to its initial marketing efforts, the Company sought to cut costs and limit expenses in a macroeconomic environment characterized by low consumer confidence, inflation, an elevated interest and mortgage rate environment, and lower existing home sales.  To do so, the Company implemented various cost-saving initiatives, including, but not limited to, (i) managing vendor relationships;  (ii) closing  underperforming  stores;  and  (iii) reducing  employee headcount. To that end, the Company initiated a strategic review of its cost structure in 2023.  Since the initiation of this review, the Company estimates it has achieved savings of $21.8 million.

### (a)      Vendor Relationships

65.      Beginning in 2022, the Company began actively managing payments to suppliers and renegotiating contracts with vendors.  In 2023, the Company opened its distribution center in Dallas,  Texas,  which  allowed  it  to  significantly  reduce  transportation  mileage  and expenses. These efforts resulted in more than $8 million in outbound transportation savings annually.  These changes were also accompanied by the Company's negotiations for lower pricing and more favorable terms with vendors.

66.     In June and July 2024, the Company started to strategically cut back on payments to vendors and suppliers in an effort to manage liquidity.  Around the same time, the Company's financial hardships were publicized in the news. Many of the Debtors' key vendors reacted negatively to news of the Debtors' financial challenges by refusing to ship merchandise.  Despite long-standing and supportive relationships with most of their vendors, in July 2024, leading up to the commencement of these Chapter 11 Cases, approximately fifty percent (50%) of the Debtors' vendors stopped shipping or constrained their inventory flow to the Company.  In the two (2) weeks leading up to the Petition Date, nearly all international vendors stopped production and shipping of the Debtors' inventory.  As of the Petition Date, approximately eighty percent (80%) of the Company's annual volume is impacted by stopped shipments, constrained inventory flow, or unfavorable payment terms, drastically exasperating the Debtors' liquidity position.

### (b)    Real Estate Portfolio Evaluations

67.     The Company historically engaged Advanced Real Estate Services, Inc. ("Ares") to advise the Company with respect to its real estate portfolio and assist with its real estate negotiation strategy, including potential rent concessions, renegotiations, rental deferments, and other relief.  In October, 2023, the Company engaged B. Riley Real Estate, LLC (together with Ares, the "Real Estate Advisors") to further assist with additional maintenance and management of the Company's real estate portfolio.  However, as the Company's financial hardships increased, the Company determined that it was not in its best interests to pay the costs associated with the continued engagement of the Real Estate Advisors.  As a result, prior to the Petition Date, the Debtors terminated the agreements with the Real Estate Advisors.

### (c)    Workforce Reductions

68.     In connection with evaluating its real estate footprint and determining to close underperforming stores, the Company implemented workforce reductions in five (5) waves.  In

October 2022, the Company laid off thirty-seven (37) employees; in January 2023 and June 2023, the Company laid off forty-one (41) and 157 employees, respectively; in January 2024, the Company laid off thirteen (13) employees; and in April 2024, the Company laid off eighty-seven (87) employees. While the Company incurred additional severance costs in light of these workforce reductions, these workforce reductions also reduced the Company's costs by $21.8 million as a result of eliminating certain payroll and benefits obligations for terminated employees.

### (iii)    *2023-2024 Refinancing and Marketing Efforts and Negotiations with Prepetition ABL Lenders*

69.    Despite the Company's efforts to alleviate their liquidity pressures, the Company continued to face financial difficulties in light of ongoing negative macroeconomic issues. Though prior discussions with F9 had not resulted in an actionable transaction, in November 2023, F9 submitted an updated non-binding indication of interest proposing a transaction with an F9 subsidiary, Cabinets To Go, accompanied by a notice that Mr. Sullivan intended to nominate three (3) candidates to stand for election to the Board at the Company's 2024 annual shareholders' meeting. In January 2024, the Company and F9 engaged regarding the eligibility of the F9 nominees, John Jason Delves, Mr. Sullivan, and Jill Witter (the "F9 Nominees"), to serve on the Board. On May 2, 2024, F9 resubmitted its nomination notice to the Company, and on May 9, 2024, the Company recommended that its shareholders vote for the directors who then-currently served on the Board rather than for the F9 Nominees.[7]

---

[7]    The Company's shareholders voted to appoint the F9 Nominees at the Company's 2024 annual shareholders' meeting. As noted above, the F9 Nominees subsequently served on the Board as non-employee directors from July 12, 2024, until August 8, 2024, when the F9 Nominees resigned from the Board, effective immediately.

70.     As these marketing efforts continued, the Company and its advisors recognized that reaching an agreement with any potential buyer on terms that would result in the most value-maximizing transaction for the Company and its creditors would require additional time.  However, financial pressures on the Company continued to mount and, on June 28, 2024, the Company disclosed on its Form 8-K that it believed it may not have sufficient liquidity to maintain compliance with the minimum liquidity covenant under the Prepetition ABL Agreement by the third quarter of 2024.

### (a)     Prepetition Refinancing Efforts

71.     Beginning in April, 2024, the Company authorized Houlihan Lokey Capital, Inc. ("Houlihan") to commence outreach regarding the potential refinancing of the Prepetition ABL Facility and an additional capital raise.  In May 2024, and continuing into June 2024, as the Debtors and Houlihan, AlixPartners, and proposed counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP (together, the "Restructuring Advisors") further engaged with the Prepetition ABL Lenders, Houlihan reached out to twenty-eight (28) potential lenders, ultimately entering into confidentiality agreements with twenty-one (21) parties, who were granted access to a virtual data room to conduct diligence.  This marketing and solicitation process was conducted over approximately three (3) months and the Company received eight (8) indications of interest to provide financing.  However, as further described in the DIP Financing Motion (as defined below) none of the proposals received were actionable and, as described below, the Company was not able to reach agreement with the Prepetition ABL Lenders on refinancing or forbearance terms.

### (b)     Negotiations with Prepetition ABL Lenders

72.     As the Company's liquidity became further compressed, on June 13, 2024, the Company, together with the Restructuring Advisors, began engaging with the Prepetition ABL Lenders to discuss ways to provide the Company with supplemental liquidity by modifying certain

provisions of the Prepetition ABL Agreement. These discussions were informed by several liquidity forecasts and considered various ways to increase availability under the Prepetition ABL Agreement (*e.g.*, expanded borrowing capacity on the Company's owned real estate assets). As a result of these discussions, the Prepetition ABL Lenders agreed to provide limited relief but, due in part to regulatory and institutional requirements imposed on the Prepetition ABL Lenders, the negotiations ultimately did not materialize into an agreement with the Prepetition ABL Lenders to provide incremental liquidity.

73.     As discussions continued, by late July 2024, the Company's liquidity forecasts indicated that it may not be able to maintain the minimum availability requirement under the Prepetition ABL agreement. Failure to satisfy that requirement would trigger a requirement to comply with a financial covenant, testing the Company's fixed charge coverage ratio, and an inability to maintain compliance with the financial covenant would have been an event of default under the Prepetition ABL Agreement. Recognizing that to continue operations while they pursued a value-maximizing transaction, the Company would need additional financing and may ultimately need to implement a transaction through chapter 11 proceedings, the Company and the Restructuring Advisors began to simultaneously explore (i) a sale of the Sandston DC; (ii) possible buyers willing to act as a stalking horse bidder in the event of a potential 363 sale; and (iii) debtor in possession ("DIP") financing arrangements, including re-engaging in negotiations with the Prepetition ABL Lenders regarding potential DIP financing.

### (c)     Sandston DC Transaction

74.     At the end of the first quarter of 2024, the Company engaged JLL Capital Markets ("JLL") to assist the Company in pursuing a transaction involving the Sandston DC designed to provide the Company with a short-term liquidity injection while it pursued other strategic options. After an extensive prepetition marketing process and competitive bidding process with

multiple bidders for the Sandston DC, the Debtors entered into a nonbinding letter of intent with a potential buyer (the "DC Bidder") for approximately $100 million. Under the letter of intent, the Debtors paid a prepetition $350,000 work fee to the DC Bidder and also agreed to seek, through the Bidding Procedures Motion, authorization for a three percent (3%) break up fee (the "DC Breakup Fee") to come into effect upon entry into a binding purchase agreement (the "DC Purchase Agreement") provided that the Court approves the DC Breakup Fee. The DC Bidder indicated that the DC Breakup Fee was critical to its decision to enter into the nonbinding letter of intent and to continue its diligence on the property and with negotiations towards a binding purchase agreement (the "DC Purchase Agreement"). Given how extensively marketed the Sandston DC was and the bidding process that already occurred prepetition, the Debtors intend to seek approval of the DC Purchase Agreement at a later date, likely through a private sale motion, separate and apart from the transaction contemplated in the Bidding Procedures; *provided*, *that*, if a Stalking Horse Bidder (as defined below) comes forward and expresses an interest in the Sandston DC, the Debtors fully intend to pursue that broader transaction if it is likely to lead to greater value for the estates. In large part recognizing that risk, the DC Bidder insisted upon the DC Breakup Fee.

