## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **LL FLOORING HOLDINGS, INC.,** *et al.*, | **Case No. 24-11680 (___)** |
| **Debtors.[1]** | **(Joint Administration Pending)** |

## MOTION OF DEBTORS FOR ENTRY OF
## INTERIM AND FINAL ORDERS (I) AUTHORIZING
## DEBTORS TO (A) HONOR CERTAIN PREPETITION OBLIGATIONS TO
## CUSTOMERS AND (B) CONTINUE CERTAIN CUSTOMER PROGRAMS IN
## THE ORDINARY COURSE OF BUSINESS; AND (II) GRANTING RELATED RELIEF

LL Flooring Holdings, Inc. and certain of its affiliates, as the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, the "Company"), respectfully represent as follows in support of this motion (this "Motion"):

## BACKGROUND

1. On the date hereof (the "Petition Date"), each Debtor commenced a case by filing a petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors have requested that these voluntary cases (the "Chapter 11 Cases") be jointly administered.

2. The Debtors continue to operate their business and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of their respective tax identification numbers, are as follows: LL Flooring Holdings, Inc. (0817); LL Flooring, Inc. (9199); Lumber Liquidators Leasing, LLC (N/A); LL Flooring Services, LLC (5960); and Lumber Liquidators Foreign Holdings, LLC (4568). The address of the Debtors' corporate headquarters is 4901 Bakers Mill Lane, Richmond, VA 23230.

3.     To date, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed a creditors' committee in the Chapter 11 Cases, nor has any trustee or examiner been appointed therein.

4.     The Company is one of North America's leading specialty retailers of flooring.  The Company carries a wide range of hard surface floors and carpets in a range of styles and designs, and primarily sells to consumers or flooring focused professionals.

5.     Additional factual background regarding the Company, including their business operations, corporate and capital structure, and the events leading up to the filing of the Chapter 11 Cases, is set forth in detail in the *Declaration of Holly Etlin of in Support of Chapter 11 Petitions and First Day Papers* (the "First Day Declaration"),[2] filed contemporaneously herewith and incorporated herein by reference.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these Chapter 11 Cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

7.     Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final judgment or order by the Court with respect to this

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

Motion if it is later determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## **RELIEF REQUESTED**

8.     By this Motion, pursuant to sections 105(a), 363(b), 1107, and 1108 of the Bankruptcy Code, Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1 and 9013-1, the Debtors respectfully request entry of orders, (i) authorizing, but not directing, the Debtors to (a) honor certain prepetition obligations to customers and (b) continue certain customer programs in the ordinary course of business; and (ii) granting related relief.

9.     The Debtors further request that the Court (i) authorize financial institutions (collectively, the "Banks") to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing to the extent directed by the Debtors in accordance with this Motion and to the extent the Debtors have sufficient funds on deposit in their accounts with such Banks, whether such checks were presented or electronic requests were submitted before or after the Petition Date; and (ii) authorize all Banks to rely on the Debtors' designation of any particular check or electronic payment request as appropriate pursuant to this Motion without any duty of further inquiry and without liability for following the Debtors' instructions.

10.     A proposed form of order granting the relief requested herein on an interim basis is attached hereto as **Exhibit A** (the "Proposed Interim Order"), and a proposed form of order granting the relief requested herein on a final basis is attached hereto as **Exhibit B** (the "Proposed Final Order" and, together with the Proposed Interim Order, the "Proposed Orders").

## THE DEBTORS' CUSTOMER PROGRAMS

**I.      The Debtors' Customers.**

11.      The Debtors primarily generate revenue from the sale of their products to a wide variety of customers, including both flooring professionals, such as flooring installers and remodelers ("<u>Professionals</u>"), as well as individual homebuilders and consumers ("<u>Consumers</u>" and, together with the Professionals, the "<u>Customers</u>").

**II.      The Debtors' Customer Programs.**

12.      As is customary in their industry, the Debtors, prior to the Petition Date and in the ordinary course of their business, maintained certain customer programs and related practices (collectively, the "<u>Customer Programs</u>") that are designed to (i) attract and retain Customers; (ii) develop and sustain a positive reputation in the marketplace for the Debtors' products; (iii) ensure Customer satisfaction; (iv) engender Customer loyalty; and (v) meet competitive market pressures. As set forth in more detail below, the Customer Programs are critical to the Debtors' ongoing operations and the preservation and maximization of stakeholder value. Therefore, the Debtors seek authority to continue to maintain and administer their Customer Programs and the cash- and performance-based obligations thereunder (the "<u>Customer Programs Obligations</u>"), including certain prepetition Customer Programs Obligations.

13.      The Debtors generate goodwill through the Customer Programs and the satisfaction of their Customer Programs Obligations, thereby allowing the Debtors not only to retain their current Customers, but also to attract new ones. In addition, some of the Debtors' prepetition Customer Programs Obligations do not require the expenditure of cash. For these, and the other reasons set forth herein, it is essential and in the best interests of the Debtors, their estates, and their creditors that the Debtors be permitted to honor their prepetition Customer Programs Obligations and to continue the Customer Programs in the ordinary course of their business.

14.    As described in greater detail below, the Debtors' Customer Programs are common in the Debtors' industry. Indeed, the Debtors believe that most major flooring manufacturing companies, including many of the Debtors' competitors, employ similar customer programs. Therefore, if the Debtors are to stay competitive, it is critical that the Debtors be authorized, in their business judgment, to continue the Customer Programs and to honor the prepetition Customer Programs Obligations associated therewith subject to the Customer Programs Modifications (as defined below).[3] The following are general descriptions and examples of the Debtors' principal Customer Programs.

### A.    Promotional Pricing Programs

#### (i)    Best Price Guarantee

15.    To ensure that their Customers are paying the best price for their products, the Debtors guarantee (the "Best Price Guarantee") that (i) they will match a competitor's lower price for the identical product; and (ii) if a Customer purchases a product from the Debtors and the Debtors put that product on sale[4] within thirty (30) days of the Customer's purchase, the Debtors will refund the Customer an amount equal to the difference between (a) the price the customer paid and (b) the lower sale price. The Best Price Guarantee, along with the Debtors' other promotional tactics, are crucial for the Debtors' maintenance of Customer goodwill.

---

[3]    All Customer Programs at the Closing Stores (as defined in the Store Closing Motion (as defined herein)) are subject to the relief sought in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Agency Agreement; (II) Authorizing and Approving the Conduct of Store Closing Sales, with Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances; (III) Authorizing Customary Bonuses to Employees of Closing Stores; and (IV) Granting Related Relief* (the "Store Closing Motion").

