## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **LL FLOORING HOLDINGS, INC.,** *et al.*, | **Case No. 24-11680 (BLS)** |
| Debtors.[1] | **(Joint Administration Pending)** |

**MOTION OF DEBTORS FOR ENTRY
OF ORDERS (I) APPROVING (A) BIDDING
PROCEDURES, (B) FORM ASSET PURCHASE
AGREEMENT, (C) FORM AND MANNER OF NOTICE
OF SALE, AUCTION, AND SALE HEARING, AND (D) ASSUMPTION
AND ASSIGNMENT PROCEDURES; (II) SCHEDULING AUCTION AND
SALE HEARING; (III) APPROVING (A) SALE OF SUBSTANTIALLY ALL OF
DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND
ENCUMBRANCES, AND (B) ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF**

LL Flooring Holdings, Inc. ("LL Flooring") and its debtor subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, the "Company"), respectfully represent as follows in support of this motion (the "Motion"):[2]

## PRELIMINARY STATEMENT

1.       The Debtors commenced these voluntary cases (the "Chapter 11 Cases") to right-size their store footprint, raise incremental liquidity, and maximize the value of their estates for the benefit of their creditors through a sale of substantially all of their business (the "Business").

---

[1]    The Debtors in these chapter 11 cases, along with the last four (4) digits of their respective tax identification numbers, are as follows: LL Flooring Holdings, Inc. (0817); LL Flooring, Inc. (9199); Lumber Liquidators Leasing, LLC (N/A); LL Flooring Services, LLC (5960); and Lumber Liquidators Foreign Holdings, LLC (4568).  The address of the Debtors' corporate headquarters is 4901 Bakers Mill Lane, Richmond, VA 23230.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration and the Bidding Procedures, each as defined herein.

As further described herein, the Debtors and their advisors engaged in a robust and extensive prepetition marketing process (the "Prepetition Sale Process") to devise a transaction to preserve the going concern value of the Debtors' Business. The Debtors also spent several months attempting to resolve their liquidity issues by negotiating with prepetition lenders and seeking financing proposals from third parties in an attempt to refinance their existing funded debt obligations. The negotiations with prepetition lenders and third party financing proposals received did not result in an actionable proposal, and as a result, recognizing that an in-court restructuring solution provided them with the opportunity to continue operations while pursuing a value-maximizing transaction, the Debtors refocused the Prepetition Sale Process towards marketing and soliciting to parties who may serve as a stalking horse ("Stalking Horse Bidder") in connection with a going concern sale pursuant to section 363 of the Bankruptcy Code. The Debtors remain engaged in negotiations with multiple potential Stalking Horse Bidders and have thus commenced these Chapter 11 Cases to provide the Debtors with sufficient time and resources to allow interested parties to continue engaging with the Debtors, with the goal of finding a Stalking Horse Bidder in the first few weeks of these Chapter 11 Cases and ultimately paving a path forward for the sale of the Business for the benefit of all stakeholders. Further, the Debtors engaged in a separate comprehensive prepetition sale process for one of the Debtors' assets, the Sandston Distribution Center (defined below), and entered into a non-binding letter of intent, with an approximately $100 million purchase price for the facility, with a bidder (the "DC Bidder") prior to filing these Chapter 11 Cases. The Debtors are continuing negotiations with the DC Bidder with the goal of reaching definitive documentation and seeking approval from this Court for that transaction, potentially through a private sale motion to be filed in a few weeks. Recognizing their obligations to maximize value, however, the Debtors will not enter into a definitive purchase

agreement with the DC Bidder to the extent a Stalking Horse Bidder is interested in the Sandston Distribution Center and the Debtors believe that the sale to the Stalking Horse Bidder will lead to greater recovery for all stakeholders. The DC Bidder, well aware of this risk, has insisted on a breakup fee, which is also a subject of this Motion. With these goals in mind, the Debtors file this Motion to advance the sale process in order to secure the highest or otherwise best bid for the benefit of their estates.

2.      Building upon the Prepetition Sale Process and in an effort to maximize value for all stakeholders, the Debtors have developed postpetition marketing, bidding, and auction procedures (the "Postpetition Sale Process") for the orderly marketing and sale of the Business (the "Bidding Procedures"). The Bidding Procedures are designed to promote a competitive and robust bidding process to maximize value in the sale of the Business.

3.      The Bidding Procedures provide the Debtors with flexibility to solicit proposals, negotiate transactions, select a Stalking Horse Bidder, hold an auction, and proceed to consummate a sale transaction (a "Sale Transaction"), all while protecting the due process rights of all interested parties and ensuring that there is a full and fair opportunity to review and consider proposed transactions.

4.      The Debtors propose to establish the following key dates and deadlines for the sale process:[3]

| Key Event | Deadline |
|---|---|
| Deadline to enter into a Stalking Horse Agreement | **August 26, 2024 at 11:59 p.m. (prevailing Eastern Time)** |
| Bidding Procedures hearing | **August 29, 2024 at 10:00 a.m. (prevailing Eastern Time)** |

---

[3]   Capitalized terms used but not yet defined in this table of key dates shall have the meanings ascribed elsewhere in this motion or the referenced exhibits attached hereto, as applicable.

| Key Event | Deadline |
|---|---|
| Deadline to file objections to Sale Transaction, including any objection to the sale of the Business free and clear of liens, claims, encumbrances, and other interests | **September 5, 2024 at 4:00 p.m. (prevailing Eastern Time)** |
| Deadline to file objections to the proposed Cure Costs (as defined in the Cure Cost Notice), assumption and assignment of a Potential Assigned Contract, and to a lack of adequate assurance of the Stalking Horse Bidder's (if applicable) future performance | **September 5, 2024 at 4:00 p.m. (prevailing Eastern Time)** |
| Deadline to submit Bids | **September 9, 2024 at 4:00 p.m. (prevailing Eastern Time)** |
| Deadline to reply to objections to Sale Transaction | **September 11, 2024 at 12:00 p.m. (prevailing Eastern Time)** |
| Deadline for Debtors to notify bidders of status as Qualified Bidders | **September 11, 2024 at 4:00 p.m. (prevailing Eastern Time)** |
| Auction to be held if the Debtors receive more than one Qualified Bid | **September 12, 2024 at 10:00 a.m. (prevailing Eastern Time)** |
| Deadline to file notice identifying bidder who submitted highest or otherwise best bid as the Successful Bidder and the bidder who submitted the second highest or otherwise bid as the Back-Up Bidder | **September 13, 2024 at 10:00 a.m. (prevailing Eastern Time)** |
| Sale Hearing (subject to the Court's availability) | **September 16, 2024 at 10:00 a.m. (prevailing Eastern Time)** |
| Deadline to file objections to the identity of the Successful Bidder(s), adequate assurance of their future performance, or changes to the Stalking Horse Agreement | **September 16, 2024 at 10:00 a.m. (prevailing Eastern Time) (to be addressed at Sale Hearing** |

5.     The Debtors encourage interested parties to contact the Debtors' proposed investment banker prior to the proposed deadline to submit bids.  Given the state of the Debtors' operations and financial condition, it is vital that the Debtors consummate a sale in an efficient manner.  Accordingly, the Debtors request approval of the Bidding Procedures to facilitate a potential Sale Transaction in a timely and efficient manner.

## BACKGROUND

6.        On August 11 (the "Petition Date"), each Debtor commenced a case by filing a petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors have requested that these Chapter 11 Cases be jointly administered.

7.        The Debtors continue to operate the Business and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.        To date, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official creditors' committee (a "Committee") in the Chapter 11 Cases, nor has any trustee or examiner been appointed therein.

9.        The Company is one of North America's leading specialty retailers of flooring. The Company carries a wide range of hard-surface floors and carpets in a range of styles and designs, and primarily sells to consumers or flooring focused professionals.

10.        Additional factual background regarding the Company, including their business operations, corporate and capital structure, and the events leading up to the filing of the Chapter 11 Cases, is set forth in detail in the *Declaration of Holly Etlin in Support of Chapter 11 Petitions and First Day Papers* (the "First Day Declaration"), filed contemporaneously herewith and incorporated herein by reference.

## JURISDICTION

11.        This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these Chapter 11 Cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

12.     Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final judgment or order by the Court with respect to this Motion if it is later determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

**RELIEF REQUESTED**

13.     By this Motion, pursuant to sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014, and Local Rules 2002-1, 6004-1, and 9006-1, the Debtors seek the following:

(i)     entry of the "Bidding Procedures Order," substantially in the form attached hereto as **Exhibit A**:

(a)     authorizing and approving the Bidding Procedures substantially in the form attached to the Bidding Procedures Order as **Exhibit 1**;

(b)     setting the deadline for potential bidders (each a "Potential Bidder") to submit a proposal to purchase all or part of the Business (the "Bid Deadline"), authorizing and scheduling an auction (the "Auction"), and scheduling a hearing with respect to the approval of the proposed sale transaction (the "Sale Hearing");

(c)     authorizing and approving the form and manner of notice of the sale of the Business, the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "Sale Notice");

(d)     approving the procedures set forth in the Bidding Procedures Order (the "Assumption and Assignment Procedures") for the assumption and assignment of the Debtors' executory contracts and unexpired leases (the "Assigned Contracts") and the determination of the amount necessary to cure any defaults thereunder (the "Cure Costs");

(e)     authorizing and approving the form and manner of notice to each relevant non-Debtor counterparty to an executory contract or unexpired lease (collectively, the "Contract Counterparties") regarding the Debtors' potential assumption and assignment of

6

certain executory contracts and unexpired leases of the Debtors and of the Debtors' calculation of the Cure Costs, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "Cure Notice");

(ii)    approving certain procedures for the selection of a Stalking Horse Bidder (as defined below), bid protections for the Stalking Horse Bidder, if any, including a breakup fee of up to 3% (the "Breakup Fee") of the purchase price contemplated by the Stalking Horse Agreement (as defined below) if the Debtors determine, in their business judgment and in consultation with the Consultation Parties, that a Breakup Fee is appropriate, and the possibility of other Stalking Horse Bid Protections (as defined below);

(iii)    authorizing the Debtors to provide to the DC Bidder a breakup fee of 3% of the purchase price provided for in a validly executed DC Purchase Agreement, conditioned on entry into such DC Purchase Agreement, which shall be treated as a super priority administrative expense under section 503 of the Bankruptcy Code;

(iv)    approving a form of Asset Purchase Agreement, substantially in the form attached as **Exhibit 4** to the Bidding Procedures Order (the "Form APA");

(v)    entry of one or more orders (each, a "Sale Order") authorizing and approving the following:

(a)    a sale or sales of substantially all of the Business pursuant to section 363 of the Bankruptcy Code free and clear of all liens, claims, interests, and encumbrances, except certain permitted encumbrances as determined by the Debtors and any purchaser of the Business to the extent set forth in an asset purchase agreement, with liens to attach to the proceeds of such sale(s);

(b)    the assumption and assignment of the Assigned Contracts as set forth in an asset purchase agreement; and

(vi)    granting related relief.

## PREPETITION MARKETING PROCESS

14.    On November 18, 2022, the Company engaged J.P. Morgan Securities LLC ("JPM") as financial advisor to assist in its search for viable strategic investment initiatives and transactions, including potential sale transactions.  With JPM's assistance, throughout the fall of 2022 and early January 2023, the Company engaged with various interested parties, including

private equity sponsors and strategic buyers. The Company received various expressions of interest while working with JPM, but none ultimately resulted in a viable deal.

15.    In May 2023, the Company received an unsolicited, non-binding indication of interest ("IOI") from F9 Investments, LLC, an entity founded and controlled by the founder of LL Flooring. On August 14, 2023, in response to outreach from several parties expressing interest in a potential acquisition of the Company, LL Flooring publicly announced that it was exploring strategic alternatives, including a potential sale, merger, or other strategic transaction. Later that month, JPM initiated outreach to twenty-one (21) prospective buyers to gauge their interest in an acquisition of the Company. The Management Team and JPM engaged with multiple of these parties, including conducting management presentations and providing potential buyers with access to a confidential dataroom.

16.    As a result of these discussions, by October 2023, the Company had received three (3) IOIs, including a non-binding IOI from Live Ventures Incorporated ("Live Ventures"). Unfortunately, after actively engaging with the parties, all prospective bidders other than Live Ventures indicated that they did not wish to continue in the process. The discussions with Live Ventures also did not culminate in a transaction at the time due to Live Ventures' failure to demonstrate financial wherewithal for the proposed transaction. When no other actionable transactions materialized, the Company ultimately pivoted to focus on cost-saving initiatives and alternative transactions.

17.    In June 2024, recognizing that an in-court restructuring solution provided them with the ability to continue operations while continuing to negotiate terms for a potential Sale Transaction, the Debtors decided to refocus their efforts towards finding a Stalking Horse Bidder for a potential sale under section 363 of the Bankruptcy Code. In connection with the pivot, the

Debtors entered into an agreement with Houlihan Lokey ("Houlihan") to run a process specifically focused on finding potential Stalking Horse Bidders, and Houlihan began a renewed marketing and solicitation process geared towards potential Stalking Horse Bidders.  To date, Houlihan has contacted eighteen (18) potential buyers and two (2) parties have submitted proposals to acquire a substantial portion of the Company's operations.  The Company and Houlihan remain in active negotiations with these parties who may prove to be viable Stalking Horse Bidders for the Sale Transaction.

18.    Although the Debtors were unable to finalize negotiations and the selection of a stalking horse prepetition, the Debtors believe they nonetheless can achieve value for all stakeholders through a postpetition going concern sale process.  As such, the Debtors now seek the relief requested herein in order to commence a formal postpetition bidding process to ensure they can complete their sale process in a timely manner, with the ultimate goal of maximizing value for their estates and stakeholders.  The Debtors intend to identify a Stalking Horse Bidder, if any, by August 26, 2024, in advance of the hearing on this Motion.  The Stalking Horse Asset Purchase Agreement will be filed with the Court in advance of the hearing.  Under the terms of the Debtors' DIP ABL Facility, if a Stalking Horse is not identified by that date, the Debtors intend to pursue a liquidation process for all stores.

19.    *Sandston Distribution Center Marketing Process.*  In the first quarter of 2024, the Company engaged JLL Capital Markets ("JLL") to assist the Company in pursuing a transaction involving the Sandston Distribution Center in an effort to inject liquidity into the Company while it pursued other strategic options and in order to delay impending defaults under the Prepetition ABL Agreement.  After an extensive prepetition marketing process and competitive bidding process with multiple bidders for the Sandston Distribution Center, the Debtors entered into a

nonbinding letter of intent with the DC Bidder for approximately $100 million.  As part of that nonbinding letter of intent, the Debtors paid a prepetition $350,000 work fee to the DC Bidder and also agreed to seek authorization for a 3% break up fee (the "DC Breakup Fee") to be calculated based on the purchase price as set forth in a binding purchase agreement for the Sandston Distribution Center (the "DC Purchase Agreement").  Any of the following events shall give rise to the DC Breakup Fee (each, a "DC Breakup Fee Trigger Event"): (a) closing a transaction with an alternate buyer for the Sandston Distribution Center, whether as a standalone sale of the Sandston Distribution Center or the sale of the Sandston Distribution Center as part of a larger transaction to a buyer purchasing a portion or all of the Debtors' Business (a "DC Alternative Transaction"); (b) the Debtors elect to close a DC Alternative Transaction but fail to close either the DC Alternative Transaction or the transaction with the DC Bidder as the DC Back-Up Bidder (as defined below) by October 30, 2024; (c) an order is entered converting the Chapter 11 Cases to chapter 7; or (d) a termination event is triggered under the DC Purchase Agreement for breach of a customary representation or warranty, provided that, the Debtors agree to such breach or termination event being an additional trigger event for the DC Breakup Fee (and the Debtors shall have obtained the consent of the DIP ABL Agent (in the DIP Agent's sole discretion) to such additional trigger events) at the time the DC Purchase Agreement is executed.  Following the occurrence of a DC Breakup Fee Trigger Event, the DC Breakup Fee shall be payable (a) within (3) business days of the closing of a DC Alternative Transaction, or (b) following the DIP ABL Obligations and the Prepetition ABL Obligations being Paid in Full.

20.     Subject to the Debtors and the DC Bidder executing the DC Purchase Agreement, the DC Bidder has agreed to act as a back-up bidder at the purchase price in the DC Purchase Agreement in the event the Debtors identify a higher or otherwise better bid for a DC Alternative

Transaction (the "<u>DC Back-Up Bid</u>").  Subject to the Debtors and the DC Bidder executing the DC Purchase Agreement, the DC Back-Up Bid will remain open and irrevocable until the earliest to occur of (a) consummation of the DC Alternative Transaction; (b) October 30, 2024; and (c) release of the DC Back-Up Bid by the Debtors in writing.

21.     For the avoidance of doubt, the DC Bidder will not be entitled to a DC Breakup Fee unless the Debtors and the DC Bidder enter into a validly executed DC Purchase Agreement.  The DC Bidder indicated that the DC Breakup Fee was critical to its decision to enter into the nonbinding letter of intent and to finalize its diligence on the property and to continue negotiating the DC Purchase Agreement.  Given how extensively marketed the Sandston Distribution Center was and the bidding process that already occurred prepetition, the Debtors intend to seek approval of the DC Purchase Agreement at a later date, likely through a private sale motion, separate and apart from the Sale Transaction contemplated in this Motion.  That said, if a Stalking Horse Bidder comes forward that expresses an interest in the Sandston Distribution Center, the Debtors fully intend to pursue that broader transaction if it is likely to lead to greater value for the estates.  In large part recognizing that risk, the DC Bidder insisted upon the DC Breakup Fee that is a subject of this Motion (the approval of entry into a DC Purchase Agreement, if any, will be reserved for another day).  Even if the Debtors do not identify a Stalking Horse Bidder by August 26, 2024, which is the deadline to do so under the Case Milestones (as defined in the DIP Motion), the Debtors intend to move forward with the hearing on this Motion in order to obtain approval of the DC Breakup Fee.  The sale to the DC Bidder is even more critical to bringing in value for the Debtors estates if a going concern Sale Transaction for the full Business is not feasible.

## **NEED FOR A TIMELY SALE PROCESS**

22.     The Debtors believe that the time periods set forth in the Bidding Procedures are reasonable under the circumstances and will provide all parties with sufficient time and

information to submit a bid for all or part of the Business.  In formulating the Bidding Procedures and the time periods set forth therein, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest and Potential Bidders with the need to quickly and efficiently run a sale process with the Debtors' available liquidity to maximize value.  To that end, the Bidding Procedures are designed to encourage all prospective bidders to submit bids to provide the highest or otherwise best available recoveries to the Debtors' stakeholders.

23.     The Debtors' formulation of the Bidding Procedures was also informed by the Prepetition Marketing Process.  Potential Bidders have had, and will, in accordance with the Bidding Procedures, continue to have access to comprehensive information prepared by the Debtors and their advisors that is compiled in an electronic data room.  In light of the foregoing, the Debtors have determined that the Bidding Procedures will provide interested parties with sufficient opportunity to participate.

24.     Access to the postpetition DIP financing is also critical to the Debtors' ability to operate the Business during the sale process and pendency of these Chapter 11 Cases.  After extensive, arms'-length negotiations, the Debtors and the DIP ABL Agent (as defined in the First Day Declaration) agreed on certain Case Milestones, including certain Case Milestones applicable to the Bidding Procedures, sale process, and the sale of the Sandston Distribution Center.  The Case Milestones set forth in the DIP motion include:

(a)     on or before August 26, 2024, the Debtors shall have entered into a Stalking Horse Agreement;

(b)     on or before August 29, 2024, the Bankruptcy Court will have entered the Bidding Procedures Order;

(c)     in the event no Stalking Horse Bidder emerges by the August 26, 2024 deadline, on or before September 7, 2024, the Debtors shall have (i) entered into a binding purchase agreement, or other similar binding agreement, with respect to the Sandston Distribution Center

and (ii) filed a motion seeking approval of the transaction as described therein;

(d) on or before September 16, 2024, the Bankruptcy Court will have entered the Sale Order and/or an order approving the sale to the DC Bidder; and

(e) on or before September 30, 2024 the Debtors will have closed the Sale Transaction and/or the transaction with the DC Bidder.

25. Access to the DIP financing is critical to the Debtors' ability to continue their operations with minimal disruption on account of the commencement of their Chapter 11 Cases. Failure to adhere to the Case Milestones could jeopardize the Debtors' availability under the DIP Facility, and, in turn, compromise the sale process and the Debtors' ability to maximize recoveries for creditors. Accordingly, the Debtors request that the Court approve the relief requested herein in accordance with the Debtors' proposed timeline to ensure continued compliance with the DIP Facility.

## THE BIDDING PROCEDURES

### A. Overview

26. The Bidding Procedures are designed to promote a competitive and robust sale process for the Debtors' Business. If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from Potential Bidders, and to identify, in the exercise of their business judgment and with the consent of the DIP ABL Agent and the Prepetition ABL Agent, which bid constitutes the highest or otherwise best offers for all or parts of the Business on a timeline that is consistent with the Case Milestones (a "Successful Bid" and, the bidder submitting such bid, a "Successful Bidder"). The Debtors believe that the time periods set forth in the Bidding Procedures are reasonable and appropriate under the circumstances. Under the proposed timeline, there will be approximately thirty (30) days between the filing of this Motion and the Bid Deadline

(as defined in the Bidding Procedures). Although the Debtors and their advisors have been pursuing potential sales and other strategic transactions since November 2022 and have disseminated information to a number of parties during that time, any Potential Bidders who have not previously conducted diligence on the Business will have immediate access, subject to the execution of an appropriate confidentiality agreement, to a substantial body of information regarding the Debtors' assets, including information gathered based upon countless, specific due diligence requests of various prepetition bidders.

27.  The Bidding Procedures are attached to the Bidding Procedures Order and therefore are not restated herein in their entirety. The Debtors will have the ability to alter the Bidding Procedures based upon the exigencies of a given situation if the Debtors determine, in their business judgment, in a manner consistent with their fiduciary duties and applicable law, and in consultation with certain parties as provided in the Bidding Procedures. Pursuant to Local Rule 6004-1(c), certain of the key terms of the Bidding Procedures are highlighted in the chart below.[4]

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| **Provisions Governing Qualification of Bidders and Qualified Bids** <br> Local Rule 6004-1(c)(i)(A)-(B) | A. **Bid Deadline** – the deadline to submit a binding and irrevocable offer to acquire some or all of the Business (a "Bid") is September 9, 2024 at 4:00 p.m. prevailing Eastern Time. <br><br> B. **Potential Bidder Requirements** – To access the dataroom of the Debtors' material documents, parties must provide (parties who satisfy items 1 and 2 below, "Potential Bidders"): <br><br>   1. Confidentiality Agreement. An executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors (unless such party is already a party to an existing confidentiality agreement with the Debtors that is acceptable to the Debtors for this due diligence process, in which case such agreement will govern). <br><br>   2. Financial Wherewithal. Sufficient information, as reasonably determined by the Debtors, to allow the Debtors to determine that the interested party (i) has the financial wherewithal to consummate the applicable Sale |

---

[4]   To the extent that there are any inconsistencies between the terms of the Bidding Procedures and the summary of such terms in this Motion, the terms of the Bidding Procedures shall control. Capitalized terms used but not otherwise defined in the summary chart below shall have the meanings ascribed in the Bidding Procedures.

| **MATERIAL TERMS OF THE BIDDING PROCEDURES** |
| --- |

| | Transaction and (ii) intends to access the dataroom for a purpose consistent with the Bidding Procedures. |
| | C. **Qualified Bid Requirements** – The Debtors, in their reasonable judgment, will determine whether such bids may qualify as "Qualified Bids" (each bidder that submits such a Qualified Bid a "Qualified Bidder"). |

C. **Qualified Bid Requirements** – The Debtors, in their reasonable judgment, will determine whether such bids may qualify as "Qualified Bids" (each bidder that submits such a Qualified Bid a "Qualified Bidder").

1. Identity of Bidder. A Qualified Bid must fully disclose, the legal identity of each person or entity bidding or otherwise participating in connection with such Bid (including each equity holder or financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the proposed transaction(s) contemplated by such Bid), and the complete terms of any such participation, and must also disclose any connections or agreements with the Debtors, any other known Potential Bidder, Consultation Party (as defined in the Bidding Procedures) or Qualified Bidder, and/or any officer or director of the foregoing. Under no circumstances will any undisclosed principals, equity holders, or financial backers be associated with any Bid.

2. Acquired Property. A Qualified Bid must clearly identify in writing the particular assets the Potential Bidder seeks to acquire from the Debtors, which Qualified Bid may include less than all or substantially all of the Business.

3. Purchase Price. A Qualified Bid must specify the price (the "Purchase Price") proposed to be paid for the Business.

4. Assumed Liabilities. A Qualified Bid must clearly identify the particular liabilities, if any, the Bidder seeks to assume.

5. Form of Consideration. Each Bid must indicate (a) whether it is an all-cash offer (including confirmation that the cash component of the Bid is based in U.S. Dollars) or consists of certain non-cash components, such as the assumption of liabilities and (b) the allocation of the Purchase Price among the assets to be acquired and the liabilities to be assumed, if applicable.

6. Sandston Distribution Center[5]: A Qualified Bid must specify whether the Qualified Bidder intends to (i) purchase the Sandston Distribution Center, and/or (ii) enter into a lease for a certain period of time for all or a portion of the Sandston Distribution Center if the Sandston Distribution Center is sold to a third party.

7. Satisfy Funded Debt. A Qualified Bid's Purchase Price must include a cash component sufficient (in combination with the DC Bidder's Bid, to the extent the Potential Bidder's Bid does not include the purchase of the Sandston Distribution Center) to repay in full the "Obligations" under the Prepetition ABL Agreement and DIP ABL Obligations (and result in sufficient cash proceeds to permit the cash collateralization of all obligations relating to the letters of credit and contingent exposure). Provided, however, that the Debtors reserve the right to approve joint Bids that would satisfy the above conditions and are acceptable to the DIP ABL Agent.

---

[5]    The "Sandston Distribution Center" is that certain land and building, commonly known and numbered 6115 Engineered Wood Way, Sandston, VA 21350.

| **MATERIAL TERMS OF THE BIDDING PROCEDURES** |
|---|

8. <u>Joint Bids</u>. The Debtors will be authorized to approve joint Bids in their reasonable discretion on a case-by-case basis.

9. <u>Deposit</u>. A Qualified Bid must be accompanied by a good faith deposit in the form of cash in an amount equal to ten percent (10%) of the Purchase Price.

    a. To the extent a Qualified Bidder increases the Purchase Price before, during, or after the Auction, the Debtors reserve the right to require that such Qualified Bidder adjust its deposit so that it equals ten percent (10%) of the increased Purchase Price.

    b. Each Successful Bidder's deposit (if any) will be applied against the portion of the Purchase Price of its Successful Bid upon the consummation of the applicable Sale Transaction.

    c. A deposit of any Qualified Bidder will be forfeited to the Debtors if (a) the Qualified Bidder attempts to modify, amend, or withdraw its Qualified Bid, except as permitted herein or with the Debtors' written consent, during the time the Qualified Bid remains binding and irrevocable or (b) the Qualified Bidder is selected as a Successful Bidder and fails to enter into the required definitive documentation or to consummate the applicable Sale Transaction in accordance with the Bidding Procedures.

10. <u>Proposed Asset Purchase Agreement</u>. A Qualified Bid must include, in both PDF and MS-WORD format, an executed purchase agreement (the "<u>Proposed Purchase Agreement</u>"), together with a copy of the same that has been marked against the Form APA provided to prospective bidders.

11. <u>Employee and Labor Obligations</u>. Each Bid must include a statement of proposed terms for employees of the Debtors and the population of which employees the Qualified Bidder intends to hire.

12. <u>Designation of Contracts and Leases</u>. A Qualified Bid must identify with particularity each executory contract and unexpired lease, the assumption and assignment of which is a condition to closing the applicable Sale Transaction.

13. <u>Financial Information</u>. A Qualified Bid must include the following:

    a. A Qualified Bid must contain such financial and other information that allows the Debtors to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the applicable Sale Transaction, including:

        (i) without limitation, such financial and other information setting forth the Potential Bidder's willingness to perform under any contracts that are assumed and assigned to such party,

        (ii) current financial statements or similar financial information certified to be true and correct as of the date thereof,

        (iii) proof of financing commitments (if needed) to close the applicable Sale Transaction (not subject to, in the Debtors' sole discretion, any unreasonable conditions),

        (iv) contact information for verification of such information, including any financing sources, and

| **MATERIAL TERMS OF THE BIDDING PROCEDURES** |
|---|

|  | (v)  any other information reasonably requested by the Debtors necessary to demonstrate that the Potential Bidder has the ability to close the applicable Sale Transaction in a timely manner. |

14. <u>Representations and Warranties</u>.  A Qualified Bid must include the following representations and warranties:

   a.  Statement that the Potential Bidder had an opportunity to conduct all due diligence regarding the Business prior to submitting bid,

   b.  Statement that the Potential Bidder relied solely upon its own due diligence in making its bid,

   c.  Statement that the Potential Bidder agrees to serve as Back-Up Bidder, if its bid is selected as the second highest or otherwise best bid after the Successful Bid with respect to the Business,

   d.  Statement that the Potential Bidder has not engaged in any collusion with respect to the submission of its bid,

   e.  Statement that all proof of financial ability to consummate the applicable Sale Transaction in a timely manner and all information provided to support adequate assurance of future performance is true and correct, and

   f.  Statement that the Potential Bidder agrees to be bound by the terms of the Bidding Procedures.

15. <u>Required Approvals</u>.

   a.  If applicable, a statement that the Potential Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and pay any related fees.

   b.  If applicable, explanation or evidence of Potential Bidder's plan and ability to obtain all governmental and regulatory approvals to operate or own the Business, including, an explanation from the bidder's legal counsel to the Debtors' legal counsel such Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Proposed Purchase Agreement.

   c.  Bid is reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors in consultation with the professionals to the Committee.

16. <u>Authorization</u>.  A Qualified Bid must include evidence of corporate authorization with respect to the submission, execution, and delivery of a Bid, participation in the Auction, and closing the Sale Transaction(s) contemplated by the applicable Proposed Purchase Agreement.

17. <u>Other Requirements</u>.

   a.  A Qualified Bidder must agree to serve as a Back-Up Bidder if such bidder's Qualified Bid is selected as the second highest or otherwise best bid after the Successful Bid with respect to the Business.

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | b. A Qualified Bid must be binding, unconditional, and irrevocable until the first business day following the close of any Sale Transaction(s) with the Successful Bidder(s) for the Business. |
| | c. Statement that the Bid does not entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement, and a waiver of any substantial contribution administrative expense claims under section 503(b) of the Bankruptcy Code related to the bidding process. |
| | d. Provide contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the Bid submitted by the Potential Bidder. |
| | e. Written evidence of available cash, a commitment for financing (not subject to any conditions other than those expressly set forth in the Proposed Purchase Agreement) and such other evidence of ability to consummate the transaction contemplated by the Proposed Purchase Agreement, the Bidding Procedures Order, and the Bidding Procedures, as acceptable in the Debtors' business judgment. |
| | f. Provide the identity of each entity that will be participating in connection with such Bid and taking ownership of the Business and a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed and to consummate the transaction contemplated by the Proposed Purchase Agreement |
| | g. Covenant to cooperate with the Debtors to provide pertinent factual information regarding the Potential Bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements. |
| | h. Detailed analysis of the value of any non-cash component of the Bid, if any, and back-up documentation to support such value. |
| **Provisions Providing Bid Protections to "Stalking Horse," or Initial Bidder** Local Rule 6004-1(c)(i)(C) | 1. The Debtors and their advisors are engaged in negotiations with one or more potential Stalking Horse Bidders for the Business. To that end, in the event that the Debtors enter into an asset purchase agreement with a Stalking Horse Bidder (each, a "Stalking Horse Agreement"), the Debtors shall be authorized, upon entry of the Bidding Procedures Order, to (i) deem such Stalking Horse Agreement a Qualified Bid; (ii) designate such Stalking Horse Agreement as a baseline bid (a "Stalking Horse Bid"); (iii) provide such Stalking Horse Bidder a break-up fee not to exceed 3% of the Purchase Price set forth in the Stalking Horse Agreement (the "Breakup Fee"); (iv) provide such Stalking Horse Bidder an expense reimbursement (an "Expense Reimbursement" and together with the Breakup Fee, the "Stalking Horse Bid Protections"). |
| | 2. To the extent the Debtors enter into one or more Stalking Horse Agreements prior to the hearing on entry of the Bidding Procedures Order, the Debtors will (i) file a copy of the Stalking Horse Agreement, (ii) include a summary thereof in accordance with Local Rule 6004-1(b), and (iii) seek approval of the Stalking Horse Agreement and Stalking Horse Bid Protections at the Bidding Procedures hearing. |

| **MATERIAL TERMS OF THE BIDDING PROCEDURES** | |
|---|---|
| | 3. <u>DC Breakup Fee</u>. Following the occurrence of both the entry of the Bidding Procedures Order, and entry into a DC Purchase Agreement, the Debtors are authorized to provide the DC Breakup Fee to the DC Bidder equal to three percent (3%) of the purchase price set forth in the DC Purchase Agreement which shall accrue upon the occurrence of a DC Breakup Fee Trigger Event. |
| **Modification of Bidding and Auction Procedures** Local Rule 6004-1(c)(i)(D) | 1. The Debtors may extend the Bid Deadline or otherwise extend the timelines provided in the Bidding Procedures without further order of the Bankruptcy Court, after consultation with the Consultation Parties; *provided, however,* that any such extensions will be subject to the consent of the DIP ABL Agent. |
| | 2. The Debtors reserve the right to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualified Bid. |
| | 3. The Debtors may, in consultation with the Consultation Parties, announce at the relevant Auction additional procedural rules (*e.g.*, the amount of time to make subsequent bids, the amount of the incremental overbid, or the requirement that parties submit "best and final" Bids) for conducting the Auction or otherwise modify the Bidding Procedures; *provided that* such rules (1) are not materially inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Court, and (2) disclosed to each Qualified Bidder at the Auction. |
| | 4. The Sale Hearing may be adjourned or continued to a later date by the Debtors, after consultation with the Consultation Parties, by sending notice prior to or making an announcement at the Sale Hearing. No further notice of such adjournment or continuance will be required to be provided to any party. |
| | 5. The Debtors may elect to seek approval of a Sale Transaction in advance of the Sale Hearing. To the extent the Debtors determine to do so, notice will be provided for alternative hearing dates and related timelines. |
| **Closing with Alternative Back-Up Bidders** Local Rule 6004-1(c)(i)(E) | 1. The Debtors may identify which Qualified Bid(s) constitute the second highest or otherwise best bid(s) and deem such second or otherwise best bid a back-up bid (a "<u>Back-Up Bid</u>," and the bidder submitting such Bid, a "<u>Back-Up Bidder</u>"). |
| | 2. Back-Up Bid(s) will remain open and irrevocable until the earliest to occur of: |
| |     a. applicable "outside date" for consummation of the Sale Transaction set forth in the Back-Up Bid, |
| |     b. consummation of the Sale Transaction with a Successful Bidder, and |
| |     c. release of such Back-Up Bid by the Debtors in writing (such date, the "<u>Back-Up Bid Expiration Date</u>"). |
| | 3. If a Sale Transaction with a Successful Bidder is terminated prior to the Back-Up Bid Expiration Date, the Back-Up Bidder will be deemed a Successful Bidder and will be obligated to consummate the Back-Up Bid as if it were a Successful Bid. |
| | 4. Subject to the Debtors and the DC Bidder executing the DC Purchase Agreement, the DC Bidder has agreed to act as a back-up bidder in the event |

| **MATERIAL TERMS OF THE BIDDING PROCEDURES** | |
|---|---|
| | the Debtors identify a higher or otherwise better bid for a DC Alternative Transaction (the "DC Back-Up Bid").  Subject to the Debtors and the DC Bidder executing the DC Purchase Agreement, the DC Back-Up Bid will remain open and irrevocable until the earliest to occur of (a) consummation of the DC Alternative Transaction; (b) October 30, 2024; and (c) release of the DC Back-Up Bid by the Debtors in writing. |
| **Provisions Governing the Auction** Local Rule 6004-1(c)(ii) | 1.  If the Debtors select a Stalking Horse Agreement and do not receive any Qualified Bids (other than the Stalking Horse Bid) for the Business on the same or better terms as provided in the Stalking Horse Bid by the Bid Deadline, the Debtors will not conduct the Auction and will file a notice with the Bankruptcy Court indicating that the Auction has been cancelled. The Debtors will also publish such notice on the website of their claims and noticing agent, Stretto.  If no other Qualified Bid is received, but a Stalking Horse Agreement is entered into, the Stalking Horse Bidder will be deemed the Successful Bidder and the Stalking Horse Bid will be deemed a Successful Bid. 2.  If the Debtors receive any Qualified Bids (other than the Stalking Horse Bid), the Debtors will conduct the Auction on September 12, 2024 beginning at 10:00 a.m. (prevailing Eastern Time), or such other date as may be determined by the Debtors in consultation with the Consultation Parties either (i) at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, One Manhattan West, 395 9th Ave, New York, NY 10001, or (ii) virtually pursuant to procedures to be timely filed on the Bankruptcy Court's docket.  The Auction will be conducted openly and will be transcribed or recorded. **Participants and Attendees:** A.  Only Qualified Bidders will be eligible to participate in the Auction. B.  Professionals and/or other representatives of the Debtors and of any the Committee will be permitted to attend and observe the Auction. C.  Qualified Bidder(s) must confirm on record that they have not engaged in any collusion and that its Qualified Bid represents a binding, good faith, bona fide offer. **Auction Procedures:** A.  Open Auction.  The Auction will be transcribed or recorded. B.  Baseline Bids.  Bidding for the Business will start with the highest or otherwise best Purchase Price and/or terms received as determined by the Debtors in their sole discretion. C.  Minimum Overbid.  Bidding increments will begin in the amount of $1,000,000 (the "Minimum Overbid Amount").  The Debtors have the right to increase or decrease the Minimum Overbid Amount at any time during the Auction. D.  Disclosure of Bids.  All material terms of each Qualified Bid submitted in response to any successive bids made at the Auction will be disclosed to all other bidders. |

## ASSUMPTION AND ASSIGNMENT PROCEDURES

28.     The Debtors also seek approval of the Assumption and Assignment Procedures to facilitate the fair and orderly assumption, assumption and assignment, or rejection of certain contracts and leases as may be designated in the Stalking Horse Agreement or any other Successful Bid.  The Assumption and Assignment Procedures are set forth in the Cure Notice attached to the Bidding Procedures Order as **Exhibit 3**.