### (d)   363 Marketing Process

75.    As the likelihood of a chapter 11 filing increased, in late June 2024, the Company revised the terms of its engagement with Houlihan to include a prepetition marketing process for a potential buyer to serve as a stalking horse bidder (a "Stalking Horse Bidder") in a 363 sale process. Following the revision of Houlihan's engagement letter, Houlihan contacted eighteen (18) potential buyers and strategic partners. Two (2) parties submitted proposals to acquire substantial portion of the Company's operations through a 363 process. Houlihan also engaged with other parties who could potentially serve as a stalking horse bidder in connection

with the Going Concern Sale Process.  Additionally, Houlihan continued to lay the groundwork to market the Company's assets in furtherance of the Going Concern Sale Process and as set out in the proposed Bidding Procedures.  The Company and Houlihan remain in active negotiations with various parties around the terms of their proposed transactions to determine if any of these parties could potentially serve as a stalking horse bidder in these Chapter 11 Cases.

**(e)     DIP Financing**

76.     Starting in July 2024, Houlihan began the process of assisting the Company with seeking potential DIP financing.  During that process, Houlihan reached out to eight (8) parties to solicit proposals for DIP financing.  Given the Debtors' limited unencumbered assets and the Prepetition ABL Lenders' lack of consent to third party financing that would result in priming liens on the Prepetition ABL Collateral, Houlihan sought financing proposals that would either (i) replace the Prepetition ABL Facility and provide incremental liquidity for chapter 11 proceedings; or (ii) provide liquidity on a junior basis to the Prepetition ABL Facility. The Company received two (2) proposals to provide incremental liquidity on a junior basis, however, both proposals either (a) had fees and interest terms well in excess of the cost of the incremental financing provided by the DIP ABL Facility or (b) included conditions that rendered the proposal inactionable.

77.     In parallel to the third party DIP financing outreach process, the Company and the Restructuring Advisors engaged with the Prepetition ABL Lenders on the terms of potential DIP financing. The negotiations were conducted on an arm's-length basis, were iterative, and proceeded in good faith, with each party agreeing to certain concessions. The efforts of the Company and the Restructuring Advisors ultimately resulted in the terms of the DIP ABL Facility (as defined and described below).

### (iv)    *Contingency Planning*

78.     In anticipation of these Chapter 11 Cases, the Company undertook a number of additional measures to ensure a seamless transition into chapter 11, including appointing a special restructuring committee of the Board (the "Restructuring Committee") to oversee the Company's restructuring process. Further, the Debtors and its Restructuring Advisors, overseen by the Restructuring Committee, worked to carefully manage liquidity as they prepared for these Chapter 11 Cases and worked towards securing a transaction that would ensure the continuation of the Company's business and maximize value for their stakeholders.  The Debtors intend to continue carefully managing liquidity and only make payments and incur administrative expenses that are critical and necessary to preserve the Debtors' ability to obtain the highest value in a sale for the benefit of the estates.

### (a)    **Restructuring Committee**

79.     In consultation with the Restructuring Advisors, on July 14, 2024, the Board established the Restructuring Committee to consider, evaluate, and oversee any potential restructuring transaction under the Bankruptcy Code (a "Restructuring Transaction"), including the negotiation of the terms of any proposal, any Restructuring Transaction, and/or the implementation of the foregoing. In addition, the Restructuring Committee is authorized and empowered to make findings with respect to the fairness of any Restructuring Transaction, which may be based, in part, on advice and/or opinions from financial advisors to the Company or the Restructuring Committee and make recommendations to the Board with respect to the same.

### (b)    **Going Concern Sale Process**

80.     As noted above, the Debtors engaged in an extensive prepetition marketing process.  As the Petition Date approached, the Restructuring Committee worked closely with the Restructuring Advisors to prepare for the postpetition Going Concern Sale Process.  Although the

Debtors were unable to finalize negotiations and the selection of a Stalking Horse Bidder prepetition, the Debtors believe they nonetheless can achieve value for all stakeholders through the postpetition Going Concern Sale Process. As such, the Debtors are seeking, by the Bidding Procedures Motion, to commence a formal postpetition bidding process to ensure they can complete the Going Concern Sale Process in a timely manner, with the ultimate goal of maximizing value for their estates and stakeholders. The Debtors intend to identify a Stalking Horse Bidder, if any, by August 26, 2024, in advance of the hearing on the Bidding Procedures Motion. The Stalking Horse Asset Purchase Agreement (as defined in the Bidding Procedures Motion) will be filed with the Court in advance of the hearing. Under the terms of the Debtors DIP Facility, if a Stalking Horse Bidder is not identified by that date, the Debtors intend to pursue a liquidation process for all stores.

81. In pursuit of such a value-maximizing sale transaction, the Debtors have filed the Bidding Procedures Motion seeking approval of the Bidding Procedures and authority to enter into a stalking horse purchase agreement at a later date to commence the Going Concern Sale Process and achieve a value-maximizing sale of the Debtors' business other than assets that will be sold through the Store Closing Sales. The Bidding Procedures are designed to promote a competitive and robust bidding process to maximize the value obtained by a sale of the business. The Debtors intend to run the Going Concern Sale Process on an expedited timeline and consummate a sale either before or simultaneous with the completion of the Store Closing Sales so as to maximize value and avoid the administrative costs of a prolonged case.

### (c)    Agency Agreement and Store Closing Sales

82. In accordance with the protections and tools afforded by the Bankruptcy Code and the liquidity provided under the DIP Facility, the Debtors intend to reject certain burdensome leases, reduce unnecessary administrative expenses, and efficiently consummate a sale transaction

to preserve a transformed business with a reduced, right-sized store footprint. The Company determined that engaging an agent to manage the Store Closing Sales, alongside the Going Concern Sale Process, would result in the most efficient and financially beneficial process given the Agent's expertise and without overburdening the Company's employees who would have otherwise been tasked with handling store closing sales in addition to their roles assisting the Company in conducting the business and administering these Chapter 11 Cases.

83.     To that end, the Debtors, in consultation with the Restructuring Advisors, solicited and considered bids from various third party agents and held diligence sessions to determine which agent possessed the requisite skills, resources, and experience to perform the Debtors' Store Closing Sales in a controlled, efficient process.

84.     In order to ensure that the Debtors received the most favorable terms possible under the circumstances, the Debtors and the Restructuring Advisors successfully negotiated material improvements to the economics and compensation structures proposed by each agent. Following these extensive negotiations, the Debtors determined to enter into the Agency Agreement, which the Debtors, in consultation with their Restructuring Advisors and Restructuring Committee, determined represented the best terms available.

85.     Pursuant to the Agency Agreement, which the Debtors are seeking to assume in connection with the commencement of these Chapter 11 Cases pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Agency Agreement; (II) Authorizing and Approving the Conduct of Store Closing Sales, with Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances; (III) Authorizing Customary Bonuses to Employees of Closing Stores; and (IV) Granting Related Relief*, filed contemporaneously herewith, Hilco will serve as the agent to the Debtors in connection with the

Store Closing Sales.[8]  The Debtors commenced the Store Closing Sales on August 9, 2024, prior to the commencement of these Chapter 11 Cases and expect the process to be completed by September 28, 2024.

## PART III: THE DEBTORS' FIRST DAY PAPERS

86.    To facilitate their restructuring efforts, to minimize any adverse effects of commencing the Chapter 11 Cases, and to promote a smooth transition into chapter 11, the Debtors have filed the First Day Papers, concurrently with this Declaration and respectfully request that this Court enter the proposed orders granting such First Day Papers.  I have reviewed each of the First Day Papers and proposed orders and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  I believe that the relief sought in each First Day Paper (i) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their business or loss of productivity or value; and (ii) constitutes a critical element in maximizing value during the Chapter 11 Cases.

## II.    Administrative Papers

87.    The Debtors have filed four (4) "administrative" papers that seek to (i) jointly administer the Chapter 11 Cases for procedural purposes only; (ii) authorize the Debtors to file a consolidated list of creditors, among other things; (iii) authorize the Debtors to retain Stretto, Inc. ("Stretto") as claims and noticing agent; and (iv) extend the time period by which the Debtors must file their schedules and statements.

---

[8]    To the extent the Debtors do not find a stalking horse bidder in connection with the Going Concern Sale Process, they will resolicit bids for a liquidation of all stores.