[4]    During these Chapter 11 Cases, stores other than those subject to the Store Closing Motion will not match sale prices offered at Closing Stores under the Store Closing Motion.

### (ii)    *Sales Promotions*

16.     In the ordinary course of business, the Debtors conduct certain limited sales promotions at their retail stores and through their website (the "Sales Promotions" and, together with the Best Price Guarantee, the "Promotional Pricing Programs"). The Sales Promotions include clearance discounts, seasonal discounts, and other sales and promotions on eligible merchandise.  The Debtors notify Customers of their Sales Promotions through mobile, email, and online channels, among others.

17.     The Debtors believe that the Promotional Pricing Programs encourage sales and enable the Debtors to better manage their inventory.  Without the Promotional Pricing Programs, the Debtors would quickly lose Customers to lower-priced competitors, resulting in much greater financial losses than the Debtors risk by offering discounts.  As of the Petition Date, the Debtors do not believe there are any amounts due and owing on account of the Promotional Pricing Program. The Debtors seek authority to continue the Promotional Pricing Programs in the ordinary course of business and to honor their obligations related thereto on a postpetition basis.

## B.    Customer Deposits

18.     The Debtors routinely accept deposits from Customers for products and services purchased in stores[5] that have not yet been delivered (collectively, the "Customer Deposits").  Customer Deposits generally represent a minimum of fifty percent (50%)[6] of the price of an order, though the Debtors may accept lower Customer Deposits from time to time under the Promotional Pricing Programs.  A Customer must pay an initial deposit at the time of purchase

---

[5]    Customer Deposits are only accepted for purchases made in the Debtors' stores.  Customers purchasing products or services online must pay the full price at the time of purchase.

[6]    In California, the Debtors accept Customer Deposits for services equal to less than fifty percent (50%) of the service price in accordance with section 7159 of California's Business and Professions Code, which limits the down payment a contractor may accept to the lesser of (i) $1,000 and (ii) ten percent (10%) of the contract price.

and the remainder of the purchase price is due when the Customer receives their product. Open orders may also be adjusted by the Customer before the order is fulfilled. Customers may request adjustments in accordance with the Best Price Guarantee or to apply a Customer Deposit to a different product, and products may be added or removed from orders. The Debtors regularly adjust open orders, especially for Professionals, whose needs may change based on the progress of their projects.

19.     In the event a Customer no longer needs or wants the product they opened an order for, that Customer's Customer Deposit may be allocated to the purchase price of other products, as described above, or the order may be cancelled and the Customer Deposit refunded. In the event Customers who placed orders prior to the Petition Date cancel such orders after the Petition Date, those Customers may seek refunds of their Customer Deposits and assert claims against the Debtors therefor. Such claims for refunds of Customer Deposits may be entitled to priority under section 507 of the Bankruptcy Code, in each case, in an amount up to $3,350[7] (the "Priority Cap"). In order to maintain Customer goodwill and loyalty, the Debtors also seek authority to refund Customer Deposits for orders placed prior to the Petition Date up to the Priority Cap upon Customer request.

20.     In an effort to manage their liquidity and right-size their physical store footprint, the Debtors modified their Customer Deposits guidelines in certain Closing Stores that implemented Store Closing Sales (as defined in the Store Closing Motion) prior to the Petition Date. By this Motion, the Debtors seek to similarly modify their Customer Deposits guidelines in

---

[7]     Section 507(a)(7) of the Bankruptcy Code establishes a priority for "unsecured claims of individuals, to the extent of $3,350 for each such individual, arising from the deposit, before the commencement of the case, of money in connection with the purchase, lease, or rental of property, or the purchase of services . . . that were not delivered or provided."

all continuing stores as follows (the "<u>Customer Deposits Modifications</u>"): (i) Customers with open orders must pick up their orders within thirty (30) days of placing such orders;[8] and (ii) the Debtors will not accept Customer Deposits for any products that are not in stock at the applicable store or at the Debtors' distribution centers at the time the Customer places the order.  The Debtors will inform Customers of the Customer Deposits Modifications by posting these new guidelines their website and notifying Customers directly via the Customer Notice (as defined below).

21.     As of the Petition Date, the Debtors estimate that the total amount of Customer Deposits for open orders is approximately $36.5 million, with a majority of such Customer Deposits individually amounting to less than the Priority Cap.  It is crucial for the Debtors to continue maintaining and applying Customer Deposits, subject to the Customer Deposits Modifications, to preserve the goodwill and loyalty of their Customers and minimize disruptions to the Debtors' business.  Absent the ability to process and continue accepting Customer Deposits, the Debtors would be faced with additional claims and would lose sales to competitors offering lower prices with more limited up-front payment requirements.  Accordingly, the Debtors request authority to maintain, accept, process, and adjust Customer Deposits in the ordinary course of business and subject to the Customer Deposit Modifications.

### C.     Customer Payments and Financing

#### (i)     Credit Card and Other Payment Processors

22.     In addition to cash, the Debtors accept a variety of payment methods from Customers, including: (i) debit cards; (ii) LL Consumer Cards (as defined below); (iii) payment under the Professional Line of Credit Program (as defined below); and (iv) Visa, MasterCard, Discover, and American Express (collectively, the "<u>Non-Cash Payments</u>").  To process Non-Cash

---

[8]     Customers who placed orders prior to the Petition Date will need to pick up their orders by September 11, 2024.

Payments, the Debtors are party to certain agreements (the "Payment Processing Agreements") with certain payment processors (the "Payment Processing Companies"), including those described above.  Pursuant to the Payment Processing Agreements, the Debtors generally receive the net Customer sales amount, *less* any chargebacks and processing fees charged.  The processing fees charged by the Payment Processing Companies are set off from the funds that are remitted to the Debtors on account of the Non-Cash Payments on a monthly basis.  The additional fees owing to the Payment Processing Companies that are customarily charged with every credit card and debit card transaction (together with the Processing Fees, the "Processing Obligations") are generally debited against the Debtors' accounts with the Payment Processing Companies.