## APPROVAL OF THE RELIEF REQUESTED IS WARRANTED AND IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ECONOMIC STAKEHOLDERS

### A.     The Bidding Procedures are Fair and Reasonable

29.     The Bidding Procedures are designed to promote the paramount goal of any proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by the estate.  *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor had fiduciary duty to maximize and protect value of estate's assets); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (recognizing that main goal of any proposed sale of property of a debtor's estate is to maximize value).  Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing value of a debtor's estate.  *See Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.),* 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *Off. Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that sale procedures "encourage bidding and . . . maximize the value of the debtor's assets").

30.     The Bidding Procedures provide for an orderly, uniform, and competitive process through which interested parties may submit offers to purchase the Business.  The Debtors, with

the assistance of their advisors, have structured the Bidding Procedures to promote active bidding by interested parties and to reach the highest or otherwise best offer reasonably available for the Business. Additionally, the Bidding Procedures will allow the Debtors to conduct the Auction, if necessary, in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to timely consummate a Sale Transaction. The Bidding Procedures provide the Debtors with an adequate opportunity to consider competing bids and to select the highest or otherwise best offers for the completion of a Sale Transaction.

31. Moreover, an orderly and expeditious sale process is critical to preserve and realize the Debtors' going concern value and maximize recoveries for the Debtors' stakeholders. In formulating the Bidding Procedures, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest and potential bidders with the need to quickly and efficiently run a sale process. Courts in this jurisdiction have recently approved similar sale and auction timelines to those proposed in this Motion. *See, e.g., In re Sunpower Corporation*, Case No. 24-11649 (CTG) (Bankr. Del. Aug. 7, 2024) [Docket No. 91] (interim cash collateral order) (timeline provided for approval of bidding procedures order within 28 days of the petition date, an auction within 36 days of the petition date, and entry of the sale order within 44 days after the petition date)

32. The Debtors submit that the proposed Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved by this Court. *See, e.g., In re SIO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Apr. 25, 2023); In re Lucira Health, Inc., No. 23-10242 (MFW) (Bankr. D. Del. Mar. 27, 2023); *In re Performance Powersports Group Holdings, Inc.*, No. 23-10047 (LSS)

(Bankr. D. Del. Feb. 27, 2023); *In re Alex & Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del. Jul. 16, 2021); *In re Bluestem Brands, Inc.*, No. 20-10566 (MFW) (Bankr. D. Del. Jun. 3, 2020).

**B.**     **The Stalking Horse Bid Protections and the DC Bid Protections Should Be Approved.**

33.     In the event the Debtors select a Stalking Horse Bidder or enter into the DC Purchase Agreement with the DC Bidder, the Debtors seek authority but not direction to offer customary bid protections to any selected Stalking Horse Bidder and the DC Bidder, including breakup fees of up to 3% and/or expense reimbursements.[6]  The use of a stalking horse or other initial bidder's terms at a public auction process for the sale of a debtor's assets is a customary practice in chapter 11 cases, as the use of baseline bids for some or all of a debtor's assets is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and [facilitating] a realization of that value." *Off. Comm. Of Unsecured Creditors v. Interform Holding LLC,* No. 11-CV-219, 2011 WL 2671254, No. 11-129, *1 (E.D. Wis. July 7, 2011).

34.     Generally, bid protections, such as breakup fees, are a normal and, in many cases, necessary component of significant sales under the Bankruptcy Code.  *See Integrated Res*., 147 B.R. at 659–60 ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets. . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize value.").  As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate.  *See In re Energy Future Holdings*

---

[6]     The DC Bidder already received a work fee prior to filing so the relief being sought in this Motion for the DC Bidder solely relates to a 3% breakup fee based on the purchase price of a validly executed DC Purchase Agreement filed with the Court which was specifically requested by the DC Bidder before filing to protect it against the risk of a DC Alternative Transaction.

*Corp.*, 904 F.3d 298 (3d Cir. 2018) (holding that "[T]he allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees [a]re actually necessary to preserve the value of the estate.") (internal quotations omitted) (alterations in original); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010); *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999). The Debtors believe that the allowance of the Stalking Horse Bid Protections is in the best interests of their estates and their creditors. The Debtors will only select and approve bid protections for a Stalking Horse Bidder to the extent that the Debtors, in their business judgment and in consultation with the Consultation Parties, believe that the Stalking Horse Agreement or DC Purchase Agreement will add significant value to their estate by establishing a floor for further bidding that may increase the consideration given in exchange for some or all of the Business.

35.     In the Third Circuit, bidding protections, such as those proposed here, are subject to the general standard used for administrative expenses under section 503 of the Bankruptcy Code. *Energy Future*, 904 F.3d at 313 (citing *O'Brien*, 181 F.3d at 535); *Reliant Energy*, 594 F.3d at 206 (holding that the general standard used for all administrative expenses applies to breakup fees). Thus, "the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Reliant Energy*, 594 F.3d at 206 (internal quotations omitted) (quoting *O'Brien*, 181 F.3d at 535).

36.     The Debtors propose to pay the Stalking Horse Bid Protections and/or the DC Bid Protections only if the Debtors determine after good faith, arm's-length negotiations, and in consultation with the Consultation Parties, that providing such bid protections would be necessary and beneficial for their estates. Courts have routinely approved breakup fees and/or expense

reimbursements offered to stalking horse bidders or other initial bidders. *See, e.g., In re Things Remembered, Inc*., Case No 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019) (authorizing stalking horse break-up fee and expense reimbursement); *In re Haggen Holdings, LLC*, No. 15- 11874 (KG) (Bankr. D. Del. Oct. 19, 2015) (same); *In re AgFeed USA*, LLC, No. 13-11761 (BLS) (Bankr. D. Del. Aug. 1, 2013) (authorizing breakup fee of 3% and expense reimbursement of 1%); *In re Solyndra LLC*, No. 11-12799 (MFW) (Bankr. D. Del. Sept. 28, 2012) (authorizing break-up fee of 2.6%); *In re AES Thames, L.L.C.*, No. 11-10334 (KJC) (Bankr. D. Del. Nov. 16, 2011) (authorizing a break-up fee of $300,000 in the event the debtor entered into a stalking horse purchase agreement with a purchase price of at least $10 million); *In re Magic Brands, LLC*, No. 10-11310 (BLS) (Bankr. D. Del. May 18, 2010) (authorizing stalking horse expense reimbursement). Without the Stalking Horse Bid Protections or DC Bid Protections, a potential bidder may elect not to participate in the process at all to the detriment of the Debtors' estates.

37.    Importantly, the Bidding Procedures do not require the payment of the Stalking Horse Bid Protections or DC Bid Protections. Rather, the Debtors have the option of paying or otherwise incurring such obligations in the event that offering such Stalking Bid Protections is necessary to foster a competitive bidding process that will maximize the value of the Debtors' estates. In that instance, the value created for the Debtors' estates will likely greatly outweigh the cost of any Stalking Horse or DC Bidder's protections. In any case, granting the Debtors authority to offer the bid protections to the Stalking Horse or DC Bidder(s) sends a strong signal to the market that the Debtors are serious about running a competitive sale process to generate the best result for the Debtors and their stakeholders.

38.    Accordingly, for the reasons set forth above, the Debtors respectfully request that the Court grant the Debtors the authority, but not direction, to incur and pay the Stalking Horse

Bid Protections or the DC Bid Protections to preserve the value of the Debtors' estates. In order to provide full transparency for the sale process, in the event the Debtors appoint a Stalking Horse Bidder and/or enter into a DC Purchase Agreement with the DC Bidder, the Debtors will file a notice on the docket identifying the proposed buyer and the Stalking Horse Bid Protections offered and the DC Purchase Agreement and DC Breakup Fee respectively.

## C.     Assumption and Assignment of Assigned Contracts Should be Approved

39.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code. *See, e.g.*, *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); *In re HQ Glob. Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject executory contract is governed by business judgment standard and may only be overturned if decision is product of bad faith, whim, or caprice). The "business judgment" test in this context only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (citing *In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. 845 (Bankr. W.D. Pa. 1987)).

40.     The assumption of the Assigned Contracts in connection with a Sale Transaction is an exercise of the Debtors' sound business judgment because the Assigned Contracts are necessary to operate the Business and, as such, are essential to obtaining the highest or otherwise best offer for the Business. Further, any Stalking Horse Agreement and any marked copy of the Form APA

submitted by a Potential Bidder will likely provide that the assumption and assignment of the Assigned Contracts is integral to, and inextricably integrated in, a proposed Sale Transaction. Moreover, the Assigned Contracts will be assumed and assigned in accordance with the Assumption and Assignment Procedures approved by the Court pursuant to the Bidding Procedures Order, which will be reviewed by the Debtors' key stakeholders. Accordingly, the Debtors' assumption of the Assigned Contracts is an exercise of sound business judgment and should be approved.

41.     The consummation of a Sale Transaction, which will involve the assignment of the Assigned Contracts, will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code. Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assigned Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured. As set forth above, the Debtors propose to file with the Court and serve on each Contract Counterparty, the Cure Notice indicating the Debtors' calculation of the Cure Cost for each such contract. Further, any Stalking Horse Agreement and any marked copy of the Form APA submitted by Potential Bidder will require that the Debtors cure all defaults associated with, or that are required to properly assume, any Assigned Contracts. The Contract Counterparties will have the opportunity to file objections to the proposed assumption and assignment of the Assigned Contracts to the Successful Bidder, including the proposed Cure Costs.

42.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property only if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2)(B). The meaning of "adequate assurance of future performance" depends on the facts

and circumstances of each case but should be given "practical, pragmatic construction." *Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

43.     As set forth in the Bidding Procedures, for a bid to qualify as a Qualified Bid a Potential Bidder must provide information regarding its ability (and the ability of its designated assignee, if applicable) to perform under the Potential Assigned Contracts (the "Adequate Assurance Information").  The Debtors will provide Adequate Assurance Information to all counterparties to the Potential Assigned Contracts and counterparties will have an opportunity to file an adequate assurance objection (a Cure Objection or an Auction Results Objection, as applicable) in advance of the Sale Hearing.  Based on the foregoing, the Debtors' assumption and assignment of the Assigned Contracts satisfy the requirements under section 365 of the Bankruptcy Code and should be approved.

44.     In addition, to facilitate the assumption and assignment of the Assigned Contracts, the Debtors further request that the Court find that all anti-assignment provisions in the Potential Assigned Contracts, whether such provisions expressly prohibit or have the effect of restricting or

limiting assignment of such contract or lease, to be unenforceable under section 365(f) of the Bankruptcy Code.[7]

D.   **The Proposed Sale**

45.   Ample authority exists for approval of a Sale Transaction. Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts routinely authorize a sale of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *Off. Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

46.   Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (i) whether a sound business justification exists for the sale; (ii) whether adequate and reasonable notice of the sale was provided to interested parties; (iii) whether the sale will produce a fair and reasonable price for the property; and (iv) and whether the parties have

---

[7]   Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease[.]" 11 U.S.C. § 365(f)(1). Section 365(f)(3) further provides that, "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

acted in good faith. *See In re Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at *2 (D.

Del. May 20, 2002) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)). Where

a debtor demonstrates a valid business justification for a decision, it is presumed that "in making

a business decision the directors of a corporation acted on an informed basis, in good faith and in

the honest belief that the action taken was in the best interests of the company." *Off. Comm. of

Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656

(S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

### (a)    Debtors Have Demonstrated a Sound Business Justification for the Proposed Sale

47.    A sound business purpose for the sale of a debtor's assets outside the ordinary

course of business exists where such sale is necessary to preserve the value of the estate for the

benefit of creditors and interest holders. *See, e.g., In re Lionel*, 722 F.2d at 1071; *see also In re

Food Barn Stores*, 107 F.3d at 565 (recognizing that paramount goal of any proposed sale of

property of estate is to maximize value).

48.    A strong business justification exits for the proposed Sale Transaction. An orderly

but expeditious sale of the Business is critical to both preserving and realizing the Company's

going-concern value and maximizing recovery for the Debtors' economic stakeholders.

### (b)    The Proposed Sale Process is Designed to Produce a Fair and Reasonable Purchase Price for the Assets

49.    As set forth above, the Bidding Procedures were carefully designed to ensure that

the Auction, if necessary, will yield the maximum value for the Debtors' estates and creditors. The

Bidding Procedures allow all parties in interest an opportunity to conduct in-depth diligence. The

Bidding Procedures also provide an appropriate framework for the Debtors to review, analyze, and

compare all bids received to determine which bids are in the best interests of the Debtors and their

economic stakeholders.  The Bidding Procedures clearly set forth the participation requirements for Qualified Bidders and bid requirements for Qualified Bids.  In addition, the Bidding Procedures are prudently designed to stimulate bidding on the Business.  Finally, compliance with the Bidding Procedures and the Bidding Procedures Order will provide a basis for the Court to find that no Sale Transaction constitutes a fraudulent transfer because the purchase price represents reasonably equivalent value and is fair and reasonable.

>           **(c)      The Bidding Procedures Ensure that the Proposed Sale Transaction Will Be Consummated in Good Faith**

50.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) fosters the "'policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely.'" *In re Abbotts Dairies of Pa.*, 788 F.2d at 147; *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal.").

51.    Further, as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process to allow the Debtors to obtain the highest or otherwise best offer for the sale of the Business.  Any sale agreement, Stalking Horse Agreement or Form APA, or any marked versions thereof, would be a good-faith, arms'-length agreement entitled to

31

the protections of section 363(m) of the Bankruptcy Code.[8]   Accordingly, the Debtors seek a finding that each Successful Bidder at the Auction is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

52.     In light of the foregoing, the Debtors have demonstrated that the Sale Transaction (or higher or better bids) is a sound exercise of the Debtors' business judgment and should be approved.

### E.     Sale Free and Clear of Liens, Claims, Interests, and Encumbrances

53.     In the interest of attracting the best offers, the Business should be sold free and clear of any and all liens, claims, interests, and encumbrances in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, interests, and encumbrances attaching to the proceeds of the Sale Transaction.   Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if any one of the following conditions is satisfied:

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

---

[8]     The Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder.  Pursuant to the Bidding Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bidding Procedures.  In addition, the Debtors will not choose as the Successful Bidder or Back-Up Bidder any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

54.      The Debtors submit that the sale of the Business free and clear of liens, claims, interests, and encumbrances will satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code.  Any lien holder will be adequately protected by having its lien attach to the proceeds of the Sale Transaction, subject to any claims and defenses that the Debtors may have with respect thereto.  Accordingly, the Debtors request that the Court authorize the Debtors to sell the Business free and clear of any liens, claims, interests, and encumbrances in accordance with section 363(f) of the Bankruptcy Code.

## **WAIVER OF BANKRUPTCY RULES 6004(h) 6006(d)**

55.      The Debtors request waivers of the fourteen-day stay requirements under Bankruptcy Rules 6004(h) and 6006(d).  The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Fed. R. Bankr. P. 6004(h) (Former subdivision (g) redesignated as subdivision (h)) Advisory Committee's note to 1999 Amendment and Fed. R. Bankr. P. 6006(d) Advisory Committee's note to 1999 Amendment.  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 *Collier on Bankruptcy* ¶ 6004.11 (16th ed. 2024).

Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*  Further, delays in closing a Sale Transaction could risk the Debtors defaulting under the DIP Facility.

56.     To maximize the value received for their estates, the Debtors seek to close the Sale Transaction as soon as possible after the Sale Hearing.  Accordingly, the Debtors request the Sale Order approving the Sale Transaction be effective immediately upon entry of such order and that the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such stay applies.

## RESERVATION OF RIGHTS

57.     Nothing in this Motion should be construed as (i) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (ii) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (iii) a promise to pay any claim or other obligation; (iv) granting third party beneficiary status or bestowing any additional rights on any third party; or (v) being otherwise enforceable by any third party.

## NOTICE

58.     Notice of this Motion will be given to: (i) the U.S. Trustee; (ii) the parties included on the Debtors' consolidated list of their thirty (30) largest unsecured creditors; (iii) the Internal Revenue Service and all applicable state and local taxing authorities; (iv) the Securities and Exchange Commission; (v) the Office of the United States Attorney for the District of Delaware; (vi) counsel to the DIP ABL Agent and the Prepetition ABL Agent; (vii) all persons and entities known by the Debtors to have expressed a written interest to the Debtors in a transaction involving a material portion of the Business during the past twelve (12) months; (viii) counsel to any

Committee appointed in these Chapter 11 Cases; (ix) all persons and entities known or reasonably believed to have asserted a lien, claim, interest, or encumbrance with respect to the Business; (x) any party that has requested notice pursuant to Bankruptcy Rule 2002; (xi) the offices of the attorneys general for the states in which the Debtors operate; and (xii) all parties entitled to notice pursuant to Local Rules 2002-1(b) and 9013-1(m) (the parties in items (i) through (xii), the "Sale Notice Parties").  The Debtors submit that no other or further notice is required.

**No Prior Request**

59.    No previous request for the relief sought therein has been made to this Court or any other court.

*[Remainder of Page Intentionally Left Blank]*

**CONCLUSION**

The Debtors respectfully request entry of the Bidding Procedures Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  August 12, 2024
         Wilmington, Delaware

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Joseph O. Larkin*
Joseph O. Larkin (I.D. No. 4883)
Jason M. Liberi (I.D. No. 4425)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Joseph.Larkin@skadden.com
Jason.Liberi@skadden.com

- and -

Lisa Laukitis (*pro hac vice* admission pending)
Shana A. Elberg (*pro hac vice* admission pending)
Elizabeth M. Downing (*pro hac vice* admission pending)
Angeline J. Hwang (*pro hac vice* admission pending)
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Lisa.Laukitis@skadden.com
Shana.Elberg@skadden.com
Elizabeth.Downing@skadden.com
Angeline.Hwang@skadden.com

*Proposed Counsel to Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **LL FLOORING HOLDINGS, INC.,** *et al.*, | **Case No. 24-11680 (BLS)** |
| Debtors. [1] | **(Joint Administration Pending)** |

## NOTICE OF MOTIONS AND HEARING

PLEASE TAKE NOTICE that, on August 11, 2024, LL Flooring Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned Chapter 11 Cases (collectively, the "Debtors") filed the *Motion of Debtors for Entry of Orders (I) Approving (A) Bidding Procedures, (B) Form and Manner of Notice of Sale, Auction, and Sale Hearing, (C) Assumption and Assignment Procedures, (II) Scheduling Auction and Sale Hearing, (III) Approving (A) Sale of Substantially All of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* (the "Motion") with the United States Bankruptcy Court for the District of Delaware (the "Court").

PLEASE TAKE FURTHER NOTICE that, contemporaneously with the filing of the Motion, the Debtors also filed a motion to shorten the notice and objection periods with respect to the Motion (the "Motion to Shorten").

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four (4) digits of their respective tax identification numbers, are as follows: LL Flooring Holdings, Inc. (0817); LL Flooring, Inc. (9199); Lumber Liquidators Leasing, LLC (N/A); LL Flooring Services, LLC (5960); and Lumber Liquidators Foreign Holdings, LLC (4568).  The address of the Debtors' corporate headquarters is 4901 Bakers Mill Lane, Richmond, VA 23230.

PLEASE TAKE FURTHER NOTICE that, if the Court grants the relief requested in the Motion to Shorten: (i) a hearing to consider the Motion will be held on **August 29, 2024 at 10:00 a.m./p.m. (ET)** (the "Hearing") before The Honorable [_], United States Bankruptcy Judge for the District of Delaware, at the Court, [_], [_] Floor, Courtroom [_], Wilmington, Delaware 19801, and (ii) any responses or objections to the Motion must be filed with the Court by **August 23, 2024 at 4:00 a.m./p.m. (ET)**.

PLEASE TAKE FURTHER NOTICE that if the Court approves or denies, in whole or in part, the relief requested in the Motion to Shorten, parties-in-interest will receive separate notice of the Court-approved objection deadline and hearing date for the Motion.

Dated:  August 12, 2024
         Wilmington, Delaware

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Joseph O. Larkin*
Joseph O. Larkin (I.D. No. 4883)
Jason M. Liberi (I.D. No. 4425)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Joseph.Larkin@skadden.com
Jason.Liberi@skadden.com

- and -

Lisa Laukitis (*pro hac vice* admission pending)
Shana A. Elberg (*pro hac vice* admission pending)
Elizabeth M. Downing (*pro hac vice* admission pending)
Angeline J. Hwang (*pro hac vice* admission pending)
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Lisa.Laukitis@skadden.com
Shana.Elberg@skadden.com
Elizabeth.Downing@skadden.com
Angeline.Hwang@skadden.com

*Proposed Counsel to Debtors and Debtors in Possession*

**Exhibit A**

**Bidding Procedures Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **LL FLOORING HOLDINGS, INC.**, *et al.*, | **Case No. 24-11680 (BLS)** |
| Debtors.[1] | **(Joint Administration Pending)** |

## ORDER (I) APPROVING (A) BIDDING PROCEDURES, (B) FORM ASSET PURCHASE AGREEMENT, (C) FORM AND MANNER OF NOTICE OF SALE, AUCTION, AND SALE HEARING, AND (D) ASSUMPTION AND ASSIGNMENT PROCEDURES; (II) SCHEDULING AUCTION AND SALE HEARING; (III) APPROVING (A) SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, AND (B) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "Motion"),[2] of LL Flooring Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned Chapter 11 Cases (collectively, the "Debtors"), pursuant to sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 2002-1, 6004-1, and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for entry of an order (i) approving the bidding procedures, substantially in the form attached hereto as **Exhibit 1** (the "Bidding

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four (4) digits of their respective tax identification numbers, are as follows: LL Flooring Holdings, Inc. (0817); LL Flooring, Inc. (9199); Lumber Liquidators Leasing, LLC (N/A); LL Flooring Services, LLC (5960); and Lumber Liquidators Foreign Holdings, LLC (4568).  The address of the Debtors' corporate headquarters is 4901 Bakers Mill Lane, Richmond, VA 23230.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion, Bidding Procedures, or the DIP Order (as defined herein), as applicable.

Procedures"), including the Stalking Horse Bid Protections, in connection with the sale of substantially all of the Debtors' business (the "Business") (subject to certain exceptions); (ii) approving the Form APA attached hereto as **Exhibit 4**; (iii) authorizing and scheduling an auction (the "Auction") and scheduling a hearing (the "Sale Hearing") with respect to the approval of a proposed sale transaction (the "Sale Transaction"); (iv) authorizing and approving the form and manner of notice of the Auction and Sale Hearing, substantially in the form attached hereto as **Exhibit 2** (the "Sale Notice"); (v) approving the procedures set forth herein (the "Assumption and Assignment Procedures") for the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases (the "Assigned Contracts") and the determination of the amount necessary to cure any defaults thereunder (the "Cure Costs"); (vi) authorizing and approving the form and manner of notice to each relevant non-Debtor counterparty to an executory contract or unexpired lease (collectively, the "Contract Counterparties") regarding the Debtors' assumption and assignment of the Potential Assigned Contracts (as defined in the Cure Notice) to the Successful Bidder (as defined herein) and of the Debtors' calculation of the Cure Costs, substantially in the form attached hereto as **Exhibit 3** (the "Cure Notice"); (vii) authorizing the Debtors, upon execution of a DC Purchase Agreement, to provide the DC Bidder with the DC Breakup Fee; and (viii) granting related relief; all as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated February 29, 2012; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Sale Notice Parties (as defined in the

4

Motion), and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and this Court having held a hearing to consider the relief requested in the Motion; and upon the record of the hearing; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion; and this Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

### IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.      <u>Jurisdiction</u>.  This Court has jurisdiction to hear and determine the Motion and to grant the relief requested herein pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      <u>Statutory and Legal Predicates</u>.  The statutory and legal predicates for the relief requested in the Motion are sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014 and Local Rules 2002-1, 6004-1, and 9006-1.

C.      <u>Prepetition Marketing Process</u>.  The Debtors and their current and former advisors, including Houlihan Lokey, Inc. ("<u>Houlihan</u>") and J.P. Morgan Securities LLC ("<u>JPM</u>"),

---

[3]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

engaged in robust and extensive sale processes before and after the commencement of these Chapter 11 Cases, over a period of roughly twenty-two (22) months, to solicit and develop the highest or otherwise best offer for the Business.

D.     Bidding Procedures.  The Debtors have articulated good and sufficient business reasons for the Court to approve the Bidding Procedures.  The Bidding Procedures are fair, reasonable, and appropriate under the circumstances and designed to maximize the recovery on, and realizable value of, the Business, as determined by the Debtors' sound business judgment. The Bidding Procedures were negotiated in good faith and at arms' length and are reasonably designed to promote a competitive and robust bidding process to generate the greatest level of interest in all or part of the Debtors' assets and businesses resulting in the highest or otherwise best offer.  The Bidding Procedures comply with the requirements of Local Rule 6004-1(c).

E.     Assumption and Assignment Provisions.  The Debtors have articulated good and sufficient business reasons for the Court to find that the Assumption and Assignment Procedures, set forth in the form of the Cure Notice attached hereto as **Exhibit 3**, are fair, reasonable, and appropriate.  The Assumption and Assignment Procedures provide an adequate opportunity for all Contract Counterparties to raise any objections to the proposed assumption and assignment or the proposed Cure Costs.  The Assumption and Assignment Procedures comply with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

F.     Cure Notice.  The Cure Notice, the form of which is attached hereto as **Exhibit 3**, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Assumption and Assignment Procedures, as well as any and all objection deadlines related thereto, and no other or further notice shall be required for the Motion and the procedures described therein, except as expressly required herein.

6

G.     <u>Sale Notice</u>.  The Sale Notice, the form of which is attached hereto as **Exhibit 2**, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Bidding Procedures, the Assumption and Assignment Procedures, the Auction, the Sale Hearing, and the Sale Transaction free and clear of any liens, claims, encumbrances, or interests pursuant to section 363(f) of the Bankruptcy Code, and any and all objection deadlines related thereto, and no other or further notice shall be required for the Sale Motion, the Sale Transaction, or the assumption and assignment of the Assigned Contracts except as expressly required herein.

H.     <u>Notice</u>.  Good and sufficient notice of the relief sought in the Motion has been provided under the circumstances, and no other or further notice is required, except as set forth in the Bidding Procedures and the Assumption and Assignment Procedures.  A reasonable opportunity to object and be heard regarding the relief granted herein has been afforded to all parties in interest, including those persons and entities entitled to notice pursuant to Bankruptcy Rule 2002.

I.      The Debtors have articulated good and sufficient business reasons for the Court to approve (i) the Bidding Procedures, (ii) the Assumption and Assignment Procedures, (iii) the form and manner of notice of the Auction and the Sale Hearing for the Sale Transaction, and the (iv) the DC Breakup Fee and/or the Stalking Horse Bid Protections.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.     The Motion is GRANTED to the extent set forth herein.

2.     All objections to the relief granted herein that have not been withdrawn with prejudice, waived, or settled, and all reservations of rights included in such objections, are hereby overruled and denied on the merits with prejudice.

3.      The Bidding Procedures are hereby approved in their entirety, are incorporated herein by reference, and shall govern the bids and proceedings related to the sale of the Business and the Auction.  The failure to specifically include or reference any particular provision of the Bidding Procedures in the Motion or this Order shall not diminish or otherwise impair the effectiveness of such procedures, it being the Court's intent that the Bidding Procedures are approved in their entirety, as if fully set forth in this Order.  The Debtors are authorized to take all actions necessary or appropriate to implement the Bidding Procedures.

## THE BIDDING PROCEDURES

4.      The Bidding Procedures, attached hereto as **Exhibit 1**, are fully incorporated herein and approved, and shall apply with respect to any bids (a "Bid") for, and the Auction and sale of, the Business.  The procedures and requirements set forth in the Bidding Procedures, including those associated with submitting a "Qualified Bid" (as defined herein), are fair, reasonable and appropriate, and are designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest.  The Debtors are authorized to take all actions necessary or appropriate to implement the Bidding Procedures in accordance with the terms of this Order and the Bidding Procedures.

5.      The Form APA, substantially in the form attached hereto as **Exhibit 4**, is hereby approved.

6.      The deadline for submitting Bids (the "Bid Deadline") is **September 9, 2024 at 4:00 p.m. (prevailing Eastern Time)**; provided, that the Debtors shall have the right to extend the Bid Deadline, in their reasonable business judgment, for all or certain Potential Bidders, without further order of the Court, subject to providing prior notice to counsel to the Committee (as defined in the Motion), counsel to the DIP ABL Agent and the Prepetition ABL Agent, and all Potential Bidders (as defined in Bidding Procedures); provided that if the extension of the Bid

Deadline breaches or is likely to breach a Case Milestone, such extension shall require consent of the DIP ABL Agent and the Prepetition ABL Agent.  Any party that does not submit a Qualified Bid by the Bid Deadline in accordance with the Bidding Procedures will not be allowed to (a) submit any offer after the Bid Deadline or (b) participate in the Auction.

7.       All Potential Bidders submitting bids determined by the Debtors to be Qualified Bids in accordance with the Bidding Procedures are deemed to have submitted to the jurisdiction of this Court with respect to all matters related to the Auction and the terms and conditions of the sale or transfer of the acquired assets.

8.       To qualify as a Qualified Bid, each such bid must be accompanied by information supporting the Potential Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code (the "Adequate Assurance Information"), including the bidder's financial wherewithal and willingness to perform under any contracts that will be assumed and assigned to such bidder.  In addition to the other requirements of a Qualified Bid as set forth in the Bidding Procedures, each such bid must be accompanied by a written statement confirming that (a) the bidder has not engaged in any collusion with respect to the submission of any bid, the bidding, or the Auction and (b) its Qualified Bid is a good faith bona fide offer that it intends to consummate if selected as the Successful Bidder.

9.       Subject to the terms of the Bidding Procedures, the Debtors shall have the right as they may reasonably determine to be in the best interests of their estates to carry out the Bidding Procedures, including, without limitation, to: (a) determine which bidders are Qualified Bidders; (b) determine which bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best purchase price and/or terms received prior to the Auction; (d) determine which Qualified Bid(s) is the Successful Bid; (e) designate the second a or otherwise best bids as Back-

Up Bids, each as it relates to the Auction; (f) reject any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of this Order, the Bidding Procedures, or the requirements of the Bankruptcy Code, or (iii) contrary to the best interests of the Debtors and their estates; (g) adjourn and/or cancel the Auction and/or the Sale Hearing in open court without further notice or subject to the terms of the Bidding Procedures; (h) modify the Bidding Procedures consistent with their fiduciary duties and the Bankruptcy Code, and as set forth in the Bidding Procedures; and (i) withdraw the Motion at any time with or without prejudice.