**A.** ***Motion of Debtors for Entry of an Order (I) Directing Joint Administration of Cases; (II) Waiving the Requirements of Section 342(c)(1) of the Bankruptcy Code and Bankruptcy Rules 1005 and 2002(n); and (iii) Granting Related Relief***

88.     The Debtors have requested that these Chapter 11 Cases be jointly administered for procedural purposes only. As set forth above, the Debtors are affiliated with each other. Joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders, and other papers and related notices that otherwise would need to be filed in all of the cases absent joint administration. Accordingly, joint administration will save considerable time and expense.

**B.** ***Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated Creditor Matrix in Lieu of Submitting a Separate Creditor Matrix for each Debtor and Waiving Certain Creditor Matrix Requirements, (B) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors, (C) Redact Certain Personal Identification Information, and (D) Serve Certain Parties in Interest by Email; (II) Establishing Procedures for Notifying Parties of the Commencement of These Cases; (III) Waiving the Requirement to File a List of Equity Security Holders; and (IV) Granting Related Relief***

89.     Through the above-titled motion, the Debtors seek entry of an order (i) authorizing, but not directing, the Debtors to (a) file a consolidated creditor matrix (the "<u>Creditor Matrix</u>") in lieu of submitting a separate mailing matrix for each Debtor and waiving certain creditor matrix requirements, (b) file a consolidated list of the Debtors' thirty (30) largest unsecured creditors, (c) redact certain personal identification information of natural persons, and (d) serve certain parties in interest by email; (ii) establishing procedures for notifying parties of the commencement of these Chapter 11 Cases and of the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code using notices substantially in the form annexed to the proposed order (the "<u>Notice of Commencement</u>"); (iii) waiving the requirement to file a list of, and to provide notice directly to, the equity security holders of Debtor LL Flooring Holdings, Inc.; and (iv) granting related relief.

90.     I believe that permitting the Debtors to maintain a single consolidated Creditor Matrix, and to file a single list of the Debtors' thirty (30) largest unsecured creditors, in lieu of maintaining a separate creditor matrix for each Debtor, is appropriate. I believe that the Debtors filing separate lists of their twenty (20) largest creditors would be of limited utility while consuming a disproportionate amount of the Debtors' and their advisors' resources. Further, the Debtors can more efficiently provide required notices to parties in interest, and reduce duplicative mailings, if permitted to maintain a single, consolidated Creditor Matrix.

91.     I further believe that it is appropriate to authorize the Debtors to redact personally identifiable information of individuals. This redaction will prevent unnecessary disclosure of personal information and protect against identity theft. Further, the Debtors plan to provide unredacted versions of applicable documents to the Court, the U.S. Trustee, any official committee appointed in these Chapter 11 Cases, and will further provide unredacted versions of applicable documents upon reasonable request of any party in interest.

92.     I also believe that the Debtors should be authorized to serve their creditors by email where an email address is available. I am informed that the Debtors have approximately 4,000 vendors, approximately 55,000 customers, approximately 2,000 current employees and, over the last two (2) years, over 2,500 former employees. I understand that email service will help alleviate administrative burdens. I am further informed that email service is likely the most efficient and cost-effective manner by which service of all interested parties can be completed, and is also the most likely to facilitate creditor responses.

93.     I believe that the requirement to file a list of, and provide notice directly to, equity security holders should be waived as to Debtor LL Flooring Holdings, Inc. ("Holdings"). Holdings maintains a list of only its registered equity security holders and therefore would need to obtain

the names and addresses of its beneficial shareholders from a securities agent. Preparing and submitting such a list with the last known addresses for each equity security holder and sending notices to all such parties will create undue expense and administrative burdens with limited corresponding benefit to the estates or parties in interest. Additionally, the registered holders of Holdings' common stock will be provided with notice of these Chapter 11 Cases and instructed to serve such notice down to the beneficial holders, and the Notice of Commencement will be published (i) once in the national edition of *USA Today*; and (ii) on both the website to be established by the Debtors' claims and noticing agent and the Debtors' website.

94.     In addition, I believe that it is in the best interests of the Debtors and their estates to leave off of the Creditor Matrix (i) past Customers who do not have open orders; (ii) Customers who have a claim, including for a refund of a Customer Deposit, for amounts below the statutory cap under section 507(a)(7) of the Bankruptcy Code (the "Priority Cap"), as such Customers' orders and/or refunds will be honored in the ordinary course; and (iii) Customers who have Vouchers, as such Customers may redeem their Vouchers in the ordinary course, in each case, to the extent that such Customers would be required to be included on the Creditor Matrix solely on such bases. In particular, I believe the request is appropriate in light of the costs associated with mailing notice to tens of thousands of Customers, the impossibility of giving individual notice to Customers for whom no physical or email address is available, and the fact that the relief requested in this Motion and in the Customer Programs Motion that will still provide all Customers with notice of the commencement of these Chapter 11 Cases and any modifications to Customer Programs (as defined below) that would affect such Customers.

C.    ***Application of the Debtors for an Order (I) Appointing Stretto, Inc. as Claims and Noticing Agent; and (II) Granting Related Relief***

95.    Through the above-titled motion, the Debtors seek authority to retain Stretto as claims and noticing agent in the Chapter 11 Cases.  I understand that requesting such appointment is required by the local rules of this Court, given that the Debtors anticipate that there will be more than 250 creditors and/or parties in interest listed on their Creditor Matrix.  I believe that Stretto's retention is the most effective and efficient manner of noticing these creditors and parties in interest of the filing of the Chapter 11 Cases and other developments in the Chapter 11 Cases.  Further, prior to the selection of Stretto as the Claims and Noticing Agent, the Debtors reviewed and compared engagement proposals from three (3) court-approved claims and noticing agents, including Stretto, to ensure selection through a competitive process.  Based on all engagement proposals obtained and reviewed, I believe that Stretto's rates, as set forth in the engagement agreement between Stretto and the Debtors, are competitive and reasonable given Stretto's quality of services and expertise.  In addition, Stretto will transmit, receive, docket, and maintain proofs of claim filed in connection with these Chapter 11 Cases.  Accordingly, I believe that retention of Stretto, an independent third party with significant experience in this role, to act as an agent of this Court, is in the best interests of the Debtors and their estates and their creditors.

D.    ***Motion of Debtors for Entry of an Order (I) Extending the Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs; (II) Extending the Time to File Reports of Financial Information Required Under Bankruptcy Rule 2015.3; and (III) Granting Related Relief***

96.    Through the above-titled motion, the Debtors are requesting that the Court (i) extend the initial deadline to file the Debtors' schedules and statements (the "Schedules and Statements") by twenty-one (21) days in addition to the 28-day extension provided by Local Rule 1007-1(b), through and including September 30, 2024; (ii) extend the time to file reports of financial information with respect to entities in which the Debtors hold a controlling or substantial

interest as set forth in Bankruptcy Rule 2015.3(d) (the "2015.3 Reports") to the later of (a) thirty (30) days after the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code or (b) sixty (60) days after the Petition Date; and (iii) grant related relief.

97.     I am informed that the Debtors qualify for an automatic 28-day extension of the time to file Schedules and Statements provided by Local Rule 1007-1(b) because the Creditor Matrix alone will contain such information regarding 55,000 customers and 4,500 current and former employees.  Additionally, I believe that, given the substantial burdens already imposed on the Management Team by the commencement of these Chapter 11 Cases, the limited number of employees available to collect the information, the competing demands upon such employees, and the time and attention the Debtors must devote to their chapter 11 proceedings, cause exists to extend the deadline for the Debtors to file the Schedules and Statements and 2015.3 Reports.  Preparation of the 2015.3 Reports will require the Debtors to gather specific information from the books and records of their non-Debtor affiliates, including compiling financial reports of such entities' value, operations, and profitability which, in the time mandated by Rule 2015.3, would put undue strain on the Debtors' employees. The requested extension will enhance the accuracy of the Schedules and Statements and 2015.3 Reports when filed and help avoid the potential necessity of substantial subsequent amendments. I do not believe that any party in interest will be prejudiced by the requested extension of time.