23.     The Debtors' continued acceptance of Non-Cash Payments is essential to the administration of the Debtors' estates because the majority of the Debtors' sales are made using Non-Cash Payments.  Refusing to accept Non-Cash Payments would have a severe negative effect on the Debtors' efficient administration of their estates during the pendency of these Chapter 11 Cases, the cost of which would be borne by their estates and all stakeholders.  To avoid disrupting these vital payment processing services, the Debtors seek authority to continue paying the Processing Obligations in the ordinary course of business pursuant to the terms of the Payment Processing Agreements, and request that the Bankruptcy Court authorize the Payment Processing Companies to continue to set off the Processing Obligations against amounts remitted to the Debtors, whether arising before or after the Petition Date, in a manner consistent with past practices.

### *(ii)     Consumer Financing Program and LL Consumer Cards*

24.     The Debtors maintain a program for Consumers (the "Consumer Financing Program") with Synchrony Bank ("Synchrony") based on a proprietary credit card (the "LL Consumer Card").  The Consumer Financing Program is governed by a private label credit card

program agreement by and between Debtor LL Flooring, Inc. and Synchrony (as amended, modified, supplemented, and/or restated from time to time, the "Synchrony Agreement").  Under the Synchrony Agreement, qualifying Consumers can apply for an LL Consumer Card that can be used only to purchase the Debtors' products and services.  Synchrony offers, issues, and services LL Consumer Cards, which are accepted solely at the Debtors' stores.  The Debtors are responsible for marketing and promoting the Consumer Financing Program and paying certain fees to Synchrony. Due to the variety of payment flows between the Debtors and Synchrony in connection with the Consumer Financing Program, the Synchrony Agreement permits the Debtors and Synchrony to set off or recoup payments under certain circumstances.

25.     When a Consumer makes a purchase using an LL Consumer Card, the Consumer finances their purchase through Synchrony Bank. Consumer payment plans vary depending on (i) the type of promotional financing offer (past promotions have included offers of deferred interest, equal pay with no interest, and reduced interest rates with fixed monthly payments); (ii) the length of the promotion period; and (iii) the size of the purchase being financed.  For example, certain promotions allow Consumers to finance their purchase and pay no interest if the full amount of the purchase price is paid within a certain timeframe.  Once the Consumer chooses an applicable promotional financing offer, the Consumer pays Synchrony directly.  Pursuant to the Synchrony Agreement, the Debtors generally receive an amount equal to the net Consumer purchase price amount, *less* any chargeback, interest, and/or processing fees charged by Synchrony.  Fees owed to Synchrony are set off from the funds that are remitted to the Debtors on a daily basis.[9]

---

[9]     On July 11, 2024, the Debtors and Synchrony temporarily adjusted the terms of payment under the Synchrony Agreement to preserve the Debtors' ability to offer Customers the best prices and financing options and maintain the business relationship with one of their most crucial vendors. Specifically, the Debtors agreed to allow

26.     Approximately fourteen percent (14%) of Consumer payments are tendered through Synchrony. The Debtors' ability to continue offering the Consumer Financing Program and honoring the Synchrony Agreement is critical. The Consumer Financing Program does not require any cash outlay from the Debtors, as fees under the Synchrony Agreement are deducted from amounts remitted to the Debtors by Synchrony. The Debtors therefore request (i) the authority to continue the Consumer Financing Program in the ordinary course in accordance with the Synchrony Agreement; and (ii) that the Court authorize Synchrony to continue to set off payments against amounts remitted to the Debtors in the ordinary course of business.

### (iii)     *Professional Line of Credit Program*

27.     The Debtors also provide a financing option for Professionals (the "Professional Line of Credit Program") through Capital One, N.A. ("Capital One") pursuant to an agreement between Debtor LL Flooring, Inc. and Capital One (the "Professional Line of Credit Program Agreement"). When a Professional makes a purchase using the Professional Line of Credit Program, the Professional subsequently makes payments to Capital One and Capital One, in turn, remits payment to the Debtors on a monthly basis equal to the aggregate purchase amounts paid under the Professional Line of Credit Program, *less* certain fees specified in the Professional Line of Credit Program Agreement. The Professional Line of Credit Program effectively permits Professionals to open a line of credit with Capital One, and such Professionals must repay the purchase price in full to Capital One on the payment due date or otherwise pay interest on the unpaid amount.

---

Synchrony to divert twenty-eight percent (28%) (or approximately $82,000-$85,000) of daily remittance amounts between July 15, 2024, and August 24, 2024 (which time period may be shortened depending on daily sales volume metrics), to be held in reserve by Synchrony.

28.     The Professional Line of Credit Program is an important tool for the Debtors as it facilitates financial flexibility for a significant portion of their Customers without risk to the Debtors of non-payment.  The Professional Line of Credit Program also does not require any cash outlay from the Debtors, as fees under the Professional Line of Credit Program Agreement are deducted from the purchase price amount paid to the Debtors by Capital One. The Debtors accordingly seek authority to continue the Professional Line of Credit Program in the ordinary course in accordance with the terms of the Professional Line of Credit Program Agreement.

**D.     Gift Card Program**

29.     The Debtors maintain a program (the "Gift Card Program") whereby Customers can purchase gift cards ("Gift Cards") that can be redeemed for the Debtors' products or services at a later date.  The Gift Card Program is crucial for the Debtors to maintain Customer loyalty.  If Customers cannot redeem their Gift Cards to obtain products or services from the Debtors, Customers may lose trust in the Debtors' brand overall. As of the Petition Date, the Debtors estimate there is approximately $131,000 worth of Gift Cards outstanding.

30.     The Debtors seek to modify the Gift Card Program (the "Gift Card Modifications" and, together with the Customer Deposits Modifications, the "Customer Programs Modifications") in connection with these Chapter 11 Cases as follows: for the first twenty-one (21) days following entry of the Proposed Interim Order, the Debtors will continue accepting and processing Gift Cards in the ordinary course of business, giving their Customers an opportunity to redeem any outstanding Gift Cards.  To manage their liquidity, after the expiration of such 21-day period, the Debtors will no longer accept Gift Cards and such Gift Cards will be deemed to have no remaining value.  Consistent with past practices, and notwithstanding any policy or state law to the contrary, the Gift Cards are not and will not be redeemable for cash at any time.  The Debtors will inform

Customers of the modified Gift Card Program by posting on the Debtors' website and including this information in the Customer Notice.