10.    Subject to the terms of the Bidding Procedures, the Debtors shall have the right, in their reasonable business judgment, in a manner consistent with their fiduciary duties, and applicable law, to modify the Bidding Procedures, including to (a) waive terms and conditions with respect to any Potential Bidder or Qualified Bid; (b) extend the deadlines set forth in the Bidding Procedures; and (c) announce at the Auction modified or additional procedures for conducting the Auction, in each case, to the extent not inconsistent with the Bidding Procedures and this Order. Nothing in this Order or the Bidding Procedures shall obligate the Debtors to consummate or pursue any transaction with respect to any Asset with a Qualified Bidder.

11.    Subject to the terms of the Bidding Procedures, the Debtors shall identify those bids that qualify as Qualified Bids (each bidder that submits such a Qualified Bid being a "Qualified Bidder") by **September 11, 2024 at 4:00 p.m. (prevailing Eastern Time)**. If more than one Qualified Bid is timely received, the Auction shall be conducted either (i) at the offices of Skadden, Arps, Slate, Meagher & Flom LLP; One Manhattan West, 395 9th Ave, New York, NY 10001, or (ii) virtually pursuant to procedures to be timely filed on the Bankruptcy Court's docket, on **September 12, 2024 at 10:00 a.m. (prevailing Eastern Time)** or at such other time and location as the Debtors, after consultation with the Consultation Parties, after providing notice to the

10

Qualified Bidders and Sale Notice Parties, may determine in their reasonable business judgment; *provided* that if the extension of the Auction breaches or is likely to breach a Case Milestone, such extension shall require consent of the DIP ABL Agent and the Prepetition ABL Agent.

12. Only Qualified Bidders will be eligible to participate in the Auction, subject to such limitations as the Debtors may impose in good faith. In addition, professionals and/or other representatives of the Debtors, the DIP ABL Agent and the Prepetition ABL Agent, and the Committee shall be permitted to attend and observe the Auction. The Debtors may, in their sole discretion, establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of or accompany Qualified Bidders or other creditors at the Auction. The proceedings of the Auction shall be transcribed or videotaped, at the Debtors' option.

13. Absent further order of the Court, no Qualified Bidder shall be entitled to any expense reimbursement, break-up fee, termination fee, or other similar fee or payment in connection with any Sale Transaction, and by submitting a bid, such Qualified Bidder is deemed to have waived their right to request or to file with this Court any request for expense reimbursement or any fee of any nature, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

14. Subject to the terms of the Bidding Procedures, the Debtors may, in the exercise of their business judgment, identify the highest or otherwise best Qualified Bid(s) as the successful bid(s) (a "<u>Successful Bid</u>" and, the bidder submitting such bid, a "<u>Successful Bidder</u>"). The Debtors may also identify which Qualified Bid(s) constitute the second highest or otherwise best bid(s) (such bid(s) shall each be a "<u>Back-Up Bid</u>" and, the bidder submitting such bid, a "<u>Back-Up Bidder</u>").

15.     Within one (1) business days after the conclusion of the Auction, if one is held, or as soon as reasonably practicable thereafter, the Debtors shall file with the Court and post on the website of the Debtors' claims agent (the "Claims Agent Website") a notice of the Successful Bid(s), Successful Bidder(s), Back-Up Bid(s), and Back-Up Bidder(s).

## BID PROTECTIONS

16.     Subject to the terms of the Bidding Procedures, the Debtors are hereby authorized but not obligated, in an exercise of their business judgment, and in consultation with the Consultation Parties, to: (a) select one or more Qualified Bidders to act as Stalking Horse Bidders and (b) in connection with any Stalking Horse Agreement to (i) provide a Breakup Fee in an amount not to exceed three percent (3%) of the proposed Purchase Price, and/or (ii) agree to the Expense Reimbursement.

17.     Subject to the terms of the Bidding Procedures, the Debtors are hereby authorized in an exercise of their business judgment, to provide a Breakup Fee to the DC Bidder upon entry into the DC Purchase Agreement; *provided* that, the DC Purchase Agreement is filed on the Court's docket. Following the occurrence of a DC Breakup Fee Trigger Event, the DC Breakup Fee would be payable (a) within (3) business days of the closing of a DC Alternative Transaction, or (b) following the DIP ABL Obligations and the Prepetition ABL Obligations being Paid in Full.

## SALE HEARING AND SALE OBJECTION DEADLINE

18.     If the Debtors elect to proceed with a Sale Transaction pursuant to a sale under section 363 of the Bankruptcy Code, the Debtors will seek the entry of an order, in form and substance satisfactory to the DIP ABL Agent and the Prepetition ABL Agent, authorizing and approving, among other things, the Sale Transaction in which all or some of the assets of the Business will be sold to the applicable Successful Bidder at a hearing before the Court to be held on **September 16, 2024 at 10:00 a.m. (prevailing Eastern Time)** (the "Sale Hearing"). Upon

entry of this Order, the Debtors are authorized to perform any obligations of the Debtors set forth in the Stalking Horse Agreement or Form APA that are intended to be performed prior to the Sale Hearing or entry of the Sale Order. The Sale Hearing may be adjourned by this Court or the Debtors from time to time with the consent of the DIP ABL Agent and the Prepetition ABL Agent without further notice other than by announcement in open court or through the filing of a notice or other document on this Court's docket.

19.     The Successful Bidder shall appear at the Sale Hearing and be prepared, if necessary, to have a representative(s) testify in support of the Successful Bid and the Successful Bidder's ability to close in a timely manner and provide adequate assurance of its future performance under any and all executory contracts and unexpired leases to be assumed and assigned as part of the proposed Sale Transaction.

20.     Objections to the Sale Transaction (each, a "Sale Objection") must: (i) be in writing; (ii) state the name and address of the objecting party and the amount and nature of the claim or interest of such party; (iii) state with particularity the basis and nature of any objection, and provide proposed language that, if accepted and incorporated by the Debtors, would obviate such objection; (iv) conform to the Bankruptcy Code, Bankruptcy Rules, and Local Rules; and (v) be filed with the Bankruptcy Court and be served on the Objection Notice Parties (as defined in the Sale Notice) by the deadline provided in the applicable Sale Notice. All Sale Objections will be heard by this Court at the Sale Hearing.

21.     The failure of any objecting person or entity to timely file and serve a Sale Objection on the Objection Notice Parties shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, or to the consummation and performance of a Sale Transaction, including the transfer of the Business to the Successful Bidder, free and clear of all

claims and interests pursuant to section 363(f) of the Bankruptcy Code. Failure to object shall constitute consent for the purposes of sections 363(f), 1123 and 1141(c), as applicable, of the Bankruptcy Code.

22.     Closing of the Sale Transaction shall occur no later than September 30, 2024, or such later date as consented to by the DIP ABL Agent and the Prepetition ABL Agent.

### NOTICE OF SALE TRANSACTION

23.     The Sale Notice, substantially in the form attached hereto as **Exhibit 2**, is approved, and no other or further notice of the Assumption and Assignment Procedures, the Auction, the Sale Hearing, the Sale Objection Deadline (as defined in the Bidding Procedures), and the Sale Transaction shall be required if the Debtors serve and publish such notice, in the manner provided in the Bidding Procedures and this Order. The Sale Notice contains the type of information required under Bankruptcy Rule 2002 and Local Rule 6004-1, and complies in all respects with applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

24.     All parties in interest shall receive or be deemed to have received good and sufficient notice of (a) the Motion; (b) the Assumption and Assignment Procedures, including the proposed assumption and assignment of the Potential Assigned Contracts (as defined in the Cure Notice) to the Successful Bidder; (c) the Auction; (d) the Sale Objection Deadline; (e) the Sale Transaction, including the sale of the Business; and (f) the Sale Hearing, and no further notice of the foregoing shall be required, if:

(a)     On the same day this Order is entered, the Debtors shall cause the Sale Notice to be filed with this Court and served by email, mail, facsimile, or overnight delivery on: (1) counsel to any Stalking Horse Bidder; (2) counsel to each Consultation Party; (3) all persons and entities known by the Debtors to have expressed a written interest to the Debtors in a transaction involving a material portion of the Business during the past twelve (12) months; (4) all entities known by the Debtors to have asserted any lien, claim,

encumbrance, or other interest in the acquired assets (for whom identifying information and addresses are available to the Debtors); (5) all non-Debtor parties to the Potential Assigned Contracts (for whom identifying information and addresses are available to the Debtors); (6) any Governmental Unit (as defined in section 101(27) of the Bankruptcy Code) known to have a claim in these Chapter 11 Cases; (7) the United States Attorney for the District of Delaware; (8) the Office of the Attorney General in each state in which the Debtors operate; (9) the Office of the Secretary of State in each state in which the Debtors operate or are organized; (10) the Debtors' known creditors (for whom identifying information and addresses are available to the Debtors); and (11) all other Persons requesting notice under Bankruptcy Rule 2002 or as directed by this Court (for whom identifying information and addresses are available to the Debtors); and

(b)   As soon as practicable, but no later than one (1) calendar days after entry of this Order, the Debtors shall cause the Sale Notice to be published on the Claims Agent Website and once in the national edition of *The New York Times* and *USA Today*.

## ASSUMPTION AND ASSIGNMENT PROCEDURES

25.   The Assumption and Assignment Procedures are reasonable and appropriate under the circumstances, fair to all non-Debtor parties, comply in all respects with the Bankruptcy Code, Bankruptcy Rules, and Local Rules, and are approved.

26.   The Cure Notice, substantially in the form attached hereto as **Exhibit 3**, is reasonable, fair, and appropriate, contains the type of information required under Bankruptcy Rule 2002, and complies in all respects with applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules, and is hereby approved.  It is reasonably calculated to provide sufficient notice to the Contract Counterparties of the Debtors' intent to assume and assign potential assigned contracts (the "Potential Assigned Contracts") to a Successful Bidder in connection with the Sale Transaction and constitutes adequate notice thereof.  The Cure Notice shall inform each recipient of the timing and procedures relating to the assumption and assignment, and, to extent applicable list (i) the title of executory contract or lease, (ii) the name of the counterparty to the executory

15

contract or lease, (iii) the Debtors' good faith estimate of the Cure Cost, if any, required in connection with the executory contract or lease, and (iv) the objection deadline. The service of a Cure Notice does not constitute an admission that any Contract listed therein is an executory contract or that such state Cure Cost constitutes a claim against the Debtors or a right against any Successful Bidder, all rights with respect thereto being expressly reserved. Further, the inclusion of a contract or lease on the Cure Notice is not a guarantee that such contract will ultimately be assumed or assigned or a guarantee that such contract or lease is executory.

27.     The Debtors shall file the Cure Notice with this Court and serve the Cure Notice via first class mail on the Contract Counterparties no later than (14) calendar days before the Sale Hearing. Service of the Cure Notice in accordance with this Order on all Contract Counterparties and Consultation Parties is hereby deemed to be good and sufficient notice of the Cure Costs for, and the proposed assumption and assignment of, the Potential Assigned Contracts to the Successful Bidder (or as otherwise contemplated by the Successful Bid). As soon as reasonably practicable after serving the Cure Notice, the Debtors shall post a copy of the Cure Notice on the Claims Agent Website.

28.     Upon service of the Cure Notice, all Contract Counterparties shall receive or be deemed to have received good and sufficient notice of the Cure Costs for, and the proposed assumption and assignment of, the Assigned Contracts to the Successful Bidder or as otherwise contemplated by the Successful Bid.

29.     All objections to any proposed Cure Costs, the assumption and assignment of any contract or lease, and to the provision of adequate assurance of future performance of the Stalking Horse Bidder (each, a "Cure Objection") or, if the Stalking Horse Bidder does not prevail in the Auction, objections solely to the identity of the Successful Bidder or adequate assurance of

Successful Bidder's future performance following the announcement of such Auction results (each, an "Auction Results Objections") must: (a) be in writing; (b) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules; (c) state, with specificity, the legal and factual basis thereof, including, with respect to a Cure Objection, what Cure Costs the objecting party believes are required; (d) include any appropriate documentation in support thereof; and (e) be filed with this Court and served on the Cure Objection Recipients (as defined in the Cure Notice) by the deadline set forth in the applicable Cure Notice.

30.     Any Cure Objection or Auction Results Objection must be filed and served by the Cure Objection Deadline (as defined in the Cure Notice).  If a timely Cure Objection or Auction Results Objection is received and such objection cannot otherwise be resolved by the parties, such objection shall be heard at the Sale Hearing or such later date as the Debtors determine prior to the scheduled closing of the Sale Transaction.

31.     To the extent the Debtors, at any time after the Cure Notice is served, (i) identify additional contracts that may be assumed and assigned to the Successful Bidder, (ii) remove any contracts from the list attached to the Cure Notice, (iii) and/or modify the previously stated Cure Cost associated with any such contract or lease, the Debtors shall file with this Court and serve by first class mail on the relevant Contract Counterparty to such contract or lease a supplemental Cure Notice (each, a "Supplemental Cure Notice," the form of which shall be substantially similar to the form of Cure Notice attached hereto as **Exhibit 3**).  A Successful Bidder may designate additional contracts or remove contracts from the list of contracts to be assumed and assigned in accordance with the Successful Bidder's asset purchase agreement.  Any (x) Cure Objection with respect to Cure Costs set forth in a Supplemental Cure Notice and (y) Auction Results Objection with respect to the assumption and assignment of the Assigned Contract(s) set forth in such

Supplemental Cure Notice must be filed within ten (10) calendar days of service of that Supplemental Cure Notice or such other date as may be specified in such Supplemental Cure Notice.

32.     If no timely Cure Objection is filed and served in respect of a Potential Assigned Contract, the Cure Cost identified on the Cure Notice or a Supplemental Cure Notice, as applicable, will be the only amount necessary under section 365(b) of the Bankruptcy Code to cure all defaults under such Potential Assigned Contract.  Any party failing to timely file a Cure Objection shall be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts against the Debtors, their estates, or the Successful Bidder(s).

33.     If no timely Adequate Assurance Objection is filed and served with respect to a Assigned Contract, the Successful Bidder (or any other entity contemplated by the Successful Bid) will be deemed to have provided adequate assurance of future performance for such Assigned Contract in accordance with section 365(f)(2)(B) of the Bankruptcy Code.

34.     If no timely Cure Objection or Adequate Assurance Objection is filed and served with respect to a Assigned Contract, the relevant Contract Counterparty shall be deemed to have consented to the assumption and assignment of the Assigned Contract to the Successful Bidder (or as otherwise contemplated by the Successful Bid).

35.     The Debtors' assumption and assignment of Potential Assigned Contracts to the Successful Bidder (or as otherwise contemplated by the Successful Bid) is subject to approval of this Court at the Sale Hearing and the consummation of the Sale Transaction.  Accordingly, absent the closing of such sale, the Potential Assigned Contracts shall not be deemed assumed or assigned, and shall in all respects be subject to further administration under the Bankruptcy Code.

36.     The inclusion of a contract, lease, or other agreement on the Cure Notice or any Supplemental Cure Notice shall not constitute or be deemed a determination or admission by the Debtors or any other party in interest that such contract or other document is an executory contract or unexpired lease within the meaning of the Bankruptcy Code or that the stated Cure Cost is due (all rights with respect thereto being expressly reserved).  The Debtors reserve all of their rights, claims, defenses, and causes of action with respect to each contract, lease, or other document listed on the Cure Notice or any Supplemental Cure Notice.  The Debtors' inclusion of an executory contract or unexpired lease on the Cure Notice or any Supplemental Cure Notice shall not be a guarantee that such executory contract or unexpired lease ultimately will be assumed or assumed and assigned.

37.     Notwithstanding anything to the contrary contained herein or in the Bidding Procedures or otherwise: (i) the rights of the DIP ABL Agent and the Prepetition ABL Agent to consent to the sale of any portion of their DIP Collateral and Prepetition Collateral shall be expressly reserved and not modified, waived, or impaired in any way by this Order, and (ii) nothing in this Order shall amend, modify, alter, waive, or impair, in any way, any provision of the DIP Order,[4] including, but not limited to, the requirements with respect to compliance with the Budget, the DIP ABL Agreement, and Sections 19 and 26 of the DIP Order with respect to the application of the proceeds of the DIP Collateral and Prepetition Collateral.

38.     The DIP ABL Agent, the DIP Lenders, and the Prepetition ABL Parties, or any of their respective designees may, subject to section 363(k) of the Bankruptcy Code, credit bid all or

---

[4]     "DIP Order" means any interim or final *Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition ABL Parties, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*, whichever is then in effect, as applicable.

any of the respective portion of their outstanding obligations (the "Credit Bid"). Any Credit Bid

shall be a Qualified Bid without the need to provide a good faith deposit, and the applicable DIP

ABL Agent, DIP Lenders, or Prepetition ABL Parties shall be a Qualified Bidder in connection

with any such Credit Bid, and any such Credit Bid shall be a Qualified Bid.

## **GENERAL PROVISIONS**

39.     All persons or entities (whether or not Qualified Bidders) that participate in the

bidding process, including submitting a bid for the Business during the sale process and/or

Auction, shall be deemed to have knowingly and voluntarily (a) submitted to the jurisdiction of

this Court with respect to all matters related to the terms and conditions of the transfer of the

Business, the Auction, and any Sale Transaction, (b) consented to the entry of a final order by this

Court in connection with the Motion or this Order (including any disputes related to the bidding

process, the Auction, and/or any Sale Transaction) to the extent that it is later determined that this

Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith

consistent with Article III of the United States Constitution, and (c) waived any right to jury trial

in connection with any disputes relating to the any of the foregoing matters.

40.     Notwithstanding the applicability of any of Bankruptcy Rules 6004(h), 6006(d),

7062, 9014, or any other provisions of the Bankruptcy Rules or the Local Rules stating the

contrary, the terms and conditions of this Order shall be immediately effective and enforceable

upon its entry, and any applicable stay of the effectiveness and enforceability of this Order is

hereby waived.

41.     The Debtors are authorized to make non-substantive changes to the Bidding

Procedures, the Assumption and Assignment Procedures, and any related documents without

further order of the Court, including, without limitation, changes to correct typographical and

grammatical errors and to make conforming non-substantive changes to reflect any such changes made to the Debtors' disclosure statement and plan prior to mailing.

42.     The Debtors are authorized to take all steps necessary or appropriate to carry out this Order.

43.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

**Exhibit 1**

**Bidding Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **LL FLOORING HOLDINGS, INC.**, *et al.*, | **Case No. 24-11680 (BLS)** |
| Debtors.[1] | **(Joint Administration Pending)** |

## BIDDING PROCEDURES

### Overview

On August 11, 2024 (the "Petition Date"), LL Flooring Holdings, Inc. ("LL Flooring") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors' Chapter 11 Cases have been consolidated for procedural purposes under the lead case, LL Flooring Holdings, Inc., *et al.*, Case No [_] ([_]) (the "Chapter 11 Cases").

On [_], 2024, the Bankruptcy Court entered an order (Docket No. [_]) (the "Bidding Procedures Order"),[2] which approved these procedures (the "Bidding Procedures") for the selection of the highest or otherwise best offer or collection of offers to acquire substantially all of the Debtors' business (the "Business") (subject to certain exceptions) on the terms and conditions set forth herein.

### Summary of Important Dates

These Bidding Procedures provide interested parties the opportunity to submit competing bids for all or any portion of the Business, and to participate in an auction to be conducted by the Debtors (the "Auction").

The key dates for the sale process are as follows. Such dates may be extended or otherwise modified by the Debtors, after consultation with the Consultation Parties (as defined below), by filing a notice of such extension or modification on the Court's docket; provided that if any extension breaches or is likely to breach a Case Milestone set forth in the DIP Order and the DIP

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four (4) digits of their respective tax identification numbers, are as follows: LL Flooring Holdings, Inc. (0817); LL Flooring, Inc. (9199); Lumber Liquidators Leasing, LLC (N/A); LL Flooring Services, LLC (5960); and Lumber Liquidators Foreign Holdings, LLC (4568). The address of the Debtors' corporate headquarters is 4901 Bakers Mill Lane, Richmond, VA 23230.

[2]   Unless otherwise indicated, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or Bidding Procedures Order, as applicable.

ABL Agreement, such extension shall require consent of the DIP ABL Agent and the Prepetition ABL Agent:

| Key Event | Deadline |
|---|---|
| Deadline to enter into a Stalking Horse Agreement | **August 26, 2024 at 11:59 p.m. (prevailing Eastern Time)** |
| Bidding Procedures hearing | **August 29, 2024 at 10:00 a.m. (prevailing Eastern Time)** |
| Deadline to file objections to Sale Transaction, including any objection to the sale of the Business free and clear of liens, claims, encumbrances, and other interests | **September 5, 2024 at 4:00 p.m. (prevailing Eastern Time)** |
| Deadline to file objections to the proposed Cure Costs (as defined in the Cure Cost Notice), assumption and assignment of a Potential Assigned Contract, and to a lack of adequate assurance of the Stalking Horse Bidder's (if applicable) future performance | **September 5, 2024 at 4:00 p.m. (prevailing Eastern Time)** |
| Deadline to submit Bids | **September 9, 2024 at 4:00 p.m. (prevailing Eastern Time)** |
| Deadline to reply to objections to Sale Transaction | **September 11, 2024 at 12:00 p.m. (prevailing Eastern Time)** |
| Deadline for Debtors to notify bidders of status as Qualified Bidders | **September 11, 2024 at 4:00 p.m. (prevailing Eastern Time)** |
| Auction to be held if the Debtors receive more than one Qualified Bid | **September 12, 2024 at 10:00 a.m. (prevailing Eastern Time)** |
| Deadline to file notice identifying bidder who submitted highest or otherwise best bid as the Successful Bidder and the bidder who submitted the second highest or otherwise bid as the Back-Up Bidder | **September 13, 2024 at 10:00 a.m. (prevailing Eastern Time)** |
| Sale Hearing (subject to the Court's availability) | **September 16, 2024 at 10:00 a.m. (prevailing Eastern Time)** |
| Deadline to file objections to the identity of the Successful Bidder(s), adequate assurance of their future performance, or changes to the Stalking Horse Agreement | **September 16, 2024 at 10:00 a.m. (prevailing Eastern Time) (to be addressed at Sale Hearing** |

## Property To Be Sold

The Debtors seek to sell all or substantially all of the Business to one or more purchasers (each sale in furtherance of the same, a "Sale Transaction").

## Due Diligence

The Debtors have posted copies of all material documents related to the Business to the Debtors' confidential electronic data room (the "Data Room"). To access the Data Room, an interested party must submit to the Debtors or their advisors the following:

(A)     an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors (unless such party is already a party to an existing confidentiality agreement with the Debtors that is acceptable to the Debtors for this due diligence process, in which case such agreement will govern); and

(B)     sufficient information, as reasonably determined by the Debtors, to allow the Debtors to determine that the interested party (i) has the financial wherewithal to consummate the applicable Sale Transaction and (ii) intends to access the Data Room for a purpose consistent with these Bidding Procedures.

Each interested party that meets the above requirements to the satisfaction of the Debtors will be a "Potential Bidder." As soon as practicable, the Debtors will provide all Potential Bidders access to the Data Room; provided, that such access will be terminated by the Debtors in their reasonable discretion at any time, including if (i) a Potential Bidder does not become a Qualified Bidder or (ii) these Bidding Procedures are terminated.

Each Potential Bidder will comply with all reasonable requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder to consummate the applicable Sale Transaction.

Until the Bid Deadline, the Debtors will provide all Potential Bidders with reasonable access to the Data Room and any additional information requested by Potential Bidders that the Debtors believe to be reasonable and appropriate under the circumstances. All additional due diligence requests will be directed to the Debtors' advisors, Houlihan Lokey, Inc., Surbhi Gupta (sgupta@hl.com), Ethan Kopp (ekopp@hl.com), Sam Ward (spward@hl.om), and Iman Sennoun (iman.sennoun@hl.com). Unless prohibited by law or otherwise determined by the Debtors, the availability of additional due diligence to a Potential Bidder will cease if (i) the Potential Bidder does not become a Qualified Bidder or (ii) these Bidding Procedures are terminated.

Neither the Debtors nor any of their representatives will be obligated to furnish any information of any kind whatsoever relating to the Business (i) to any person or entity who (a) is not a Potential Bidder; (b) does not comply with the participation requirements set forth above; or (c) in the case of competitively sensitive information, is a competitor of the Debtors (except pursuant to "clean team" or other information sharing procedures reasonably satisfactory to the Debtors) and (ii) to the extent not permitted by law.

## Auction Qualification Procedures

### Bid Deadline

A Potential Bidder that desires to make a bid (a "Bid") on some or all of the Business will deliver electronic copies of the Bid, so as to be received no later than **September 9, 2024 at 4:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline"); provided, that the Debtors may extend the Bid Deadline without further order of the Bankruptcy Court subject to providing prior notice to all Potential Bidders, counsel to the DIP ABL Agent and the Prepetition ABL Agent, and counsel to the any official committee of unsecured creditors (a "Committee"); *provided* that if the extension of the Bid Deadline breaches or is likely to breach a Case Milestone, such extension shall require consent of the DIP ABL Agent and the Prepetition ABL Agent. **The submission of a Bid by the Bid Deadline will constitute a binding and irrevocable offer to acquire the Business specified in such Bid.** Any party that does not submit a Bid by the Bid Deadline will not be allowed to (i) submit any offer after the Bid Deadline or (ii) participate in the Auction.

Bids must be submitted by email to the following:

### Skadden, Arps, Slate, Meagher & Flom LLP
Lisa.Laukitis@skadden.com
Maxim.MayerCesiano@skadden.com
Elizabeth.Downing@skadden.com
Chambliss.Williams@skadden.com

### Houlihan Lokey, Inc.
sgupta@hl.com
ekopp@hl.com
spward@hl.com
iman.sennoun@hl.com

### Form and Content of Qualified Bids

A Bid must contain a signed document from a Potential Bidder received by the Bid Deadline that identifies the purchaser by its legal name and any other party that will be participating in connection with the Bid. To constitute a "Qualified Bid" a Bid must include, at a minimum, the following:

(A)     <u>Identity of Bidder and Corporate Authorization</u>.  A Qualified Bid must fully disclose, the legal identity of each person or entity bidding or otherwise participating in connection with such Bid (including each equity holder or financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the proposed transaction(s) contemplated by such Bid), and the complete terms of any such participation, and must also disclose any connections or agreements with the Debtors, any other known Potential Bidder, Consultation Party (as defined in the Bidding Procedures) or Qualified Bidder, and/or any officer or director of the foregoing.  Under no circumstances will any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include evidence of corporate authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of a Bid, participation in the Auction, and closing of the transactions contemplated by the Potential Bidder's Proposed Purchase Agreement in accordance with the terms of the Bid and these Bidding Procedures.

(B)     <u>Acquired Property</u>.  Each Bid must clearly identify in writing the particular assets the Potential Bidder seeks to acquire from the Debtors.  For the avoidance of doubt, a Qualified Bid may include a bid for less than all or substantially all of the Business.[3]

(C)     <u>Sandston Distribution Center</u>: A Qualified Bid must specify whether the Qualified Bidder intends to (i) purchase the Sandston Distribution Center, and/or (ii) enter into a lease for a certain period of time for all or a portion of the Sandston Distribution Center if the Sandston Distribution Center is sold to a third party.

(D)     <u>Satisfy Funded Debt</u>.  A Qualified Bid's Purchase Price must include a cash component sufficient (in combination with the DC Bidder's bid, to the extent the Potential Bidder's Bid does not include the purchase of the Sandston Distribution Center) to repay in full the "Obligations" under the Prepetition ABL Agreement and DIP ABL Obligations (and result in sufficient cash proceeds to permit the cash collateralization of all obligations relating to the letters of credit and contingent exposure); *provided*, *however*, that the Debtors reserve the right to approve joint Bids that would satisfy the above conditions and are acceptable to the DIP ABL Agent and the Prepetition ABL Agent.

(E)     <u>Proposed Asset/Stock Purchase Agreement</u>. Each Bid must include, in both PDF and MS-WORD format, an executed purchase agreement (the "<u>Proposed Purchase Agreement</u>"), together with a copy of the same that has been marked against the form asset purchase agreement provided to prospective bidders.

---

[3]     The Debtors will consider a Qualified Bid for less than all or substantially all of the Business, as long as the Debtors have an acceptable sale, restructuring, or other solution for the remaining assets, as determined by the Debtors.

(F)    <u>Unconditional Offer</u>.  A commitment that the Bid is formal, binding, and unconditional (except for those conditions expressly set forth in the Proposed Purchase Agreement), is not subject to any due diligence or financing contingency, and is irrevocable until the Debtors notify such Potential Bidder that such Bid has not been designated as a Successful Bid or a Back-Up Bid, or until the first business day after consummation of a Sale Transaction with the Successful Bidder.  In the event a Bid is chosen as a Back-Up Bid, it must remain irrevocable until the Back-Up Bid Expiration Date (as defined herein).

(G)    <u>Proof of Financial Ability to Perform</u>.  Each Bid must contain such financial and other information that allows the Debtors to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the applicable Sale Transaction, including, without limitation, such financial and other information setting forth the Potential Bidder's willingness to perform under any contracts that are assumed and assigned to such party.  Without limiting the foregoing, such information must include current financial statements or similar financial information certified to be true and correct as of the date thereof, proof of financing commitments (if needed) to close the applicable Sale Transaction (not subject to, in the Debtors' sole discretion, any unreasonable conditions), contact information for verification of such information, including any financing sources, and any other information reasonably requested by the Debtors necessary to demonstrate that the Potential Bidder has the ability to close the applicable Sale Transaction in a timely manner.

(H)    <u>Designation of Contracts and Leases</u>.  Each Bid must identify with particularity each executory contract and unexpired lease, the assumption and assignment of which is a condition to closing the applicable Sale Transaction.  Each Bid must also include information demonstrating adequate assurance of future performance under such contracts and leases in satisfaction of the requirements under section 365(f)(2)(B) of the Bankruptcy Code.

(I)    <u>Required Approvals</u>.  A statement or evidence (i) that the Potential Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, or other antitrust laws, as applicable, and pay the fees associated with such filings; (ii) of the Potential Bidder's plan and ability to obtain all requisite governmental, regulatory, or other third-party approvals and the proposed timing for the Potential Bidder to undertake the actions required to obtain such approvals; and (iii) that the Bid is reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors after consultation with the Consultation Parties.  A Potential Bidder further agrees that its legal counsel will discuss with and explain to the Debtors' legal counsel such Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable.

(J)    <u>Employee and Labor Obligations</u>.  Each Bid must include a statement of proposed terms for employees of the Debtors and the population of which employees the Qualified Bidder intends to hire.

(K)    <u>No Entitlement to Break-Up Fee, Expense Reimbursement, or Other Amounts</u>.  Subject to the Debtors' right to enter into a Stalking Horse Agreement that provides for Stalking Horse Bid Protections (each as defined in the Motion), each Bid must include a statement that the Bid does not entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement, and a waiver of any substantial contribution administrative expense claims under section 503(b) of the Bankruptcy Code related to the bidding process.

(L)    <u>Joint Bids</u>.  The Debtors will be authorized to approve joint Bids in their reasonable discretion on a case-by-case basis.

(M)    <u>Representations and Warranties</u>.  Each Bid must include the following representations and warranties:

   (i)     a statement that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the Business prior to submitting its Bid;

   (ii)    a statement that the Potential Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents, as well as the assets and the liabilities to be assumed (as applicable), in making its Bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding such assets or liabilities or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Potential Bidder's Proposed Purchase Agreement;

   (iii)   a statement that the Potential Bidder agrees to serve as Back-Up Bidder, if its Bid is selected as the next highest or next best Bid after the Successful Bid with respect to the Business;

   (iv)    a statement that the Potential Bidder has not engaged in any collusion with respect to the submission of its Bid;

   (v)     a statement that all proof of financial ability to consummate the applicable Sale Transaction in a timely manner and all information provided to support adequate assurance of future performance is true and correct; and

   (vi)    a statement that the Potential Bidder agrees to be bound by the terms of the Bidding Procedures.

(N)    <u>Additional Requirements</u>.  A Potential Bidder must also accompany its Bid with:

   (i)     a Deposit (as defined herein), except as otherwise set forth herein;

   (ii)    the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the Bid submitted by the Potential Bidder;

7

(iii)     written evidence of available cash, a commitment for financing (not subject to any conditions other than those expressly set forth in the Proposed Purchase Agreement) and such other evidence of ability to consummate the transaction contemplated by the Proposed Purchase Agreement, the Bidding Procedures Order, and the Bidding Procedures, as acceptable in the Debtors' business judgment;

(iv)     the identity of each entity that will be participating in connection with such Bid and taking ownership of the Business (including any equity owners or sponsors, if the Potential Bidder is an entity formed for the purpose of consummating the Sale Transaction) and a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable Bid on the terms proposed and to consummate the transaction contemplated by the Proposed Purchase Agreement;

(v)     a covenant to cooperate with the Debtors to provide pertinent factual information regarding the Potential Bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements; and

(vi)     a detailed analysis of the value of any non-cash component of the Bid, if any, and back-up documentation to support such value.

### Review of Bids; Designation of Qualified Bids

The Debtors will evaluate all Bids that are timely submitted and may engage in negotiations with Potential Bidders who submitted Bids as the Debtors deem appropriate, in the exercise of their business judgment, based upon the Debtors' evaluation of each Bid.

The Debtors will determine, in their reasonable judgment and with the consent of the DIP ABL Agent and the Prepetition ABL Agent, which of the Bids received by the Bid Deadline qualify as a "Qualified Bid" (each Potential Bidder that submits such a Qualified Bid being a "Qualified Bidder") and will notify each Qualified Bidder of its status as a Qualified Bidder by no later than **September 11, 2024 at 4:00 p.m. (prevailing Eastern Time)**.  To the extent reasonably practicable, counsel to the Debtors will provide summaries of the material terms of each Qualified Bid to the counsel to the Committee on a professionals' eyes only basis prior to the Auction.

Without the written consent of the Debtors, the DIP ABL Agent and the Prepetition ABL Agent, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the Purchase Price or otherwise improve the terms of its Qualified Bid during the period that such Qualified Bid remains binding as specified herein; provided, that any Qualified Bid may be improved at the Auction as set forth in these Bidding Procedures.  The Debtors reserve the right to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed a Qualified Bid and to clarify or otherwise improve such Bid such that it may be designated a Qualified Bid.

In evaluating the Bids, the Debtors may take into consideration the following non-binding factors:

2. the assets and liabilities included in or excluded from the Bid, including any executory contracts or unexpired leases proposed to be assumed;

3. the value to be provided to the Debtors under the Bid, including the net economic effect upon the Debtors' estates;

4. any benefit to the Debtors' bankruptcy estates from any assumption or waiver of liabilities;

5. the transaction structure and execution risk, including conditions to, timing of, and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approvals;

6. the impact on employees;

7. the impact on trade creditors;

8. the certainty of the Debtors being able to confirm a plan of liquidation; and

9. any other factors the Debtors may reasonably deem relevant consistent with their fiduciary duties.