## III.    Operational Pleadings[9]

### A.    *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Secured Financing Pursuant To Section 364*

---

[9]    Although the Debtors filed on the Petition Date the *Motion of Debtors for Entry of Orders (I) Approving (A) Bidding Procedures, (B) Form Asset Purchase Agreement, (C) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (D) Assumption and Assignment Procedures; (II) Scheduling Auction and Sale Hearing; (III) Approving (A) Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* (the "Bidding Procedures Motion"), the Debtors are not seeking approval of the

*Of The Bankruptcy Code and (B) Utilize Cash Collateral; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief*

98.     Through the above titled motion (the "DIP Motion"), the Debtors are requesting approval of senior secured, superpriority, postpetition financing (the "DIP ABL Facility") from the Prepetition ABL Lenders (in such capacity, the "DIP ABL Lenders"), in the aggregate principal amount of up to $130 million, which will include a $12 million sublimit for the issuance of letters of credit.  The terms of the DIP ABL Facility also provides for the (i) "rolling up" of $10.6 million in aggregate principal amount of existing letters of credit issued under the Prepetition ABL Facility into the DIP ABL Facility, along with Secured Bank Services (as defined in the proposed interim order attached as Exhibit A to the DIP Motion); and (ii) refinancing of the Prepetition ABL Facility pursuant to a "creeping roll up" mechanic whereby collections of collateral pay down principal on prepetition revolving loans, and any and all remaining outstanding Prepetition ABL Obligations (as defined in the DIP Motion) and all accrued and unpaid interest thereon and fees and expenses shall be fully "rolled" into the DIP ABL Facility and shall constitute DIP ABL Obligations (as defined in the DIP Motion) upon entry of the final order approving the DIP Motion.  Through the DIP Motion, the Debtors are also requesting authorization to use Cash Collateral (as defined in the Motion).

99.     As described above, as of the Petition Date, the Debtors' cash on hand was insufficient to operate their business or fund these Chapter 11 Cases.  I believe that the incremental liquidity available to the Debtors under the DIP ABL Facility is necessary to stabilize the Debtors' business, continue their operations, and provide time for the Debtors to continue to pursue a value

---

Bidding Procedures Motion at the "first day" hearing and may file additional factual support of the Bidding Procedures Motion in advance of the hearing on such motion.

maximizing transaction. I further believe that, without access to the proceeds of the DIP ABL Facility and Cash Collateral, the Debtors will be unable to pay vendors and administer these Chapter 11 Cases, which would cause immediate and irreparable harm to the value of the Debtors' estates and any sale value to the detriment of all of their stakeholders.

      **B.**    ***Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using Existing Cash Management Systems, Bank Accounts, and Business Forms and (B) Implement Changes to their Cash Management System in the Ordinary Course of Business; (II) Granting a Suspension with Respect to the Requirements of 11 U.S.C. § 345(b); and (III) Granting Related Relief***

100. By the above-titled motion (the "Cash Management Motion"), the Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to (a) continue using their existing cash management system (the "Cash Management System"), bank accounts, and business forms and (b) implement changes to their Cash Management System in the ordinary course of business; (ii) granting a suspension with respect to the requirements of section 345(b) of the Bankruptcy Code; and (iii) granting related relief.

101. The Debtors' Cash Management System is similar to the centralized cash management systems used by other comparably sized and situated companies to manage cash flow. The Debtors use their Cash Management System in the ordinary course to transfer and distribute funds and to facilitate cash monitoring, forecasting, and reporting. The Debtors' treasury team maintains daily oversight over their Cash Management System and implements cash management controls for entering, processing and releasing funds, including in connection with Intercompany Transactions (as defined below). In addition, the Debtors' treasury and accounting teams regularly reconcile the Debtors' books and records to ensure that all transfers are properly recorded. While many of the Debtors' internal and external payments are automated, the Debtors'

treasury and accounts payable teams are also responsible for approving and initiating manual wires and checks when necessary.

102.    *Cash Dominion*. Nearly all collections and receipts entering the Debtors' Cash Management System, including retail and other receipts, store collections, credit card receipts, wire receipts, and ACH Transfers (as defined in the Cash Management Motion), are swept into the Debtors' collections concentration account with an account number ending in 1788 (the "BofA Cash Dominion Account") and maintained by Bank of America, N.A. ("BofA"). All funds received in the 205 BofA collections accounts are automatically swept to a zero (0) balance on a daily basis and transferred to the BofA Cash Dominion Account. These daily, automatic sweeps of funds into the BofA Cash Dominion Account cover all funds received through the Debtors' BofA store collections accounts, the BofA collection accounts that receive payments from Capital One and Synchrony related to certain customer programs, and the BofA credit card collections account that receives funds from American Express, Master Card, and Visa. These automatically-swept funds account for over ninety percent (90%) of the Debtors' aggregate customer receipts. The receipts collected through the Debtors' remaining collections accounts, including the store collections accounts maintained at PNC, First Horizon, WF, and JPM (each as defined below), are swept manually into the BofA Cash Dominion Account; these are not zero (0) balance accounts and small amounts of funds may be left in these accounts at any given time and not swept into the BofA Cash Dominion Account.[10] Once transferred into the BofA Cash Dominion Account, all funds are automatically transferred to BofA, in its capacity as the

---

[10]    Some receipts are swept into a collections concentration account before being ultimately swept into the BofA Cash Dominion Account. The collections received through the BofA store collections accounts and all other non-BofA collections accounts are first swept into a collections concentration account, and then swept either manually or automatically into the BofA Cash Dominion Account.

Prepetition ABL Agent under the Prepetition ABL Agreement, in order to pay down the Prepetition ABL Facility. BofA, in turn, places funding, as necessary to fund the Debtors' various outgoing payment obligations upon the Debtors' daily or weekly funding requests, in the Debtors' Master Concentration Account (as defined below).

103.    *Bank Accounts*.  As of the Petition Date, the Debtors' Cash Management System is comprised of 431 Debtor bank accounts (each, a "<u>Bank Account</u>" and, collectively, the "<u>Bank Accounts</u>"), all of which are owned and controlled by Debtor LL Flooring, Inc. ("<u>LL Inc</u>.").  The Bank Accounts may generally be divided into six (6) types of account according to their primary function, each of which is described below.  Because of the disruption that would result if the Debtors were forced to close their existing bank accounts, I believe that it is critical that the existing Cash Management System remain in place in order for the Debtors to continue to operate their business during these Chapter 11 Cases.

104.    *Master Concentration Account*. The Debtors maintain one (1) master concentration account at the BofA account ending in 0031 (the "<u>Master Concentration Account</u>").  This account serves as the main account for the Company's cash pooling.  Under cash dominion, the Master Concentration Account is funded by BofA via daily or weekly funding requests.  The Master Concentration Account makes disbursements in the form of ACH and wire payments to third parties. To fund other Debtor payroll and check clearing, the Master Concentration Account funds the Disbursement Accounts (as defined below).  Finally, the Master Concentration account makes Intercompany Transfers (as defined in the Cash Management Motion) to the Shanghai Affiliate to fund the Shanghai Affiliate's obligations as further described below.  As of the Petition Date, the Master Concentration Account held approximately $3,238,000.

105. *Disbursement Accounts*.  The Debtors maintain two disbursement accounts at BofA (the "Disbursement Accounts").  The BofA account ending in 4458 is the main payroll account used to fund payroll obligations for the Debtors' employees (the "Payroll Account").  Funds are pulled weekly via direct debit from the Payroll Account by a third party human resources software and service firm (Dayforce, formerly known as Ceridian) as necessary to satisfy the Debtors' payroll obligations.  The BofA account ending in 0044 is the Debtors' check clearing account (the "Check Clearing Account").  Funds are automatically pulled from the Check Clearing Account as necessary to honor Debtors' outstanding check balances.

106. *Collections Concentration Accounts*.  The Debtors maintain eight (8) collections concentration accounts (the "Collections Concentration Accounts").  These accounts receive funds both directly from customers as well as from the underlying receipt accounts via automatic and manual transfers. The Collections Concentration Accounts receive funds which are then automatically or manually transferred to the BofA Cash Dominion Account.  As a result of BofA's cash dominion which is exercised on account of the Prepetition ABL Agreement, funds transferred to the BofA Cash Dominion Account are, in turn, automatically transferred to BofA as the Prepetition ABL Agent. As of the Petition Date, the Collections Concentration Accounts held approximately $1,381,000.

107. *Cash and Check Receipt Accounts*.  The company maintains 416 cash and check receipt accounts (the "Cash and Check Receipt Accounts").  These accounts are responsible for receiving payments from customers and other third parties via cash or check.  Funds in the Cash and Check Receipt Accounts are automatically or manually swept into various Collections Concentration Accounts.  Given that most receipts are received at the Other Receipt Accounts (as defined below), the Cash and Check Receipt Accounts receive less than ten percent (10%) of the

Company's total receipts. As of the Petition Date, the Cash and Check Receipt Accounts had a combined balance of approximately $264,000.

108. *Other Receipt Accounts*. The Debtors maintain three accounts that collect funds via methods other than cash or check (the "Other Receipt Accounts"). The Other Receipt Accounts receive funds via credit card receipts through Visa, MasterCard, and American Express or via the Synchrony or Capital One financing programs. The Other Receipt Accounts do not make disbursements, and funds placed in the Other Receipt Accounts are automatically swept into the BofA Cash Dominion Account. Over ninety percent (90%) of customer receipts are received in the three Other Receipt Accounts. As of the Petition Date, the Other Receipt accounts hold approximately $0 as funds are automatically swept into the BofA Collection Concentration Account.