### E.    Warranty Program

31.    In the ordinary course of business, the Debtors provide Customer warranties and accommodations (the "Warranty Program") for their products.  Under the Warranty Program, the Debtors agree to maintain certain standards with respect to the quality of their products and certain services (the "Warranties"). The Warranties vary by type of product, but generally cover manufacturing defects that would prevent the product from performing in line with its intended and marketed use.  The terms of the product Warranties range from five (5) years to the lifetime of the product and provide for the repair or replacement of the defective product.  The Debtors also provide Warranties for installation services solely to the extent the Customer also purchased a Warranty for the underlying product being installed.  The Debtors coordinate installation for Customers with third party installation professionals and provide Warranties to Customers for those services (*i.e.*, guarantee the third parties' services) for a period of one (1) year.

32.    The Debtors maintain a reserve of approximately $410,000 for merchandise claims and approximately $120,000 for installation claims under the Warranty Program. Once a Customer files a claim under the Warranty Program, the Debtors coordinate with the applicable product or installation service supplier or vendor to allocate financial responsibility for the replacement product or service or payment to the applicable Customer.  Smaller Warranty claims valued at $500 or less may be handled in stores by store managers in their discretion.

33.    The Debtors incur liability, on average, of approximately $600,000 per month related to the Warranty Program, of which approximately sixty-five percent (65%) (or $460,000) are settled in cash and approximately thirty-five percent (35%) (or $240,000) of such obligations

are settled by providing the Customer with store credit.[10]  Of this amount, approximately $230,000 per month is paid or credited back to the Debtors by third party vendors, manufacturers, and installation professionals who supplied the applicable products and services in accordance with the warranty terms of their respective contracts with the Company.

34.    As of the Petition Date, there are approximately 1,250 open customer complaints under the Warranty Program, representing approximately $800,000 of outstanding liability, of which $600,000 will become due and owing within thirty (30) days following the Petition Date.[11]  Based on historical payments and timing of Customer claims under the Warranty Program, the Debtors expect that, as of the Petition Date, there is potential liability of up to $5 million under the Warranty Program relating to products sold prior to the Petition Date for which Customers have not yet filed claims.

35.    The Debtors' ability to continue serving their Customers and meeting their expectations depends upon the Debtors' ability to offer and effectively operate the Warranty Program in the ordinary course of their business.  Therefore, it is of paramount importance that the Debtors be authorized to continue to maintain and administer the Warranty Program in the ordinary course of business and to honor all prepetition Customer Programs Obligations related thereto.

**F.    Sales Returns**

36.    In the ordinary course of business, the Debtors allow Customers to return unopened product within ninety (90) days of purchase (the "Sales Return Program").  As of the Petition Date, the Debtors estimate that there is potential liability of approximately $1.6 million related to the

---

[10]    As of the Petition Date, there is approximately $7.9 million in store credit outstanding, inclusive of store credit issued in connection with the Warranty Program.

[11]    This estimate is based off of $900,000 of potential liability and assumes that, consistent with past practices, the Debtors will be paid back approximately thirty-five percent (35%) of total liability under the Warranty Program by third party vendors, manufacturers, and installation professionals.

Sales Return Program. Sales Return Program obligations are settled via replacement product or via the same tender method used by the Customer. If the amount of the refund is greater than fifty dollars ($50) and the Customer initially paid for the product via cash or cashier's check, the Customer will receive their refund in the form of a corporate refund check. If a Customer cannot prove their initial method of tender, a refund will be issued in the form of store credit. The Debtors seek authority to honor all valid Customer returns under the Sales Return Program in the ordinary course of their business, including those returns related to prepetition sales.

### G.    Voucher Program

37.    In 2018, the Company entered into a settlement agreement to resolve claims related to Chinese-manufactured laminate products (the "Formaldehyde MDL Settlement"). Under the Formaldehyde MDL Settlement, among other things, the Company provided $14 million in store credit in the form of vouchers (the "Formaldehyde Vouchers"). Additionally, in 2019, the Company finalized a settlement to resolve claims related to certain bamboo flooring products (the "Gold Settlement" and, together with the Formaldehyde MDL Settlement, the "Product Settlements"). Under the terms of the Gold Settlement, among other things, the Company provided $16 million in store credit in the form of vouchers (the "Gold Vouchers" and, together with the Formaldehyde Vouchers, the "Vouchers"). The Vouchers may be redeemed by Customers for the Debtors' products and/or services[12] until the Vouchers expire, which expiration date depends on the state in which the applicable Voucher was issued.

38.    As of the Petition Date, approximately $2.4 million in Formaldehyde Vouchers and approximately $9.7 million in Gold Vouchers remain outstanding, representing approximately

---

[12]    The Formaldehyde Vouchers may be redeemed for the Debtors' products only; the Gold Vouchers may be redeemed for the Debtors' products and/or services.

$12.1 million in the aggregate.  The Debtors seek authority to continue accepting and processing the outstanding Vouchers in the ordinary course of business in accordance with the terms of the Product Settlements.

### THE DEBTORS' PROPOSED CUSTOMER NOTICING PROCEDURES

39.    The Debtors have approximately 52,500 open orders from Customers who paid Customer Deposits before the Petition Date.  The Debtors have over 550,000 Customers who have placed an order within the last year, including the 52,500 open orders described above.  Of the 550,000 Customers, the Debtors have email addresses for approximately 500,000, or approximately ninety percent (90%).  Under the *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated Creditor Matrix in Lieu of Submitting a Separate Creditor Matrix for each Debtor and Waiving Certain Creditor Matrix Requirements, (B) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors, (C) Redact Certain Personal Identification Information, and (D) Serve Certain Parties in Interest by Email; (II) Establishing Procedures for Notifying Parties of the Commencement of These Cases; (III) Waiving the Requirement to File a List of Equity Security Holders; and (IV) Granting Related Relief* (the "Consolidated Creditors Motion") filed contemporaneously herewith, the Debtors have requested authority to exclude from the Creditor Matrix (as defined in the Consolidated Creditors Motion) (i) past Customers who do not have open orders; and (ii) Customers who have a claim, including for a refund of a Customer Deposit, for amounts below the Priority Cap.  To ensure such Customers are aware of the Customer Programs Modifications, the Debtors request that the Court enter the Proposed Interim Order authorizing the Debtors to (a) serve a notice, substantially in the form attached as **Exhibit C** hereto (the "Customer Notice"), by email to such Customers for whom the Debtors have an email address and (b) post copies of the Customer Notice on the Debtors' website.