### **Stalking Horse Bidders, DC Bidders, and Respective Bid Protections**

Upon the entry of the Bidding Procedures Order, the Debtors shall be authorized but not obligated, in an exercise of their reasonable business judgment, and in consultation with the Consultation Parties, to provide a breakup fee (the "Breakup Fee") to any stalking horse bidder (each, a "Stalking Horse Bidder") in an amount not to exceed three percent (3%) of the proposed Purchase Price, and/or (ii) agree to reimburse reasonable and documented out-of-pocket fees and expenses (the "Expense Reimbursement," and together with the Breakup Fee, the "Stalking Horse Bid Protections").

Following the occurrence of both the entry of the Bidding Procedures Order, and entry into a binding purchase agreement for the Sandston Distribution Center (the "DC Purchase Agreement"), the Debtors are authorized but not directed to provide a breakup fee (the "DC Breakup Fee") to the bidder for the Sandston Distribution Center (the "DC Bidder") equal to three percent (3%) of the purchase price set forth in the DC Purchase Agreement which shall accrue upon the occurrence of a DC Breakup Fee Trigger Event.

Upon entry of the Bidding Procedures Order approving the designation of a Stalking Horse Bidder and Stalking Horse Agreement, the Debtors are authorized, but not directed, and in consultation with the Consultation Parties, to provide Stalking Horse Bid Protections to a Stalking Horse Bidder.

## Deposit

Other than a Credit Bid (if any), a Bid must be accompanied by a good faith cash deposit in the amount of no less than ten percent (10%) of the Purchase Price (a "Deposit"), unless otherwise agreed to by the Debtors and a Potential Bidder. A Deposit must be deposited prior to the Bid Deadline with an escrow agent selected by the Debtors (the "Escrow Agent") pursuant to an escrow agreement to be provided by the Debtors. To the extent a Qualified Bidder increases the Purchase Price before, during, or after the Auction, the Debtors reserve the right to require that such Qualified Bidder adjust its Deposit so that it equals ten percent (10%) of the increased Purchase Price.

## Auction Procedures

If the Debtors receive any Qualified Bids, the Debtors will conduct the Auction on **September 12, 2024 beginning at 10:00 a.m. (prevailing Eastern Time), or on such other date as may be determined by the Debtors after consultation with the Consultation Parties, either (i) at the offices of Skadden, Arps, Slate, Meagher & Flom LLP; One Manhattan West, 395 9th Ave, New York, NY 10001, or (ii) virtually pursuant to procedures to be timely filed on the Bankruptcy Court's docket**; provided that if the extension of the Auction breaches or is likely to breach a Case Milestone, such extension shall require consent of the DIP ABL Agent and the Prepetition ABL Agent. Only Qualified Bidders will be eligible to participate in the Auction, subject to such limitations as the Debtors may impose in good faith. In addition, professionals and/or other representatives of the Debtors and the Consultation Parties will be permitted to attend and observe the Auction. Further, any creditor of the Debtors may attend and observe the Auction; provided, that such creditor provides the Debtors with written notice of its intention to attend the Auction on or before one (1) business day prior to the Auction, which written notice will be sent to proposed counsel for the Debtors via electronic mail at Lisa.Laukitis@skadden.com; Maxim.MayerCesiano@skadden.com; Elizabeth.Downing@skadden.com; and Chambliss.Williams@skadden.com.

Each Qualified Bidder will be required to confirm, both before and after the Auction, that it has not engaged in any collusion with respect to the submission of any Bid, the bidding, or the Auction.

At the Auction, bidding for the Business will start with the highest or otherwise best purchase price and/or terms received as determined by the Debtors and will proceed thereafter in minimum bid increments of not less than $1,000,000 (a "Minimum Overbid Amount"). The Debtors reserve the right to adapt and may increase or decrease the Minimum Overbid Amount at any time during the Auction. Qualified Bidders may increase their bids at the Auction, including with cash, cash equivalents, or other forms of consideration.

The Debtors may, in the exercise of their business judgment, adopt rules for the Auction consistent with these Bidding Procedures and the Bidding Procedures Order that the Debtors, after consultation with the Consultation Parties, reasonably determine to be appropriate to promote a competitive auction. Any rules developed by the Debtors will provide that all bids in the Auction will be made and received on an open basis, and all bidders participating in the Auction will be entitled to be present for all bidding with the understanding that the true identity of each bidder

placing a bid at the Auction will be fully disclosed to all other bidders participating in the Auction and that all material terms of each Qualified Bid submitted in response to any successive bids made at the Auction will be disclosed to all other bidders. Each Qualified Bidder will be permitted what the Debtors reasonably determine to be an appropriate amount of time to respond to the previous bid at the Auction. The Auction will be conducted openly and will be transcribed or recorded.

The Debtors may, in the exercise of their business judgment and with the consent of the DIP ABL Agent and the Prepetition ABL Agent, identify the highest or otherwise best Qualified Bid(s) as the successful bid(s) (a "Successful Bid" and, the bidder submitting such bid, a "Successful Bidder"). The Debtors may also identify, in consultation with the Consultation Parties, which Qualified Bid(s) constitute the second highest or otherwise best bid(s) (such bid(s) will each be a "Back-Up Bid" and, the bidder submitting such bid, a "Back-Up Bidder"). Back-Up Bid(s) will remain open and irrevocable until the earliest to occur of (i) the applicable outside date for consummation of the Sale Transaction set forth in the Back-Up Bid, (ii) consummation of the Sale Transaction with a Successful Bidder, and (iii) the release of such Back-Up Bid by the Debtors in writing (such date, the "Back-Up Bid Expiration Date"). If a Sale Transaction with a Successful Bidder is terminated prior to the Back-Up Bid Expiration Date, the Back-Up Bidder will be deemed a Successful Bidder and will be obligated to consummate the Back-Up Bid as if it were a Successful Bid.

Notwithstanding anything to the contrary herein, the Debtors shall not, without the consent of the DIP ABL Agent and the Prepetition ABL Agent, accept a Bid or select a Successful Bid unless such bid, when considered together with all other Successful Bids, including Bids for the Sandston Distribution Center, as applicable, provides for the full payment of all DIP ABL Obligations and any outstanding Prepetition ABL Obligations (as each is defined in the DIP Order), including the cash collateralization of all obligations related to letters of credit and contingent exposure, in accordance with the Case Milestones set forth in the DIP Order and the DIP ABL Agreement.

Within one (1) business day after the Auction, (i) the Successful Bidder(s) will submit to the Debtors fully executed documentation memorializing the terms of the Successful Bid(s) and (ii) the Back-Up Bidder(s) will submit to the Debtors execution versions of the documentation memorializing the terms of the Back-Up Bid(s). Neither a Successful Bid nor a Back-Up Bid may be assigned to any party without the consent of the Debtors.

At any time before entry of an order approving any Sale Transaction, the Debtors reserve the right to and may reject the applicable Qualified Bid if such Qualified Bid, in the Debtors' judgment, is: (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, these Bidding Procedures, or the terms and conditions of the applicable Sale Transaction; or (iii) contrary to the best interests of the Debtors and their estates.

## Post-Auction Process

Within twelve (12) hours after the Auction (if any), the Debtors will provide the counsel and financial advisors to the Consultation Parties with written copies of the best and final version of each Qualified Bid submitted to the Debtors (along with any supplemental documentation). No later than **September 13, 2024 at 10:00 a.m. (prevailing Eastern Time)**, the Debtors will file

with the Bankruptcy Court and post on the Claims Agent Website a notice of the Successful Bid(s), Successful Bidder(s), Back-Up Bid(s), and Back-Up Bidder(s). Unless otherwise required by the Debtors' fiduciary duties, the Debtors will not consider any bids submitted after the conclusion of the Auction.

Each Successful Bidder will appear at the Sale Hearing and be prepared to have a representative(s) testify in support of its Successful Bid and the Successful Bidder's ability to close in a timely manner and provide adequate assurance of its future performance under all executory contracts and unexpired leases to be assumed and assigned as part of the applicable Sale Transaction. Within seven (7) calendar days after the Auction (if any), the Debtors will direct the Escrow Agent to return the Deposits of all bidders, together with interest accrued thereon, other than the Deposits of the Successful Bidder(s) and Back-Up Bidder(s). Within five (5) calendar days after the Back-Up Bid Expiration Date, the Debtors will direct the Escrow Agent to return the Deposit(s) of the Back-Up Bidder(s), together with interest accrued thereon (if any). Upon the authorized return of any such Deposits, the Bid associated therewith will be deemed revoked and no longer enforceable.

Each Successful Bidder's Deposit (if any) will be applied against the portion of the Purchase Price of its Successful Bid upon the consummation of the applicable Sale Transaction. In addition to the foregoing, the Deposit of any Qualified Bidder will be forfeited to the Debtors if (i) the Qualified Bidder attempts to modify, amend, or withdraw its Qualified Bid, except as permitted herein or with the Debtors' written consent, during the time the Qualified Bid remains binding and irrevocable or (ii) except as provided herein, the Qualified Bidder is selected as a Successful Bidder and fails to enter into the required definitive documentation or to consummate the applicable Sale Transaction in accordance with these Bidding Procedures.

## Consultation Parties

The term "Consultation Parties" as used in these Bidding Procedures will mean the DIP ABL Agent, the DIP ABL Lenders, the Prepetition ABL Agent, and any Committee; *provided, however*, that to the extent any Consultation Party submits a Bid for any assets, such party shall not be a Consultation Party with respect to the evaluation and qualification of competing Bids for the assets included in the Credit Bid or with respect to seeking and/or obtaining information about other Bids, but shall remain a Consultation Party for other purposes set forth in these Bidding Procedures; *provided, further,* notwithstanding anything herein to the contrary, the Debtors will only be required to reasonably consult with any Committee and any such Committee will not have any consent rights with respect to these Bidding Procedures. The Debtors will regularly and timely consult and confer with the Consultation Parties in respect of all aspects of the bidding and Auction process in order to maximize value for all parties in interest.

## Notices Regarding Assumption and Assignment

The Debtors will provide all notices regarding the proposed assumption and assignment of contracts and leases in accordance with the Assumption and Assignment Procedures included in the Bidding Procedures Order.

## Sale Hearing

The Debtors will seek entry of an order, which shall be in form and substance satisfactory to the DIP ABL Agent and the Prepetition ABL Agent, authorizing and approving, among other things, the applicable Sale Transaction at a hearing before the Bankruptcy Court to be held on **September 16, 2024 at 10:00 a.m. (prevailing Eastern Time)** (the "Sale Hearing"). The objection deadline for any Sale Transaction to be approved at the Sale Hearing will be **September 5, 2024 at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline"). The Sale Hearing may be adjourned or continued to a later date by the Debtors, with the consent of the DIP ABL Agent and the Prepetition ABL Agent, after consultation with counsel to the Committee, by sending notice prior to or making an announcement at the Sale Hearing. No further notice of any such adjournment or continuance will be required to be provided to any party.

The Debtors may elect to seek approval of a Sale Transaction in advance of the Sale Hearing. To the extent the Debtors determine to do so, notice will be provided for alternative hearing dates and related timelines.

Objections to any Sale Transactions, including any objection to the sale of the Business free and clear of liens, claims, encumbrances, and other interests (each, a "Sale Objection"), must: (i) be in writing; (ii) state the name and address of the objecting party and the amount and nature of the claim or interest of such party; (iii) state with particularity the basis and nature of any objection, and provide proposed language that, if accepted and incorporated by the Debtors, would obviate such objection; (iv) conform to the Bankruptcy Code, Bankruptcy Rules, and Local Rules; and (v) be filed with the Bankruptcy Court and be served on the Objection Notice Parties (as defined in the Sale Notice) by the deadline provided in the applicable Sale Notice. In addition to being filed with the Bankruptcy Court, any such responses or objections must be served on the Objection Notice Parties and any such other parties as the Bankruptcy Court may order, by the Sale Objection Deadline; provided, that the Debtors may extend such Sale Objection Deadline, as the Debtors deem appropriate in the exercise of their reasonable business judgment. If a timely Sale Objection cannot otherwise be resolved by the parties, such objection will be heard by the Bankruptcy Court at the applicable sale hearing (which may be the Sale Hearing).

Any party who fails to file a Sale Objection with the Bankruptcy Court and serve it on the Objection Notice Parties by **September 5, 2024 at 4:00 p.m. (prevailing Eastern Time)** will be forever barred from asserting, at the Sale Hearing or thereafter, any objection to the consummation of the applicable Sale Transaction and any related relief requested by the Debtors.

## Consent to Jurisdiction and Authority as Condition to Bidding

All Potential Bidders that participate in the bidding process will be deemed to have (i) consented to the core jurisdiction of the Bankruptcy Court with respect to these Bidding Procedures, the bid process, the Auction, any Sale Transaction, the Sale Hearing, or the construction and enforcement of any agreement or any other document relating to a Sale Transaction; (ii) waived any right to a jury trial in connection with any disputes relating to any of the foregoing; and (iii) consented to the entry of a final order or judgment in any way related to any of the foregoing if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

## Reservation of Rights

The Debtors reserve the right to, in their reasonable business judgment, in a manner consistent with their fiduciary duties and applicable law: (i) to modify these Bidding Procedures; (ii)    waive terms and conditions set forth herein with respect to all Potential Bidders; (iii) extend the deadlines set forth herein; and (iv) announce at the Auction the modified or additional procedures for conducting the Auction, in each case, to the extent not materially inconsistent with these Bidding Procedures and the Bidding Procedures Order; provided that (a) the Debtors may not amend these Bidding Procedures, the Bidding Procedures Order or the bidding process to reduce or otherwise modify their obligations to consult with the DIP ABL Agent, the DIP ABL Lenders or the Prepetition ABL Agent without the consent of such parties or further order of the Court and (b) without the prior written consent of the DIP ABL Agent, the DIP ABL Lenders and the Prepetition ABL Agent , the Debtors shall not adopt new rules, procedures or deadlines or otherwise modify these Bidding Procedures or the Bidding Procedures Order in a manner that alters or limits the rights of, or imposes additional burdens on, the DIP ABL Agent, the DIP ABL Lenders or the Prepetition ABL Agent , including by (x) requiring the DIP ABL Agent, the DIP ABL Lenders or the Prepetition ABL Agent, to include a deposit as part of a Credit Bid or (y) removing, limiting, or imposing additional conditions on, the rights of such parties to Credit Bid and/or to be deemed a Qualified Bidder (and their Bids deemed Qualified Bids). If any of the DIP ABL Agent, the DIP ABL Lenders, the Prepetition ABL Agent, the U.S. Trustee or any Committee appointed in these cases determines in good faith that any modification to these Bidding Procedures or the Bidding Procedures Order, or any adoption of new rules procedures or deadlines, would not be consistent with this paragraph or these Bidding Procedures or the Bidding Procedures Order, such DIP ABL Agent, DIP ABL Lenders, Prepetition ABL Agent , U.S. Trustee, or Committee may file an objection with the Bankruptcy Court, and no such modification or adoption shall become effective until such objection is resolved.  Nothing in these Bidding Procedures will obligate the Debtors to consummate or pursue any transaction with respect to any Asset with a Qualified Bidder.

## Fiduciary Out

Nothing in these Bidding Procedures will require the Debtors to take any action, or refrain from taking any action to the extent the Debtors determine, based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.

## DIP Order

Notwithstanding anything to the contrary contained in these Bidding Procedures or otherwise: (i) the rights of the DIP ABL Agent, the DIP ABL Lenders and the Prepetition ABL Agent to consent to the sale of any portion of their collateral on terms and conditions acceptable to the DIP ABL Agent, the DIP ABL Lenders and the Prepetition ABL Agent are hereby expressly reserved and not modified, waived or impaired in any way by these Bidding Procedures, (ii) subject to the terms of the DIP Orders, all proceeds generated from the sale of the Business contemplated herein shall be paid to the DIP ABL Agent upon the closing of such sale for permanent application against the DIP ABL Obligations and the Prepetition ABL Obligations in accordance with the terms and conditions of the DIP Order and the DIP ABL Documents until the DIP ABL Obligations

14

and the Prepetition ABL Obligations have been Paid in Full (as defined in the DIP Order), and (iii) nothing in these Bidding Procedures shall amend, modify, or impair any provision of the DIP Order, or the rights of the DIP ABL Agent, the DIP ABL Lenders or the Prepetition ABL Agent thereunder.

**<u>Exhibit 2</u>**

**Sale Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **LL FLOORING HOLDINGS, INC.**, *et al.*, | **Case No. 24-11680 (BLS)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

## NOTICE OF SALE, BIDDING, PROCEDURES, AUCTION AND SALE HEARING

On August 11, 2024, LL Flooring Holdings, Inc. and certain of its affiliates, as debtors and debtors in possession in the above-captioned Chapter 11 Cases (collectively, the "Debtors") filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") a motion (Docket No. [_]) (the "Motion")[2] for the entry of an order (the "Bidding Procedures Order"): (i) approving the Bidding Procedures, substantially in the form attached to the Bidding Procedures Order as **Exhibit 1**; (ii) setting the deadline for Potential Bidders to submit a proposal to purchase the Business (the "Bid Deadline"), scheduling an auction (the "Auction"), and scheduling the hearing with respect to the approval of the sale (the "Sale Hearing"); (iii) authorizing and approving the form and manner of the Sale Notice; (iv) authorizing and approving the Cure Notice to the Contract Counterparties regarding the Debtors' potential assumption and assignment of the Assigned Contracts and of the Debtors' calculation of the amount necessary to cure any defaults thereunder (the "Cure Costs"); (v) authorizing and approving procedures for the assumption and assignment of the Assigned Contracts and the determination of Cure Costs with respect thereto (collectively, the "Assumption and Assignment Procedures"); and (vi) granting related relief.

On [_], 2024, the Bankruptcy Court entered the Bidding Procedures Order (Docket No. [_]) approving, among other things, the Bidding Procedures, which establishes the key dates and times related the Auction and Sale Hearing. All interested bidders should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety.[3]

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four (4) digits of their respective tax identification numbers, are as follows: LL Flooring Holdings, Inc. (0817); LL Flooring, Inc. (9199); Lumber Liquidators Leasing, LLC (N/A); LL Flooring Services, LLC (5960); and Lumber Liquidators Foreign Holdings, LLC (4568). The address of the Debtors' corporate headquarters is 4901 Bakers Mill Lane, Richmond, VA 23230.

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion or Bidding Procedures, as applicable.

[3]    To the extent of any inconsistencies between the Bidding Procedures and the summary descriptions of the Bidding Procedures in this notice, the terms in the Bidding Procedures shall control in all respects.

**Important Dates and Deadlines**

- **Bid Deadline**. Any person or entity interested in participating in the Auction for the sale of the Business must submit a Qualified Bid on or before **September 9, 2024 at 4:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline").

- **Auction**. If the Debtors receive more than one Qualified Bid, the Debtors will conduct the Auction, which has been scheduled for **September 12, 2024 at 10:00 a.m. (prevailing Eastern Time)** either (i) at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, One Manhattan West, 395 9th Ave, New York, NY 10001 or (ii) virtually pursuant to procedures to be timely filed on the Bankruptcy Court's docket, or such other, date, time, and location as will be timely communicated to all entities entitled to attend the Auction.

- **Sale Objection Deadlines**. Objections to the sale (a "Sale Objection"), including any objection to the sale of the Business free and clear of all claims and interests pursuant to section 363(f) of the Bankruptcy Code, must be (i) filed in accordance with the Bidding Procedures, (ii) filed with the Bankruptcy Court, and (iii) served on the Objection Notice Parties (as defined herein) on or before **September 5, 2024 at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline").

- **Sale Hearing**. A hearing to approve and authorize the sale of the Business to the Successful Bidder will be held before the Court on or before **September 16, 2024 at 10:00 a.m. (prevailing Eastern Time)** or such other date as determined by the Court.

**Filing Objections**

Sale Objections, if any, must (i) be in writing, (ii) state, with specificity, the legal and factual bases thereof, (iii) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules, (iv) be filed with the Court by no later than the Sale Objection Deadline, and (v) be served on (i) LL Flooring Holdings, Inc., 4901 Bakers Mill Lane, Richmond, VA 23230 (Attn: Alice Givens, Esq. (agivens@llflooring.com)); (ii) proposed counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 920 North King Street, Wilmington, Delaware 19801 (Attn: Joseph O. Larkin, Esq. (joseph.larkin@skadden.com) and Jason M. Liberi, Esq. (jason.liberi@skadden.com)) and One Manhattan West, New York, New York 10001 (Attn: Lisa Laukitis, Esq. (lisa.laukitis@skadden.com); Elizabeth M. Downing, Esq. (elizabeth.downing@skadden.com); and Chambliss Williams, Esq. (chambliss.williams@skadden.com)); (iii) the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Rosa Sierra-Fox, Esq. (rosa.sierra-fox@usdoj.gov)); (iv) counsel to the DIP ABL Agent and the Prepetition ABL Agent, (a) Morgan Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110 (Attn: Christopher L. Carter, Esq. (christopher.carter@morganlewis.com)) and (b) Reed Smith LLP, 1201 Market Street, Suite 1500, Wilmington, Delaware 19801 (Attn: Kurt E. Gwynne, Esq. (KGwynne@ReedSmith.com)); and (v) counsel to any Committee (collectively, the "Objection Notice Parties").

## Additional Information

The Bidding Procedures set forth the requirements for becoming a Qualified Bidder and submitting a Qualified Bid, and any party interested in making an offer to purchase the Business must comply with the Bidding Procedures. Only Qualified Bids will be considered by the Debtors, in accordance with the Bidding Procedures.

Any party interested in submitting a bid should contact the Debtors' investment banker, Houlihan Lokey, Inc. (Attn: Surbhi Gupta (sgupta@hl.com), Ethan Kopp (ekopp@hl.com)), Sam Ward (spward@hl.com), and Iman Sennoun (iman.sennoun@hl.com)) as soon as possible.

Copies of the Motion, the Bidding Procedures Order, and the Bidding Procedures, as well as all related exhibits and all other agreements filed with the Court, may be obtained free of charge at the website dedicated to the Debtors' Chapter 11 Cases maintained by their claims and noticing agent, Stretto, located at 7 Times Square 16th Floor New York, NY 10036.

## Reservation of Rights

Except as otherwise set forth herein and in the Bidding Procedures, the Debtors reserve the right to, in their reasonable business judgment, in a manner consistent with their fiduciary duties and applicable law, to modify the Bidding Procedures; waive terms and conditions set forth therein with respect to all Potential Bidders; extend the deadlines set forth therein; announce at the Auction modified or additional procedures for conducting the Auction; alter the assumptions set forth therein; provided that the Debtors will not be authorized to make material modifications to the Bidding Procedures without further order of the Court. The Debtors may provide reasonable accommodations to any Potential Bidder(s) with respect to such terms, conditions, and deadlines of the bidding and Auction process to promote further bids on the Debtors' business, in each case, to the extent not materially inconsistent with the Bidding Procedures and the Bidding Procedures Order. All parties reserve their rights to seek Bankruptcy Court relief with regard to the Auction, the Bidding Procedures, and any related items (including, if necessary, to seek an extension of the Bid Deadline).

**FAILURE TO ABIDE BY THE BIDDING PROCEDURES, THE BIDDING PROCEDURES ORDER, OR ANY OTHER ORDER OF THE BANKRUPTCY COURT IN THESE CHAPTER 11 CASES MAY RESULT IN THE REJECTION OF YOUR BID.**

**THE FAILURE OF ANY PERSON OR ENTITY TO FILE AND SERVE AN OBJECTION IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER BY THE SALE OBJECTION DEADLINE WILL FOREVER BAR SUCH PERSON OR ENTITY FROM ASSERTING ANY OBJECTION TO THE MOTION, THE ORDER APPROVING THE SALE TRANSACTION, THE PROPOSED SALE TRANSACTION, OR ANY OTHER AGREEMENT EXECUTED BY THE DEBTORS AND A SUCCESSFUL BIDDER AT THE AUCTION.**

*[Remainder of page intentionally left blank]*

3

Dated: [_] [_], 2024
      Wilmington, Delaware

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

_____

Joseph O. Larkin (I.D. No. 4883)
Jason M. Liberi (I.D. No. 4425)
One Rodney Square
920        N. King        Street
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Joseph.Larkin@skadden.com
Jason.Liberi@skadden.com

- and -

Lisa Laukitis (*pro hac vice* admission pending)
Shana A. Elberg (*pro hac vice* admission pending)
Elizabeth M. Downing (*pro hac vice* admission pending)
Angeline J. Hwang (*pro hac vice* admission pending)
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Lisa.Laukitis@skadden.com
Shana.Elberg@skadden.com
Elizabeth.Downing@skadden.com
Angeline.Hwang@skadden.com

*Proposed Counsel to Debtors and Debtors in Possession*

## Exhibit 3

**Cure Notice**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

*In re*

**LL FLOORING HOLDINGS, INC.,** *et al.*,

Debtors.[1]

**Chapter 11**

**Case No. 24-11680 (BLS)**

**(Joint Administration Pending)**

**NOTICE OF PROPOSED ASSUMPTION AND**
**ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS**

---

**PLEASE TAKE NOTE OF THE FOLLOWING DEADLINES:**

**Cure Objection Deadline:** On or before **September 5, 2024, at 4:00 p.m. (prevailing Eastern Time)**, or such deadline set forth in the applicable Supplemental Assumption Notice.

**Auction Results Objection Deadline:** If the Stalking Horse Bidder is not the Successful Bidder at the Auction, on or before **September 16, 2024, at 10:00 a.m. (prevailing Eastern Time)**.

---

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.     On August 11, 2024, LL Flooring Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), filed with the United States Bankruptcy Court for the District of Delaware (the "Court") the *Motion of Debtors for Entry of Orders (I) Approving (A) Bidding Procedures, (B) Form Asset Purchase Agreement, (C) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (D) Assumption and Assignment Procedures, (II) Scheduling Auction and Sale Hearing, (III) Approving (A) Sale of Substantially All of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, and (V) Granting Related Relief* (Docket No. [_]) (the "Bidding Procedures Motion"), seeking an order (the "Bidding Procedures Order"),[2] among other things, (a) approving certain bidding procedures (the "Bidding Procedures") in connection with the sale or sales of substantially all of the Debtors' business (the "Business") pursuant to section 363 of the Bankruptcy Code (the "Sale"), including certain dates and deadlines thereunder for the Sale process; and (b) authorizing procedures (such procedures, the "Assumption and

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four (4) digits of their respective tax identification numbers, are as follows: LL Flooring Holdings, Inc. (0817); LL Flooring, Inc. (9199); Lumber Liquidators Leasing, LLC (N/A); LL Flooring Services, LLC (5960); and Lumber Liquidators Foreign Holdings, LLC (4568).  The address of the Debtors' corporate headquarters is 4901 Bakers Mill Lane, Richmond, VA 23230.

[2]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Bidding Procedures Motion or the Bidding Procedures Order.

Assignment Procedures") to facilitate the fair and orderly assumption, assumption and assignment, and rejection of certain executory contracts (the "Contracts") or unexpired leases (the "Leases") of the Debtors.

2.     On August [_], 2024, the Court, entered the Bidding Procedures Order (Docket No. [_]). Pursuant to the Bidding Procedures Order, the Debtors hereby provide notice (this "Cure Notice") that they are seeking to assume and assign to [_] (the "Stalking Horse Bidder")[3], or, if the Stalking Horse Bidder is not the Successful Bidder at the Auction (if any), any other Successful Bidder(s), the Contracts or Leases listed on **Exhibit A** attached hereto (each, a "Potential Assigned Contract"). **You are receiving this Cure Notice because you may be a counterparty to a Contract or Lease (a "Counterparty") that is proposed to be assumed and assigned to the Successful Bidder in connection with the Sale.**

3.     If the Debtors assume and assign to the Successful Bidder(s) a Potential Assigned Contract to which you are a party, on the closing date of the Sale, or as soon thereafter as practicable, such Successful Bidder will pay you the amount the Debtors' records reflect is owing for **pre-bankruptcy filing arrearages** as set forth on **Exhibit A** (the "Cure Cost"). The Debtors' records reflect that all postpetition amounts owing under your Potential Assigned Contract have been paid and will continue to be paid in the ordinary course until the assumption and assignment of the Potential Assigned Contract, and that other than the Cure Cost, there are no other defaults under the Potential Assigned Contract.

4.     The Debtors' inclusion of a Contract or Lease as a Potential Assigned Contract on **Exhibit A** is not a guarantee that such Contract or Lease will ultimately be assumed and assigned to any Successful Bidder. Should it be determined that a Potential Assigned Contract will not be assumed and assigned, the Debtors will notify such party to the Potential Assigned Contract in writing of such decision.

5.     Notwithstanding anything to the contrary herein, the proposed assumption and assignment of each of the Potential Assigned Contracts listed on **Exhibit A** hereto (a) will not be an admission as to whether any such Potential Assigned Contract was executory or unexpired as of the Petition Date or remains executory or unexpired postpetition within the meaning of Bankruptcy Code section 365; and (b) will be subject to the Debtors', the Stalking Horse Bidder's, or any Successful Bidder(s)'s right to conduct further confirmatory diligence with respect to the Cure Cost of each Potential Assigned Contract and to modify such Cure Cost accordingly. In the event that the Debtors or any Successful Bidder determine that your Cure Cost should be modified, you will receive a notice pursuant to the Assumption and Assignment Procedures below, which will provide for additional time for you to object to such modification.

I.     **Assumption and Assignment Procedures**

6.     The Assumption and Assignment Procedures set forth below regarding the assumption and assignment of the Potential Assigned Contracts proposed to be assumed by the

---

[3]     [A copy of the purchase agreement between the Debtors and the Stalking Horse Bidder (the "Stalking Horse Agreement" or the "APA," and such bid memorialized therein, the "Stalking Horse Bid") is attached as Exhibit [_] to the [_] (Docket No. [_]).

Debtors and assigned to the Successful Bidder(s) in connection with the Sale will govern the assumption and assignment of all of the Potential Assigned Contracts, subject to the payment of any Cure Costs:

**Cure Costs and Adequate Assurance of Future Performance.** The payment of the applicable Cure Costs by any party, as applicable, will (i) effect a cure of all monetary defaults existing thereunder and (ii) compensate for any actual pecuniary loss to such Counterparty resulting from such default.

**Additions.** The Debtors may also designate additional Contracts or Leases as Potential Assigned Contracts to be assumed by the Debtors and assigned to a Successful Bidder (the "Additional Potential Assigned Contracts") until three (3) days before the closing of the Sale. Following the addition of an Additional Potential Assigned Contract, the Debtors will as soon as reasonably practicable thereafter serve an assumption and assignment notice ("Assumption and Assignment Notice") on each of the counterparties to such Additional Potential Assigned Contracts and their counsel of record, if any, indicating (i) that the Debtors intend to assume and assign the Counterparty's Contract or Lease, as applicable, to the Successful Bidder(s), and (ii) the corresponding Cure Cost. The Debtors will provide any counterparties to such Additional Potential Assigned Contracts an opportunity to be heard, if necessary, with respect to the assumption and assignment of their Potential Assigned Contract.

**Eliminations**. The Debtors may remove any Contract or Lease, as applicable, to be assumed by the Debtors and assigned to the Successful Bidder (the "Eliminated Agreements") until three (3) days before the closing of the Sale. Following the removal of an Eliminated Agreement, the Debtors will as soon as reasonably practicable thereafter serve a notice (a "Removal Notice") on each of the impacted counterparties and their counsel of record, if any, indicating that the Debtors no longer intend to assign the Counterparty's Contract or Lease, as applicable, to the Successful Bidder(s) in connection with the Sale.

**Supplemental Contract Assumption Notice**. Although the Debtors intend to make a good faith effort to identify all Potential Assigned Contracts that may be assumed and assigned in connection with the Sale, the Debtors may discover certain executory contracts inadvertently omitted from the Potential Assigned Contracts list or the Successful Bidder(s) may identify other Contracts or Leases that they desire to have assumed and assigned in connection with the Sale. Accordingly, the Debtors reserve the right, but only in accordance with the Stalking Horse Agreement or the purchase and sale agreement with the Successful Bidder(s) (the "Successful Bidder Purchase Agreement"), as applicable, or as otherwise agreed by the Debtors and the Successful Bidder(s), at any time before the deadline for designation of additional Potential Assigned Contracts or removal of potentially Potential Assigned Contracts set forth in the Stalking Horse Agreement or the Successful Bidder Purchase Agreement, to (i) supplement the list of Potential Assigned Contracts with previously omitted executory contracts, (ii) remove Potential Assigned Contracts from the list of executory contracts ultimately selected as Potential Assigned Contracts that a Successful Bidder proposes be assumed and assigned to it in connection with the Sale, or (iii) modify the previously stated Cure Cost associated with any Potential Assigned Contracts. In the event the Debtors exercise any of these reserved rights, the Debtors will promptly serve a supplemental notice of contract assumption (a "Supplemental Assumption and Assignment Notice") on each of the counterparties to such contracts and their counsel of record, if any;

*provided*, *however*, the Debtors may not add an executory contract to the list of Potential Assigned Contracts that has been previously rejected by the Debtors by order of the Court. Each Supplemental Assumption and Assignment Notice will include the same information with respect to listed Potential Assigned Contracts as was included in the Assumption and Assignment Notice, or in the event of a removal, the information required in a Removal Notice. Any Supplemental Assumption and Assignment Notice will be served as soon as reasonably practicable following the Successful Bidder's identification of any such omissions, removals, or modifications to any Potential Assigned Contracts.

**Objections**. Objections, if any, to the proposed assumption and assignment or the Cure Cost proposed with respect thereto, must (i) be in writing; (ii) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; (iii) state, with specificity, the legal and factual bases thereof; (iv) if a Cure Objection that pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Counterparty, together with the appropriate documentation including the cure amount the Counterparty believes is required to cure defaults under the relevant Contract or Lease; (v) include any appropriate documentation in support thereof; and (vi) be filed with the Court and served on, so actually be received by, the Objection Recipients (as defined below) by the applicable deadlines below or such deadline as set forth in the applicable Supplemental Assumption and Assignment Notice.