109. *Utilities Adequate Assurance Account*. The Debtors maintain one (1) no-activity account, which was formerly utilized as a receipt account for a store that has been closed and will be utilized for utilities adequate assurance during the pendency of these Chapter 11 Cases (the "Utilities Adequate Assurance Account"). This account does not have automatic sweeps, has no activity, and will be used to hold funds as adequate assurance for utility providers. As of the Petition Date, the Utilities Adequate Assurance Account held approximately $9,000.

110. *Business Forms*. As part of the Cash Management System, the Debtors utilize a number of preprinted business forms, including, but not limited to, letterhead, purchase orders, invoices, and preprinted and future checks (the "Business Forms"). Applicable U.S. Trustee guidelines require that the Banks (as defined in the Cash Management Motion) print "Debtor in Possession" and the bankruptcy case number on checks issued after the Petition Date. To minimize expenses to their estates, through the Cash Management Motion, the Debtors request

that the Court authorize, but not direct, their continued use of all Business Forms in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession. Once the Debtors exhaust their existing supply of checks during these Chapter 11 Cases, the Debtors will, when reordering (or with respect to checks the Debtors or their agents print themselves), require or print the "Debtor in Possession" legend and corresponding bankruptcy case number on all such items.

111.    *Corporate Credit Card Programs*.  As part of the Cash Management System, the Debtors provide certain employees who regularly incur business expenses corporate credit cards (the "Employee Credit Cards").  The Debtors maintain 187 Employee Credit Cards with BofA (the "Employee Credit Card Program").  The Employee Credit Cards are reimbursed by the BofA Disbursement Account ending in 0031.  The Employee Credit Cards issued under the Employee Credit Card Program are used by the Debtors' employees to cover certain approved company expenditures, including payments for office supplies, utilities, business supplies, facilities upkeep, or employee travel expenses.  The Debtors pay on average approximately $325,000 per month to maintain the Employee Credit Card Program.

112.    The Employee Credit Card Program is an integral part of the Debtors' Cash Management System. Employees' continued use of the Employee Credit Cards for ordinary course business expenses, and the Debtors' ability to reimburse expenses incurred through the Employee Credit Card Program, is essential to the continued operation of the Debtors' business.  Accordingly, through the Cash Management Motion, the Debtors seek authority, but not direction, to issue Employee Credit Cards consistent with the Employee Credit Card Program, subject to any terms and conditions thereof, and to pay any amount due and owing thereunder in the ordinary course of business on a postpetition basis, including, without limitation, making

payments on account of charges that were made pursuant to the Employee Credit Card Program both prior to and after the Petition Date.

113.    *Bank Fees*.  The Debtors incur periodic service charges and other fees related to the Cash Management System (collectively, the "Bank Fees").  On average, the Debtors incur between $25,000 and $30,000 in monthly BofA fees and between $22,000 and $25,000 in monthly fees owed to nine (9) other banks. As of the Petition Date, the Debtors estimate that they owe approximately $80,000 in prepetition Bank Fees.  The Debtors request authority, but not direction, to pay any prepetition Bank Fees for prepetition transactions that are charged postpetition, and to continue to pay the Bank Fees in the ordinary course on a postpetition basis.

114.    *Intercompany Transactions*.  Because LL Inc. maintains all of the Debtors' Bank Accounts, the Debtors' continued operation of their Cash Management System in the ordinary course of business will not require or result in any intra-Debtor intercompany transactions.  Rather, through the Cash Management Motion, the Debtors' seek the limited authority to maintain, in the ordinary course of business, transfers from LL Inc. to the Shanghai Affiliate (such transactions, the "Intercompany Transactions"), as necessary to fund required disbursements in China, which are remitted through the Shanghai Affiliate's account at Industrial and Commercial Bank of China ending in 5041.  Because the Shanghai Affiliate is merely a representative office that does not independently generate revenue, is not permitted to trade in China or abroad, and is authorized to perform only a limited number of services on behalf of the Company, LL Inc. must cover the Shanghai Affiliate's operational costs, including the payment of the Shanghai Affiliate's workforce (provided by FESCO), general office expenses, and applicable taxes. LL Inc.'s payments to the Shanghai Affiliate predominately cover payroll amounts owed to FESCO, with

approximately seventy-five percent (75%) of the remittances to the Shanghai Affiliate covering payroll, but the payments also cover the Shanghai Affiliate's general office expenses and taxes.

115.    LL. Inc. funds the Shanghai Affiliate through a monthly transfer that is based upon forecasted fees for the upcoming month.  Because such payments are necessary to maintain the Shanghai Affiliate's operations, through the Cash Management Motion, the Debtors request authority to continue providing such funding to the Shanghai Affiliate through such Intercompany Transactions on a go forward basis to ensure (i) the Shanghai Affiliate is operational in the event a potential buyer seeks to acquire the Shanghai Affiliate; or (ii) the Company liquidates, in which case the Debtors' ability to make such Intercompany Transactions will be crucial to avoid personal liability and other ramifications in connection with such a process, including a protracted wind down process for the Shanghai Affiliate that would deplete estate resources.   Accordingly, through the Cash Management Motion, the Debtors seek authority, but not direction, to continue to engage in Intercompany Transactions.

116.   Payments to the Shanghai Affiliate are made directly from the Master Concentration Account via wire.  Because the Shanghai Affiliate does not owe any money or make any payments back to LL Inc., there are no intercompany receivables or payables created by these transactions, and as result there are no intercompany claims resulting from these transactions.  Rather, the payments are merely one-way payments from LL Inc. to the Shanghai Affiliate based upon expense forecasts provided by Shanghai Affiliate. The Debtors generally account for and record all such Intercompany Transactions by LL Inc. to the Shanghai Affiliate in the Company's general ledger.

**C.**     ***Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Certain Prepetition Employee Obligations and (B) Continue Compensation and Benefits Programs; and (II) Granting Related Relief***

117.     By the above-titled motion (the "Wages Motion"), the Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to (a) pay all prepetition wages, salaries, other compensation, and certain reimbursable expenses on account of the Compensation and Benefits Programs (as defined below), and (b) continue to administer the Compensation and Benefits Programs in the ordinary course of business; and (ii) granting related relief.

118.     I believe that providing for the Debtors' current employees (the "Employees") protects the value of the Debtors' business for the benefit of all stakeholders. The Employees perform a wide variety of critical services for the Debtors. Moreover, the vast majority of the Employees rely exclusively on their compensation and benefits from the Debtors to pay their daily living expenses and support their families. Absent an order granting the relief requested in the Wages Motion, many of the Employees may, by necessity, seek other employment alternatives. I believe that replacing the Employees would require significant time and expense, causing severe disruption and harm to the Debtors' operations and Sale Processes, and would be particularly challenging in the context of these Chapter 11 Cases.

119.     The Debtors' Employees perform a wide variety of critical functions, including sales, marketing, human resources, information technology, administrative, compliance, legal, finance, and management related tasks. The Employees include personnel who are intimately familiar with the Debtors' business, processes, and systems, who possess unique skills and experience related to the Debtors' core business segments, and/or who have developed relationships with vendors and other key counterparties that are essential to the Debtors' business. I believe that the skills and expertise of the Debtors' Employees, as well as their relationships with the Debtors' customers and vendors and their knowledge of the Debtors'

infrastructure, are essential to the Debtors' ongoing operations and ability to operate their business effectively during these Chapter 11 Cases.

120.    Accordingly, to ensure the uninterrupted operation of the Debtors' business, enable compliance with applicable laws, prevent undue harm to the Employees, and maximize the value of the Debtors' estates, I believe it is critical that the Debtors be authorized to pay the Prepetition Employee Obligations (as defined in the Wages Motion) and to continue the Compensation and Benefits Programs (as defined in the Wages Motion) in the ordinary course during the pendency of these Chapter 11 Cases.