40.     The Debtors believe that all parties in interest in these Chapter 11 Cases are interested in ensuring that the Customers receive their flooring and other products and services in a timely manner.  The Debtors are concerned, however, that Customers may become nervous that the Debtors will not fulfill their obligations or timely deliver product in light of the news regarding the commencement of these Chapter 11 Cases.  The Debtors believe the Customer Notice will more adequately address concerns and questions that such Customers may have regarding the Customer Programs Modifications without causing undue stress and disruption to the Debtors' customers.

<u>**RELIEF REQUESTED SHOULD BE GRANTED**</u>

**I.      Payment of the Customer Programs Obligations is Warranted under Sections 363(b)(1) and 105(a) of the Bankruptcy Code and the Doctrine of Necessity, and the Proposed Modifications to the Debtors' Customer Programs are Appropriate.**

41.     The Debtors submit that an order authorizing them to (i) continue their Customer Programs in the ordinary course of business as they determine, in their business judgment, to be appropriate and subject to the Customer Programs Modifications; (ii) renew, modify, terminate, or replace such Customer Programs or agreements that, in their discretion, are necessary and in the best interests of the Debtors' estates, creditors, and other parties in interest; and (iii) make payments owing on account of prepetition Customer Programs Obligations, regardless of when such obligations were incurred, is critical to the preservation of their business and should be authorized under sections 105(a) and 363 of the Bankruptcy Code and the "doctrine of necessity."

42.     Section 363(b)(1) of the Bankruptcy Code permits the debtor to, after notice and a hearing, "use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).  The debtor typically only needs to justify the proposed use, sale, or lease of the property with a "sound business purpose." *In re Montgomery Ward Holding*

*Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also In re Phx. Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (requiring a "good business reason" for use under section 363(b) of the Bankruptcy Code). Demonstrating sound business judgment that the proposed use, sale, or lease will benefit the debtor's estate generally prevents other parties from successfully challenging such exercise of the debtor's business judgment. *See In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

43. In addition, the Court has the authority under section 105(a) of the Bankruptcy Code to authorize the relief requested herein because such relief is necessary for the Debtors to carry out its fiduciary duties under section 1107(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 1107(a) of the Bankruptcy Code "provides that the debtor in possession, *i.e.*, the debtor's management, enjoys the powers that would otherwise vest in the bankruptcy trustee," including the "fiduciary duty to maximize the value of the bankruptcy estate." *In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (quoting *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003)); *see also Unofficial Comm. of Equity Holders v. McManigle (In re Penick Pharm., Inc.)*, 227 B.R. 229, 232–33 (Bankr. S.D.N.Y. 1998) ("[U]pon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy

trustee."). Courts have consistently permitted payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors. *See, e.g.*, *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that "if payment of a claim which arose prior to reorganization is essential to the continued operation of the . . . [business] during reorganization, payment may be authorized even if it is made out of [the] corpus").

44.     The Court may also authorize the payment of prepetition claims in appropriate circumstances under section 105(a) of the Bankruptcy Code and the doctrine of necessity when such payment is essential to the continued operations of a debtor's business. *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 824-25 (D. Del. 1999) (holding that holding that section 105(a) of the Bankruptcy Code provides a statutory basis for payment of prepetition claims under the doctrine of necessity and noting that "[t]he Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (confirming that the doctrine of necessity is standard for enabling a court to authorize payment of prepetition claims prior to confirmation of a reorganization plan).

45.     The relief requested in this Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is justified under section 105(a) and 363(b) of the Bankruptcy Code. Satisfaction of the Customer Programs Obligations in the ordinary course of business and the Customer Programs Modifications requested in this Motion are necessary to preserve the Debtors' resources, thereby promoting their prospects for a successful sale process and enhancing stakeholder recoveries. Customers will not be disadvantaged by the Customer Deposits Modifications as such

policy changes merely operate to ensure Customers are able to obtain their products by limiting the potential for postpetition orders to go unfulfilled without disadvantaging Customers who placed orders prior to the Petition Date.  In addition, with respect to the Gift Card Modifications, the grace period between the entry of the Proposed Interim Order and the date after which the Debtors will no longer accept Gift Cards affords Customers ample opportunity to spend any remaining balances.

46.     The Debtors believe that, should they fail to honor their Customer Programs Obligations, they will be at a serious competitive disadvantage relative to their industry peers.  If the Customers perceive that the Debtors are unable or unwilling to honor their Customer Programs Obligations, the Debtors' goodwill and business relationships may erode. Prompt and regular payment and/or performance of the Customer Programs Obligations will avoid any unnecessary and disruptive actions.  Thus, even if the Debtors could avoid payment and/or performance of the Customer Programs Obligations, the collateral consequences on the Debtors' go-forward business would vastly exceed whatever modest short-run cost savings the Debtors might achieve.

47.     Courts in this district have granted similar relief in other chapter 11 cases.  *See*, *e.g.*, *In re Coach USA, Inc.*, No. 24-11258 (MFW) (Bankr. D. Del. July 9, 2024); *In re Number Holdings, Inc.*, No. 24-10719 (JKS) (Bankr. D. Del. May 6, 2024); *In re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. May 15, 2024); *In re Joann Inc.*, No. 24-10418 (CTG) (Bankr. D. Del. Mar. 19, 2024) *In re MVK FarmCo LLC*, No. 23-11721 (LSS) (Bankr. D. Del. Nov. 13, 2023); *In re PGX Holdings, Inc.*, No. 23-10718 (CTG) (Bankr. D. Del. July 19, 2023);

*In re Lannett Co., Inc.*, No. 23-10559 (JKS) (Bankr. D. Del. June 5, 2023); *In re Armstong Flooring, Inc.*, No. 22-10426 (MFW) (Bankr. D. Del. June 1, 2022).[13]

## II.     Certain Customer Programs Obligations May be Entitled to Priority Pursuant to Section 507 of the Bankruptcy Code.

48.     Certain Customers owed refunds on account of Customer Deposits may be entitled to priority treatment of their claims under section 507(a)(7) of the Bankruptcy Code, which establishes a priority for "unsecured claims of individuals, to the extent of $3,350 for each such individual, arising from the deposit, before the commencement of the case, of money in connection with the purchase, lease, or rental of property, or the purchase of services, . . . that were not delivered or provided." As such, qualifying payments, including but not limited to refunds on account of Customer Deposits, would be paid up to the amount of the statutory cap provided under section 507 of the Bankruptcy Code prior to the satisfaction of any general unsecured obligations of the Debtors.