(vii)     *Cure Objection Deadline*. Any objection to the Cure Cost, to assumption and assignment of a Potential Assigned Contract, or to lack of adequate assurance of the performance of the Stalking Horse Bidder (including as set forth in Part I hereof) must be filed with the Bankruptcy Court on or before **September 5, 2024, at 4:00 p.m. (prevailing Eastern Time)** (the "Cure Objection Deadline"), **or such deadline set forth in the applicable Supplemental Assumption Notice**, and served on: (a) counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 920 North King Street, Wilmington, Delaware 19801 (Attn: Joseph O. Larkin, Esq. (joseph.larkin@skadden.com) and Jason M. Liberi, Esq. (jason.liberi@skadden.com)) and One Manhattan West, New York, New York 10001 (Attn: Lisa Laukitis, Esq. (lisa.laukitis@skadden.com); Elizabeth M. Downing, Esq. (elizabeth.downing@skadden.com); and Chambliss Williams, Esq. (chambliss.williams@skadden.com)); and (b) counsel to the Stalking Horse Bidder, [_], [address of counsel to Stalking Horse] (Attn: [_] ([_]), [_] ([_]))  (collectively, the "Cure Objection Recipients").

(viii)     *Auction Results Objection Deadline.* If the Debtors hold an Auction and if a Successful Bidder that is not the Stalking Horse Bidder prevails at the Auction, as soon as reasonably practicable after selecting such Successful Bidder(s), the Debtors will file (but not serve) and cause to be published on the Case Website a notice of results of the Auction (the "Notice of Auction Results"). Upon the filing of any Notice of Auction Results, objections *solely* to the identity of the Successful Bidder(s), changes to the Stalking Horse Agreement, or adequate assurance of future performance (each, a "Auction Results Objection") may be made. Any Auction Results Objection must be filed with the Bankruptcy Court and served on (A) counsel for the Debtors and (B) the Successful Bidder(s) and its counsel, if any and together with the Cure Objection Recipients, the "Objection Recipients"), so as to be received by **September 16, 2024, at 10:00 a.m. (Prevailing Eastern Time)** (the "Auction Results Objection Deadline"); *provided, however*, that the Cure Objection Deadline will not be extended.

Any party properly noticed by the Debtors in accordance with these Assumption and Assignment Procedures that fails to timely file an objection to (i) the proposed Cure Cost or (ii) the proposed assumption and assignment of an Potential Assigned Contract or Additional Potential Assigned Contract listed on the Assumption and Assignment Notice or a Supplemental Assumption and Assignment Notice, is deemed to have consented to (A) such Cure Cost, (B) the assumption and assignment of such Potential Assigned Contract or Additional Potential Assigned Contract (including the adequate assurance of future payment), and (C) the related relief requested in the Bidding Procedures Motion. Such party will be forever barred and estopped from objecting to the Cure Cost, the assumption and assignment of the Potential Assigned Contract, or Additional Potential Assigned Contract, adequate assurance of future performance, or the related relief requested herein and in the Bidding Procedures Motion, whether applicable law excuses such Counterparty from accepting performance by, or rendering performance to, the Successful Bidder(s), and from asserting any additional cure or other amounts against the Debtors and the Successful Bidder(s) with respect to such party's Potential Assigned Contract or Additional Potential Assigned Contract.

If a Cure Objection or Auction Results Objection, as applicable, filed by the Cure Objection Deadline or Auction Results Objection Deadline, as applicable, cannot otherwise be resolved by the parties prior to the Sale Hearing, such objections and all issues regarding the Cure Cost amount to be paid, the assignability, or the adequate assurance of future performance, as applicable, will be determined by the Court at the Sale Hearing, or at a later hearing on a date to be scheduled by the Debtors in their discretion, and in consultation with the Successful Bidder(s).

## II.    Additional Information

7.     Unless otherwise provided in the Sale Order, the Debtors will have no liability or obligation with respect to defaults relating to the Potential Assigned Contracts arising, accruing, or relating to a period on or after the effective date of assignment.

8.     Copies of the Bidding Procedures Motion, the Bidding Procedures Order, the Bidding Procedures, and the Sale Notice may be obtained free of charge at the website dedicated to the Debtors' Chapter 11 Cases maintained by their claims and noticing agent and administrative advisor, Stretto[4], located at 7 Times Square 16th Floor New York, NY 10036.

*[Remainder of Page Intentionally Left Blank]*

---

[4]    Stretto is the trade name of Bankruptcy Management Solutions, Inc. and its subsidiaries.

Dated:  [_] [_], 2024
      Wilmington, Delaware

                  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                  _____
                  Joseph O. Larkin (I.D. No. 4883)
                  Jason M. Liberi (I.D. No. 4425)
                  One Rodney Square
                  920 N. King Street
                  Wilmington, Delaware 19801
                  Telephone: (302) 651-3000
                  Joseph.Larkin@skadden.com
                  Jason.Liberi@skadden.com

                  - and -

                  Lisa Laukitis (*pro hac vice* admission pending)
                  Shana A. Elberg (*pro hac vice* admission pending)
                  Elizabeth M. Downing (*pro hac vice* admission pending)
                  Angeline J. Hwang (*pro hac vice* admission pending)
                  One Manhattan West
                  New York, New York 10001
                  Telephone: (212) 735-3000
                  Lisa.Laukitis@skadden.com
                  Shana.Elberg@skadden.com
                  Elizabeth.Downing@skadden.com
                  Angeline.Hwang@skadden.com

                  *Proposed Counsel to Debtors and Debtors in Possession*

**Exhibit 4**

**Form APA**

**FOR DISCUSSION PURPOSES ONLY**

---

**ASSET PURCHASE AGREEMENT**

**DATED AS OF [•], 2024**

**BY AND AMONG**

**[•],**

**AS PURCHASER,**

**[•], AS GUARANTOR,**

**AND**

**LL FLOORING HOLDINGS, INC.**

**AND ITS SUBSIDIARIES NAMED HEREIN, AS SELLERS**

---

# ARTICLE I
## PURCHASE AND SALE OF THE ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

| | | |
|---|---|---|
| 1.1 | Purchase and Sale of the Acquired Assets | 4 |
| 1.2 | Excluded Assets | 8 |
| 1.3 | Assumption of Certain Liabilities | 10 |
| 1.4 | Excluded Liabilities | 10 |
| 1.5 | Assumption/Rejection of Certain Contracts | 11 |

# ARTICLE II
## CONSIDERATION; PAYMENT; CLOSING

| | | |
|---|---|---|
| 2.1 | Consideration | 13 |
| 2.2 | Closing | 14 |
| 2.3 | Closing Deliveries by Sellers | 14 |
| 2.4 | Closing Deliveries by Purchaser | 14 |
| 2.5 | Withholding | 15 |
| 2.6 | Allocation | 15 |

# ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

| | | |
|---|---|---|
| 3.1 | Organization and Qualification | 16 |
| 3.2 | Authorization of Agreement | 16 |
| 3.3 | Conflicts; Consents | 17 |
| 3.4 | Financial Statements; No Undisclosed Liabilities | 17 |
| 3.5 | Title to Properties | 18 |
| 3.6 | Contracts | 18 |
| 3.7 | No Litigation; Orders | 20 |
| 3.8 | Permits; Compliance with Laws | 20 |
| 3.9 | Environmental Matters | 20 |
| 3.10 | Intellectual Property | 20 |
| 3.11 | Tax Matters | 22 |
| 3.12 | Assumed Benefit Plans | 23 |
| 3.13 | Employees | 24 |
| 3.14 | Affiliate Transactions | 24 |
| 3.15 | Suppliers | 24 |
| 3.16 | Brokers | 24 |
| 3.17 | No Other Representations or Warranties | 25 |

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

| | | |
|---|---|---|
| 4.1 | Organization and Qualification | 25 |
| 4.2 | Authorization of Agreement | 25 |
| 4.3 | Conflicts; Consents | 26 |
| 4.4 | Financing | 26 |

4.5     Brokers ................................................................................................ 27
4.6     No Litigation ....................................................................................... 27
4.7     Investment Representation; Investigation ........................................... 27
4.8     No Foreign Person ............................................................................... 27
4.9     Solvency............................................................................................... 27
4.10    No Other Representations or Warranties............................................. 28

**ARTICLE V**
**BANKRUPTCY COURT MATTERS**

5.1     Bankruptcy Actions.............................................................................. 28
5.2     Cure Costs ........................................................................................... 30
5.3     Sale Order ............................................................................................ 30
5.4     Approval .............................................................................................. 31

**ARTICLE VI**
**COVENANTS AND AGREEMENTS**

6.1     Conduct of Business of Sellers ............................................................ 31
6.2     Access to Information .......................................................................... 34
6.3     Employee Matters ................................................................................ 36
6.4     Filings and Authorizations .................................................................. 38
6.5     Reasonable Efforts; Cooperation......................................................... 39
6.6     Further Assurances............................................................................... 39
6.7     Receipt of Misdirected Assets.............................................................. 39
6.8     Acknowledgment by Purchaser............................................................ 40
6.9     Guaranty............................................................................................... 41
6.10    Intellectual Property Matters................................................................ 42
6.11    Delivery of Schedules .......................................................................... 43
6.12    Professional Fee Escrow Account ........................................................ 43

**ARTICLE VII**
**CONDITIONS TO CLOSING**

7.1     Conditions Precedent to the Obligations of Purchaser and Sellers ..... 43
7.2     Conditions Precedent to the Obligations of Purchaser........................ 44
7.3     Conditions Precedent to the Obligations of Sellers ............................ 44
7.4     Frustration of Closing Conditions ....................................................... 45

**ARTICLE VIII**
**TERMINATION**

8.1     Termination of Agreement.................................................................... 45
8.2     Effect of Termination .......................................................................... 47

**ARTICLE IX**
**TAXES**

9.1     Transfer Taxes ..................................................................................... 47
9.2     Cooperation .......................................................................................... 47

9.3          Preparation of Tax Returns and Payment of Taxes ............................................ 47

**ARTICLE X**
**MISCELLANEOUS**

10.1         Non-Survival of Representations and Warranties and Certain Covenants;
             Certain Waivers.......................................................................................... 48
10.2         Expenses ..................................................................................................... 48
10.3         Notices........................................................................................................ 49
10.4         Binding Effect; Assignment........................................................................ 49
10.5         Amendment and Waiver .............................................................................. 50
10.6         Third-Party Beneficiaries ........................................................................... 50
10.7         Non-Recourse.............................................................................................. 50
10.8         Severability................................................................................................. 50
10.9         Construction ............................................................................................... 51
10.10        Schedules .................................................................................................... 51
10.11        Complete Agreement................................................................................... 51
10.12        Specific Performance .................................................................................. 52
10.13        Jurisdiction and Exclusive Venue............................................................... 52
10.14        Governing Law; Waiver of Jury Trial......................................................... 53
10.15        No Right to Set-off...................................................................................... 53
10.16        Counterparts and PDF ................................................................................ 54
10.17        Publicity...................................................................................................... 54
10.18        Bulk Sales Laws ......................................................................................... 54
10.19        Fiduciary Obligations ................................................................................. 55
10.20        Time of Essence.......................................................................................... 55
10.21        Sellers' Representative ................................................................................ 55

**ARTICLE XI**
**ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS**

11.1         Certain Definitions...................................................................................... 55
11.2         Index of Defined Terms............................................................................... 62
11.3         Rules of Interpretation................................................................................ 64

**INDEX OF EXHIBITS**

EXHIBIT A         FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION
                  AGREEMENT

EXHIBIT B         FORM OF TRADEMARK ASSIGNMENT AGREEMENT

EXHIBIT C         FORM OF COPYRIGHT ASSIGNMENT AGREEMENT

EXHIBIT D          FORM OF BARGAIN AND SALE DEED

EXHIBIT E         FORM OF SALE ORDER

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of [•], 2024, is made by and among [•], a [•] ("**Purchaser**"), [•], a [•] ("**Guarantor**")[1], and LL Flooring Holdings, Inc., a Delaware corporation (the "**Company**") and the Subsidiaries of LL Flooring that are indicated on the signature pages attached hereto (together with the Company, each, a "**Seller**," and collectively, "**Sellers**"). Purchaser, Sellers and Guarantor are referred to herein individually as a "**Party**" and collectively as the "**Parties**." Capitalized terms used herein shall have the meanings set forth herein or in Article XI of this Agreement.

WHEREAS, on August 12, 2024 (the "**Petition Date**"), the Company, together with certain other of the Company's Subsidiaries, commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), which cases are jointly administered for procedural purposes as [•], case number [•](collectively, the "**Bankruptcy Cases**"); and

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Sellers, and Sellers desire to sell, convey, assign and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement, including the entry and terms of the Sale Order;

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, intending to be legally bound hereby, the Parties hereby agree as follows.

## ARTICLE I
## PURCHASE AND SALE OF THE ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

1.1     Purchase and Sale of the Acquired Assets. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Sellers, all of Sellers' right, title and interest in, to and under, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "**Acquired Assets**" means all of the properties, rights, interests and other assets of each Seller as of the Closing, whether tangible or intangible, real, personal or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, including any such properties, rights, interests and other assets acquired by any Seller after the date hereof and prior to the Closing subject to the terms of this Agreement,

---

[1]     **Note to Draft:** Seller expects Guarantor to be a creditworthy entity with proven financial wherewithal to complete the transaction. If Purchaser entity would satisfy these requirements itself, Guarantor concept may be removed.

and including Sellers' right, title and interest in and under, as of the Closing, the following assets of each Seller, but excluding in all cases the Excluded Assets:

        (a)    (i) each Contract (including Acquired Real Property Leases) to which any Seller is a party listed on Schedule 1.1(a) (the "**Initial Assumed Contracts**"); (ii) all Contracts listed on Schedule 1.5, subject to section 1.5 (such Contracts, the "**Post-Closing Assumed Contracts,**"); and (iii) all purchase orders to the extent assignable under applicable law (items in clauses (i) through (iii), the "**Assigned Contracts**");

        (b)    all (i) accounts receivable, notes receivable, negotiable instruments and chattel paper and other amounts owed to Sellers, together with all security or collateral therefor and any unpaid interest, financing charges or fees accrued thereon or other amounts due with respect thereto, including all causes of action pertaining to the collection of amounts payable, or that may become payable, to Sellers with respect to products sold or services performed on or prior to the Closing Date, (ii) license and royalty receivables, (iii) rebate receivables from suppliers or vendors, (iv) tenant inducement receivables, (v) all account receivables of the Business and all cash receipts received from customers of the Business after the Closing, and (vi) other amounts due to Sellers, classified as accounts receivable in accordance with GAAP;

        (c)    to the extent transferable in compliance with applicable Law and not subject to attorney-client privilege or other work product privilege, all Documents;

        (d)    the real property owned by Sellers or their Subsidiaries listed on Schedule 1.1(d) (the "**Owned Real Property**");

        (e)    subject to Section 1.5, all leasehold interests in the leased real property listed on Schedule 1.1(e) (the "**Acquired Leased Real Property**"), including any Leasehold Improvements and all rights of Sellers in and to any permanent fixtures, improvements and appurtenances thereto, and all leases, subleases and other occupancy Contracts with respect thereto (the "**Acquired Real Property Leases**"), and, solely to the extent located on or otherwise appurtenant to the Owned Real Property or the Acquired Leased Real Property, as applicable, (i) all other rights-of-way, surface leases, surface use agreements, easements, real property interests, real property rights, licenses, servitudes, Permits and privileges constituting real property or a real property interest owned or held for use by Sellers and (ii) Sellers' right, title and interest in and to all structures, facilities or improvements located thereon and all rights, tenements, appurtenant rights and privileges relating thereto ((i) and (ii), collectively, "**Real Property Appurtenances**");

        (f)    all shares of capital stock or other equity interests that any Seller owns in the Non-Debtor Subsidiaries, including any securities convertible into, or exchangeable or exercisable for, any such shares of capital stock or other equity interests, investments or contributions in the Non-Debtor Subsidiaries (collectively, the "**Purchased Ownership Interests**");

        (g)    all tangible assets (including Equipment, accessories, materials, machinery and all other similar items of tangible personal property or capital assets) of Sellers, including the tangible assets owned, leased or used (or held for use) by Sellers located at any Acquired Leased

Real Property or Owned Real Property and any tangible assets on order to be delivered to any Seller;

(h)    all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Assigned Contract), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (other than Tax refunds or Tax attributes that constitute Excluded Assets), causes of action, rights of setoff, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties with respect to any of the Acquired Assets or Assumed Liabilities (in each case, other than against any Seller);

(i)    to the extent transferable under applicable Law and subject to obtaining the applicable consents set forth on Schedule 1.1(i), all of the rights, interests and benefits (if any) accruing under all Permits and Governmental Authorizations, and all pending applications therefor;

(j)    the sponsorship of, and all rights, interests and assets associated with, the Seller Plans set forth on Schedule 1.1(j) solely as to the Transferred Employees (collectively, the "**Assumed Benefit Plans**");

(k)    all Seller Intellectual Property (including all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights to sue, enforce, prosecute and retain or recover damages, costs, or attorneys' fees for past, present and future infringements, dilutions, misappropriations of, or other conflicts with or violations of, such Intellectual Property and all rights of renewal with respect to the foregoing together with all royalties, fees, income, payments and other proceeds due or payable to any Seller from and after the Closing with respect to the foregoing and any and all corresponding rights, privileges and protections that, now or hereafter, may be accruing or secured throughout the world by any applicable law, treaty or other international convention throughout the world, including the right to assign the rights conveyed herein, the same to be held and enjoyed by Purchaser for its own use and benefit, and for the benefit of its successors, assigns, and legal representatives) and Seller IP Rights;

(l)    all goodwill associated with the Acquired Assets;

(m)    all Inventory, wherever located;

(n)    all Cash and Cash Equivalents, subject to the Professional Fee Escrow Account; provided that if, after payment in full of all professional fees and expenses owing to Advisors of Sellers or their Subsidiaries, any excess amount remains in the Professional Fee Escrow Account, such amount shall be promptly paid by Sellers to Purchaser;

(o)    all deposits (including maintenance deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Seller, in each case, except to the extent in respect of an Excluded Asset;

(p)      subject to section 363(b)(1)(A) of the Bankruptcy Code, all rights of Sellers to the websites, domain names, telephone and facsimile numbers and email addresses used by each Seller, as well as rights to receive mail and other communications addressed to each Seller (including mail and communications from customers, vendors, suppliers, distributors and agents);

(q)      except as contemplated by Section 1.2(e), and to the extent transferable under applicable Law, each insurance policy covering the Business, the Acquired Assets and related to the Assumed Liabilities (the "**Insurance Policies**") and rights and benefits thereunder, including (i) all rights to indemnification for losses, defense costs and settlements, credits, refunds, proceeds, claims (including first-party and third-party insurance claims), causes of action or other rights arising under or relating to such Insurance Policies, (ii) all claims, demands, proceedings and causes of action asserted or that may be asserted by such Seller under such Insurance Policies and (iii) any letters of credit or other credit support related thereto;

(r)      all benefits and rights under non-disclosure or confidentiality or invention assignment, non-compete, non-solicitation, non-interference, non-disparagement or similar agreements or arrangements or clawback arrangements to which any Seller is a party or with respect to which such Seller or any Affiliate of Sellers (or any of the predecessors in interest) is a beneficiary or has any rights thereunder, including any such agreement with current or former directors, managers, officers, employees, contractors or agents of Sellers or any Affiliate of Sellers (or any of the predecessors in interest), or with third parties (but excluding any Excluded Contracts);

(s)      all (i) rights (including lien rights), claims (including commercial tort claims), settlement proceeds, causes of action, choses in action, rights of recovery, rights of recoupment, rights of setoff, equity rights and defenses, against Persons (including suppliers, vendors, merchants, manufacturers, counterparties to leases, counterparties to licenses and counterparties to any Assigned Contract or Acquired Real Property Lease) and (ii) rights of indemnity, warranty rights, rights of contribution, rights to refunds (other than Tax refunds or Tax attributes that constitute Excluded Assets), rights of reimbursement and other rights of recovery to the extent relating to the Acquired Assets or Assumed Liabilities;

(t)      all claims, rights or causes of action of any Seller for avoidance, recovery, subordination or other relief and actions of Sellers (including, without limitation, any such claims, rights or causes of action arising under chapter 5 of the Bankruptcy Code, including Sections 544, 547, 548, 549 and 550 of the Bankruptcy Code or applicable state), including all actions against (x) any counterparties to any Assigned Contract or Acquired Real Property Lease and (y) any Persons with whom Sellers contracted for goods and services;

(u)      except to the extent that any transfer or assignment is prohibited by applicable Law and not subject to attorney-client privilege or other work product privilege, (i) all personnel files for Transferred Employees and (ii) to the extent such files relate to any of the Acquired Assets or any of the Assumed Liabilities, all personnel files for any former or current employee of such Seller that is not a Transferred Employee;

(v)      to the extent transferable under applicable Law and not subject to attorney-client privilege or other work product privilege, the bank and deposit accounts set forth on

7

Schedule 1.1(u) (other than the Professional Fee Escrow Account); provided that if, after payment in full of all professional fees and expenses owing to Advisors of Sellers or their Subsidiaries, any excess amounts remain in the Professional Fee Escrow Account, such amounts shall be promptly paid by Sellers to Purchaser; and

(w)     all proceeds and products of any and all of the foregoing Acquired Assets.

EXCEPT AS SPECIFICALLY AND EXPRESSLY SET FORTH IN ARTICLE III (AS MODIFIED BY THE SCHEDULES) OR ANY CERTIFICATE DELIVERED PURSUANT TO THIS AGREEMENT, (I) SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, RELATING TO THE BUSINESS, THE ACQUIRED ASSETS OR THE ASSUMED LIABILITIES, INCLUDING ANY REPRESENTATION OR WARRANTY AS TO VALUE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR FOR ORDINARY PURPOSES, OR ANY OTHER MATTER, (II) SELLERS MAKE NO, AND HEREBY DISCLAIM ANY, OTHER REPRESENTATION OR WARRANTY REGARDING THE BUSINESS, THE ACQUIRED ASSETS OR THE ASSUMED LIABILITIES AND (III) THE ACQUIRED ASSETS AND THE ASSUMED LIABILITIES ARE CONVEYED ON AN "AS IS, WHERE IS" BASIS AS OF THE CLOSING, AND PURCHASER SHALL RELY UPON THEIR OWN EXAMINATION THEREOF.

1.2     Excluded Assets. Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, convey or deliver, and Sellers shall retain all right, title and interest to, in and under the following properties, rights, interests and other assets of Sellers (collectively, the "**Excluded Assets**"):

(a)     except as contemplated by Section 1.1(n), (i) all deposits (including maintenance deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Seller, in each case of this clause (i), solely to the extent in respect of an Excluded Asset, and (ii) any retainers or similar amounts paid to Advisors or other professional service providers;

(b)     subject to Section 1.5, all Contracts of Sellers that are not Assigned Contracts (the "**Excluded Contracts**");

(c)     all documents (including information stored on the computer systems, data networks or servers of any Seller, written files, papers, books, reports and records, including those prepared or received by any Seller or any of its Affiliates or Representatives) (i) to the extent they relate exclusively to any of the other Excluded Assets or Excluded Liabilities, (ii) that are Sellers' financial accounting Documents to the extent relating to the business activities of Sellers unrelated to the Business, all minute books, organizational documents, stock certificates and stock registers of any Seller as pertaining to the ownership, organization or existence of such Seller, Tax Returns (and any related work papers), corporate seal, checkbooks and canceled checks, (iii) that any Seller is required by Law to retain;

(d)     all documents prepared or received by any Seller or any of its Affiliates or on their behalf in connection with the sale of the Acquired Assets, this Agreement or the other Transaction Agreements, the transactions contemplated hereby or thereby, or the Bankruptcy Cases

that are subject to any attorney-client privilege or other work product privilege, including (i) all records and reports prepared or received by Sellers or any of their respective Affiliates or Advisors in connection with the sale of the Acquired Assets and the transactions contemplated hereby, including analyses relating to the business of Purchaser or its Affiliates so prepared or received, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of any of Sellers' businesses or assets, (iii) all privileged materials, documents and records of any Seller or any of its Affiliates and (iv) any other files or records to the extent relating exclusively to any Excluded Assets, Excluded Liabilities or the Bankruptcy Cases;

(e)      all insurance Contracts or other Contracts associated with any Seller Plan that is not an Assumed Benefit Plan, each insurance policy covering the Excluded Assets or related to the Excluded Liabilities (to bring claims thereunder) and all director and officer insurance policies, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance policies or recoveries;

(f)      all stock, membership interests or other equity interests of any Seller or any of their respective Subsidiaries or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests, in each case, other than the Purchased Ownership Interests;

(g)      all rights, claims and causes of action that any Seller may have against any Person with respect to any Excluded Assets or any Excluded Liabilities;

(h)      Sellers' claims, causes of action or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument or other document executed and delivered between any Seller, on the one hand, and any Purchaser, on the other hand, in connection with the transactions contemplated hereby, or any other agreement between any Seller, on the one hand, and Purchaser, on the other hand, entered into on or after the date hereof;

(i)      all Tax refunds and Tax attributes that are not transferred by the operation of applicable Tax Law, except for any refunds of Taxes included in the definition of Assumed Liabilities;

(j)      all real estate and all interests in real estate other than the Owned Real Property and the Acquired Leased Real Property, including any Leasehold Improvements and Real Property Appurtenances thereto;

(k)      the properties, rights, interests and assets set forth on <u>Schedule 1.2(k)</u>;

(l)      the Professional Fee Escrow Account;

(m)      all Seller Plans that are not Assumed Benefit Plans; and

(n)      except as expressly set forth in <u>Section 1.1(b)(v)</u>, all accounts receivable (or other amounts receivable) and other intercompany obligations of any Seller or any of its Affiliates or Subsidiaries owed to any Seller.

9

1.3     <u>Assumption of Certain Liabilities</u>. On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, Purchaser shall irrevocably assume from each Seller (and from and after the Closing assume, pay, perform, discharge, or otherwise satisfy in accordance with their respective terms) only the following Liabilities (collectively, the "**Assumed Liabilities**"):

(a)     all Liabilities and obligations of any Seller under the Assigned Contracts and Acquired Real Property Leases that become due from and after the Closing;

(b)     all Liabilities (including all government charges or fees) solely to the extent arising out of the conduct of the Business or the operation of the Acquired Assets, in each case, by Purchaser from and after the Closing Date;

(c)     without duplication: (i) all Taxes with respect to the Acquired Assets for any taxable period beginning after the Closing Date and the post-Closing portion of any Straddle Period (as determined in accordance with <u>Section 9.3(c)</u>); (ii) Transfer Taxes; (iii) all personal property Taxes with respect to the Acquired Assets for any Straddle Period (I) that are payable in arrears following the Closing Date, (II) with respect to which, if not paid, an Encumbrance will arise following the Closing Date and (III) that are payable only in the jurisdictions disclosed in the property liability summary on <u>Schedule 3.12</u>; and (iv) all sales and use Taxes with respect to the Acquired Assets with respect to which "responsible person" or similar claims may be made against any of Seller's or any Affiliate of any Seller's employees, managers, officers, directors or similar persons ("**Responsible Person Liabilities**"); provided that such Responsible Person Liabilities shall constitute Assumed Liabilities solely to the extent Sellers are unable to satisfy such Taxes because of a lack of available funds or discharge such Responsible Person Liabilities pursuant to the Bankruptcy Code;

(d)     the sponsorship of, and all Liabilities with respect to the assets associated with or any unfunded amounts accrued on the books and records of Sellers as of the Closing Date associated with, the Assumed Benefit Plans solely as to the Transferred Employees, and all Liabilities for compliance with the requirements of section 4980B of the Tax Code and the rules and regulations thereunder with respect to all individuals who are "M&A qualified beneficiaries" as such term is defined in 26 C.F.R. § 54.4980B-9;

(e)     all Cure Costs;

(f)     without duplication, (i) all Liabilities incurred by Sellers in connection with ceasing the operations or winding up the affairs of Sellers and their Affiliates and closing the Bankruptcy Cases, included the items listed on <u>Schedule 1.3(f)</u> and (ii) any unfunded or unpaid Liabilities or claims under Assumed Benefit Plans that are due or arise as a cash payment obligation on or prior to the Closing;

(g)     all Liabilities set forth on Schedule <u>1.3(g)</u>; and

(h)     Liabilities assumed by Purchaser pursuant to <u>Section **Error! Reference source not found.**</u>.

1.4     Excluded Liabilities. Notwithstanding any provision in this Agreement to the contrary, Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, any Seller, the Business or any of the Acquired Assets of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission or circumstance taking place on or prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "**Excluded Liabilities**"). For the avoidance of doubt, Excluded Liabilities for all purposes hereunder includes (a) all claims, demands, proceedings and causes of action asserted or that may be asserted by or on behalf of any current or former employees or independent contractors of Sellers (including, without limitation, the Transferred Employees), and any Liabilities, arising out of or relating to the employment or engagement of any current or former employees or independent contractors of Sellers (including, without limitation, the Transferred Employees) on or prior to the Closing Date and (b) all accounts payable (or other amounts payable) and other intercompany obligations of any Seller owed to another Seller or any of its Affiliates or Subsidiaries.

1.5     Assumption/Rejection of Certain Contracts.

(a)     Assumption and Assignment of Executory Contracts and Unexpired Leases. Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts or unexpired leases to which any Seller is a party that are Assigned Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by Sellers and assigned to Purchaser, as applicable, pursuant to sections 365s 363, 364(f) of the Bankruptcy Code.  Subject to the approval of the Bankruptcy Court, the Sale Order shall provide that as of and conditioned on the occurrence of the Closing, the applicable Sellers shall assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included in a notice filed with the Bankruptcy Court and set forth in Schedule 1.5(a). Such notice shall also set forth Sellers' good faith estimate of the amounts necessary to cure Sellers' monetary defaults, if any, and to pay all actual pecuniary losses that have resulted from such defaults under any Assigned Contract and that must be paid pursuant to section 365(b)(1)(A) and section 365(b)(1)(B) of the Bankruptcy Code to effectuate the assumption of such Assigned Contract by the applicable Seller and the assignment thereof to Purchaser as provided hereunder (such amounts required to be paid pursuant to section 365(b)(1)(A) and section 365(b)(1)(B) of the Bankruptcy Code, the "**Cure Costs**").  At the Closing, Sellers shall, pursuant to the Sale Order and the Bill of Sale and Assignment and Assumption Agreement(s), assume and assign to Purchaser (the consideration for which is included in the Purchase Price) all Assigned Contracts that may be assigned by any such Seller to Purchaser pursuant to sections 363, 364(f) and 365 of the Bankruptcy Code, subject to adjustment pursuant to Section 1.5(b). All Cure Costs in respect of all of the Assigned Contracts shall be paid by Purchaser.

(b)     Excluding or Adding Assigned Contracts Following Closing. As of the date hereof, Sellers shall deliver to Purchaser a list setting forth all executory Contracts and unexpired

leases to which any Seller is a party (all such executory Contracts and unexpired leases, whether or not on such list, the "**Available Contracts**").

(i)    Purchaser shall have the right to notify Sellers in writing of any Available Contract (including purchase orders but excluding any Assigned Contract on Schedule 1.1(a)) that it does not wish to assume or an Available Contract that Purchaser wishes to add as an Assigned Contract at any time during the period commencing from the date hereof and ending at the end of the auction in connection with the Bankruptcy Cases (the "**Auction**" (or if no Auction occurs, the date that is 2 Business Days before the commencement of the Sale Hearing (the "**Designation Rights Period**")), and (A) (x) any such Available Contract or previously considered Assigned Contract (other than any  Assigned Contract on Schedule 1.1(a)) that Purchaser no longer wishes to assume shall be automatically deemed removed from Schedule 1.5 and automatically deemed to be an Excluded Contract, in each case, without any adjustment to the Purchase Price, and (y) to the extent such notice is provided to Sellers following the Closing, Sellers shall reject any such Contract as promptly as reasonably practicable upon Sellers' receipt of Purchaser's written request that such Contracts be rejected, and (B) any Available Contract or previously considered Excluded Contract that Purchaser wishes to assume as an Assigned Contract shall be automatically deemed added to Schedule 1.5, automatically deemed not to be an Excluded Contract, and assumed by the applicable Seller to sell and assign to Purchaser, without any adjustment to the Purchase Price. Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the time of and after the Closing.

(ii)    During the Designation Rights Period, Sellers shall not reject or terminate and shall not amend, supplement, modify, waive any rights under or create an adverse interest with respect to any Available Contract, or take any affirmative action not required thereby, other than in accordance with this Section 1.5, without the prior written consent of Purchaser, given in its sole discretion.

(iii)    During the Designation Rights Period, Purchaser shall be responsible for any and all applicable payment Liabilities of Purchaser, Sellers or any of their respective Affiliates (A) under the Available Contracts and/or (B) as a result of, arising out of or in connection with the operation of any store or distribution center governed by any such Available Contracts that are incurred and come due and payable during the period from and after Closing through the effective date of such Available Contract's assumption and assignment to Purchaser or rejection by any Seller in accordance with this Agreement, in each case other than any Liabilities arising in connection with any breach of this Agreement by any Seller or any of its Affiliates.

(iv)    Each of Purchaser and Sellers shall take all actions reasonably required for Sellers to assume and assign the Assigned Contracts and Acquired Real Property Leases to Purchaser; provided, that Purchaser and its Affiliates shall control and be responsible for the negotiation and verification of all Cure Costs for

each Assigned Contract and Acquired Real Property Leases, and Sellers shall obtain an order of the Bankruptcy Court in a form reasonably satisfactory to Purchaser containing a finding that the proposed assumption and assignment of the applicable Contracts to Purchaser satisfies all applicable requirements of section 365 of the Bankruptcy Code and approving the assumption and assignment of the Assigned Contracts to Purchaser, pursuant to, and subject to the provisions of, section 365 of the Bankruptcy Code.

(v)     Purchaser shall as promptly as reasonably practicable, but in any event within 3 Business Days of assuming any Assigned Contract hereunder, pay all Cure Costs (if any) in connection with any such assumption in accordance with this <u>Section 1.5</u> and <u>Section 5.2</u>.

(c)     <u>Non-Assignment</u>. Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset is (i) prohibited by any applicable Law or (ii) requires a Consent or Governmental Authorization (other than, and in addition to and determined after giving effect to any order of the Bankruptcy Court, including the Sale Order) in order to permit the sale or transfer to Purchaser any Acquired Asset, and such Consent or Governmental Authorization has not been obtained or such applicable Law remains in effect prior to such time as such Acquired Asset is to be transferred to Purchaser, such asset shall not be an Acquired Asset hereunder and shall not be transferred to, or received by, Purchaser. If any Acquired Asset is deemed not to be assigned pursuant to this <u>clause (ii)</u>, the Closing shall nonetheless take place (without any reduction in the Purchase Price) subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and 6 months following the Closing Date (or the closing of the Bankruptcy Cases, if shorter), Sellers and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing or sublicensing to Purchaser, any or all of any Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Sellers or their respective Affiliates or any direct costs associated with the retention and maintenance of such Acquired Asset incurred by any Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (2) Purchaser shall assume and timely discharge any related burden and obligation with respect to such Acquired Asset. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, such Seller's right, title and interest in and to such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement and the Sale Order. Notwithstanding anything herein to the contrary, neither Purchaser nor any Seller will be obligated to pay any consideration therefor to any third party from whom Consent or Governmental Authorization is requested or to initiate any litigation to obtain any such Consent or Governmental Authorization.