   **D.**    ***Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors, (B) Lienholders, (C) Import Claimants, and (D) 503(B)(9) Vendors; (II) Authorizing the Debtors to Pay Prepetition Customs Duties; and (III) Granting Related Relief***

121.    By the above-titled motion (the "<u>Critical Vendors Motion</u>"), the Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors, in their sole discretion, to pay certain prepetition claims of (a) certain vendors and service providers whose goods and services are critical to the Debtors' operations (the "<u>Critical Vendors</u>" and their claims, the "<u>Critical Vendor Claims</u>"), (b) common carriers, shippers, warehousemen, toll processors, mechanics, installers, freight forwarders, and other third party service providers or contractors who, in each case, may have or may be capable of asserting statutory or possessory liens against the Debtors' property (collectively, the "<u>Lienholders</u>"), (c) certain parties who may have possessory claims in relation to customs duties and import taxes, and (d) certain vendors entitled to administrative expense status under section 503(b)(9) of the Bankruptcy Code (the "<u>503(b)(9)</u> <u>Vendors</u>" and, collectively with the Critical Vendors, Lienholders, and Import Claimants, the "<u>Specified Trade Claimants</u>" and their claims, the "<u>Specified Trade Claims</u>"); (ii) authorizing, but

not directing, the Debtors to pay, in the ordinary course of business, certain prepetition customs duties; and (iii) granting related relief.

122.    Through the Critical Vendors Motion, the Debtors request the authority to pay, in their sole discretion, the Specified Trade Claims only to the extent such payments are necessary to either preserve and maximize the value of their business in the event of a going concern sale or to maximize the returns obtained during liquidation sales of their remaining merchandise. The Debtors also propose, in their sole discretion, to condition payment of any Specified Trade Claims upon agreement by the Specified Trade Claimant to supply goods or services to the Debtors on such Specified Trade Claimant's most favorable trade terms offered to the Debtors in the 18-month period prior to the Petition Date or on such other terms and conditions as are acceptable to the Debtors.

123.    *Critical Vendors*.  The Debtors have identified certain Critical Vendors, which may be classified in the following categories, each of which is critical to the continuing operation of the Debtors' business: (i) suppliers of hard and soft flooring products; (ii) suppliers of other goods used in the Debtors' retail stores and central offices; (iii) providers of technical support in connection with the Debtors' facilities and website; and (iv) other critical services.

124.    The Debtors have determined that the continued receipt of goods and services from the Critical Vendors is necessary to maximize the value of their estates, whether through continuing to operate and market their business as a going concern or to maximize recoveries in going out of business sales.  If granted discretion to satisfy Critical Vendor Claims, the Debtors will assess, on a case-by-case basis, the benefits to their estates of paying the Critical Vendor Claims, and will pay any such claims only to the extent their estates will benefit.  Without this relief, the Debtors believe that the Critical Vendors may cease providing goods and services to the

Debtors and thereby negatively impact the Debtors' going concern value and liquidation value, a result that could be devastating for the Debtors and their stakeholders.

125.    Through the motion, the Debtors seek authority, in their business judgment, to make payments on account of Critical Vendor Claims in an aggregate amount not to exceed $5.7 million, of which $4.275 million shall be available upon entry of the proposed interim order and the remaining $1.425 million available upon entry of the proposed final order, which amounts represent the Debtors' best estimate as to what aggregate amounts must be paid to the Critical Vendors to continue an uninterrupted supply of critical goods and services.

126.    *Lienholders*.  The Debtors utilize the services of various vendors who may be able to assert statutory, possessory, or other liens under non-bankruptcy law.  These vendors include shippers, freight carriers, common carriers, customs processors, mechanics, installers, warehouse owners, and warehousemen.  As a result of the services they provide, the Lienholders regularly possess certain of the Debtors' goods in the ordinary course of the Debtors' operations and may be able to assert liens and block the Debtors' access to the goods in their possession.

127.    Failure to pay the Lienholders could result in the Lienholders' refusing the Debtors access to their goods.  This would be disruptive to the Debtors' operations and would reduce the overall value of the Debtors' available merchandise.  As such, the Debtors believe that payments to the Lienholders in order to maintain access to all of their inventory are critical for maximizing value for the benefit of Debtors' stakeholders, whether in the context of a sale of the Debtors' business or in the context of liquidation sales.  As of the Petition Date, the Debtors estimate that the Lienholders' accrued and unpaid prepetition claims total approximately $10.4 million.

128.    *Import Claimants*.  In the ordinary course of business, the Debtors import merchandise from certain foreign vendors (the "Import Claimants").  Accordingly, the Debtors are

required to pay customs duties, excise taxes, and other similar obligations related to the purchase and sale of goods from or in foreign jurisdictions (the "Customs Duties") to various Import Claimants. The Debtors predominately pay these Customs Duties through third party customs processing Lienholders.

129.    If the Debtors fail to pay, directly or indirectly, the Customs Duties on time, then shipments of merchandise may be stopped in transit.  Failure to receive imported merchandise has the potential to severely disrupt the Debtors' business to the detriment of the Debtors, their estates, and their stakeholders.

130.    As of the Petition Date, the Debtors estimate that approximately $1.2 million is owed in the aggregate on account of prepetition Customs Duties.

131.    *503(b)(9) Vendors*.  The Debtors have identified certain claims which are entitled to priority status under sections 503(b)(9) and 507(a)(2) of the Bankruptcy Code (the "503(b)(9) Claims") due to the fact that they are undisputed obligations for goods received by the Debtors in the ordinary course of business in the twenty (20) days prior to the Petition Date.

132.    The Debtors seek, in their discretion, to pay certain 503(b)(9) Claims as they come due in the ordinary course instead of satisfying these claims upon confirmation of a chapter 11 plan. The Debtors do not currently anticipate paying any claims that solely qualify as 503(b)(9) Claims, but not Critical Vendor Claims or Lienholder Claims, during the pendency of these Chapter 11 Cases.  The Debtors nonetheless seek the Court's authority, but not direction to pay any 503(b)(9) Claims in the unexpected event that parties who are not currently classified as Critical Vendors, but who otherwise have 503(b)(9) Claims and require timely payment, may be paid. The Debtors believe that by altering the timing of payments that 503(b)(9) Vendors are entitled to receive as a matter of statute, such payments can induce the 503(b)(9) Vendors to adhere

to favorable trade terms and do business with the Debtors on a go-forward basis. I believe that this relief is in the best interests of the Debtors' estates because (i) favorable trade terms will prevent further contraction of the Debtors' liquidity; and (ii) this Court's time and resources will not be burdened with motions from individual 503(b)(9) Vendors requesting payment on account of their 503(b)(9) Claims or seeking reclamation of goods received by the Debtors in the twenty (20) days prior to the Petition Date. As such, through the Critical Vendors Motion, the Debtors request authority, but not direction, to pay the 503(b)(9) Claims as necessary in their business judgment to avoid interruption of the Debtors' operations. As of the Petition Date, the Debtors estimate that accrued and unpaid 503(b)(9) Claims total approximately $9.5 million.

**E.** ***Motion of Debtors for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment; (II) Establishing Procedures for Resolving Objections by Utility Providers; (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief***

133. Through the above-titled motion (the "Utilities Motion") Debtors request that the Court (i) approve the Debtors' proposed form of adequate assurance of payment to the Utility Providers (as defined in the Utilities Motion); (ii) establish procedures for resolving objections by the Utility Providers relating to the adequacy of the Adequate Assurance Deposit (as defined in the Utilities Motion) (the "Adequate Assurance Procedures"); (iii) prohibit the Utility Providers from altering, refusing, or discontinuing service to, or discriminating against the Debtors on account of the commencement of the Chapter 11 Cases or outstanding prepetition invoices; (iv) authorize payment of any Utilities Service Fees (as defined below); and (v) grant related relief.

134. In the ordinary course of business, the Debtors receive electricity, telephone, water, waste disposal, and similar utility products and services (the "Utility Services") from several entities. Any interruption in Utility Services—even for a brief period of time—would seriously

disrupt the Debtors' ability to continue their business operations.  Such a result could seriously jeopardize the Debtors' restructuring efforts and the value of their estates.

135.    Further, the Debtors' proposed Adequate Assurance Procedures provide the Utility Providers with a fair and orderly process for seeking modification of the Proposed Adequate Assurances (as defined in the Utilities Motion) while protecting the Debtors from needing to address numerous adequate assurance requests in a disorganized manner and when the Debtors could be more productively focused on the seamless continuation of their operations in chapter 11.  If the Adequate Assurance Procedures are not approved, the Debtors likely will be confronted with two (2) equally oppressive choices: (i) succumb to a Utility Provider's last-minute demand for an unreasonably large deposit; or (ii) face the cessation of essential services.

136.    Lastly, to facilitate timely and efficient processing and payment of invoices with respect to the Utility Services, the Debtors contract, in the ordinary course of business, with Capturis UBP LLC (the "Utilities Payment Processor") to process and remit payments to nearly all Utility Providers on the Debtors' behalf.  The Utilities Payment Processor receives, processes, and reviews applicable utility bills and submits to the Debtors a master invoice of unpaid and processed utility bills in exchange for a monthly fee of approximately $4,000 (the "Utilities Service Fees").  Without the Utilities Payment Processor, the Debtors' ability to pay their Utilities Providers would be severely impeded and their attention drawn away from maximizing the value of the Debtors' estates.  Accordingly, I believe the relief requested in the Utilities Motion is necessary to avoid immediate and irreparable harm to the Debtors, is in the best interests of the Debtors' estates, and should be granted.