## III.     Cause Exists to Authorize the Banks to Honor Checks and Electronic Fund Transfers.

49.     The Debtors anticipate having sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of access to cash on hand and anticipated access to debtor in possession financing. In addition, under the Debtors' existing cash management system, the Debtors can identify readily whether checks or wire transfer requests are payments authorized by the relief requested in this Motion. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently and that the Court should authorize the Banks, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfers in respect of the relief

---

[13]     Because of the voluminous nature of the orders cited herein, they are not attached to this Motion, but are available on request.

requested herein, to the extent the Debtors have sufficient funds on deposit in their accounts with such Banks, and such Banks may rely on the representations of the Debtors without any duty of further inquiry and without liability for following the Debtors' instructions.

**IV.    The Bankruptcy Court Should Authorize the Debtors to Serve the Customer Notice.**

50.    Section 105(a) of the Bankruptcy Code authorizes the Bankruptcy Court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of th[e Bankruptcy Code]. 11 U.S.C. § 105(a). In addition, Bankruptcy Rule 2002(m) specifically authorizes the Bankruptcy Court to "enter orders designating the matters in respect to which, the entity to whom, and the form and manner in which notices shall be sent . . ." Fed. R. Bankr. P. 2002(m).

51.    The Debtors submit that the proposed manner of providing notice to certain Customers via the Customer Notice is appropriate given the facts and circumstances of these Chapter 11 Cases. In particular, the Debtors believe such relief is appropriate to the extent the Court grants the Debtors authority to implement the Customer Programs Modifications and the relief requested in the Consolidated Creditors Motion and in light of (i) the exclusion of such Customers from the Creditor Matrix; (ii) the impossibility of giving individual notice to Customers for whom no physical or email address is available to the Debtors; (iii) the Debtors' belief that all key parties in interest wish to ensure continued Customer satisfaction; and (iv) the inclusion with the Customer Notice of a link to the Debtors' website, which will allow Customers to access additional information about the Debtors' stores and Customer Programs Modifications. This Court has previously authorized similar relief, which the Debtors submit is in the best interests of their estates and stakeholders. *See In re David's Bridal*, No. 18-12635 (LSS) (Bankr. D. Del. Nov. 20, 2018) (permitting the debtors to send an email to customers for whom the debtors had

email addresses notifying such customers of the commencement of the bankruptcy proceedings and the debtors' continued business operations).

## <u>IMMEDIATE AND UNSTAYED RELIEF IS NECESSARY</u>

52.     The Court may grant the relief requested in this Motion immediately if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003; *see also In re First NLC Fin. Servs., LLC*, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008) (holding that Rule 6003 permits entry of retention orders on an interim basis to avoid irreparable harm).  In the context of preliminary injunctions, the Third Circuit has interpreted the language "immediate and irreparable harm" to refer to a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages are inadequate. *See, e.g.*, *Norfolk S. Ry. Co. v. City of Pittsburgh*, 235 F. App'x 907, 910 (3d Cir. 2007) (citing *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)). The harm also must be actual and imminent, not speculative or unsubstantiated.  *See, e.g.*, *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653-55 (3d Cir. 1994).  The Debtors submit that, for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm.

53.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## **RESERVATION OF RIGHTS**

54.     Nothing in this Motion should be construed as (i) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (ii) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (iii) a promise to pay any claim or other obligation; (iv) granting third party beneficiary status or bestowing any additional rights on any third party; or (v) being otherwise enforceable by any third party.

## **NOTICE**

55.     Notice of this Motion will be given to: (i) the U.S. Trustee; (ii) the parties included on the Debtors' consolidated list of their thirty (30) largest unsecured creditors; (iii) the Internal Revenue Service; (iv) the Securities and Exchange Commission; (v) the Office of the United States Attorney for the District of Delaware; (vi) counsel to the DIP ABL Agent and the Prepetition ABL Agent; (vii) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (viii) all parties entitled to notice pursuant to Local Rules 2002-1(b) and 9013-1(m).  The Debtors submit that no other or further notice is required.

## **NO PRIOR REQUEST**

56.     No previous request for the relief sought therein has been made to this Court or any other court.


*[Remainder of Page Intentionally Left Blank]*

## **CONCLUSION**

The Debtors respectfully request that this Court enter the Proposed Orders, each substantially in the form attached hereto, granting the relief requested herein and such other and further relief as may be just and proper.

Dated: August 11, 2024
       Wilmington, Delaware

                                SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                                */s/ Joseph O. Larkin*
                                Joseph O. Larkin (I.D. No. 4883)
                                Jason M. Liberi (I.D. No. 4425)
                                One Rodney Square
                                920 N. King Street
                                Wilmington, Delaware 19801
                                Telephone: (302) 651-3000
                                Joseph.Larkin@skadden.com
                                Jason.Liberi@skadden.com

                                and

                                Lisa Laukitis (*pro hac vice* admission pending)
                                Shana A. Elberg (*pro hac vice* admission pending)
                                Elizabeth M. Downing (*pro hac vice* admission pending)
                                Angeline J. Hwang (*pro hac vice* admission pending)
                                One Manhattan West
                                New York, New York 10001
                                Telephone: (212) 735-3000
                                Lisa.Laukitis@skadden.com
                                Shana.Elberg@skadden.com
                                Elizabeth.Downing@skadden.com
                                Angeline.Hwang@skadden.com

                                *Proposed Counsel to Debtors and Debtors in Possession*

# EXHIBIT A

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|   |   |
|---|---|
| *In re* | **Chapter 11** |
| **LL FLOORING HOLDINGS, INC., *et al.*,** | **Case No. 24-11680 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

**INTERIM ORDER (I) AUTHORIZING DEBTORS
TO (A) HONOR CERTAIN PREPETITION OBLIGATIONS TO
CUSTOMERS AND (B) CONTINUE CERTAIN CUSTOMER PROGRAMS IN
THE ORDINARY COURSE OF BUSINESS; AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the Debtors for an interim order (this "Interim Order")

and a final order (i) authorizing the debtors to (a) honor certain prepetition obligations to customers

and (b) continue certain customer programs in the ordinary course of business; and (ii) granting

related relief, all as more fully set forth in the Motion; and the Court having jurisdiction over this

matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from

the United States District Court for the District of Delaware, dated February 29, 2012; and this

Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this

Court may enter a final order consistent with Article III of the United States Constitution; and this

Court having found that venue of this proceeding and the Motion in this district is proper pursuant

to 28 U.S.C. §§ 1408 and 1409; and due and sufficient notice of the Motion having been given

under the particular circumstances; and it appearing that no other or further notice is necessary;

---

[1]    The Debtors in these chapter 11 cases, along with the last four (4) digits of their respective tax identification numbers, are as follows: LL Flooring Holdings, Inc. (0817); LL Flooring, Inc. (9199); Lumber Liquidators Leasing, LLC (N/A); LL Flooring Services, LLC (5960); and Lumber Liquidators Foreign Holdings, LLC (4568). The address of the Debtors' corporate headquarters is 4901 Bakers Mill Lane, Richmond, VA 23230.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

and this Court having reviewed the Motion; and this Court having held a hearing to consider the relief requested in the Motion on an interim basis (the "Hearing"); and upon the First Day Declaration and the record of the Hearing; and all objections to the relief requested in the Motion on an interim basis, if any, having been withdrawn, resolved, or overruled; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003, and is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and upon all of the proceedings had before this Court; and after due deliberation thereon; and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is GRANTED on an interim basis as set forth herein.