**ARTICLE II**
**CONSIDERATION; PAYMENT; CLOSING**

2.1     <u>Consideration</u>. The aggregate consideration (collectively, the "**Purchase Price**") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities plus (ii) the payment of all Cure Costs.

2.2     <u>Closing</u>. Upon the terms and subject to the conditions contained in this Agreement, the closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "**Closing**") will take place by telephone conference and electronic exchange of documents and signatures (or, if the Parties agree to hold a physical closing, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, located at One Manhattan West, New York, New York 10001) at 10:00 a.m. Eastern Time on the date that is the second (2nd) Business Day following, subject to the satisfaction or, to the extent permitted by applicable Law, due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in <u>Article VII</u> (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permitted by applicable Law, waiver of those conditions), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "**Closing Date**." For financial, accounting and economic purposes, including risk of loss, and for all other purposes under this Agreement, upon the occurrence of the Closing, the Closing shall be deemed to have occurred at 12:01 a.m., New York City time, on the Closing Date.

2.3     <u>Closing Deliveries by Sellers</u>. At or prior to the Closing, Sellers shall deliver to Purchaser:

(a)     bill of sale and assignment and assumption agreement substantially in the form of <u>Exhibit A</u> (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the applicable Sellers;

(b)     trademark assignment agreements substantially in the form of <u>Exhibit B</u> (the "**Trademark Assignment Agreement**"), duly executed by the applicable Sellers;

(c)     copyright assignment agreements substantially in the form of <u>Exhibit C</u> (the "**Copyright Assignment Agreement**"), duly executed by the applicable Sellers;

(d)     an IRS Form W-9 executed by each Seller or each Seller's regarded owner for U.S. federal income Tax purposes;

(e)     with respect to each Owned Real Property, a bargain and sale deed substantially in the form attached hereto as <u>Exhibit D</u>, duly executed and notarized, together with any Transfer Tax forms that Seller (or its applicable Subsidiary that is the owner of any Owned Real Property) is required to file in connection with the conveyance thereof, and other transfer forms, duly executed and notarized, as necessary, required to be delivered by Seller (or its applicable Subsidiary that is the owner of any Owned Real Property) in the jurisdiction where any Owned Real Property is located; and

(f)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of the Company certifying that the conditions set forth in Sections 7.2(a), 7.2(b) and 7.2(d) have been satisfied.

2.4     <u>Closing Deliveries by Purchaser</u>. At the Closing, Purchaser shall deliver to (or at the direction of) Sellers:

(a)     the Bill of Sale and Assignment and Assumption Agreements, duly executed by Purchaser;

(b)     the Trademark Assignment Agreements, duly executed by Purchaser;

(c)     the Copyright Assignment Agreements, duly executed by Purchaser;

(d)     any Transfer Tax forms that Purchaser is required to file in connection with acquisition of the Owned Real Property, and other transfer forms, duly executed and notarized, as necessary, required to be delivered by Purchaser in the jurisdiction where any Owned Real Property is located;

(e)     the Purchase Price in cash by wire transfer of immediately available funds to an account or accounts designated by Sellers; and

(f)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of each of Purchaser certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied.

2.5     <u>Withholding</u>. Purchaser shall not be entitled to deduct and withhold any Taxes from any amounts otherwise payable pursuant to this Agreement, except to the extent resulting from a Seller's failure to satisfy its obligations under Section 2.3(f).

2.6     <u>Allocation</u>.

(a)     No less than 5 Business Days prior to the Closing Date, Seller shall provide to Purchaser a proposal for the portions of the Purchase Price allocable to Acquired Assets with respect to which Transfer Taxes will be due (the "<u>Preliminary Allocation</u>"). Seller shall consider in good faith any of Purchaser's comments to the Preliminary Allocation received prior to the Closing Date. Such Preliminary Allocation (including any of Purchaser's comments agreed to by Seller) shall be final and the parties shall file any tax returns in respect of Transfer Taxes consistent therewith.

(b)     Within 30 Business Days following the Closing Date, Seller shall provide to Purchaser an allocation of the Purchase Price for federal, state and local tax purposes (in accordance with the rules of Section 1060 of the Code and the Treasury Regulations promulgated thereunder and any similar provision of state or local law) among the Acquired Assets (the "<u>Allocation</u>"), which Allocation shall not be inconsistent with the Preliminary Allocation. Seller shall consider in good faith any of Purchaser's comments to the Allocation received within 30 days of Purchaser's receipt of the Allocation.

(c)     The Parties shall (a) cooperate in the filing of any forms (including Internal Revenue Service Form 8594 under Section 1060 of the Code) with respect to the Allocation, including any amendments to such forms required pursuant to this Agreement with respect to any adjustments to the Purchase Price, and (b) file all federal, state and local tax returns and related tax documents that are required to be filed consistent with such Allocation, as the same may be adjusted pursuant to this Agreement, and not take any position inconsistent with such allocation unless otherwise required by any audit adjustment by, or closing agreement with, the Internal Revenue Service, a decision, judgment, decree or other order by any court of competent jurisdiction (each, a "Determination").

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as (i) disclosed in any forms, statements or other documents publicly filed with the Bankruptcy Court in connection with the Bankruptcy Cases prior to the date hereof, or (ii) set forth in the Schedules delivered by Sellers to Purchaser after the date hereof pursuant to Section 6.11 and subject to Section 10.10, Sellers jointly and severally represent and warrant to Purchaser as follows:

3.1     Organization and Qualification. Each Seller is a corporation, limited liability company or limited partnership, as applicable, duly incorporated or organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation and has all requisite power and authority necessary to carry on the Business as it is now being conducted, except (other than with respect to each Seller's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Business or the Acquired Assets, taken as a whole, in any material respect or would not materially impair or delay Sellers' ability to consummate the transactions contemplated by this Agreement and the other Transaction Agreements. Each Seller is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Business or the Acquired Assets, taken as a whole, in any material respect or would not materially impair or delay Sellers' ability to consummate the transactions contemplated by this Agreement and the other Transaction Agreements.

3.2     Authorization of Agreement. The execution, delivery and performance by each Seller of this Agreement and the other Transaction Agreements to which such Seller is a party, and the consummation by such Seller of the transactions contemplated hereby and thereby, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate action, limited liability company action or limited partnership action on the part of such Seller, as applicable, and no other organizational proceedings on such Seller's part are necessary to authorize the execution, delivery and performance by such Seller of this Agreement or the other Transaction Agreements to which it is a party and the consummation by it of the transactions contemplated hereby and thereby. Subject to requisite Bankruptcy Court approvals, this Agreement and the other Transaction Agreements to which each Seller is a party have been, or will be, duly executed and

delivered by such Seller and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, constitute, or will constitute, legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with its and their terms, except as such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "**Enforceability Exceptions**").

      3.3    <u>Conflicts; Consents</u>.

      (a)    Assuming that (i) requisite Bankruptcy Court approvals are obtained, and (ii) the notices, authorizations, approvals, Orders or consents set forth on Schedule 3.3 are made, given or obtained (as applicable), none of (x) the execution and delivery by Sellers of this Agreement or the other Transaction Agreements to which it is a party, (y) the consummation by Sellers of the transactions contemplated hereby or thereby, or (z) the performance or compliance by Sellers with any of the terms or provisions hereof or thereof (A) conflict with or violate any provision of a Seller's certificate of incorporation or bylaws, certificate of formation or limited liability company agreement, certificate of limited partnership, partnership agreement or other governing documents, as applicable, (B) violate any Law or Order applicable to Sellers or their assets, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, terms or provisions of any loan, credit agreement or other Material Contract or accelerate any Seller's obligations under any such loan, credit agreement or other Material Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of any Seller, except, in the case of <u>clauses (A)</u> through <u>(D)</u>, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

      (b)    Except as set forth on Schedule 3.3(a), Sellers are not required to file, seek or obtain any notice, authorization, approval, Order, permit, registration with or consent of or with any Governmental Body, in connection with the execution, delivery and performance by Sellers of this Agreement or the other Transaction Agreements to which they are a party or the consummation by Seller of the transactions contemplated hereby or thereby, except where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

      3.4    <u>Financial Statements; No Undisclosed Liabilities</u>.

      (a)    Attached to <u>Schedule 3.4</u> are Sellers' and its Subsidiaries' audited consolidated balance sheet as of December 31, 2023, and the related consolidated statements of operations, comprehensive loss, cash flows and deficit for the fiscal year then ended (collectively, the "**Audited Financial Statements**") and unaudited consolidated balance sheets as of March 31, 2024 and the related consolidated statements of operations, comprehensive loss, cash flows and deficit for the portion of the fiscal year then ended (the "**Unaudited Financial Statements**" and, together with the Audited Financial Statements, the "**Financial Statements**"). The Financial

Statements have been prepared in accordance with GAAP applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and, in the case of Unaudited Financial Statements, subject to (i) normal year-end audit adjustments (none of which are material, individually or in the aggregate) and (ii) the absence of notes (none of which if presented would materially differ in amount or nature from those included in the Audited Financial Statements), and such Financial Statements fairly present in all material respects the consolidated financial position of Sellers and their Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods shown.

(b)     Sellers have no Liabilities, required by GAAP to be disclosed or reflected on or reserved on a consolidated balance sheet (or the notes thereto) prepared in accordance with GAAP, except for Liabilities (i) reflected and reserved for in the Financial Statements, (ii) incurred in the Ordinary Course, (iii) that are Excluded Liabilities, (iv) arising out of or incurred in connection with this Agreement or the other Transaction Agreements or the transactions contemplated hereby or thereby, (v) that are not and would not reasonably be expected to be material, individually or in the aggregate, (vi) arising from the commencement of the Bankruptcy Cases or (vii) disclosed on <u>Schedule 3.4(b)</u>.

3.5     <u>Title to Properties</u>.

(a)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Company has good and valid title to the Owned Real Property set forth in <u>Schedule 3.5(a)</u> free and clear of all Encumbrances, including any leases, subleases, licenses, concessions or other agreements by or pursuant to which the Company grants to any party or parties the right of use or occupancy of any portion of the Owned Real Property (other than Permitted Encumbrances). Except as set forth on <u>Schedule 3.5(a)</u>, Sellers and their Subsidiaries do not own any real property.

(b)     Except as set forth on <u>Schedule 3.5(b)</u>, there are no outstanding options, repurchase rights or rights of first refusal to purchase or lease any Owned Real Property, or any portion thereof or interest therein, granted by any Seller or any Subsidiary of any Seller or, to the knowledge of Sellers, to which any Seller or any Subsidiary of any Seller is a party.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Company has a good and valid leasehold interest to all Acquired Leased Real Property, in each case sufficient in all material respects to continue the conduct of the Business free and clear of all Encumbrances (other than Permitted Encumbrances).

(d)     Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Cases, Sellers hold good and valid title to, or good and valid leasehold interest in, all of the material tangible property necessary for, used in or held for use in the conduct of the Business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property that is not material to the Business and the Acquired Assets, taken as a whole.

18

3.6     Contracts.

(a)     Schedule 3.6 sets forth a list of each Material Contract as of the date of this Agreement. For purposes of this Agreement, "**Material Contract**" means any Contract (x) by which any of the Acquired Assets are bound or affected or (y) to which a Seller is a party or by which it is bound in connection with the Acquired Assets (in each case, excluding any Seller Plan and excluding purchase orders, statements of work and similar commercial documents issued in the Ordinary Course) that:

(i)     is a joint venture, alliance or partnership agreement that is material to the operation of the Company and its Subsidiaries, taken as whole;

(ii)     is a loan, guarantee of indebtedness or credit agreement, note, mortgage, indenture or other binding commitment (other than those between the Company and its Subsidiaries) relating to indebtedness for borrowed money in an amount in excess of $10,000,000 individually;

(iii)     is an acquisition agreement, asset purchase agreement, stock purchase agreement or other similar agreement (other than agreements to purchase or acquire inventory in the Ordinary Course of business) entered into after January 1, 2023 and which has not yet been consummated, pursuant to which (A) the Company or any Subsidiary reasonably expects that it is required to pay total consideration (including assumption of debt) after the date hereof in excess of $1,000,000 or (B) any other Person has the right to acquire any assets of the Company or any of its Subsidiaries (or any interests therein) after the date of this Agreement with a purchase price of more than $1,000,000;

(iv)     is a Contract (other than purchase orders in the Ordinary Course consistent with past practice) (A) with any Material Supplier or (B) for the purchase of materials, supplies, goods, services, Equipment or other assets, in the case of this clause (B), pursuant to which the Company or any of its Subsidiaries would reasonably be expected to make payments of more than $1,000,000 during any fiscal year (other than a Contract with any Material Supplier); or

(v)     contains any provision (A) limiting, in any material respect, the right of Sellers to engage in any business, make use of any Seller Intellectual Property (or any Seller IP Rights) that is material to Seller, taken as a whole, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, in each case of clauses (A) and (B), other than a Contract that can be terminated by Sellers on 90 days' notice or less without resulting in a breach or violation of, or any acceleration of any rights or obligations or the payment of any penalty under, such Contract or (C) pursuant to which any license, covenant or immunity has been granted by or to any Seller under any Intellectual Property material to any Seller, other than licenses of uncustomized, commercially available, off-the-shelf Software granted to such Seller on standard terms and conditions for less than $1,000,000 annually;

19

(b)      Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction by Purchaser of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Cases, (A) each Material Contract is valid and binding on any Seller that is a party thereto and, to the knowledge of Sellers, each other party thereto, and is in full force and effect, subject to the Enforceability Exceptions, (B) the applicable Seller, and, to the knowledge of Sellers, any other party thereto, have performed all obligations required to be performed by it under each Material Contract, (C) there are no events or conditions which constitute, or, after notice or lapse of time or both, would constitute, a default under, result in a right to terminate or cancel, or cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit under, a Material Contract, on the part of a Seller, or to the knowledge of Sellers, any counterparty under such Material Contract and (D) Sellers have not received any written notice from any Person that such Person intends to terminate, or not renew, any Material Contract, except in each case of <u>clauses (B)</u> through <u>(D)</u>, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.7     <u>No Litigation; Orders</u>. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, other than as set forth on <u>Schedule 3.7</u>, there are no Actions pending or, to the knowledge of Sellers, threatened against or affecting (i) the Acquired Assets or the Assumed Liabilities or (ii) Sellers or arising out of or relating to the Business, that will adversely affect any Seller's performance of its obligations under this Agreement or the other Transaction Agreements to which it is a party or the consummation of the transactions contemplated by this Agreement or the other Transaction Agreements to which it is a party.

3.8     <u>Permits; Compliance with Laws</u>. Except as set forth on <u>Schedule 3.8</u>, each Seller is in compliance in all material respects with all state, provincial or federal Laws or Orders, applicable to such Seller, the Acquired Assets and the Assumed Liabilities, and each Seller holds all licenses, franchises, permits, certificates, approvals and authorizations from Governmental Bodies necessary for the lawful conduct of the Business and the lawful ownership of the Acquired Assets, except where the failure to hold the same would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect (collectively, "**Permits**"). Each Seller and each of their respective directors, officers and employees acting in such capacity and, to the knowledge of Sellers, each of its and their other agents acting on its or their behalf, is, and has been since January 1, 2022, in compliance in all material respects with the Foreign Corrupt Practices Act of 1977 and any rules and regulations promulgated thereunder.

3.9     <u>Environmental Matters</u>. Except as would not reasonably be expected to have a Material Adverse Effect, (a) Sellers are in compliance with all applicable Environmental Laws, (b) Sellers possess and are in compliance with all Permits required under applicable Environmental Laws for the operation of their businesses as currently conducted at each Owned Real Property and each Acquired Leased Real Property (such permits, the "**Environmental Permits**"), (c) there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or threatened in writing against any Seller, and (d) Sellers are not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of any Seller.

3.10    Intellectual Property.

(a)    Schedule 3.10(a) sets forth a true and accurate list of all Seller Intellectual Property: (i) that is registered or issued or subject of an application for registration or issuance (the "**Seller Registered IP**") (including for each item, the owner, the jurisdiction or registrar, the registration or application number, the registration or application date, the status, and the expiration date); and (ii) that is material unregistered Mark or material unregistered proprietary Software. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all necessary payments (including registration, maintenance, renewal and other filing fees due through the date that is 30 days after the Closing Date) with respect to any material Seller Registered IP have been timely paid and all necessary filings (including necessary documents and certificates) in connection therewith have been timely filed with the relevant Governmental Body in the United States or foreign jurisdictions, as the case may be, and all other actions required to be taken for the purpose of maintaining such Seller Registered IP in full force and effect have been taken.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Sellers possess and are the sole and exclusive owner of (and upon Closing, Purchaser will possess and be the sole and exclusive owner of) all of the entire worldwide rights, title and interest in and to all Seller Intellectual Property and has a valid and enforceable license pursuant to an Assigned Contract to use, sell and license (and upon Closing, Purchaser will have a valid and enforceable license pursuant to an Assigned Contract to use, sell and license), as the case may be, all other Intellectual Property as used, sold or licensed in, or that is otherwise necessary for the conduct of, the Business, in each case, free and clear of all Encumbrances (other than Permitted Encumbrances) (and other than Intellectual Property licensed pursuant to any Contracts that are rejected by Purchaser in accordance with Section 1.5), and none of the foregoing will be encumbered, extinguished, impaired, or otherwise adversely altered or impacted by (nor will require any consent, notification, approval, waiver or payment or grant of additional amounts or consideration as a result of) the execution, delivery or performance of any Transaction Agreement or the consummation of any transactions contemplated thereby except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. All of the Seller Intellectual Property that is material to the operation of the Business is subsisting, valid and enforceable.

(c)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) Sellers own or have legally enforceable and sufficient rights to use all Intellectual Property necessary to the conduct of the business of Sellers as currently conducted free and clear of all Encumbrances (other than Permitted Encumbrances); provided that nothing in this Section 3.10(c) shall be interpreted or construed as a representation or warranty with respect to whether there is any infringement, misappropriation or violation of any Intellectual Property, which is the subject of Section 3.10(e).

(d)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no Actions are pending or, to the knowledge of Sellers, threatened against any Seller, and since January 1, 2022, none of Sellers have received any written notice or claim (including any invitation or offer to license or demand for indemnification), (i) challenging the ownership, validity, enforceability or use by any Seller of any Intellectual Property

owned by or exclusively licensed to any such Seller or (ii) alleging that any Seller is infringing, misappropriating or otherwise violating any Intellectual Property right of any Person.

(e)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, since January 1, 2022, (i) no Person has infringed, misappropriated or otherwise violated the rights of Sellers with respect to any Intellectual Property owned by or exclusively licensed to any Seller (and no Seller has instituted an Action or made any claim alleging any of the foregoing against any Person) and (ii) none of Sellers, the use of the Seller Intellectual Property, nor the operation of the business of Sellers has infringed, misappropriated, or otherwise violated any Intellectual Property right of any other Person.

(f)     The Seller Intellectual Property together with the Intellectual Property licensed to Purchaser pursuant to the Assigned Contracts (i) constitutes all of the material Intellectual Property used or practiced (or held for use or practice) in or in connection with or otherwise relating to or necessary for the conduct of the businesses of Sellers and (ii) includes all of the material Intellectual Property necessary and sufficient to enable Purchaser to conduct the businesses of Sellers from and after Closing in substantially the same manner and to the same extent as currently conducted or currently contemplated to be conducted, in each case, other than Intellectual Property licensed pursuant to any Contracts that are rejected by Purchaser in accordance with <u>Section 1.5</u>. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, as of the date of this Agreement, no Seller Intellectual Property is subject to any outstanding (or to the knowledge of Sellers, prospective) Order or motion or petition for an Order or any settlement agreement restricting or impairing the ownership, the use or other practice or exploitation thereof by any Seller (or by Purchaser after the Closing) or restricting or impairing the sale, transfer, assignment or licensing thereof by any Seller (or by Purchaser after the Closing), except pursuant to export, import, trade control, environmental, Hazardous Substance or other applicable Laws.

(g)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Sellers have used commercially reasonable efforts in accordance with industry practice to maintain and protect the confidentiality of all non-public Seller Intellectual Property. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, there has been no unauthorized disclosure of any Trade Secrets included in the Acquired Assets and no Trade Secrets included in the Acquired Assets have been used by or disclosed to any Person other than Persons who are subject to reasonably protective confidentiality obligations.

3.11   <u>Tax Matters</u>.

(a)     Each Seller has prepared (or caused to be prepared) and timely filed (taking into account valid extensions of time within which to file) all material Tax Returns required to be filed prior to the Closing Date by it with respect to the Acquired Assets.

(b)     All material Taxes owed by a Seller with respect to the Acquired Assets that are due prior to the Closing Date (whether or not shown on a filed Tax Return) have been timely paid, except to the extent the nonpayment thereof is permitted or required by the Bankruptcy Code.

(c)     There are no Encumbrances for Taxes on any of the Acquired Assets other than Permitted Encumbrances.

(d)     None of Sellers has been a member of an affiliated group of corporations filing a consolidated federal income Tax Return (other than a group the common parent of which is LL Flooring or one of its Subsidiaries) or has any material Liability for the Taxes of any Person (other than a Seller) under U.S. Treasury Regulations Section 1.1502-6 (or any similar provision of any state, local or non-U.S. Law), as a transferee or successor.

(e)     None of Sellers has, within the past 5 years, waived any statute of limitations in respect of material Taxes with respect to the Acquired Assets or agreed to any extension of time with respect to an assessment or deficiency for material Taxes with respect to the Acquired Assets (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course), in each case, which could have effect after the Closing Date.

(f)     None of Sellers has participated in any "listed transaction" within the meaning of 26 C.F.R. § 1.6011-4(b)(2).

(g)     No Seller has any material liability under any escheat or unclaimed liability statute which by operation of Law would become a liability of Purchaser or any Affiliate.

(h)     Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this <u>Section 3.11</u> and <u>Section 3.12</u> (insofar as they relate to Taxes) shall constitute the sole representations and warranties with respect to Taxes. No representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute in each case for any Tax period (or any portion thereof) following the Closing.

3.12    <u>Assumed Benefit Plans</u>.

(a)     Each Assumed Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Tax Code has received a favorable determination letter from the IRS or is entitled to rely upon a favorable opinion letter issued by the IRS. To the knowledge of Sellers, there are no existing circumstances or any events that have occurred that would reasonably be expected to cause the loss of any such qualification status of any such Seller Plan. There are no pending, or to the knowledge of Sellers, threatened claims (other than routine claims for benefits) by, on behalf of or against any Assumed Benefit Plan which could reasonably be expected to result in any material Liability to Purchaser, and no material audit or other proceeding by a Governmental Body is pending, or to the knowledge of Sellers, threatened with respect to such plan. The Assumed Benefit Plans comply in form and in operation in all material respects with their terms and applicable Laws, including the applicable requirements of the Tax Code and ERISA, except as would not reasonably be expected to be material to Purchaser.

(b)     None of Sellers nor any of their ERISA Affiliates in the past 6 years have maintained, contributed to, or has had any Liability or obligation to contribute to any (i) pension plan that is subject to Title IV of ERISA or Section 412 of the Tax Code or (ii) "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA). For purposes of this Agreement, "**ERISA Affiliate**" means any employers (whether or not incorporated) that would be treated together with

Sellers or any of their Subsidiaries as a single employer within the meaning of Section 414 of the Code.

(c)    No Assumed Benefit Plan provides benefits or coverage in the nature of health or life insurance following retirement or other termination of employment, other than coverage or benefits required to be provided under Part 6 of Subtitle B of Title I of ERISA or section 4980B of the Tax Code, or any other applicable Law.

(d)    Except as set forth in <u>Schedule 3.12(d)</u>, the consummation of the transactions contemplated hereby will not (i) entitle any employees of Sellers to notice, pay in lieu of notice or severance pay or any material increase in notice, pay in lieu of notice or severance pay, (ii) accelerate the time of payment or vesting, or materially increase the amount, of compensation due to any director, officer, employee or other individual service provider of any Seller under any Assumed Benefit Plan, (iii) cause a Seller to transfer or set aside any assets to fund any benefits under any Assumed Benefit Plan or (iv) require a "gross-up," indemnification for, or payment to any individual for any taxes imposed under Section 409A or Section 4999 of the Code or any other tax, or (v) result in the payment of any amount that could, individually or in combination with any other such payment, constitute an "excess parachute payment" as defined in Section 280G(b)(1) of the Code.

3.13    <u>Employees</u>. None of Sellers are party to or required to negotiate any collective bargaining agreements or similar Contracts with (nor are any Sellers subject to any legal binding commitments to) any labor union, employee association or similar entity, applicable to any employees of a Seller. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) no demand for recognition as the exclusive bargaining representative of any employees has been made to any Seller by or on behalf of any labor union and (b) there is no pending or, to the knowledge of Sellers, threatened strike, lockout, organized labor slowdown or concerted work stoppage by or with respect to the employees of any Seller. Each Seller is in material compliance with all applicable Laws respecting employment and employment practices, including Laws concerning terms and conditions of employment, wages and hours, exempt and non-exempt employee and individual independent contractor classification and occupational safety and health.

3.14    <u>Affiliate Transactions</u>. Except as set forth on <u>Schedule 3.14</u>, no Affiliate of any Seller, or any officer or director of any Seller, (a) is a party to any Material Contract that constitutes an Acquired Asset, other than (i) loans and other extensions of credit to directors and officers of a Seller for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course and (iii) the Seller Plans, or (b) has any material interest in any Acquired Asset.

3.15    <u>Suppliers</u>. <u>Schedule 3.15</u> sets forth a true, complete and correct list of the 5 largest suppliers from which the Company and its Subsidiaries purchased materials, supplies, services or other goods (determined on the basis of aggregate purchases made by the Company and its Subsidiaries over the fiscal year ended December 31, 2023) (each such supplier, a "**Material Supplier**").

3.16    Brokers. Except for those Persons set forth in Schedule 3.16, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Sellers.

3.17    No Other Representations or Warranties. Except for the representations and warranties expressly contained in this Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or any certificate delivered pursuant to this Agreement (the "**Express Representations**") (it being understood that Purchaser and its Affiliates have relied only on such express representations and warranties), Purchaser acknowledges and agrees, on its own behalf and on behalf of its Affiliates, that no Seller nor any other Person on behalf of any Seller makes, and neither Purchaser nor any of its Affiliates have relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to any Seller, the Acquired Assets, or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (the "**Information Presentation**") or datasite provided to Purchaser on behalf of Seller (the "**Dataroom**") or elsewhere to Purchaser or any of its Affiliates or Advisors on behalf of Sellers or any of their Affiliates or Advisors.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers as follows.

4.1    Organization and Qualification. Purchaser is a corporation, duly incorporated, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement and the other Transaction Agreements. Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement and the other Transaction Agreements. Purchaser is not in violation of any of the provisions of its organizational documents, except as would not reasonably be expected to be material to Purchaser.

4.2    Authorization of Agreement. Purchaser has all necessary power and authority to execute and deliver this Agreement and the other Transaction Agreements to which it is a party and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and the other Transaction Agreements to which it is a party, and the consummation by

Purchaser of the transactions contemplated hereby and thereby, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the other Transaction Agreements to which it is a party and the consummation by it of the transactions contemplated hereby and thereby. Subject to requisite Bankruptcy Court approvals, this Agreement and the other Transaction Agreements to which it is a party have been, or will be, duly executed and delivered by Purchaser, and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, constitute, or will constitute, legal, valid and binding obligations of Purchaser, enforceable against Purchaser, in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3     Conflicts; Consents.

(a)     Assuming that (i) requisite Bankruptcy Court approvals are obtained, and (ii) the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 4.3(a) are made, given or obtained (as applicable), none of the execution and delivery by Purchaser of this Agreement or the other Transaction Agreements to which it is a party, nor the consummation by Purchaser of the transactions contemplated hereby or thereby, nor performance or compliance by Purchaser with any of the terms or provisions hereof or thereof, will (A) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (B) violate any Law or Order applicable to Purchaser or its assets, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other Contract to which Purchaser is a party or by which it or its assets are bound or accelerate Purchaser's obligations under any such Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of clauses (A) through (D), as would not, individually or in the aggregate, reasonably be expected to materially impair or delay the ability of Purchaser to consummate the transactions contemplated hereby.

(b)     Except as set forth on Schedule 4.3(a), Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit, registration with or consent of or with any Governmental Body, in connection with the execution, delivery and performance by Purchaser of this Agreement or the other Transaction Agreements to which they are a party or the consummation by Purchaser of the transactions contemplated hereby or thereby, except where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to materially impair or delay the ability of Purchaser to consummate the transactions contemplated hereby or thereby.

4.4     Financing. At the Closing, Purchaser will have sufficient funds in an aggregate amount necessary to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other transactions contemplated by this Agreement and the other Transaction Agreements, including the payment of all fees, expenses of, and other amounts required to be paid by Purchaser in connection with the transactions contemplated by this

Agreement and the other Transaction Agreements. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code, with respect to the Assigned Contracts and the related Assumed Liabilities. Purchaser acknowledges that its respective obligations under this Agreement are not subject to any conditions regarding its ability to obtain financing for any portion or all of the Purchase Price.

4.5     Brokers. No broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Purchaser.

4.6     No Litigation. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, there are no Actions pending or, to the knowledge of Purchaser, threatened against or affecting Purchaser that seek to prevent, restrain, materially delay, prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or by the other Transaction Agreements or that would, individually or in the aggregate, reasonably be expected to delay the Closing or that would otherwise adversely affect Purchaser's performance of its obligations or covenants under this Agreement or the other Transaction Agreements to which it is a party or the consummation of the transactions contemplated by this Agreement or the other Transaction Agreements to which it is a party.

4.7     Investment Representation; Investigation. Purchaser is acquiring the capital stock for its own account with the present intention of holding such securities for investment purposes and not with a view to, or for sale in connection with, any distribution of such securities in violation of any federal or state securities Laws. Purchaser is an "accredited investor" within the meaning of Regulation D promulgated pursuant to the Securities Act. Purchaser is knowledgeable about the industries in which Sellers and their Subsidiaries operate and is capable of evaluating the merits and risks of the transactions contemplated by this Agreement and the other Transaction Agreements and is able to bear the substantial economic risk of such investment for an indefinite period of time. Purchaser has been afforded full access to the books and records, facilities and personnel of each Seller and their Subsidiaries for purposes of conducting a due diligence investigation and has conducted a full due diligence investigation of Sellers and their Subsidiaries and is satisfied with the access and materials made available to it in connection with such investigation and the scope and results of such investigation.

4.8     No Foreign Person. As of Closing, each of Purchaser will not be a "foreign person," as defined in Section 721 of the U.S. Defense Production Act of 1950, including any implementing regulations thereof.

4.9     Solvency. Assuming (a) satisfaction of the conditions set forth in Article VII and (b) the accuracy in all material respects of the representations and warranties of Sellers set forth in Article III, immediately after giving effect to the transactions contemplated by this Agreement and the other Transaction Agreements, Purchaser will: (a) be able to pay their debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay their debt (including a reasonable estimate of the amount of all contingent Liabilities) and (c) not have an unreasonably small amount of capital with which to conduct their business. No transfer of property is being made and no obligation is being incurred in connection with the transactions

contemplated by this Agreement or the other Transaction Agreements with the intent to hinder, delay or defraud either present or future creditors of Purchaser or Sellers. In connection with the transactions contemplated hereby, Purchaser has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured. There are no bankruptcy, reorganization or arrangement Actions pending, being contemplated by or, to the knowledge of Purchaser, threatened against Purchaser.

4.10    No Other Representations or Warranties. Except for the representations and warranties expressly contained in this Article IV (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or any certificate delivered pursuant to this Agreement (it being understood that Sellers and their Affiliates have relied only on such express representations and warranties), Sellers acknowledge and agree, on each such Seller's behalf and on behalf of their respective Affiliates, that neither Purchaser nor any other Person on behalf of Purchaser makes, and neither Sellers nor any of their respective Affiliates has relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Sellers or any of their Affiliates or Advisors by on behalf of Purchaser or any of its Affiliates or Advisors.

## ARTICLE V
## BANKRUPTCY COURT MATTERS

5.1    Bankruptcy Actions.

(a)    As promptly as practicable, Sellers shall file with the Bankruptcy Court a motion seeking approval of the Sale Order; provided that Sellers may modify the motion seeking approval of the Sale Order pursuant to discussions with the United States Trustee assigned to the Bankruptcy Cases, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Cases, or any other party in interest.

(b)    The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order.  Purchaser agrees and acknowledges that Sellers, including through their representatives, are and may continue soliciting inquiries, proposals or offers from third parties in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order.

(c)    Sellers and Purchaser each acknowledges that this Agreement and the transactions contemplated hereby are subject to Bankruptcy Court approval. From the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article VIII and (ii) the Closing Date, Sellers shall use their reasonable best efforts to obtain entry by the Bankruptcy Court of the Sale Order.

(d)    Purchaser shall promptly take all actions as are reasonably requested by Sellers to assist in obtaining the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as practicable, including furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court or any other court of competent jurisdiction,

and making such employees and Advisors of Purchaser and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by Purchaser under this Agreement, and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(e)     If the Sale Order or any other order of the Bankruptcy Court relating to this Agreement (any such order, a "**Bankruptcy Court Order**") shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any Bankruptcy Court Order), Sellers shall use their reasonable best efforts to diligently defend against any such appeal, petition or motion and shall use their reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion, and, upon the reasonable request of Sellers, Purchaser shall use its reasonable best efforts to assist Sellers with the foregoing. Sellers shall notify Purchaser of such appeal, petition or motion as promptly as practicable and shall keep Purchaser reasonably informed and updated regarding the status of any such appeal, petition or motion. Sellers and Purchaser shall provide to the other party (i) draft copies of all motions, orders, notices, statements, schedules, applications, reports and other papers such party intends to file with the Bankruptcy Court in connection with the Sale Order or any other Bankruptcy Court Order in connection with the transactions contemplated by this Agreement within a reasonable period of time prior to the date such party intends to file any of the foregoing, and (ii) the proposed service lists in connection with the motions seeking Sale Order prior to service of materials in connection therewith and, in each case of the foregoing clauses (i) and (ii), consult in advance in good faith with the other party regarding the form and substance of any such proposed filing with the Bankruptcy Court and any such service list, as applicable.