**F.**    ***Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain Existing Insurance Policies, (B) Pay All Insurance Obligations***

**Arising Thereunder, (C) Maintain Surety Bonds, and (D) Continue to Pay Broker Fees; and (II) Granting Related Relief**

137.     Through the above-titled motion (the "Insurance Motion"), the Debtors seek entry of interim and final orders (i) authorizing, but not directing the Debtors, to (a) maintain, renew, supplement, or modify, as necessary, the Insurance Policies (as defined below) in accordance with their terms and perform with respect thereto in the ordinary course of business, (b) pay all insurance obligations arising thereunder, (c) continue, renew, or replace the Debtors' insurance Premium Financing Agreement (as defined below), including entering into new premium financing agreements, (d) maintain, renew, supplement, or modify, as necessary, surety coverage in the ordinary course of business, (e) continue to pay Broker Fees (as defined below); and (ii) granting related relief. The Debtors maintain approximately fifty (50) insurance policies (collectively, the "Insurance Policies") through several insurance carriers (each, an "Insurance Carrier").  The Insurance Policies include various liability, property, professional, cargo, executive risk, and other coverage that provide the Debtors with insurance related to, among other things, general liability, directors' and officers' liability, attorney liability, property liability, automobile liability, workers' compensation, cyber security liability, employment practices liability, criminal liability, fiduciary liability, kidnap and ransom liability, and excess liability coverage. The Debtors also maintain fifty-one (51) surety bonds (collectively, the "Surety Bonds" and together, the "Surety Bond Program") issued by certain sureties in favor of various federal, state, and industry regulatory agencies to guarantee certain obligations related to various state licenses and permits.

138.     The Debtors obtain most of their Insurance Policies and Surety Bonds through Marsh USA Inc. (the "Broker"). The Broker, among other things: (i) assists the Debtors in obtaining comprehensive insurance coverage for their operations in a cost-effective manner;

(ii) manages renewal data; and (iii) provides ongoing support throughout the applicable policy periods for the Insurance Policies and Surety Bonds.  In exchange for its services, the Debtors pay the Broker certain fees (the "Broker Fees").  As it is not economically advantageous for the Debtors to pay the premiums on all of the Insurance Policies on an annualized basis, the Debtors finance the premiums on certain of the Insurance Policies (the "Insurance Financing Program").  Prior to the Petition Date, the Debtors financed certain property and marine cargo insurance policies pursuant to a premium finance agreement (the "Premium Financing Agreement"), with AFCO Premium Credit LLC.

139.    I believe the (i) continuation of the Debtors' (a) Insurance Policies, (b) Surety Bond Program, and (c) Insurance Financing Program; and (ii) continued use of the Broker to facilitate the payment and procurement of such policies and programs postpetition will be essential to the preservation of the value of the Debtors' estates. I understand that, in certain instances, continuation of the Insurance Policies and Surety Bonds are required by law and that if any of the Debtors' Insurance Policies are terminated or lapse, the Debtors would be exposed to substantial liability to the detriment of all parties in interest and could be in violation of law.  I also understand that applicable state law may prohibit the Debtors from operating without certain insurance.  Additionally, given that the Debtors' Insurance Carriers and Broker are intimately familiar with the Debtors' Insurance Policies, even the temporary loss of their services would be detrimental to the Debtors' estates.  Accordingly, I believe authorization to continue to honor all Insurance Obligations (as defined in the Insurance Motion), which includes continuing to pay the Broker, is in the best interests of the Debtors and their estates, necessary to avoid immediate and irreparable harm to the Debtors, and critical to the continued operation of the Debtors' business.

G.    ***Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Honor Certain Prepetition Obligations to Customers and (B) Continue***

*Certain Customer Programs in the Ordinary Course of Business; and (II) Granting Related Relief*

140.    By the above-titled motion (the "<u>Customer Programs Motion</u>"), the Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to (a) honor certain prepetition obligations to customers, and (b) continue certain customer programs in the ordinary course of business; and (ii) granting related relief.

141.    As is customary in their industry, the Debtors, prior to the Petition Date and in the ordinary course of their business, maintained certain customer programs and related practices (collectively, the "<u>Customer Programs</u>") designed to (i) attract and retain customers; (ii) develop and sustain a positive reputation in the marketplace for the Debtors' products; (iii) ensure customer satisfaction; (iv) engender customer loyalty; and (v) meet competitive market pressures.  As set forth in more detail below, the Customer Programs are critical to the Debtors' ongoing operations and the preservation and maximization of stakeholder value.

142.    The Debtors generate goodwill through the Customer Programs and the satisfaction of their Customer Programs Obligations (as defined in the Customer Programs Motion), thereby allowing the Debtors not only to retain their current customers, but also to attract new ones.  In addition, some of the Debtors' prepetition Customer Programs Obligations do not require the expenditure of cash. I believe that the Customer Programs are crucial for the Debtors' maintenance of customer goodwill, and that without them, the Debtors would (i) quickly lose customers to lower priced competitors, resulting in much greater financial losses than the Debtors risk by offering discounted products; (ii) be burdened with additional claims; (iii) lose sales to competitors offering lower prices with more limited up-front payment requirements; (iii) face decreased customer satisfaction; and (iv) risk negative effects on the Debtors' efficient

administration of their estates during the pendency of these Chapter 11 Cases, the cost of which would be borne by their estates and all stakeholders.

**H.**    ***Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Related Obligations; and (II) Granting Related Relief***

143.    Through the above-titled motion (the "Taxes Motion"), the Debtors seek entry of interim and final orders (i) authorizing, but not directing the Debtors, to pay certain (a) income taxes, (b) property taxes, (c) sales and use taxes, (d) foreign taxes, (e) franchise, regulatory, and business taxes and miscellaneous fees, and (f) fees to certain third party tax service providers (collectively, the "Taxes and Assessments") due and owing to various federal, state, county, city, and foreign taxing, licensing, and regulatory authorities (the "Applicable Authorities") that arose prepetition; and (ii) granting related relief.

144.    The Debtors pay or remit, as the case may be, the Taxes and Assessments as incurred, or monthly, quarterly, semiannually, or annually to the Applicable Authorities, as required by applicable laws and regulations.  The Debtors seek to pay certain prepetition Taxes and Assessments in order to, among other things, (i) forestall Applicable Authorities from taking actions that might interfere with the Debtors' continued business and operations and potentially impose significant costs on the Debtors' estates; and (ii) continue the use of certain third party tax service providers to assure compliance with the taxing requirements of the Applicable Authorities.

145.    I understand that failure to comply with the taxing requirements of the Applicable Authorities may lead such Applicable Authorities to take actions that might interfere with the Debtors' continued business and operations, and potentially impose significant costs on the Debtors' estates.  Such actions may include (i) bringing personal liability actions against directors, officers, managers, and other key employees of the Debtors whose full-time attention to these Chapter 11 Cases is required to avoid business disruptions and maximize recoveries to the Debtors'

creditors; (ii) asserting liens on the Debtors' assets; or (iii) seeking to lift the automatic stay.  In addition, the non-payment of such Taxes and Assessments may give rise to priority claims under section 507(a)(8) of the Bankruptcy Code.  Accordingly, I believe the relief requested in the Taxes Motion is necessary to avoid immediate and irreparable harm to the Debtors and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

I.    ***Motion of Debtors for Entry of Interim and Final Orders (I) Establishing Notice and Hearing Procedures for Trading in Equity Securities; and (II) Granting Related Relief***

146.    By the above-titled motion (the "<u>NOLs Motion</u>") The Debtors seek entry of interim and final orders (i) establishing notice and hearing procedures for trading in equity securities; and (ii) granting related relief, so as to protect the potential value of the Debtors' net operating losses (the "<u>NOLs</u>").

147.    The Debtors currently estimate that, as of the close of their most recent tax year, they had approximately $77,500,000 of consolidated NOL carryforwards and approximately $11,100,000 of 163(j) Carryforwards (as defined in the NOLs Motion) for federal income tax purposes.[11]  I also understand that the Debtors may generate additional Tax Attributes (as defined in the NOLs Motion) in the current tax year, including during the pendency of these Chapter 11 Cases, and that the Tax Attributes are potentially of significant value to the Debtors and their estates because they may offset future federal taxable income or federal tax liability in future years.