2.      The Debtors are authorized, but not directed, to continue the Customer Programs in the ordinary course of business and without further order of this Court, and to perform and honor prepetition obligations in the ordinary course of business in an amount not to exceed $600,000 prior to the entry of a final order, and in the same manner and on the same basis as if the Debtors performed and honored such obligations prior to the Petition Date, in each case, subject to the Customer Programs Modifications.

3.      The Debtors are authorized, but not directed, to continue, renew, replace, modify, and/or terminate such of their Customer Programs as they deem appropriate, in their discretion, and in the ordinary course of business, without further application to the Court.

4.      For the first twenty-one (21) days from the date of this Interim Order, the Debtors shall continue to accept Gift Cards issued prior to the Petition Date in the ordinary course of

business.  After the expiration of such 21-day period to redeem Gift Cards, all such Gift Cards will no longer be accepted by the Debtors and shall be deemed to have no remaining value.  Notwithstanding any policy or state law to the contrary, the Gift Cards are not redeemable for cash at any time.

5.     All Banks are (i) authorized and directed to receive, process, honor, and pay any and all prepetition and postpetition checks, drafts, electronic transfers, and other forms of payment used by the Debtors to satisfy their Customer Programs Obligations, whether presented before, on, or after the Petition Date; *provided*, *that*, sufficient funds are on deposit in the applicable accounts to cover such payments; and (ii) prohibited from placing any holds on, or attempting to reverse, any transfers on account of Customer Programs Obligations.  The Banks shall rely on the direction and representations of the Debtors as to which checks and fund transfers should be honored and paid pursuant to this Interim Order, and no such Banks shall have any liability to any party for relying on such direction and representations by the Debtors are provided for in this Interim Order.

6.     Any party receiving payment from the Debtors is authorized and directed to rely upon the representations of the Debtors as to which payments are authorized by this Interim Order.

7.     To the extent the Debtors have not yet sought to remit payment on account of the Customer Programs, the Debtors are authorized, but not directed, to issue checks or provide for other means of payment on account of the Customer Programs.

8.     The Debtors are authorized to deliver the Customer Notice, the form of which is attached to the Motion as <u>Exhibit C</u> and is hereby approved, to applicable Customers for whom the Debtors have an email address and post the Customer Notice on their website.

9.     Notwithstanding anything to the contrary contained herein, any payment to be made hereunder, and any authorization contained herein, shall be subject to any interim and final orders,

as applicable, approving the use of such cash collateral and/or the Debtors' entry into any postpetition financing facilities or credit agreements, and any budgets in connection therewith governing any such postpetition financing and/or use of cash collateral (each such order, a "DIP Order"). To the extent there is any inconsistency between the terms of the DIP Order and any action taken or proposed to be taken hereunder, the terms of the DIP Order shall control.

10.      Nothing in the Motion or this Interim Order or the relief granted (including any actions taken or payments made by the Debtors pursuant thereto) shall be construed as (i) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (ii) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' or any other party in interest's ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (iii) a promise to pay any claim or other obligation; (iv) granting third party beneficiary status or bestowing any additional rights on any third party; or (v) being otherwise enforceable by any third party.

11.      The Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

12.      Notice of the Motion satisfies the requirements set forth in Bankruptcy Rule 6004(a).

13.      Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall be effective and enforceable immediately upon entry hereof.

14.      All time periods set forth in this Interim Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

15.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Interim Order.

16.     The final hearing on the Motion shall be held on [●] [●], 2024, at [●], prevailing Eastern Time.  Any objections or responses to the entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on [●] [●], 2024, and shall be served on: (i) LL Flooring Holdings, Inc., 4901 Bakers Mill Lane, Richmond, VA 23230 (Attn: Alice Givens, Esq. (agivens@llflooring.com)); (ii) proposed counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 920 North King Street, Wilmington, Delaware 19801 (Attn: Joseph O. Larkin,     Esq.     (joseph.larkin@skadden.com)     and     Jason     M.     Liberi,     Esq. (jason.liberi@skadden.com)) and One Manhattan West, New York, New York 10001 (Attn: Lisa Laukitis,     Esq.     (lisa.laukitis@skadden.com);     Elizabeth     M.     Downing,     Esq. (elizabeth.downing@skadden.com);     and     Angeline     J.     Hwang,     Esq. (angeline.hwang@skadden.com)); (iii) the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Rosa Sierra-Fox, Esq. (rosa.sierra-fox@usdoj.gov)); (iv) counsel to the DIP ABL Agent and the Prepetition ABL Agent, (a) Morgan Lewis & Bockius, LLP, One Federal Street, Boston, Massachusetts 02110, Attn: Christopher L. Carter (Christopher.carter@morganlewis.com) and (b) Reed Smith LLP, 1201 Market Street, Suite 1500, Wilmington, Delaware 19081, Attn: Kurt F. Gwynne, Esq. (KGwynne@ReedSmith.com); and (v) counsel to any statutory committee appointed in these Chapter 11 Cases.  If no objections or responses are filed and served, this Court may enter a final order without further notice or hearing.

17.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Interim Order.