(f)     Each Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement or the other Transaction Agreements and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Sellers from the Bankruptcy Court with respect to the transactions contemplated by this Agreement or the other Transaction Agreements.

(g)     If an Auction is conducted, and Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "**Successful Bidder**") but is the next highest bidder at the Auction, Purchaser shall be required to serve as a back-up bidder (the "**Backup Bidder**") and keep Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open and irrevocable until the later of (i) 60 days following the hearing to consider the Sale Order and (ii) such other date as this Agreement is otherwise terminated. If the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the Backup Bidder will be deemed to have the new prevailing bid, and Sellers may consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may have been improved upon in the Auction).

(h)     Sellers and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher or otherwise better bids and Bankruptcy Court approval. Purchaser acknowledges that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of the Debtors and other interested parties, providing information about Sellers to prospective bidders, entertaining higher or otherwise better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction.

(i)     Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors available to testify before the Bankruptcy Court.

(j)     Nothing in this Section 5.1 shall prevent Sellers from modifying the Bidding Procedures Order as necessary or appropriate to maximize value for Sellers' estate in accordance with Sellers' fiduciary obligations.

5.2     Cure Costs. Subject to entry of the Sale Order, Purchaser shall (i) on or prior to the Closing, pay the Cure Costs and cure any and all other defaults and breaches under the Assigned Contracts listed on Schedule 1.1(a) and Acquired Real Property Leases listed on Schedule 1.1(e) so that such Contracts may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement and (ii) in the case of any Assigned Contract and Acquired Real Property Lease that is assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment, pay the Cure Costs and cure any and all other defaults and breaches under such Assigned Contracts and Acquired Real Property Leases that are deemed to be listed on Schedule 1.5 so that such Contracts may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

5.3     Sale Order. The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser (and any Affiliate) on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances) and the assumption of the Assumed Liabilities on the terms set forth herein, and (iii) the performance by Sellers of their obligations under this Agreement, (b) authorize and empower Sellers to assume and assign to Purchaser (or any Assignee) the Assigned Contracts, (c) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to any Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (d) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets, the Assumed Liabilities or the Business other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor or

30

transferee Liability, labor law, de facto merger or substantial continuity, (e) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts and (f) find that Purchaser shall have no Liability for any Excluded Liability. Purchaser agrees that it will promptly take such actions as are reasonably requested by any Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (A) demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and (B) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

5.4    Approval. Sellers' obligations under this Agreement and the other Transaction Agreements and in connection with the transactions contemplated hereby and thereby are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including the Sale Order). Nothing in this Agreement or any of the other Transaction Agreements shall require Sellers or their respective Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

## ARTICLE VI
## COVENANTS AND AGREEMENTS

6.1    Conduct of Business of Sellers.

(a)    Except (i) as required by, arising out of, relating to or resulting from the Bankruptcy Cases or otherwise applicable Law, Order or a Governmental Body, (ii) as required, limited or prohibited by the Bankruptcy Court or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (iii) as expressly required or contemplated by this Agreement or the other Transaction Agreements, (iv) to the extent related to any Excluded Store, any Excluded Asset or any Excluded Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is validly terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, conditioned or delayed), Sellers shall use their commercially reasonable efforts to (x) carry on their business in the Ordinary Course in all material respects, (y) preserve the Business and the Acquired Assets (excluding sales of Inventory in the Ordinary Course of business) and (z) preserve in all material respects their relationships with any customers, suppliers, vendors, payors, partners, Governmental Bodies, licensors and licensees and other Persons with which they have material business relations.

(b)    Except (i) as required by applicable Law, Order or a Governmental Body, (ii) as required, limited or prohibited by the Bankruptcy Court or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (iii) as expressly required by this Agreement or the other Transaction Agreements, (iv) to the extent related to any Excluded Store, any Excluded Asset or any Excluded Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is validly terminated pursuant to Article VIII), unless Purchaser

31

otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditioned), Sellers shall not:

(i)      (A) incur, assume or otherwise become liable for any indebtedness for borrowed money, issue or sell any debt securities or rights to acquire any debt securities of Sellers, guarantee any such indebtedness or any debt securities of another Person or enter into any "keep well" or other agreement to maintain any financial statement condition of another Person (collectively, "**Indebtedness**"), except for Indebtedness incurred pursuant to an existing facility, (B) enter into any swap or hedging transaction or other derivative agreements or (C) make any loans, capital contributions or advances to, or investments in, any Person;

(ii)     sell or lease to any Person, in a single transaction or series of related transactions, any of the Acquired Assets except (A) Ordinary Course dispositions of obsolete, surplus or worn out real or tangible assets or real or tangible assets that are no longer used or useful in the conduct of the business of Sellers and (B) other sales of Inventory, fixtures and leases in the Ordinary Course;

(iii)    make or authorize capital expenditures, including for property, plant and Equipment, except for those (A) in connection with the repair or replacement of facilities, properties or assets destroyed or damaged due to casualty or accident (whether or not covered by insurance) or (B) in the Ordinary Course;

(iv)     except as expressly permitted under Section 6.1(b)(iv), and except for acquisitions made with Purchaser's prior written consent, make any acquisition of, or investment in, any properties, assets, securities or business (including by merger), except in the Ordinary Course (which for the avoidance of doubt and without limitation of the foregoing shall be deemed to exclude any acquisition of capital stock or of a material portion of the assets of any other Person);

(v)      except as required pursuant to the terms of any Seller Plan, (1) grant to any employee any material increase in compensation (including bonus or long-term incentive opportunities), (2) grant to any current or former employee any material increase in severance, retention or termination pay, (3) grant or amend any equity or other incentive awards (except that the Company: (A) may provide increases in salary, wages or benefits to non-executive officer employees in the Ordinary Course of business; (B) may make usual and customary annual or quarterly bonus or commission payments in the Ordinary Course of business; and (C) enter into agreements with consultants in the Ordinary Course of business), (4) hire any employee whose base salary exceeds $300,000 per annum (other than filling any vacancies), (5) establish, adopt, enter into, materially amend or terminate any material Assumed Benefit Plan or (6) take any action to accelerate any rights or benefits under any Assumed Benefit Plan; provided that the foregoing shall not restrict any Seller from entering into or making available, to newly hired employees or to employees in the context of promotions based on job performance or workplace requirements, in each case, for the avoidance of doubt, in the Ordinary Course, plans, agreements, benefits and compensation arrangements (including

32

incentive grants) that have a value that is consistent with the past practice of making compensation and benefits available to newly hired or promoted employees in similar positions;

(vi)    make any material changes in financial accounting methods, principles or practices in effect as of January 1, 2022, except insofar as may be required (A) by GAAP (or any interpretation thereof), (B) by any applicable Law, (C) by any Governmental Body or quasi-governmental authority (including the Financial Accounting Standards Board or any similar organization), (D) to permit the audit of the Company's financial statements in compliance with GAAP, (E) as disclosed in the Company SEC Documents, or (F) to the extent that such change would not reasonably be expected to result in a Material Adverse Effect;

(vii)    grant any Encumbrance (other than Permitted Encumbrances) on any of its Acquired Assets;

(viii)    settle or agree to settle any material pending or threatened Action against any Seller that would reasonably be expected to result in an (x) any Seller being enjoined from consummating the transactions contemplated by this Agreement, (y) any adverse effect on the Business or the Acquired Assets in any material respect or (z) an Assumed Liability, other than settlements involving only unsecured claims with an allowed amount of less than $500,000;

(ix)    other than in the Ordinary Course, reject, terminate or cancel (other than at its stated expiry date) or modify, amend or waive any material rights under any Material Contract;

(x)    other than in the Ordinary Course, sell, pledge, covenant not to assert, transfer, assign, abandon, dispose of, permit to lapse or grant any license or sublicense or other right or immunity in, to or under any material Seller Intellectual Property (other than non-exclusive licenses granted in the Ordinary Course and expirations of Seller Registered IP at the end of the full applicable statutory term);

(xi)    cancel or terminate any insurance coverage with respect to the Business, the Acquired Assets or the Assumed Liabilities without using commercially reasonable effort to replace such coverage with a comparable amount of insurance coverage;

(xii)    disclose any material Trade Secrets included in Seller Intellectual Property to any Person (other than pursuant to written confidentiality agreements entered into in the Ordinary Course that contain reasonable protections to preserve all rights in such Trade Secrets); or

(xiii)    authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(c)    Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct any Seller's Subsidiary's operations

33

or business prior to the Closing, and nothing contained in this Agreement is intended to give any Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Prior to the Closing, each of Purchaser and Sellers shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations. Notwithstanding anything to the contrary contained herein, (i) any action taken, or omitted to be taken, by any Seller as required by any Law, Order, directive, pronouncement or guideline issued by any Governmental Body providing for business closures, "sheltering-in-place" or other restrictions that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall in no event be deemed to constitute a breach of this <u>Section 6.1</u> and (ii) any reasonable protective action taken, or omitted to be taken, by a Seller in its good faith reasonable determination to be in the best interests of the Business, in order to mitigate, remedy, respond to or otherwise address the effects or impact of any pandemic, epidemic or disease outbreak (any action or inaction described in <u>clauses (i)</u> or <u>(ii)</u> of this <u>Section 6.1(c)</u>, a "**COVID-19 Response**"), shall in no event be deemed to constitute a breach of this <u>Section 6.1</u>.

6.2    <u>Access to Information</u>.

(a)    From the date hereof until the Closing (or the earlier valid termination of this Agreement pursuant to <u>Article VIII</u>), Sellers (in their sole discretion) will provide Purchaser and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours to (x) Sellers' accountants, counsel, financial advisors and other Advisors, officers and senior management possessing information relating to the Business, the Acquired Assets and the Assumed Liabilities, (y) all offices and other facilities of Sellers and (z) the books and records of Sellers, in order for Purchaser and its authorized Advisors to access such information regarding the Acquired Assets and the Assumed Liabilities as is in Sellers' possession or control and reasonably necessary in order to consummate the transactions contemplated by this Agreement; <u>provided</u> that (i) such access does not unreasonably interfere with the normal operations of any Seller, (ii) such access will occur in such a manner as Sellers reasonably determine to be appropriate to protect the confidentiality of the transactions contemplated by this Agreement, (iii) all requests for access will be directed to Houlihan Lokey or such other Person(s) as Houlihan Lokey may designate in writing from time to time and (iv) nothing herein will require Sellers to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would cause significant competitive harm to any Seller if the transactions contemplated by this Agreement are not consummated, (B) would require any Seller to disclose any financial or proprietary information of or regarding the Affiliates of any Seller (other than any Subsidiary) or otherwise disclose information regarding the Affiliates of any Seller (other than any Subsidiary) that such Seller reasonably determines to be commercially sensitive, (C) would jeopardize or waive any attorney-client or other legal privilege; <u>provided</u> that Purchaser and Sellers shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not (in the good faith belief of Sellers after consultation with outside counsel) reasonably be likely to cause such privilege to be undermined with respect to such information; or (D) would be in violation of applicable Laws or the provisions of any agreement to which Sellers are bound. Notwithstanding anything to the contrary contained herein, failure to provide such access due to a COVID-19 Response by any Seller shall not be deemed to violate or breach this <u>Section 6.2</u> in any way or serve as a basis for Purchaser to terminate this Agreement or assert that any of the conditions to Closing contained herein have not been satisfied.

(b)     The information provided pursuant to this Section 6.2 will be used solely for the purpose of consummating the transactions contemplated hereby and by the other Transaction Agreements and will be governed by all the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein. Purchaser will, and will cause their respective Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to Purchaser or any of its Advisors. Sellers make no representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Representations.

(c)     From and after the Closing for a period of 3 years following the Closing Date (or, if later, the closing of the Bankruptcy Cases), Purchaser will provide Sellers (including, for clarity, any trust established under a Chapter 11 plan of any Seller or any other successors of any Seller) and their Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the Acquired Assets, the Assumed Liabilities, and the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings and other documents (for the purpose of examining and copying) relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, for the purpose of (i) completing Sellers' legal, regulatory, stock exchange and financial reporting requirements, as applicable, to the extent required by applicable Law, (ii) completing its Tax Returns, and (iii) the continued administration of the Bankruptcy Cases and remaining asset and liabilities and the investigation, prosecution and defense of all claims, causes of action, lawsuits or demands to which the bankruptcy estates of Sellers may have. Notwithstanding anything to the contrary contained in this Agreement, Purchaser and its Affiliates may restrict the foregoing access and shall not be required to provide any information or access that Purchaser reasonably believes would violate applicable Law, including antitrust Laws and data protection Laws or the terms of any applicable Contract (including confidentiality obligations) or jeopardize any attorney-client privilege or an expectation of client confidence or any other rights to any evidentiary privilege. Unless otherwise consented to in writing by Sellers, Purchaser will not, for a period of 3 years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to Sellers such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of. From and after the Closing, Purchaser will, and will cause their respective employees to, provide Sellers with reasonable assistance, support and cooperation with Sellers' wind-down (if applicable) and related activities (*e.g.*, helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

(d)     Sellers will, and will direct their Advisors to, hold in confidence, and without the prior written consent of Purchaser, not disclose any confidential, proprietary or non-public information involving or relating to any of the Acquired Assets or Assumed Liabilities, including any information obtained pursuant to Section 6.2(c). Notwithstanding the foregoing, this Section 6.2(d) shall not (i) apply to information that is or becomes generally available to the public other than as a result of a disclosure by Sellers or any of their Advisors in breach of this Section 6.2(d) or (ii) prohibit any disclosure (A) required by Law or required or requested by any Governmental Body, in each case so long as, to the extent legally permissible and feasible, Sellers

provide Purchaser with reasonable prior notice of such disclosure so that Purchaser may seek to obtain a protective order or other reasonable assurance that such disclosure shall be treated confidentially (at Purchaser's sole cost and expense) or (B) made in connection with any litigation regarding this Agreement, the other Transaction Agreements or the transactions contemplated hereby.

(e)    Purchaser will not, and will not permit any of their respective Affiliates or representatives to contact any customer, supplier, lessee, lessor, licensee, licensor or distributor of any Seller prior to the Closing with respect to any Seller, the Business or the transactions contemplated by this Agreement or the other Transaction Agreements without the prior written consent of such Seller for each such contact.

6.3    <u>Employee Matters</u>.

(a)    Prior to Closing, Purchaser shall extend to each employee of Sellers (each a "**Business Employee**") a written offer of employment which Sellers will have had an opportunity to review and comment on, providing for a position that is comparable to such employee's position immediately prior to the Closing (including level of responsibility, primary location of employment and authority) on the terms set forth in this <u>Section 6.3</u> ("**Transfer Offer**") and that, if accepted, shall become effective immediately after the Closing. Employees who accept such Transfer Offers and begin active employment with Purchaser immediately after the Closing in accordance with this <u>Section 6.3(a)</u> shall be referred to herein as "**Transferred Employees**." Notwithstanding the foregoing, Purchaser will not be required to make offers of employment in accordance with the preceding sentence to any Business Employee who is absent from active employment on or following the date hereof and continuing through the Closing Date due to short- or long-term disability or any other leave of absence (other than paid time off through Sellers' general employment policies) (a "**Leave Employee**") until such Business Employee is able to return to active employment; <u>provided</u> that such employee is able to return to active employment within 6 months of the Closing for United States-based Business Employees. If a Leave Employee is not able to return to active employment within 6 months of the Closing for United States-based Business Employees, Purchaser shall not be required to make any offer of employment to such employee. Leave Employees will become Transferred Employees for purposes of this Agreement on the date they begin active employment with Purchaser (but such delay shall not extend any of the covenants contained in this <u>Section 6.3</u>). Purchaser shall notify Sellers in a reasonable timeframe with respect to whether each such offer has been accepted or rejected. Nothing herein shall be construed as a representation or guarantee by any Seller or any of their respective Affiliates that any or all of the employees of Sellers will accept the Transfer Offer or will continue in employment with Purchaser following the Closing for any period of time. Purchaser shall carry out all necessary actions to effect the timely transfer of employment to it of each such Transferred Employee who has accepted a Transfer Offer. Sellers shall take steps to ensure that, effective as of immediately prior to the Closing, each Transferred Employee shall cease to be an employee of each Seller or their respective Affiliates. Sellers will continue the Transferred Employees on the applicable Seller's payroll until such time as Purchaser's payroll is established and the Transferred Employees can be transferred to the payroll of Purchaser or one of its Affiliates, with the fees, costs and expenses (including Taxes) incurred or payable by Sellers in connection with such continuation of payroll to be reimbursed or paid by Purchaser (except that direct payroll costs and Taxes shall be pre-funded by Purchaser). The Parties shall comply with all applicable Laws in

36

respect of such payroll continuation, including with respect to tax reporting, and shall continue to apply payroll deductions for benefits plans as directed by Purchaser.

(b)     For a period of 1 year from and after the Closing Date, Purchaser shall provide each Transferred Employee, or cause each Transferred Employee to be provided, with: (i) a base salary or wage rate, as applicable, that is no lower than that provided to such Transferred Employee as of immediately prior to the Closing; (ii) annual cash bonus opportunities that are no less favorable than those provided to such Transferred Employee as of immediately prior to the Closing; and (iii) other employee benefits (including severance benefits, but excluding equity compensation, any cash long-term incentive compensation, any retention or transaction bonus and defined benefit pension or retiree medical benefits) that are substantially comparable in the aggregate to those provided by Sellers to such Transferred Employees as of immediately prior to the Closing. For purposes of eligibility, vesting and determining level of benefits (but not for purposes of benefit accrual) under the benefit plans and programs maintained by Purchaser or any of its Affiliates after the Closing Date (the "**Purchaser Plans**"), each Transferred Employee shall be credited with his or her years of service with Sellers (and any predecessor thereof) before the Closing Date, except to the extent such credit would result in a duplication of benefits; provided, for the avoidance of doubt, that any such credit shall not apply to equity compensation.

(c)     Without limiting the generality of any other provision of this Agreement: (i) each Transferred Employee shall be immediately eligible to participate, without any waiting time, in any and all Purchaser Plans, subject to the eligibility terms of such plans; (ii) for purposes of each Purchaser Plan providing health or welfare benefits, Purchaser shall use commercially reasonable efforts to cause all pre-existing condition exclusions and actively-at-work requirements of such Purchaser Plan to be waived for such Transferred Employee and his or her covered dependents (unless such exclusions or requirements were applicable under comparable Seller Plans); and (iii) Purchaser shall use reasonable best efforts to cause any co-payments, deductible and other eligible expenses incurred by such Transferred Employee or his or her covered dependents during the plan year in which the Closing Date occurs to be credited for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee and his or her covered dependents for the applicable plan year of each comparable Purchaser Plan.

(d)     Purchaser shall assume and honor all accrued and unused vacation, personal days, sick pay and other paid time off earned but unused (collectively, "**Accrued PTO**") by each Transferred Employee as of the Closing Date; provided that such Accrued PTO to be assumed by Purchaser shall not include any Paid PTO required to be paid in accordance with the following sentence. To the extent required by applicable Law, Sellers or their Affiliates shall be responsible for the payment of Accrued PTO to the Transferred Employees upon their termination of employment by Sellers (the "**Paid PTO**"); provided, however, that Purchaser shall advance (or reimburse, if such advance is not sufficient to cover such obligations) to Sellers the amount of any such payment obligations. Purchaser shall be responsible for paying, providing and satisfying when due all compensation (including salary, wages, commissions, bonuses, incentive compensation, overtime, premium pay and shift differentials), vacation, personal days, sick pay and other paid time off, benefits and benefit claims, severance and termination pay, notice, and benefits (including any employer Taxes or other payments related thereto), in each case, accruing,

incurred or arising solely as a result of employment or separation from employment with Purchaser after the Closing with respect to such Transferred Employee.

(e)     The provisions of this Section 6.3 are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any employees of Sellers or Transferred Employees), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 6.3 or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied: (i) shall be construed to establish, amend or modify any benefit plan, program, agreement or arrangement; (ii) shall, subject to compliance with the other provisions of this Section 6.3, alter or limit Purchaser's or Sellers' ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement; or (iii) is intended to confer upon any current or former employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment.

(f)     Effective as of the Closing, Purchaser and Purchaser's Affiliates shall assume all obligations, Liabilities and commitments in respect of claims made by any Transferred Employee (or any other individual claiming that he or she is or should be a Transferred Employee) for severance or other termination benefits (including claims for wrongful dismissal, notice of termination of employment, pay in lieu of notice or breach of Contract) arising out of, relating to or in connection with any failure of Purchaser to offer employment in accordance with the terms of this Agreement to, or to continue the employment of, any such Transferred 39 Employee (or other individual claiming that he or she is or should be a Transferred Employee) following the Closing on terms and conditions that would preclude any claims of actual or constructive dismissal or similar claims under any Law or other failure to comply with the terms of this Agreement.

(g)     For 90 days following the Closing, Purchaser will not, and will cause its Affiliates not to, take any action that would cause any termination of employment of any employees by Sellers or their Affiliates occurring prior to or at the Closing to trigger the notice requirements of the Worker Adjustment and Retraining Notification Act of 1988 or any similar Laws (collectively, the "**WARN Act**"), or to create any Liability or penalty to Sellers or any of their Affiliates under the WARN Act; provided that such obligations of Purchaser are contingent upon Sellers providing Purchaser with substantially complete and accurate information regarding all employment losses, broken down by job location, that occur within 90 days prior to Closing.

(h)     For any Transferred Employees who are principally based outside the United States, the provisions of this Section 6.3 shall apply to such employees *mutatis mutandis* to the maximum extent permitted by applicable Law.

6.4     Filings and Authorizations. Each of Sellers and Purchaser, as promptly as practicable, (i) shall take, or cause to be taken, any and all actions, and to do, or cause to done, all things necessary to make all such filings and submissions under Laws, rules and regulations applicable to it, as may be required to consummate the transactions contemplated herein, in accordance with the terms of this Agreement, (ii) shall use all commercially reasonable efforts to obtain, or cause to be obtained, all authorizations, approvals, consents and waivers from all Governmental Bodies necessary to be obtained by it, in order to consummate the transactions

contemplated herein, and (iii) shall use commercially reasonable efforts to take, or cause to be taken, all other actions necessary, proper or advisable in order for him, her or it to fulfill his, her or its obligations hereunder. Sellers and Purchaser shall coordinate and cooperate with one another in exchanging such information and supplying such reasonable assistance as may be reasonably requested by each in connection with the foregoing.

6.5     Reasonable Efforts; Cooperation.

(a)     Subject to the other terms of this Agreement, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable to cause the transactions contemplated herein and by the other Transaction Agreements to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder and to assist in connection with the Bankruptcy Cases. Except as otherwise provided herein, the "reasonable best efforts" of Sellers for the purposes of this Section 6.5 will not require any Seller or any of its Affiliates or Advisors to expend any money to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forgo any right, remedy or condition hereunder.

(b)     The obligations of Sellers pursuant to this Agreement, including this Section 6.5, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Cases), and Sellers' obligations as debtors in possession to comply with any Order of the Bankruptcy Court, and Sellers' duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.6     Further Assurances. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will, and will cause its respective Affiliates to, without further consideration, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, all such conveyances, notices, assumptions, assignments, releases, documents and instruments, in form and substance reasonably satisfactory to the Parties, and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement; provided that nothing in this Section 6.6 will prohibit Sellers or any Affiliates of Sellers from ceasing operations or winding up their affairs following the Closing.

6.7     Receipt of Misdirected Assets.

(a)     Subject to the terms of this Agreement (including Section 1.5), during the 6-month period following the Closing, if either any Purchaser or any Seller becomes aware that any right, property or asset forming part of the Acquired Assets has not been transferred to Purchaser or that any right, property or asset not forming part of the Acquired Assets has been transferred to Purchaser, it shall promptly notify such other Parties hereto and Purchaser or Sellers, as applicable, shall, as soon as reasonably practicable thereafter, ensure that such right, property or asset (and any related Liability) is transferred at the expense of Sellers and with any necessary

consent, to (i) Purchaser, in the case of any right, property or asset forming part of the Acquired Assets which was not transferred to Purchaser at or in connection with the Closing, or (ii) Sellers, in the case of any right, property or asset not forming part of the Acquired Assets which was transferred to Purchaser at the Closing.

(b)     From and after the Closing, if any Seller or any of its respective Affiliates receives any right, property or asset that is an Acquired Asset or any cash, checks with appropriate endorsements, or other payment which properly belongs to Purchaser or its Affiliates pursuant to the terms of this Agreement (including any Cash and Cash Equivalents received in any bank account not transferred pursuant to Section 1.1(v)), the applicable Seller shall promptly transfer or cause such of its Affiliates to transfer its right, title and interest in and to such right, property, asset, cash, check or other payment (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and Sellers' right, title and interest in and to such asset, cash, check or other payment will be deemed the property of Purchaser held in trust by such Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset or any cash, checks with appropriate endorsements, or other payment which properly belongs to Sellers or their respective Affiliates pursuant to the terms of this Agreement, Purchaser shall promptly transfer or cause such of their Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks or other documents) to the applicable Seller, and such asset will be deemed the property of such Seller held in trust by Purchaser for such Seller until so transferred.

6.8     Acknowledgment by Purchaser.

(a)     Purchaser acknowledges and agrees that it has conducted its own independent investigation and verification of the Business (including its financial condition, results of operations, the Acquired Assets, Liabilities, properties, Contracts, business risks and prospects) of Sellers and the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied solely on the Express Representations and the results of Purchaser's own independent investigation and verification and has not relied on, is not relying on, and will not rely on, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom, the Information Presentation, or the Projections or any other information, statements, disclosures or materials, in each case, whether written or oral, made or provided by or on behalf of any Seller or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Purchaser has relied only on the Express Representations). Purchaser acknowledges and agrees that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser and on which Purchaser may rely in connection with the transactions contemplated by this Agreement and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations) including in the Dataroom, Information Presentation, Projections, meetings, calls or correspondence with management of any Seller, any Seller Parties or any other Person on behalf of any Seller or any Seller Parties or any of their respective Affiliates

or Advisors and (B) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects of Sellers, or the quality, quantity or condition of any Seller's assets (including any express or implied warranty under Section 8-108 of the Uniform Commercial Code, or of merchantability, suitability or fitness for a particular purpose), are, in each case, specifically disclaimed by each Seller, on its behalf and on behalf of Seller Parties. Purchaser: (1) disclaims reliance on the items in <u>clause (ii)</u> in the immediately preceding sentence; and (2) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in <u>clause (i)</u> in the immediately preceding sentence. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees that neither Sellers, nor any other Person (including Seller Parties), has made, is making or is authorized to make, and Purchaser hereby waives, all rights and claims they may have against any Seller Party with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (x) any potentially material information regarding any Seller or any of its assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (y) any warranty or representation (whether in written, electronic or oral form), express or implied, as to the quality, merchantability, suitability or fitness for a particular purpose, or condition of any Seller's, business, operations, assets, Liabilities, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects or any portion thereof (including any express or implied warrant under Section 8-108 of the Uniform Commercial Code), except, in each case, solely to the extent expressly set forth in the Express Representations. Purchaser will accept the Acquired Assets and Assumed Liabilities at Closing "as is," "where is" and "with all faults." Purchaser further acknowledges and agrees that the Acquired Assets that are capable of being delivered are being delivered by Sellers to Purchaser at the location where they are located on the Closing Date.

(b)     Without limiting the generality of the foregoing, in connection with the investigation by Purchaser of Sellers, Purchaser and its Advisors have received or may receive, from or on behalf of Sellers, certain projections, forward-looking statements and other forecasts (whether in written, electronic or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "**Projections**"). Purchaser acknowledges and agrees that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of Sellers, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c)     Purchaser acknowledges and agrees that they will not assert, institute or maintain, and will cause their Affiliates not to assert, institute or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in this <u>Section 6.8</u>.

(d)     Purchaser acknowledges and agrees that the covenants and agreements contained in this <u>Section 6.8</u> (i) require performance after the Closing to the maximum extent permitted by applicable Law and (ii) are an integral part of the transactions contemplated by this Agreement and that, without these agreements set forth in this <u>Section 6.8</u>, Seller would not enter into this Agreement.

6.9    <u>Guaranty</u>.

(a)    Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Sellers (i) the due and punctual performance, when and as due, of all obligations, covenants and agreements of Purchaser (and any Affiliates to which this Agreement is assigned pursuant to <u>Section 10.4</u>) arising under or pursuant to this Agreement and (ii) the punctual payment of all sums, if any, now or hereafter owed by Purchaser (and such Affiliates) under and in accordance with the terms of this Agreement, including the payment obligations set forth in <u>Section 2.1</u> (the matters set forth in clauses (i) and (ii), collectively, the "**Guaranteed Obligations**").

(b)    If Purchaser (or its Affiliates) fail to perform any of the Guaranteed Obligations, then Guarantor shall itself be jointly and severally liable for the Guaranteed Obligations and shall perform or take whatever steps as may be necessary to procure performance of the same.

(c)    Nothing herein shall be construed as imposing greater obligations or Liabilities on Guarantor than for which Purchaser itself (or its Affiliates themselves) would be liable under this Agreement or obliging Guarantor to indemnify and hold harmless Sellers against any losses, costs or expenses for which Purchaser itself would not be liable under this Agreement, except as set forth in this <u>Section 6.9</u>.

(d)    The obligations of Sellers under this Agreement shall conclusively be deemed to have been created, contracted or incurred in reliance upon this <u>Section 6.9</u> and all dealings between Sellers and Purchaser (and its Affiliates) shall likewise be conclusively presumed to have been consummated in reliance upon this <u>Section 6.9</u>.

(e)    The guarantee by Guarantor contained herein shall remain in full force and effect and shall continue to be enforceable by Sellers until the (i) consummation of the Closing and the payment in full by Purchaser of any and all amounts required to be paid by Purchaser at the Closing pursuant to this Agreement or (ii) the earlier valid termination of this Agreement pursuant to <u>Section 8.1</u>, upon which this guarantee and the obligations of Guarantor pursuant to this <u>Section 6.9</u> shall terminate automatically and be of no further force or effect without the need for any further action by any Person, and Guarantor shall stand discharged of all of its obligations under this guarantee. Guarantor's obligations under this <u>Section 6.9</u> shall not be terminated, modified, affected or impaired by reason of any relief or discharge of Purchaser (or its Affiliates) from any of Purchaser's (or its Affiliates') obligations in bankruptcy or similar proceedings, or by liquidation or dissolution.

(f)    Except as otherwise set forth herein, the liability of Guarantor under this <u>Section 6.9</u> shall be unlimited and unconditional, and this <u>Section 6.9</u> shall be a continuing guaranty.

(g)    Guarantor hereby makes the representations and warranties set forth in <u>Sections 4.1</u>, <u>4.2</u> and <u>4.3</u> as to itself, and such representations and warranties shall apply *mutatis mutandis* as if Guarantor were substituted for Purchaser therein. The Parties agree that Guarantor shall be entitled to, and Guarantor does not waive, any defenses to the payment or performance of the Guaranteed Obligations that are available to Purchaser under this Agreement.

6.10    Intellectual Property Matters.

(a)    For clarity, from and after Closing and except as expressly provided in Section 6.10(c), Sellers shall, and shall cause their Affiliates to, (i) cease any and all use or other exploitation of any and all Seller Intellectual Property and (ii) keep strictly confidential and not disclose to any Person (nor use for any purpose) any Trade Secrets included in Seller Intellectual Property (including any source code for proprietary Software included in Seller Intellectual Property).

(b)    At Closing, Sellers shall assign and transfer to Purchaser all rights, title and interest in and to all Domain Names and Social Media included in the Acquired Assets.

(c)    To the extent any Marks included in the Acquired Assets are reasonably required to be used in connection with the completion of the wind-down of Sellers' estate, Purchaser hereby grants to each Seller and its Affiliates a limited, royalty-free, fully paid-up, worldwide, non-exclusive license to continue to use and display such Marks in the manner that such Marks were used at Closing until the completion of the wind-down of Sellers' estate (the "**Wind-Down End Date**") solely to the extent reasonably necessary for the wind-down of Sellers' and their respective Affiliates' remaining corporate operations.

(d)    From and after the Closing, Sellers shall be permitted and entitled until the Wind-Down End Date to permit Sellers and its designees to use and access the llflooring.com email domain as an email server solely to the extent necessary for the wind-down of Seller's estate. Purchaser shall, and shall cause their Affiliates to, reasonably cooperate with and assist Sellers in connection with the foregoing.

6.11    Delivery of Schedules. As soon as possible after the date hereof, but in no event later than the date that is 5 days after the date hereof, Sellers shall (a) deliver to Purchaser true, accurate and complete copies of all of the Schedules hereto and (b) confirm to Purchaser that such Schedules are final and complete and can be attached to this Agreement and incorporated herein.

6.12    Professional Fee Escrow Account. On or prior to the Closing, Sellers shall fund the Professional Fee Escrow Account in an amount equal to [•].

**ARTICLE VII
CONDITIONS TO CLOSING**

7.1    Conditions Precedent to the Obligations of Purchaser and Sellers. The respective obligations of each Party to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)    no Governmental Body of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting consummations of the Closing; and

43

(b)      the Bankruptcy Court shall have entered the Sale Order substantially in the form attached hereto as Exhibit E and shall not have been stayed, reversed or modified in a manner materially adverse to Purchaser absent consent of Purchaser.

7.2      Conditions Precedent to the Obligations of Purchaser. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)      (i) the representations and warranties made by Sellers in Article III (in each case, other than the Fundamental Representations) shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except (A) that the representations and warranties that are made as of a specified date need be true and correct only as of such date and (B) to the extent the failure of such representations and warranties to be true and correct as of the Closing Date or such other specified date, as applicable, has not had a Material Adverse Effect (provided that for purposes of the foregoing clause (i), the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect (other than those contained in the second sentence of Section 3.4)) and (ii) the representations and warranties set forth in Section 3.1, Section 3.2, Section 3.5(a) and Section 3.16 (collectively, the "**Fundamental Representations**") shall be true and correct in all material respects (other than any *de minimis* inaccuracies) as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all material respects (other than any *de minimis* inaccuracies) only as of such date;

(b)      Sellers shall have performed and complied in all material respects with the covenants and agreements contained in this Agreement which are required to be performed and complied with by Sellers on or prior to the Closing Date;

(c)      Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.3;

(d)      Since the date hereof, there shall not have occurred and be continuing any Material Adverse Effect; and

(e)      the Bankruptcy Court shall have approved and authorized an Order, which may be the Sale Order, permitting and authorizing the Designation Rights Period as set forth in Section 1.5(b).