148.    I understand that the relief requested in the NOLs Motion is critical to preserve the Debtors' ability to utilize their Tax Attributes to maximize tax savings in connection with the sales contemplated in this Declaration as well as any potential future alternative reorganization efforts.  Thus, to preserve the Debtors' flexibility to maximize the use of the Tax Attributes to the

---

[11]    As estimates, these amounts are subject to change.

fullest extent possible, the Debtors seek limited relief that will enable the Debtors to closely monitor certain transfers of equity securities so as to be in a position to act expeditiously if necessary to preserve their Tax Attributes. It is my understanding that if no such restrictions are imposed by the court, the Debtors' ability to use their Tax Attributes could be severely limited or even eliminated.

J.      *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Agency Agreement; (II) Authorizing and Approving the Conduct of Store Closing Sales, with Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances; (III) Authorizing Customary Bonuses to Employees of Closing Stores; and (IV) Granting Related Relief*

149.    *The Store Closings*. Over the past several years, the Debtors have faced a challenging commercial environment brought on by both broader economic and retail-specific market pressures. Ultimately, the Debtors' management team and advisors determined that it is appropriate to close and wind down ninety-four (94) underperforming stores (the "Initial Closing Stores") through the Store Closing Sales, with the potential to close and wind down additional stores in the future (all such stores, along with the Initial Closing Stores, the "Closing Stores"). The Debtors expect all Sales (as defined in the above-titled motion (the "Store Closing Motion")) at the Initial Closing Stores to be completed and the properties vacated by September 22, 2024.

150.    *The Agent and Agency Agreement*. The Debtors have engaged the Agent to facilitate store closures and provide other advisory services for the Company. As a result, the Agent has knowledge of the Debtors' business, their merchandise, and their store operations. Additionally, the Debtors and the Agent are already party to the Agency Agreement, which sets forth the terms pursuant to which the Agent will operate store closings for the Debtors during the term of the Store Closing Sales, as set forth in the Store Closing Motion. In light of this and the Agent's historic success in conducting similar store-closing sales through similar agency

agreements, the Debtors concluded in their business judgment that (i) the services of the Agent are necessary (a) for a seamless and efficient large-scale Store Closing Sales process and (b) to maximize the value of the saleable inventory located in the Closing Stores (the "Merchandise"), and the associated furniture, fixtures, and equipment (the "FF&E" and, together with the Merchandise, the "Store Closure Assets"); and (ii) the Agent is qualified and capable of performing the required tasks in a value-maximizing manner. I believe that the Store Closing Sales are critical for the Debtors to efficiently administer their estates during the pendency of these Chapter 11 Cases and that assumption of the Agency Agreement will allow the Debtors to conduct the Store Closing Sales in an efficient, controlled manner that will maximize value for the Debtors' estates.

151.    *The Sale Guidelines*. I believe that the Sale Guidelines (as defined in the Store Closing Motion) represent the most efficient and appropriate means of maximizing the value of the Store Closure Assets while balancing the potentially competing concerns of landlords and other parties in interest. I understand that delay in approving the Store Closing Sales would diminish the recovery tied to monetization of the Store Closure Assets for a number of reasons, chief among them being that the Closing Stores are a drain on liquidity. Thus, the Debtors will realize an immediate benefit in terms of financial liquidity upon the sale of the Store Closure Assets and the termination of operations at the Closing Stores. Further, the swift and orderly commencement of the Store Closing Sales will allow the Debtors to timely reject the applicable store leases, and therefore avoid the accrual of unnecessary administrative expenses for rent payment.

152.    *Liquidation Sale Laws and Dispute Resolution Procedures*. Certain states in which the Debtors operate stores have or may have licensing or other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including, without limitation, state,

provincial, and local laws, statutes, rules, regulations, and ordinances (collectively, the "Liquidation Sale Laws") which hamper the Debtors' ability to maximize value in selling their inventory. The Debtors submit that to the extent the Sale Guidelines conflict with the Liquidation Sale Laws, the Sale Guidelines should control. This will allow the Debtors to maximize the value of their inventory. I believe, and the Debtors have determined, in the exercise of their reasonable business judgment and in consultation with their advisors, that the Sale Guidelines and the proposed Dispute Resolution Procedures (as defined in the Store Closing Motion) to orderly resolve disputes between the Debtors and any Governmental Units (as defined in the Store Closing Motion) due to the Sale Guidelines will provide the best, most efficient, and most organized means of selling the Store Closure Assets to maximize their value to the estates.

153.    *Lease Restrictions*. The Debtors seek approval of a waiver of any contractual restrictions that could otherwise inhibit or prevent the Debtors from maximizing value for creditors through the Store Closing Sales. In certain cases, the contemplated Store Closing Sales may be inconsistent with certain provisions of leases, subleases, or other documents with respect to the premises in which the Debtors operate, including (without limitation) reciprocal easement agreements, agreements containing covenants, conditions, and restrictions (including, without limitation, "go-dark" provisions and landlord recapture rights).

154.    I believe that such restrictions would also hamper the Debtors' ability to maximize value in selling their inventory. Additionally, the Debtors will be harmed if any entity, including, without limitation, utilities, landlords, shopping center managers and personnel, creditors, and all persons acting for or on their behalf, interferes with or otherwise impedes the conduct of the Store Closing Sales or institutes any action against the Debtors in any court (other than in this Court) or before any administrative body that in any way directly or indirectly interferes with, obstructs, or

otherwise impedes the conduct of the Store Closing Sales or the advertising and promotion (including through the posting of signs) thereof.

155.    *Abandonment*.  By the Store Closing Motion, the Debtors seek approval to abandon certain owned FF&E remaining in the Closing Stores.  The Debtors intend to sell any marketable owed FF&E present in the Closing Stores.  However, the Debtors may determine that the cost associated with holding or selling that property exceeds the proceeds that will be realized from its sale, or such property will not be saleable at all.  In such cases, I believe that retaining the property would be burdensome to the Debtors' estates and the property would be of inconsequential value.  The Debtors therefore believe that abandonment of such property is in the best interests of their estates.

156.    *Store Closing Bonus Plan*. By the Store Closing Motion, the Debtors are requesting the authority, but not the obligation, to pay Store Closing Bonuses (the "Store Closing Bonus Plan") to store-level non-insider employees who remain in the employ of the Debtors during the Store Closing Sales. The total payments for Store Closing Bonuses will not exceed twenty percent (20%) of the total Sale Term (as defined in the Store Closing Motion) payroll for the Store Closing employees.  I believe that the Store Closing Bonus Plan will motivate employees during the Sales and will enable the Debtors to retain those employees necessary to successfully complete the Store Closing Sales.  Providing such non-insider bonus benefits is critical to ensuring that key employees that will be affected by the reduction in the Debtors' work force due to the Store Closings will continue to provide critical services to the Debtors during the ongoing Store Closing Sales process. This will increase the likelihood of a successful Store Closing Sales process and incentivize store management to provide uninterrupted leadership during this challenging period.  I believe that the Store Closing Bonus Plan is a sound exercise of the Debtors'

business judgment and is in the best interests of the Debtors and all their estates' stakeholders.  The store employees—along with their skills, knowledge, and hard work—are more critical now than ever.  Through their commitment and performance, they can ensure that the Debtors continue to maximize stakeholder value in a challenging economic environment and a time when those employees' positions will soon be terminated.

157.    *Modifications to Customer Programs at the Closing Stores*.  Prior to the Petition Date, the Debtors enacted several new Customer Programs policies at the Closing Stores.  These include the new order policy, providing that, during the Sale Term, solely at the Closing Stores, the Closing Stores will not accept new orders unless there is available, on-hand Merchandise (as defined in the Store Closing Motion) located in the applicable Closing Store to fulfill any such new order.  These new orders must be picked up within forty-eight (48) hours of the order being placed.  The installation policy, under which  services the Closing Stores will not offer installation services but will offer third party installer recommendations to interested customers. The employee discount modifications, under which the Debtors' will continue to honor their current employee discount program for Closing Stores' employees; *provided*, *however*, *that*, the level of discount available for the Closing Stores' employees will be capped at the prevailing discount rate offered at the applicable Closing Store. In other words, the standard employee discount rates available under the existing employee discount program will apply in ordinary course until the rate of discount under the employee discount program becomes greater than or equal to the applicable Closing Store's prevailing discount rate, at which point the Closing Store's prevailing discount rate shall apply.

158.    I believe that the relief requested in the Store Closing Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors

to efficiently administer their estates during the pendency of these Chapter 11 Cases.  Accordingly,

on behalf of the Debtors, I respectfully submit that the Store Closing Motion should be approved.

*[Remainder of Page Intentionally Left Blank]*

I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 11, 2024
        Suffolk County, NY

                            */s/ Holly Etlin*
                            Name:  Holly Etlin
                            Title:   Chief Restructuring Officer