**<u>EXHIBIT B</u>**

**Proposed Final Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | **Chapter 11** |
| **LL FLOORING HOLDINGS, INC.,** *et al.*, | **Case No. 24-11680 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

## FINAL ORDER (I) AUTHORIZING DEBTORS TO (A) HONOR CERTAIN PREPETITION OBLIGATIONS TO CUSTOMERS, AND (B) CONTINUE CERTAIN CUSTOMER PROGRAMS IN THE ORDINARY COURSE OF BUSINESS; AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the Debtors for an Interim Order and a final order (this "Final Order") (i) authorizing the debtors to (a) honor certain prepetition obligations to customers, and (b) continue certain customer programs in the ordinary course of business; and (ii) granting related relief, all as more fully set forth in the Motion; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and due and sufficient notice of the Motion having been given under the particular circumstances; and it appearing that no other or

---

[1]    The Debtors in these chapter 11 cases, along with the last four (4) digits of their respective tax identification numbers, are as follows: LL Flooring Holdings, Inc. (0817); LL Flooring, Inc. (9199); Lumber Liquidators Leasing, LLC (N/A); LL Flooring Services, LLC (5960); and Lumber Liquidators Foreign Holdings, LLC (4568).  The address of the Debtors' corporate headquarters is 4901 Bakers Mill Lane, Richmond, VA 23230.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

further notice is necessary; and this Court having reviewed the Motion; and this Court having held a hearing to consider the relief requested in the Motion on an interim basis and final basis (the "Hearings"); and upon the First Day Declaration and the record of the Hearings, and the Interim Order entered on [●] [●], 2024; and all objections to the relief requested in the Motion on a final basis, if any, having been withdrawn, resolved, or overruled; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and after due deliberation thereon; and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is GRANTED on a final basis as set forth herein.

2.      The Debtors are authorized, but not directed, to continue the Customer Programs in the ordinary course of business and without further order of this Court, and to perform and honor all prepetition obligations thereunder in the ordinary course of business, and in the same manner and on the same basis as if the Debtors performed and honored such obligations prior to the Petition Date, in each case, subject to the Customer Programs Modifications.

3.      The Debtors are authorized, but not directed, to continue, renew, replace, modify, and/or terminate such of their Customer Programs as they deem appropriate, in their discretion, and in the ordinary course of business, without further application to the Court.

4.      The Debtors shall no longer accept Gift Cards and all such Gift Cards are deemed to have no remaining value.  Notwithstanding any policy or state law to the contrary, the Gift Cards are not redeemable for cash at any time.

5.      All Banks are (i) authorized and directed to receive, process, honor, and pay any and all prepetition and postpetition checks, drafts, electronic transfers, and other forms of payment used by the Debtors to satisfy their Customer Programs Obligations, whether presented before, on, or after the Petition Date; *provided*, *that*, sufficient funds are on deposit in the applicable accounts to cover such payments; and (ii) prohibited from placing any holds on, or attempting to reverse, any transfers on account of Customer Programs Obligations.  The Banks shall rely on the direction and representations of the Debtors as to which checks and fund transfers should be honored and paid pursuant to this Final Order, and no such Banks shall have any liability to any party for relying on such direction and representations by the Debtors are provided for in this Final Order.

6.      To the extent the Debtors have not yet sought to remit payment on account of the Customer Programs, the Debtors are authorized, but not directed, to issue checks or provide for other means of payment of the Customer Programs.

7.      Any party receiving payment from the Debtors is authorized and directed to rely upon the representations of the Debtors as to which payments are authorized by this Final Order.

8.      Notwithstanding anything to the contrary contained herein, any payment to be made hereunder, and any authorization contained herein, shall be subject to any interim and final orders, as applicable, approving the use of such cash collateral and/or the Debtors' entry into any postpetition financing facilities or credit agreements, and any budgets in connection therewith governing any such postpetition financing and/or use of cash collateral (each such order, a "DIP Order"). To the extent there is any inconsistency between the terms of the DIP Order and any action taken or proposed to be taken hereunder, the terms of the DIP Order shall control.

9.      Nothing in the Motion or this Final Order or the relief granted (including any actions taken or payments made by the Debtors pursuant thereto) shall be construed as (i) authority

to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (ii) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' or any other party in interest's ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (iii) a promise to pay any claim or other obligation; (iv) granting third party beneficiary status or bestowing any additional rights on any third party; or (v) being otherwise enforceable by any third party.

10.    Notice of the Motion satisfies the requirements set forth in Bankruptcy Rule 6004(a).

11.    Notwithstanding Bankruptcy Rule 6004(h), this Final Order shall be effective and enforceable immediately upon entry hereof.

12.    All time periods set forth in this Final Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

13.    The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Final Order.

14.    This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Final Order.

**<u>Exhibit C</u>**

**Customer Notice**

[•], 2024

Dear Valued Customer,

As you are a valued customer to LL Flooring, I am writing with an important update on our business and the future of our company.

On August 11, 2024, we announced that LL Flooring initiated a voluntary court-supervised process under Chapter 11 of the U.S. Bankruptcy Code and we intend to use these proceedings to pursue a going-concern sale of our business.

In order to avoid any confusion or inaccuracy, I would like to share some important information:

First and foremost, **we are open for business**. While we recently announced plans to close 94 of our stores, LL Flooring has more than 300 stores that, along with our online platform, remain open and operating, and the Company remains focused on providing customers with outstanding hard and soft surface flooring and an exceptional shopping experience.

At our other locations, we intend to continue operating almost exactly as we did before, but please take note of a few **important policy changes**:

1. Orders placed before August 11, 2024 must be picked up by **September 11, 2024**.

2. New orders may be placed for products that are in stock in our stores or distribution centers. **We will no longer accept custom orders or orders for inventory that is not currently in stock**. All new orders must be picked up within **30 days**.

3. We will continue to accept gift cards at **all stores** until [•], 2024. **After [•], 2024, we will no longer accept gift cards**. Gift cards are not redeemable for cash.

The Chapter 11 process is a legal tool that will provide us with time and financial flexibility as we pursue a going concern sale of the business. The Company is engaged in discussions with potential buyers of the Company, and this process will allow us to evaluate binding bids through a court-supervised process in order to maximize value for all of our stakeholders, including our valued customers. While we don't have a definitive timeline to share, we intend to move through this process as quickly and efficiently as possible.

You can find an FAQ, which will help address some of the initial questions you may have, and additional information related to the court-supervised process on our restructuring website at www.LLFlooringRestructuring.com. We encourage you to check our restructuring website or our Company website at www.LLFlooring.com for a list of locations conducting store closing sales, as well as updates on store operations and sales policies.

On behalf of the entire team, we value your business and we appreciate you turning to LL Flooring for your flooring needs. We look forward to continuing to serve you.

Sincerely,

Charles Tyson
Chief Executive Officer