7.3      Conditions Precedent to the Obligations of Sellers. The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)      the representations and warranties made by Purchaser in Article IV shall be true and correct in all material respects as of the Closing Date as though made on and as of the

Closing Date, except that representations and warranties that are made as of a specified date need be true and correct only as of such date;

(b)    Purchaser shall have performed and complied in all material respects with the covenants and agreements contained in this Agreement which are required to be performed and complied with by Purchaser on or prior to the Closing Date;

(c)    Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 2.4; and

(d)    the Professional Fee Escrow Account shall have been funded in an amount equal to [•].

7.4    Frustration of Closing Conditions. None of Purchaser or Sellers may rely on the failure of any condition set forth in this Article VII, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the transactions contemplated hereby as required under this Agreement.

## ARTICLE VIII
## TERMINATION

8.1    Termination of Agreement. This Agreement may be terminated only in accordance with this Section 8.1. This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of each of Sellers and Purchaser;

(b)    by written notice of either Purchaser or Sellers, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the Closing or declaring unlawful the Closing, and such Order having become final, binding and non-appealable; provided that no Party may terminate this Agreement under this Section 8.1(b) if the issuance of such Order was caused by such Party's breach of its representations, warranties, covenants or failure to perform any of its obligations under this Agreement;

(c)    by written notice of either Purchaser or Sellers, if the Closing shall not have occurred on or before the date that is [•] days from the date hereof (the "**Outside Date**"); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(c) if such Party is in material breach or violation of its representations, warranties, covenants or obligations under this Agreement that proximately caused the failure of the Closing to occur prior to the Outside Date;

(d)    by written notice of either Purchaser or Seller, if the Bankruptcy Cases are dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Sellers is appointed in the Bankruptcy Cases;

45

(e)    by written notice from Sellers to Purchaser, upon a material breach of any covenant or agreement on the part of any Purchaser, or if any representation or warranty of any Purchaser will have become untrue, in each case, such that the conditions set forth in Section 7.3(a) or 7.3(b) would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; provided that (i) if such breach is curable by Purchaser then Sellers may not terminate this Agreement under this Section 8.1(e) unless such breach has not been cured by the date that is the earlier of (A) 2 Business Days prior to the Outside Date and (B) 10 days after Sellers notify Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(e) will not be available to Sellers at any time that Sellers are in material breach of any of Sellers' covenants, representations or warranties hereunder;

(f)    by written notice from Purchaser to Sellers, upon a material breach of any covenant or agreement on the part of any Seller, or if any representation or warranty of any Seller will have become untrue, in each case, such that the conditions set forth in Section 7.2(a) or 7.2(b) would not be satisfied; provided that (i) if such breach is curable by Sellers then Purchaser may not terminate this Agreement under this Section 8.1(f) unless such breach has not been cured by the date which is the earlier of (A) 2 Business Days prior to the Outside Date and (B) 10 days after Purchaser notifies Sellers of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(f) will not be available to Purchaser at any time that Purchaser is in material breach of any of its covenants, representations or warranties hereunder;

(g)    by written notice from Sellers to Purchaser, if (i) all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but which conditions are, at the time the notice of termination is delivered by Sellers to Purchaser, capable of being satisfied if the Closing were to occur at such time) or waived by Purchaser, (ii) Sellers have confirmed in writing to Purchaser that all of the conditions set forth in Sections 7.1 and 7.3 have been satisfied, or waived by Sellers (other than conditions that by their nature are to be satisfied at the Closing, but which conditions are, at the time the notice of termination is delivered by Sellers to Purchaser, capable of being satisfied if the Closing were to occur at such time), (iii) at a time when clauses (i) and (ii) are satisfied, Sellers have confirmed in writing to Purchaser that Sellers are ready, willing and able to effect the Closing and (iv) and Purchaser fails to complete the Closing within 3 Business Days following the receipt by Purchaser of such notice specified in clause (iii);

(h)    by written notice of either Purchaser or Sellers, if prior to the entry of the Sale Order any Seller enters into one or more Superior Transactions with one or more Persons other than Purchaser or the Bankruptcy Court approves a Superior Transaction, other than with Purchaser, that has not been solicited in violation of Section 5.1(b);

(i)    by written notice from Purchaser to Sellers if the Sale Order approved by the Bankruptcy Court differs in any material respect from the form of Sale Order attached hereto as Exhibit E other than any such differences that are mutually agreed in writing between Purchaser and Sellers; or

(j)    by written notice from Purchaser to Sellers, if (i) Sellers shall have failed to deliver to Purchaser final and complete copies of all of the Schedules hereto on or before the date that is 5 days after the date hereof, or (ii) any of the final and complete Schedules, or any matter,

46

fact, item of information, circumstance, event, Liability or other disclosure set forth on, or described or referred to in, any of the Schedules, shall not be acceptable to Purchaser in its reasonable discretion; provided that Purchaser shall not be permitted to terminate this Agreement pursuant to this Section 8.1(j) after the date that is the later of (A) 1 day prior to the hearing before the Bankruptcy Court seeking entry of the Sale Order and (B) the date that is 3 days after the date on which Sellers deliver final and complete copies of the Schedules to Purchaser, unless Purchaser shall have notified Sellers in writing of its intention to terminate this Agreement pursuant to this Section 8.1(j) on or prior to such date.

8.2     Effect of Termination. In the event of the valid termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void without any further action by any Person and no Party or any of its partners, officers, directors, managers, employees, managers, Advisors or equityholders will have any Liability under this Agreement; provided that Section 6.2(b), Section 6.2(c), this Section 8.2 and Article X shall survive any such termination; provided, further, that no termination will relieve Purchaser from any Liability for damages, losses, costs or expenses resulting from any Willful Breach of this Agreement prior to the date of such termination. Subject to Section 10.12, nothing in this Section 8.2 will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement.

## ARTICLE IX
## TAXES

9.1     Transfer Taxes. Any sales, use, value-added, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated hereby (excluding, for the avoidance of doubt, income taxes of Sellers) (the "**Transfer Taxes**") shall be borne and timely paid by Purchaser with respect to any Transfer Taxes, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes.

9.2     Cooperation. Purchaser and Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation or other proceeding with respect to Taxes.

9.3     Preparation of Tax Returns and Payment of Taxes.

(a)     Except as otherwise provided by Section 9.1, Sellers shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets for any Tax period ending on or before the Closing Date and (ii) all income Tax Returns of Sellers.

(b)     Purchaser shall prepare and timely file all Tax Returns with respect to the Acquired Assets that are not addressed by Section 9.3(a).

(c)     For all purposes under this Agreement, in respect of any Straddle Period, the portion of Taxes that are allocable to the portion of the Straddle Period ending on the Closing Date will be: (i) in the case of any Tax based upon or related to income and any gross receipts, sales or use Tax, or payroll or receipts Tax, deemed to include the amount that would be payable

if the relevant Straddle Period ended on and included the Closing Date; and (ii) in the case of any Taxes other than Taxes specified in <u>clause (i)</u>, deemed to include the amount of such Tax for the entire Straddle Period multiplied by a fraction the numerator of which is the number of days in the Straddle Period ending on and including the Closing Date and the denominator of which is the number of days in the entire Straddle Period.

(d)    Purchaser and the applicable Sellers agree to utilize the standard procedure set forth in Revenue Procedure 2004-53 with respect to wage reporting for the Transferred Employees.

(e)    Sellers and Purchaser agree to treat, for U.S. federal and applicable state and local income tax purposes, the transactions contemplated by this Agreement as a taxable sale of assets by Sellers and a taxable purchase of assets by Purchaser, and none of Purchaser, any Seller or any of their respective Affiliates shall file any Tax Return or other document with, or make any statement or declaration to, any Governmental Body that is inconsistent with such treatment, unless otherwise required by a Determination.

## ARTICLE X
## MISCELLANEOUS

10.1    <u>Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers</u>. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement, the other Transaction Agreements or in any other document contemplated hereby or thereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing until fully performed in accordance with its terms, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller Parties acknowledge and agree, on their own behalf and on behalf of Purchaser's Affiliates or Seller Parties, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing in accordance with its terms and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this <u>Section 10.1</u>, none of the Parties would enter into this Agreement. Purchaser hereby waives all rights and remedies with respect to any environmental, health or safety matters, including those arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or any other Environmental Laws, relating to this Agreement, the other Transaction Agreements or the transactions contemplated hereby or thereby.

10.2    <u>Expenses</u>. Whether or not the Closing takes place, except as otherwise provided herein or in the Sale Order, all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated

hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that all Transfer Taxes will be allocated pursuant to Section 9.1.

10.3    Notices. Except as otherwise expressly provided herein, all notices, demands, consents, waivers and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail if transmitted prior to 5:00 P.M. (local time of the recipient) on a Business Day and otherwise on the next Business Day after transmittal, (c) or on the Business Day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

Notices to Purchaser:

[•]
Attention:        [•]
Email:            [•]

with a copy to (which shall not constitute notice):

[•]
Attention:        [•]
Email:            [•]

Notices to Sellers:

LL Flooring Holdings, Inc.
4901 Bakers Mill Lane
Richmond, VA 23230
Attention:        Alice Givens
Email:            AGivens@llflooring.com

with a copy to (which shall not constitute notice):

Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001
Attention:        Richard Grossman

Maxim Mayer-Cesiano
Email:            Richard.Grossman@skadden.com
                  Maxim.MayerCesiano@skadden.com

49

10.4     Binding Effect; Assignment. This Agreement shall be binding upon Purchaser and, subject to the Sale Order and terms of the Sale Order, Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 cases; provided that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated by any Party without the prior written consent of Purchaser and Sellers, and any attempted assignment or delegation without such prior written consent shall be null and void; provided, however, that the rights of Purchaser under this Agreement may be assigned by Purchaser, in whole or in part, without the prior written consent of Sellers to one or more of Purchaser's Affiliates; provided, further, that Sellers may assign some or all of their rights or delegate some or all of their obligations hereunder to successor entities pursuant to a plan of reorganization confirmed by the Bankruptcy Court.

10.5     Amendment and Waiver. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Sellers or (b) waived only in writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default. Furthermore, neither the failure nor any delay by any Party in exercising any right, power or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.

10.6     Third-Party Beneficiaries. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties and their permitted successors and assigns any legal or equitable right, remedy, cause of action or claim under or with respect to this Agreement or any provision of this Agreement.

10.7     Non-Recourse. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Agreement Dispute.

10.8     Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law so as to produce as near as may be the economic result intended by the parties hereto, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction. Upon determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to eliminate such invalidity, illegality or incapability of enforcement and to effect

50

the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

10.9   <u>Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10   <u>Schedules</u>. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; <u>provided</u> that each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules to which its relevance is reasonably apparent on its face, and any disclosure in the Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement to which its relevance is reasonably apparent on its face, without the need for repetition or cross-reference. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits: (a) shall not be construed to mean that such information is required to be disclosed by this Agreement; (b) shall not be construed as or constitute an admission, evidence or agreement that a violation, right of termination, default, non-compliance, liability or other obligation of any kind exists with respect to any item; (c) with respect to the enforceability of contracts with third-parties, the existence or non-existence of third-party rights, the absence of breaches or defaults by third-parties, or similar matters or statements, is intended only to allocate rights and risks among the Parties and is not intended to be admissions against interests, give rise to any inference or proffer of accuracy, be admissible against any Party by any Person who is not a Party, or give rise to any claim or benefit to any Person who is not a Party; and (d) does not waive any attorney-client privilege associated with such item or information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed herein. No Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened or would constitute a "**Material Adverse Effect**") or is within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations, warranties, obligations, covenants, conditions or agreements contained herein. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11   <u>Complete Agreement</u>. This Agreement (including the Schedules and the attached exhibits), together with the Confidentiality Agreement and the other Transaction Agreements

expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated hereby and thereby and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement and the other Transaction Agreements. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parole evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12  Specific Performance. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches, or threatened breaches, of this Agreement and to enforce specifically the terms and provisions hereof and its rights hereunder in the courts described in Section 10.13 without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, or other rights and remedies existing in its favor at law or in equity, and (b) the right of specific performance, injunctive relief and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Sellers nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 10.12 will not be required to provide any bond or other security in connection with any such Order. The remedies available to Sellers pursuant to this Section 10.12 will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Seller from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any action, in each case in accordance with Section 10.13, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (i) for the period during which such action is pending, plus 10 Business Days or (ii) by such other time period established by the court presiding over such action, as the case may be. In no event will this Section 10.12 be used, alone or together with any other provision of this Agreement, to require any Seller to remedy any breach of any representation or warranty made by any Seller herein.

10.13  Jurisdiction and Exclusive Venue. Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the other Transaction Agreements or the negotiation, execution or performance of this Agreement or the other Transaction Agreements or the transactions contemplated hereby or

thereby and any questions concerning the construction, interpretation, validity and enforceability of this Agreement or the other Transaction Agreements (each, an "**Agreement Dispute**") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the United States federal courts for the District of Delaware (the "**Chosen Courts**"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Court, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

      10.14  <u>Governing Law; Waiver of Jury Trial</u>.

      (a)      Except to the extent of the mandatory provisions of the Bankruptcy Code, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

      (b)      EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE OTHER TRANSACTION AGREEMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15 <u>No Right to Set-off</u>. Purchaser, on its own behalf and on behalf of its Affiliates and their respective successors and permitted assigns, hereby waive any rights of set-off, netting, offset, recoupment or similar rights that Purchaser, or any of their respective Affiliates or any of their respective successors and permitted assigns have or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement, the Transaction Agreements or any other document or instrument delivered by Purchaser or any of their respective Affiliates in connection herewith.

10.16 <u>Counterparts and PDF</u>. This Agreement, the other Transaction Agreements and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of electronic signature (including signature via DocuSign or similar services), a photographic, photostatic, facsimile, portable document format (.pdf), or similar reproduction of such signed writing using a facsimile machine or electronic mail, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any Party or pursuant to any such Transaction Agreement, each other Party hereto or thereto will re-execute original forms thereof and deliver them to all other Parties. No Party hereto or to any such other Transaction Agreement will raise the use of a .PDF, DocuSign or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of .PDF, DocuSign or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.17 <u>Publicity</u>. No Party or any of its Affiliates shall issue, and shall cause its Advisors not to issue, any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party, which approval will not be unreasonably conditioned, withheld or delayed, unless, in the reasonable judgment of Purchaser or Sellers, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Sellers (or their respective Affiliates) lists securities; <u>provided</u> that the Party intending to make such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof. Notwithstanding anything to the contrary in this Agreement, nothing shall restrict or prohibit (a) Sellers or their Affiliates from communicating with their respective employees, customers, suppliers or other business relations to the extent that such communications consist solely of, or are otherwise consistent in all material respects with previous press releases, public disclosures or public statements made by any Party hereto in accordance with this Agreement to the extent such disclosure is still accurate in all material respects (and not misleading) or (b) Purchaser or its Affiliates from making any announcement or communications to its employees, in each case, subject to the terms of the Confidentiality Agreement.

10.18    Bulk Sales Laws. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

10.19    Fiduciary Obligations. Subject to Section 5.1, nothing in this Agreement, or any document related to the transactions contemplated hereby, will require any Seller or any of their respective managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable Law.

10.20    Time of Essence. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

10.21    Sellers' Representative. Each Party agrees that LL Flooring has the power and authority to unilaterally act on behalf of all or any of Sellers for the purposes expressly specified under this Agreement. Such power will include the power to make all decisions, actions, consents and determinations on behalf of Sellers, including to make any waiver of any Closing condition or agree to any amendment to this Agreement. No Seller shall have any right to object, dissent, protest or otherwise contest the same. Purchaser shall be entitled to rely on any action or omission taken by LL Flooring on behalf of Sellers.

## ARTICLE XI
## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1    Certain Definitions.

"**Action**" means any action, claim (including a counterclaim, cross-claim or defense), complaint, summons, suit, litigation, arbitration, third-party mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, dispute, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body, tribunal or arbitrator.

"**Advisors**" means, with respect to any Person, any directors, officers, members, shareholders, equity holders, manager, partners, employees, contractors, subcontractors, investment bankers, financial advisors, accountants, auditors, agents, attorneys, consultants or other representatives of such Person.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with,

such Person, and the term "**control**" (including the terms "**controlled by**" and "**under common control with**") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"**Alternative Transaction**" means (a) any sale, transfer or other disposition, directly or indirectly, of a material portion of the assets and properties of Sellers, whether proposed to be effected pursuant to a merger, consolidation, share exchange or sale, amalgamation, foreclosure, compromise, asset sale, issuance, financing, recapitalization, liquidation, transfer or redemption of any assets or securities of any Seller or any successor thereto or any similar transaction, in one transaction or a series of transactions with one or more Persons other than the sale of the Acquired Assets to Purchaser in accordance with the terms hereof, or (b) any restructuring or reorganization of any of Sellers or their assets, properties or liabilities (including pursuant to a plan of reorganization) other than the sale of the Acquired Assets to Purchaser in accordance with the terms hereof.

"**Business**" means any and all ordinary course business or commercial activities or operations of any kind that are conducted by any of Sellers.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

"**Cash and Cash Equivalents**" means all of Sellers' cash (including checks and deposits in transit, money markets or similar accounts), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held and net of uncleared checks or drafts.

"**Confidentiality Agreement**" means any confidentiality obligations to which Purchaser or its Affiliates are subject pursuant to any agreement between Purchaser or its Affiliates, on the one hand, and Sellers and/or their respective Affiliates, on the other hand, with respect to the Business.

"**Consent**" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

"**Contract**" means any written or oral contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee or other agreement that is legally binding upon a Person or its property, in each case, other than a purchase order, service order or sales order.

"**Documents**" means all of Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies and documents, Tax Returns, ledgers, journals, title policies, customer and supplier lists, mailing lists regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.),

56

marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether in written or electronic form or any other medium.

"**Encumbrance**" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, hypothecations, easements, rights of way, licenses, encroachments, conditional sale or other title retention agreements and other similar restrictions on transfer or use.

"**Environmental Laws**" all applicable Laws concerning pollution or protection of the environment and natural resources, including the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et. seq., and similar Laws.

"**Equipment**" means any and all equipment, computers, furniture, furnishings, fixtures, supplies, vehicles, network storage infrastructure, network racks, servers, laptops and other physical IT infrastructure components, equipment (including computer equipment) and hardware, and all other fixed assets.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Governmental Authorization**" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

"**Governmental Body**" means any government, quasi-governmental entity, administrative, taxing or regulatory authority, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, municipal, state, provincial, territorial or local, or any agency, branch, department, board, bureau, official, commission entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

"**Hazardous Substance**" means (a) any pollutants, chemicals, contaminants, wastes or toxic, infectious, carcinogenic, reactive, radioactive, corrosive, ignitable, flammable or otherwise hazardous substances or materials, whether solid, liquid or gas, that are subject to regulation, control or remediation, or defined, under any Environmental Laws and (b) asbestos in any form, urea formaldehyde, polychlorinated biphenyls, radon gas, mold, crude oil or any fraction thereof, all forms of natural gas, petroleum, petroleum products, petroleum by-products, petroleum derivatives, petroleum breakdown products and per- and polyfluoroalkyl substances.

"**Intellectual Property**" means any and all intellectual or industrial property and any and all right, title and interest therein or thereto, including any and all rights of the following types, which may exist or be created under the laws of any jurisdiction in the world: (a) patents, patent applications and patent or invention disclosures; (b) trademarks, service marks, brand names, trade dress, slogans, logos, corporate names, Internet Domain Names and other indicia of origin,

together with all goodwill associated with each of the foregoing (collectively, "**Marks**"); (c) copyrights, works of authorship, design rights and moral rights; (d) trade secrets, know-how and confidential information (collectively, "**Trade Secrets**"); (e) Software and other Technology; (f) drawings, schematics and other technical plans; (g) rights of privacy and publicity; (h) rights in copies and tangible embodiments of all of the foregoing (in whatever form or medium); (i) rights in or relating to registrations, renewals, reversions, extensions, combinations, divisions, and reissues of, and applications for, any of the foregoing; and (j) all other intellectual property, proprietary rights and industrial property and rights therein or arising therefrom.

"**Inventory**" means all inventory (including materials, supplies, component parts, spare parts, work in process, finished goods and goods in transit and other property) owned or used (or held for use) by any of Sellers, wherever located and whether in Sellers' facilities, held by any third parties or otherwise.

"**Law**" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, Order, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

"**Leasehold Improvements**" means all buildings, structures, improvements and fixtures which are owned, leased or used, or held for use, by a Seller and located on any leased real property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the lease for such leased real property.

"**Liability**" means, as to any Person, any debt, adverse claim, lien, damages, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, secured or unsecured, liquidated or unliquidated, vested or unvested or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

"**Material Adverse Effect**" means a material adverse effect on the financial condition or results of operations of the Business, Sellers, the Acquired Assets and Assumed Liabilities, taken as whole; provided that none of the following (or consequences thereof), either alone or in combination, shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (a) any matter, event, change, development, occurrence, circumstance or effect (each, an "**Effect**") in, arising from or relating to general business or economic conditions affecting the industry in which Sellers and their Affiliates operate; (b) Effects in, arising from or relating to national or international political or social conditions, including tariffs, civil protests, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories,

possessions or diplomatic or consular offices or upon any military installation, asset, Equipment or personnel of the United States or of any other country; (c) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), outbreak of illness or public health event (whether human or animal), viral outbreak (including "**Coronavirus**" or "**COVID-19**" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (d) Effects in, arising from, or relating to financial, banking, securities or currency markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, and (C) any decline or rise in the price of any security, commodity, Contract or index); (e) Effects in, arising from or relating to changes in, GAAP occurring after the date hereof; (f) Effects in, arising from or relating to changes in Laws or other binding directives or determinations issued or made by or agreements with any Governmental Body occurring after the date hereof; (g) Effects in, arising from or relating to (i) the taking of any action at the written request of Purchaser or its Affiliates, (ii) the failure to take any action if such inaction is requested in writing by Purchaser, (iii) Purchaser's failure to consent to any of the actions restricted in <u>Section 6.1</u> or (iv) the announcement, consummation or pendency of this Agreement or the transactions contemplated hereby, the identity, nature or ownership of Purchaser with respect to the Acquired Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the Business with employees, customers, lessors, suppliers, vendors, or other commercial partners or Governmental Bodies or litigation arising from or relating to this Agreement or the transactions contemplated hereby; (h) Effects in, arising from, or relating to any existing event, occurrence or circumstance that is set forth in the Schedules or any matter set forth in any public filings with the Bankruptcy Court prior to the date hereof; (i) Effects that arise from any seasonal fluctuations in the Business; (j) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans or predictions (whether or not shared with Purchaser or its Affiliates or Advisors) (<u>provided</u>, that this <u>clause (j)</u> shall not prevent a determination that any Effect underlying such failure has resulted in a Material Adverse Effect, unless such Effect is otherwise excepted by this definition); (k) the Effect of any action taken by Purchaser or their its Affiliates with respect to the transactions contemplated by this Agreement or the financing thereof or any breach by Purchaser of this Agreement; (l) the matters set forth on the Schedules and any changes or developments in, or Effects or results arising from or relating to, matters set forth on the Schedules; or (m) the pendency of the Bankruptcy Cases; <u>provided</u>, however, that, in the case of <u>clauses (a)</u>, <u>(b)</u>, <u>(c)</u> and <u>(d)</u>, such Effects shall be taken into account in determining whether any such material adverse effect has occurred to the extent that any such Effect has a material and disproportionate adverse effect on the Business, taken as a whole, relative to similar businesses, operating in the industry or markets in which the Business operates.

"**Non-Debtor Subsidiaries**" means American Lumber Liquidators Leasing LLC, a China limited liability company and LL Flooring Employee Assistance Fund, a Virginia 501(c)(3) charitable organization.

"**Order**" means any order, injunction, order, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order).

"**Ordinary Course**" means the ordinary and usual course of operations of the Business, taken as a whole, consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Cases; provided that any action taken, or omitted to be taken, that relates to, or arises out of, any pandemic, epidemic, public health conditions or disease outbreak or to comply with any orders, directives, guidelines or commendations issued by a Governmental Body in response thereto or health and safety measures shall be deemed to be in the ordinary course of business.

"**Permitted Encumbrances**" means (a) Encumbrances for utilities and Taxes not yet due and payable, being contested in good faith or the nonpayment of which is permitted or required by the Bankruptcy Code where such Encumbrance will be released from the Acquired Assets pursuant to the Bankruptcy Code at Closing or otherwise upon the transfer of such Acquired Asset pursuant to Section 1.5, (b) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, materially and adversely affect the operation of the Business or the applicable Acquired Assets and, in the case of the Owned Real Property and Acquired Leased Real Property, which do not, individually or in the aggregate, materially and adversely affect the use or occupancy of such Owned Real Property or Acquired Leased Real Property, (c) applicable zoning Laws, building codes, land use restrictions and other similar restrictions presently or hereafter imposed by Law which are not violated by the current use or occupancy of such Owned Real Property or Acquired Leased Real Property, as applicable, (d) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory Encumbrances incurred in the Ordinary Course after the Petition Date for amounts not yet due and payable, (e) non-exclusive licenses of Intellectual Property granted in the Ordinary Course, (f) any Encumbrances set forth on Schedule 11.1, and (g) solely prior to Closing, any Encumbrances that will be removed or released by operation of the Sale Order.

"**Person**" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

"**Professional Fee Escrow Account**" means the segregated escrow account funded in an amount equal to [•].

"**Sale Hearing**" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"**Sale Order**" means an Order of the Bankruptcy Court in form and substance satisfactory to the Parties in all respects approving this Agreement and authorizing Sellers to undertake the transactions contemplated hereunder, including pursuant to sections 363 and 365 of the Bankruptcy Code.

"**Securities Act**" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

"**Seller Intellectual Property**" means any and all Intellectual Property owned (or purported to be owned), in whole or in part, by any Seller.

"**Seller IP Rights**" means any and all rights, title or interests of any Seller under any Intellectual Property of any other Person.

"**Seller Parties**" means each Seller and its former, current or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

"**Seller Plan**" means each (a) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (b) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (c) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (d) employment, individual consulting, severance or retention agreement or (e) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by Sellers or to which any Seller is obligated to contribute or with respect to which any Seller has any Liability.

"**Software**" means any and all (a) computer programs, applications, code and other software, including any and all software algorithms, assemblers, applets, compilers, firmware, middleware, interfaces, applications, utilities, tools, and diagnostics, databases, compilations of data, and embedded systems, as well as fixes, upgrades, updates, enhancements, and past and future versions and releases, whether in source code, executable code or object code form., and any documentation (including user and installation manuals and training software) relating to the foregoing; (b) work product used to design, plan, organize and develop any of the foregoing; and (c) source code annotations relating to any of the foregoing.

"**Straddle Period**" means any taxable period that includes but does not end on the Closing Date.

"**Subsidiary**" or "**Subsidiaries**" means, with respect to any Person, any corporation, limited liability company or other entity of which a majority of the total voting power of shares of stock or other equity interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees or other governing body or Person thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

"**Superior Transaction**" means a transaction that any Seller's board of directors (or similar governing body) determine in good faith, after considering the advice of their financial and outside legal advisors: (a) does not contain any financing contingencies, (b) would be in the best interests of such Seller and its creditors as a whole and (c) would reasonably be expected to be superior to such Seller and its creditors (taking into account (i) the likelihood and timing of consummation and (ii) all material legal, financial (including the financing terms of any such proposal),

61

conditionality, regulatory and other aspects of such proposal, taken as a whole) as compared to the transactions contemplated by this Agreement.

"**Tax**" or "**Taxes**" means, whether disputed or not, any federal, state, provincial, territorial, local, non-U.S. or other income, gross receipts, capital stock, franchise, profits, withholding, social security, employment, unemployment, government pension plan premiums and contributions, social security premiums, workers' compensation premiums, employment/unemployment insurance or compensation premiums and contributions, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum, estimated and other taxes, duties, assessments or other charges in the nature of a tax, including any interest, penalty or addition thereto.

"**Tax Code**" means the United States Internal Revenue Code of 1986.

"**Tax Return**" means any return, declaration, election, notice, designation, claim for refund, report, statement or information return relating to Taxes filed or required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

"**Technology**" means any and all (a) technology, formulae, algorithms, procedures, processes, methods and methodologies, models, techniques, know-how, ideas, creations, concepts, inventions, discoveries, improvements, and invention disclosures (whether patentable or unpatentable and whether or not reduced to practice); (b) technical, engineering, manufacturing, product, marketing, servicing, financial, supplier, personnel and other information and materials; (c) customer lists, customer contact and registration information, sales and pricing data, supplier records and vendor data, business plans, forecasts, customer correspondence and customer purchasing histories; (d) specifications, designs, models, devices, prototypes, samples, schematics and development tools; (e) Software, websites, user interfaces, content, images, flow charts, graphics, text, photographs, artwork, audiovisual works, sound recordings, graphs, blueprints, drawings, reports, analyses, writings and other works of authorship; (f) databases and other compilations and collections of data or information, data, computer data, disks, diskettes, and other technical, financial, employee or business information or data; (g) domain names, uniform resource locators and other names and locators associated with the Internet ("**Domain Names**"); (h) social media and mobile communications accounts, identifiers, user names, handles or short code designations ("**Social Media**") and (i) Trade Secrets.

"**Transaction Agreements**" means this Agreement, the Bill of Sale and Assignment and Assumption Agreement, the Trademark Assignment Agreement, the Copyright Assignment Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

"**Willful Breach**" shall mean a deliberate act or a deliberate failure to act.

11.2   Index of Defined Terms.

Accrued PTO ........................................ 39

Acquired Assets........................................ 4

Acquired Leased Real Property ................ 5
Action ........................................................ 57
Advisors .................................................... 57
Affiliate ..................................................... 57
Agreement ................................................. 4
Agreement Dispute ................................... 54
Alternative Transaction ........................... 57
Assumed Benefit Plans ............................. 6
Assumed Liabilities ................................. 10
Audited Financial Statements .................. 18
Available Contracts .................................. 12
Backup Bidder .......................................... 31
Bankruptcy Cases ...................................... 4
Bankruptcy Code ....................................... 4
Bankruptcy Court ...................................... 4
Bankruptcy Court Orders ......................... 30
Bill of Sale and Assignment and Assumption
    Agreements ......................................... 15
Business .................................................... 58
Business Day ............................................. 58
Business Employee ................................... 37
Cash and Cash Equivalents ...................... 58
Chosen Courts .......................................... 54
Closing ...................................................... 14
Closing Date ............................................. 14
Confidentiality Agreement ....................... 58
Consent ..................................................... 58
Contract .................................................... 58
control ....................................................... 57
controlled by ............................................. 57
Copyright Assignment Agreements ......... 15
Coronavirus .............................................. 60
COVID-19 ................................................. 60
COVID-19 Response ................................. 35
Cure Costs ................................................ 12
Dataroom .................................................. 26
DBI ............................................................. 4
Designation Rights Period ....................... 12
Diamond .................................................... 26
Documents ................................................ 58
Domain Names .......................................... 64
Effect ........................................................ 60
Encumbrance ............................................ 58
Enforceability Exceptions ....................... 17
Environmental Laws ................................. 58
Environmental Permits ............................ 21

Equipment ................................................ 59
ERISA ....................................................... 59
ERISA Affiliate ........................................ 25
Excluded Assets ......................................... 8
Excluded Contracts .................................... 9
Excluded Liabilities ................................. 11
Express Representations ........................... 26
Financial Statements ................................ 18
Fundamental Representations .................. 46
GAAP ........................................................ 59
Governmental Authorization ................... 59
Governmental Body .................................. 59
Guaranteed Obligations ........................... 43
Guarantor ................................................... 4
Hazardous Substance ............................... 59
Indebtedness ............................................. 33
Information Presentation .......................... 26
Insurance Policies ...................................... 7
Intellectual Property ................................ 59
Inventory .................................................. 59
Law ........................................................... 60
Leasehold Improvements ......................... 60
Leave Employee ....................................... 38
Liability .................................................... 60
Marks ........................................................ 59
Material Adverse Effect .................... 53, 60
Material Contract ..................................... 19
Material Suppliers .................................... 26
Non-Debtor Subsidiaries ......................... 61
Order ........................................................ 61
Ordinary Course ....................................... 61
Outside Date ............................................. 47
Owned Real Property ................................. 5
Paid PTO ................................................... 39
Parties ........................................................ 4
Party .......................................................... 4
Permits ..................................................... 21
Permitted Encumbrances ......................... 61
Person ....................................................... 62
Petition Date ............................................. 4
Projections ................................................ 43
Purchase Price .......................................... 14
Purchaser Plans ........................................ 38
Real Property Appurtenances .................... 5
Responsible Person Liabilities ................ 11
Sale Order ................................................. 62

Securities Act .......................................... 62
Seller ....................................................... 4
Seller Intellectual Property ...................... 62
Seller IP Rights ....................................... 62
Seller Parties .......................................... 62
Seller Plan .............................................. 62
Seller Registered IP ................................ 22
Sellers ...................................................... 4
Social Media ........................................... 64
Software .................................................. 63
Straddle Period ....................................... 63
Subsidiaries ............................................ 63
Subsidiary ............................................... 63
Successful Bidder ................................... 31
Superior Transaction .............................. 63
Tax .......................................................... 63
Tax Code ................................................. 64

Tax Return .............................................. 64
Taxes ...................................................... 63
Technology ............................................. 64
Trade Secrets ......................................... 59
Trademark Assignment Agreements ......... 15
Transaction Agreements .......................... 64
Transfer Offer ......................................... 37
Transfer Taxes ........................................ 49
Transferred Employees ........................... 37
U.S. Professional Fee Escrow Account .... 62
U.S. Purchaser .......................................... 4
Unaudited Financial Statements .............. 18
under common control with ..................... 57
WARN Act .............................................. 40
Willful Breach ........................................ 64
Wind-Down End Date ............................. 44

11.3    <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or" unless expressly indicated otherwise.

(d)    The words "to the extent" shall mean "the degree by which" and not simply "if."

(e)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)      Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)      The word "will" will be construed to have the same meaning and effect as the word "shall." The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)      All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)      All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)      Any document or item will be deemed "delivered," "provided" or "made available" by Sellers, within the meaning of this Agreement if such document or item is (i) included in the Dataroom prior to the date of this Agreement, (ii) actually delivered or provided physically or electronically to Purchaser or any of Purchaser's Advisors or (iii) made available upon request, including at Sellers' offices.

(k)      Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)      Any reference to any particular Bankruptcy Code or Tax Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Bankruptcy Code or Tax Code section or Law, the reference to such Bankruptcy Code or Tax Code section or Law means such Bankruptcy Code or Tax Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)      A reference to any party to this Agreement or any other agreement or document shall include such party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(n)      A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

*[Signature pages follow.]*