UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | Case No. 24-11680 (BLS) |
| LL FLOORING HOLDINGS, | . | |
| INC., *et al.*, | . | (Joint Administration Pending) |
| | . | |
| | . | Courtroom No. 5 |
| | . | 824 Market Street |
| Debtors. | . | Wilmington, Delaware 19801 |
| | . | |
| | . | Tuesday, August 13, 2024 |
| . . . . . . . . . . . . . . | . | 10:45 a.m. |

TRANSCRIPT OF HYBRID ZOOM HEARING
BEFORE THE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

| | |
|---|---|
| For the Debtors: | Jason M. Liberi, Esquire<br>Amy S. Phelps, Esquire<br>SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP<br>One Rodney Square<br>920 North King Street<br>Wilmington, Delaware 19801 |

(APPEARANCES CONTINUED)

| | |
|---|---|
| Audio Operator: | Dana L. Moore, ECRO |
| Transcription Company: | Reliable<br>The Nemours Building<br>1007 N. Orange Street, Suite 110<br>Wilmington, Delaware 19801<br>Telephone: (302)654-8080<br>Email: gmatthews@reliable-co.com |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES (CONTINUED):

| | |
|---|---|
| For the Debtors: | Lisa Laukitis, Esquire<br>Shana A. Elberg, Esquire<br>Elizabeth M. Downing, Esquire<br>Angeline J. Hwang, Esquire<br>Jamie S. Brumberger, Esquire<br>Chambliss Williams, Esquire<br>SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP<br>One Manhattan West<br>New York, New York 10001 |
| For the U.S. Trustee: | Rosa Sierra-Fox, Esquire<br>UNITED STATES DEPARTMENT OF JUSTICE<br>OFFICE OF THE UNITED STATES TRUSTEE<br>J. Caleb Boggs Federal Building<br>844 King Street<br>Suite 2207, Lockbox 35<br>Wilmington, Delaware 19801 |
| For Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC: | Mark L. Desgrosseilliers, Esquire<br>CHIPMAN BROWN CICERO & COLE, LLP<br>Hercules Plaza<br>1313 North Market Street<br>Suite 5400<br>Wilmington, Delaware 19801 |
| For Bank of America: | Christopher L. Carter, Esquire<br>MORGAN, LEWIS & BOCKIUS, LLP<br>One Federal Street<br>Boston, Massachusetts 02110 |
| For Brixmor Operating Partnership LP and Urban Edge Properties, LLC: | Laurel D. Roglen, Esquire<br>BALLARD SPAHR, LLP<br>919 North Market Street<br>11th Floor<br>Wilmington, Delaware 19801 |

ALSO APPEARING:

For the Debtors:

Holly Etlin
ALIXPARTNERS, LLP
909 3rd Avenue
New York, New York 10022

Surbhi Gupta
HOULIHAN LOKEY
245 Park Avenue
20th Floor
New York, New York 10167

INDEX

| MOTIONS: | | PAGE |
|---|---|---|
| Agenda Item 2: | Motion of Debtors for Entry of an Order (I) Directing Joint Administration of Cases; (II) Waiving the Requirements of Section 342(c)(1) of the Bankruptcy Code and Bankruptcy Rules 1005 and 2002(n); and (III) Granting Related Relief [Docket No. 3] | 26 |
| | Court's Ruling: | 26 |
| Agenda Item 3: | Motion of Debtors for Entry of an Order (I) Extending the Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs; (II) Extending the Time to File Reports of Financial Information Required Under Bankruptcy Rule 2015.3; and (III) Granting Related Relief [Docket No. 4] | 9 |
| | Court's Ruling: | -- |
| Agenda Item 4: | Application of Debtors for an Order (I) Appointing Stretto, Inc. as Claims and Noticing Agent and (II) Granting Related Relief [Docket No. 5] | 27 |
| | Court's Ruling: | 27 |

INDEX


| MOTIONS: | | PAGE |
|---|---|---|
| Agenda Item 5: | Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated Creditor Matrix in Lieu of Submitting a Separate Creditor Matrix for Each Debtor and Waiving Certain Creditor Matrix Requirements, (B) Omit Certain Customers from the Creditor Matrix, (C) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors, (D) Redact Certain Personal Identification Information, and (E) Serve Certain Parties in Interest by Email; (II) Establishing Procedures for Notifying Parties of the Commencement of these Cases; (III) Waiving the Requirement to File a List of Equity Security Holders; and (IV) Granting Related Relief [Docket No. 6] | 28 |
| | Court's Ruling: | 31 |
| Agenda Item 6: | Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Certain Prepetition Taxes and Related Obligations and (B) Pay Fees to Certain Tax Service Providers; and (II) Granting Related Relief [Docket No. 7] | 33 |
| | Court's Ruling: | 35 |
| Agenda Item 7: | Motion of Debtors for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment; (II) Establishing Procedures for Resolving Objections by Utility Providers; (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service; (IV) Authorizing Payment of Utilities Service Fees; and (V) Granting Related Relief [Docket No. 8] | 38 |
| | Court's Ruling: | 40 |

INDEX


| MOTIONS: | | PAGE |
|---|---|---|
| Agenda Item 8: | Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain Existing Insurance Policies, (B) Pay all Insurance Obligations Arising Thereunder, (C) Continue Insurance Financing Program, (D) Maintain Surety Bonds, (E) Continue to Pay Broker Fees; and (II) Granting Related Relief [Docket No. 9] | 40 |
| | Court's Ruling: | 42 |
| Agenda Item 9: | Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Certain Prepetition Employee Obligations and (B) Continue Compensation and Benefits Programs; and (II) Granting Related Relief [Docket No. 10] | 44 |
| | Court's Ruling: | 47 |
| Agenda Item 10: | Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Honor Certain Prepetition Obligations to Customers, and (B) Continue Certain Customer Programs in the Ordinary Course of Business; and (II) Granting Related Relief [Docket No. 12] | 47 |
| | Court's Ruling: | 54 |
| Agenda Item 11: | Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using Existing Cash Management Systems, Bank Accounts, and Business Forms and (B) Implement Changes to Their Cash Management System in the Ordinary Course of Business; (II) Granting a Waiver with Respect to the Requirements of § 345(b); and (III) Granting Related Relief [Docket No. 13] | 55 |
| | Court's Ruling: | 60 |

INDEX

| MOTIONS: | | PAGE |
|---|---|---|
| Agenda Item 12: | Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors, (B) Lienholders, (C) Import Claimants, and (D) 503(b)(9) Vendors; (II) Authorizing the Debtors to Pay Prepetition Customs Duties; and (III) Granting Related Relief [Docket No. 14] | 61 |
| | Court's Ruling: | 64 |
| Agenda Item 13: | Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Agency Agreement; (II) Authorizing and Approving the Conduct of Store Closing Sales, with Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances; (III) Authorizing Customary Bonuses to Employees of Closing Stores; and (IV) Granting Related Relief [Docket No. 15] | 65 |
| | Court's Ruling: | 88 |
| Agenda Item 14: | Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-petition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition ABL Parties, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief [Docket No. 16] | 89 |
| | Court's Ruling: | 104 |

INDEX


| DECLARATIONS: | PAGE |
|---|---|
| 1) Declaration of Holly Etlin | 24 |
| 2) Declaration of Surbhi Gupta | 25 |
| Transcriptionists' Certificate | 110 |

(Proceedings commenced at 10:45 a.m.)

MR. LIBERI: Jason Liberi at Skadden Arps --

THE COURT: Mr. Liberi, it's good to see you again.

MR. LIBERI: Thank you, Your Honor.

-- as proposed counsel for the debtors LL Flooring Holdings, Inc. and its affiliated debtors.

Thank you for getting us in here this morning so promptly. We appreciate it. We are here for --

THE COURT: Happy to oblige.

MR. LIBERI: We are here for the first day hearing.

Your Honor, we filed shortly before the hearing, an amended agenda with just a couple of minor revisions. If Your Honor doesn't have it, I can bring a copy up.

THE COURT: You know, if you would, I've got -- I think that one might be something I did not walk in with.

Thank you, sir.

MR. LIBERI: And, Judge, there's only two minor revisions there. One is simply the addition of the filing of the notice of fee letter and budget that we filed yesterday afternoon.

THE COURT: I have that.

MR. LIBERI: And the second change is with respect to Matter 3, schedules and statements. After some

discussions with the Office of the United States Trustee, we are now adjourning that motion to a date and time to be determined.

THE COURT: Okay.

MR. LIBERI: Those are the only changes.

Your Honor, at this time, I would like to introduce my colleague Lisa Laukitis, who will tee up the case and get us into the agenda.

THE COURT: Ms. Laukitis, good morning. It's good to see you again. Welcome.

MS. LAUKITIS: Good morning. It's great to see you, as well. It's been several years.

Lisa Laukitis of Skadden Arps, on behalf of the debtors and the debtors-in-possession. I wanted to introduce a few members of the team who are here today in the courtroom and appearing virtually. In addition to Mr. Liberi, I have Shana Elberg and Amy Phelps in the courtroom.

THE COURT: Welcome.

MS. LAUKITIS: And in terms of virtual presenters, Elizabeth Downing, Angeline Hwang, Chambliss Williams, and Jamie Brumberger are on the line.

THE COURT: Great.

MS. LAUKITIS: Additionally, we have Holly Etlin, who's a partner and managing director at AlixPartners. She is the company's chief restructuring officer --

THE COURT: And she's our declarant today.

MS. LAUKITIS: -- and also our first day declarant, yes, and Surbhi Gupta, who's a manager/director at Houlihan Lokey, the proposed investment banker for the debtors. She is our declarant in support of the DIP financing.

THE COURT: I have both of those declarations.

MS. LAUKITIS: Great.

I wanted to start by thanking you and your staff for accommodating us today and scheduling a hearing and allowing certain of our team members and our witnesses to appear virtually, and also to thank the Office of the United States Trustee, and, in particular, Ms. Sierra-Fox, for being available to us over the last several days as we prepare to file, including this morning, and working with us to resolve all of the issues that she raised.

I wanted to thank our management team and our board who have worked tirelessly over the last few months to try to find the best solution for the company's challenges, and to our prepetition lenders and their advisors who have partnered with us to support these cases, and have worked with us quite constructively at quite a fevered pace over the last few days.

If it works for you, I thought I would provide a brief introductory overview of the company, what it does, the

events that have led us to this point, and what we hope to achieve in the cases.

THE COURT: That sounds great.

MS. LAUKITIS: Great.

In terms of an overview of the business, LL Flooring is a leading specialty retailer of flooring. The company has been providing flooring and related services to customers since 1994. The company operating under its prior name, Lumber Liquidators, went public in November of 2007 and has been trading on the New York Stock Exchange.

THE COURT: Is it still currently trading or is it delisted?

MS. LAUKITIS: We just received a delisting notice --

THE COURT: Very good.

MS. LAUKITIS: -- following the filing.

THE COURT: Okay.

MS. LAUKITIS: Lumber Liquidators rebranded as LL Flooring in 2022 and I'll talk a little bit more about that in a moment.

The company is headquartered in Richmond, Virginia. It operates approximately 430 retail locations, through which it provides over 500 varieties of hard-surfaced flooring direct to consumers and flooring professionals, including vinyl flooring, solid and engineered hardwood,

laminate, bamboo, tile, and cork. The company also offers carpet in several of those locations.

The company offers an assortment of installation services and accessories and, in addition to the stores, customers may order products on the company's website LLflooring.com.

The company sources its product directly from flooring and other vendors both, domestically and internationally. Nearly half of the company's vendors are domestic. The remainder are significantly coming from Asian countries, including China, from Europe, and South America. The company uses just one supplier for its carpet.

The company has three distribution centers. The largest is a million-square-foot distribution center --

THE COURT: That's the one in Virginia?

MS. LAUKITIS: -- in Virginia. Correct. That one is an owned property. That services stores in the Eastern United States and then the company has two leased distribution centers in California and Texas that serve other areas of the U.S.

The company, through a nondebtor affiliate, maintains a laboratory in Shanghai, China, which is used by the company's sourcing, compliance, and quality assurance team to work with its vendors in Asia to ensure compliant standards with regulatory requirements and company quality

standards.

The company employs approximately 1,960 employees, 99 percent of whom are full time. The majority of these employees work in retail stores. 22 percent work in corporate store functions and 7 percent work in the distribution center. Then there are 20 employees that are employed indirectly through the Shanghai affiliate.

THE COURT: And they're kind of, functionally, independent contractors; is that fair?

MS. LAUKITIS: That's correct.

THE COURT: Okay.

MS. LAUKITIS: In terms of funded debt, the debtors have approximately $109.6 million in total funded indebtedness. There is approximately 99 million outstanding under a prepetition ABL facility, as well --

THE COURT: And then 10 on the LCs?

MS. LAUKITIS: That's correct.

So the company operates in a highly fragmented market; it's a large market. There was $36 billion of retail sales of hard- and soft-surfaced flooring in 2022 and $39 billion in 2023 in the market as a whole. Its competitors are --

THE COURT: It seems like it would be a ferociously competitive market. You have at one end, the small, either mom-and-pop or a couple stores and then at the

other end, you've got the very big-box --

MS. LAUKITIS: That's right.

THE COURT: -- Home Depot, Lowe's, and other home supply outfits and, obviously, you guys fit in the middle.

MS. LAUKITIS: Right. So it faces competition from all sides on a number of fronts: price, customer service, store location, the range of products that it offers, the availability of products.

To this rebranding point, in 2015, the company was the subject of an expose on 60 Minutes regarding claims that laminate flooring imported by the company from China had unsafe levels of formaldehyde. There were a variety of settlements with government entities related to environmental claims, securities law claims, settlements with respect to class actions that have led to the importance and focus on the company on testing its materials. It has a lab contained in the Sandston facility, as well as the lab that I mentioned that's in Shanghai, to do quality control and regulatory compliance for the Asian vendors. But those events had a significant, negative impact on the company's reputation and led to a rebranding of the company to LL Flooring in 2022.

Notwithstanding a significant marketing campaign to try to relaunch that brand, no doubt, low brand awareness negatively impacted the company's sales, but the company also faced some severe market pressures that have been much lower

levels of home improvements. The news is full of reports about the stagnant housing market and the reduction in home sales, as a result of elevated interest rates. Consumer discretionary spending has been depressed, given the inflationary environment, and the COVID-19 demand bubble for home renovation projects has subsided.

The company also faced a number of significant operational challenges. It faced supply chain disruptions and low inventory, rising labor costs and transportation costs, high turnover of its sales associates, and significant tariffs.

THE COURT: Is it fair to say that the company, you know, part of the challenge that it faced was the business was probably good during the pandemic and transitioning out of the pandemic was complex. That's not -- if that's the case, that's not the first time that I've sort of heard that circumstance described of businesses that became, you know, very, very popular with -- we all did home improvements and home repair when we were stuck at home.

Is that accurate, as well?

MS. LAUKITIS: I think that's accurate. There was definitely a downturn post-COVID-19, but it is also affected by the inflationary environment. This is something that tends to happen when houses turnover; someone buys a new house and they want to put new flooring in. And so, as

interest rates have gone up and home sales have slowed, that type of renovation is also happening less often.

So that, coupled with all the other inventory and operational challenges that the company faces, led to a pretty significant liquidity crisis and the company worked to implement a variety of cost-cutting measures. They started managing their vendor relationships much more closely. They closed unprofitable stores. They reduced their employee headcount. They evaluated their real estate portfolio. But they were still not able to turn the tide.

The goal of these cases is to sell the debtors' business through a going-concern sale and 363 and, hopefully, as a sale of the Sandston distribution center. It's important to note that these assets have been substantially and extensively marketed. The company began a marketing process with JPMorgan for an out-of-court sale transaction in November of 2022 and despite those efforts over a lengthy period, they were unable to secure a bid for the business.

So Houlihan Lokey was hired in April 2024 to attempt to refinance the existing ABL facility. Houlihan ran an extensive process, but unfortunately, did not receive any actionable proposals. Houlihan also worked to try to identify a stalking horse bidder for this business to be sold as a going-concern. While there's been interest from several parties, the debtors were unable to reach agreement with a

stalking horse prior to the commencement of these cases.

JLL was hired to pursue a sale of the Sandston distribution center and then the debtors also pursued, with the assistance of AlixPartners and Houlihan, bids from third-party consultants to conduct going-out-of-business sales at some of the company's underperforming locations, and you'll hear more about those after, later in the hearing.

THE COURT: Okay.

MS. LAUKITIS: So our hope is to use the next few weeks to try to reach an agreement with the stalking horse bidder for the sale of the debtors' business as a going-concern and we have a lot of work to do in a short amount of time, but we are up to the task and optimistic that we have a path to maximize the value of this business.

In addition to the going-concern sale, the debtors have entered into an LOI with the bidder for the Sandston DC at approximately $100 million.

THE COURT: And that's structured as a private sale and would travel along. If there's a going-concern purchase for the whole thing, then so be it; in the absence of that or if the deal permits the sale to the proposed purchaser, then that would move forward just for the distribution center.

Is that correct?

MS. LAUKITIS: That's correct.

We have the ability to handle it --

THE COURT: Pivot.

MS. LAUKITIS: -- either way. But, I mean, we don't have a motion in front of you on the private sale, but that bidder needs to finish their diligence --

THE COURT: Right. I think you're waiting to see how circumstances play out.

MS. LAUKITIS: That's right.

They need to finish their diligence and then we also need to see if the stalking horse bidder wants to take that facility or not --

THE COURT: Okay.

MS. LAUKITIS: -- but we have flexibility with that, as well.

The sale and -- yesterday, we filed a motion for approval of the bid procedures for that going-concern sale for bid protections for both, the going-concern sale and the Sandston --

THE COURT: And the Sandston.

MS. LAUKITIS: -- sale and we're hopeful we'll be able to be back before you before the end of the month on that, and we can talk more about that later, as well.

The sale and the wind-down process are going to be funded through the consensual use of cash collateral and through debtor-in-possession financing, provided by the

company's ABL lenders, and you'll hear from my partner Shana Elberg about that shortly. However, one of the key aspects of the DIP is, no doubt, the milestones, which will require a shortened time period for us to execute on our sale efforts.

So, at this time, I'll pass the baton back to Jason Liberi, who will handle some housekeeping matters on the admission of our declarations into evidence.

THE COURT: Before we do that, I think I'd like to hear from the United States Trustee.

Ms. Sierra-Fox, good morning. Good to see you.

MS. SIERRA-FOX: Good to see you. Good morning, Your Honor. Rosa Sierra-Fox, on behalf of the U.S. Trustee.

Your Honor, we were able to make a majority of -- come to a resolution on a majority of the U.S. Trustee's comments. Outstanding, I think, is some issues on the going-out-of-business sale order, in particular, with respect to the proposed, I guess, assumption of the agreement with agent Hilco.

We -- on the creditor matrix, I believe the debtor and debtors' counsel and I discussed certain record that would be made with respect to the request to remove certain or authority to remove certain maybe creditors from the creditor matrix and to also serve the customers and creditors by email. So that's outstanding, but depending on the record --

THE COURT: We'll look for that record.

MS. SIERRA-FOX: Yeah.

And on the cash management, you know, I think issues are resolved. There are some non-UDA bank accounts --

THE COURT: Oh, okay.

MS. SIERRA-FOX: -- but there's a waiver, an interim suspension of the 345 requirements that we've agreed to and we'll discuss that; that's not necessarily going to be a today issue.

And on the motion to shorten, I saw that was filed, we've discussed that with debtors' counsel. I think when they get to that point, they're going to discuss what Your Honor's availability is to have it heard on the timeline that they are proposing and that the lenders are requiring. And depending on that, you know, subject to this Court's availability, if it does -- if the Court is available on their proposed timeline, I think it's short, but I believe that there should be a committee appointed, at least --

THE COURT: I was going to ask --

MS. SIERRA-FOX: Yeah.

THE COURT: I assume you're still doing that process virtually?

MS. SIERRA-FOX: Yes, we are.

THE COURT: Okay.

MS. SIERRA-FOX: The solicitation went out

yesterday --

THE COURT: Great.

MS. SIERRA-FOX: -- when the case filed and we've asked for responses on Monday at noon, hopefully, to speed things up a bit. So if -- I would expect a committee to be appointed if there is interest, shortly after that. So that would still give a couple of days before the proposed hearing on the bid procedures.

I've seen it done before, so it should work, and committees get up to speed, so, I don't think it's impossible, but, of course -- and I know counsel will be reasonable in giving them extensions of deadlines, to the extent that's necessary.

THE COURT: And if not, people have demonstrated the ability to find me.

MS. SIERRA-FOX: Yes, exactly. So they could do that, as well.

So, other than that, Your Honor, I think we're mostly resolved.

THE COURT: All right. As always, I appreciate you and your colleague's engagement with --

MS. SIERRA-FOX: Yes.

THE COURT: -- the debtor in advance and doing a lot of the legwork. If there are issues, then, again, I would be happy to hear any open issues if it would make

sense. I realize that a lot of this has been moving very quickly. If it would make sense at some point to take a short break, I would be happy to accommodate.

As a general proposition, as we walk through the first days, I will assume that you've, any comments that you have made have been accepted and built in.

MS. SIERRA-FOX: Uh-huh.

THE COURT: If there are issues, you are welcome to sing out.

MS. SIERRA-FOX: Okay. Thank you, Your Honor.

THE COURT: Thank you, Ms. Sierra-Fox.

Mr. Liberi?

MR. LIBERI: Thank you, Your Honor.

I think you mentioned earlier, the debtors have two witness declarations today. Before we get into presentation of the motions, I would propose that we move those declarations into evidence, if that works for Your Honor.

THE COURT: Right. The first one is the declaration of Ms. Etlin. I believe we have communicated with counsel that we are happy to, for our first day hearing, permit the declarants to appear remotely.

Is Ms. Etlin online and participating?

Ms. Etlin, good morning. It is good to see you. It's been awhile.

MS. ETLIN: It has been, Your Honor, and it's nice to see you, as well.

THE COURT: Welcome.

All right. Are there any objections to the admission of Ms. Etlin's declaration as part of the debtors' case in chief for purposes of the relief sought at this first day hearing?

(No verbal response)

THE COURT: Hearing no objection, Ms. Etlin's declaration is admitted.

(Etlin Declaration received in evidence)

THE COURT: Is there any party present in the courtroom or participating remotely that intends or expects to cross-examine Ms. Etlin regarding the contents of her declaration?

(No verbal response)

THE COURT: Very well. Ms. Etlin's declaration is admitted.

MR. LIBERI: Thank you, Judge.

The debtors' second witness is Surbhi Gupta of Houlihan Lokey, specifically, in connection with the DIP financing motion -- there's Ms. Gupta online -- Houlihan Lokey is the debtors' proposed investment bankers, appearing by Zoom and available to be cross-examined.

With Your Honor's permission, we would move her

declaration into evidence, subject to cross-examination.

THE COURT: Very good.

Good morning, Ms. Gupta, and welcome.

MS. GUPTA: Thank you.

THE COURT: I would ask if there are any objections to the admission of Ms. Gupta's declaration, again, as part of the debtors' case in chief, in particular, for the DIP financing application?

(No verbal response)

THE COURT: Very well, in the absence of objection, Ms. Gupta's declaration is admitted.

(Gupta Declaration received in evidence)

THE COURT: Is there any party that intends or expects to cross-examine Ms. Gupta regarding the contents of her declaration?

(No verbal response)

THE COURT: Very well, Ms. Gupta's declaration is admitted, without contradiction.

Shall we proceed?

MR. LIBERI: Thank you, Your Honor.

Yeah, I will turn the podium over to my colleague who should be on Zoom, Angeline Hwang.

THE COURT: Very good.

Ms. Hwang, good morning. Welcome.

MS. HWANG: Good morning, Your Honor.

Can you hear me okay?

THE COURT: I sure can.

MS. HWANG: For the record, Angeline Hwang of Skadden Arps, proposed counsel for the debtors.

Matter 2 on the amended agenda is the joint administration motion, found at Docket 3. We request joint administration of the debtors' five Chapter 11 cases to facilitate the smooth administration of the cases.

Unless Your Honor has any questions, we request entry of the proposed order.

THE COURT: Very good. Thank you, Ms. Hwang.

I would ask if there are any objections to the debtors' request for an order authorizing joint administration of these proceedings?

(No verbal response)

THE COURT: Hearing no response, I will grant the motion. I'm satisfied that the relief requested is appropriate and warranted, and in so ruling, the Court relies upon its long experience and notes that the relief provided by this application will benefit both, the debtor, as well as creditors and the Court in providing a single caption and a single docket entry under which to look for activity in these proceedings.

The motion is granted; this order will issue.

MS. HWANG: Thank you, Your Honor.

Skipping over the third matter on the agenda, Matter 4 is the application to retain Stretto as claims and noticing agent, which is found at Docket 5. In support of this application, we submit the declaration of Ms. Betance, senior managing director at Stretto, which is attached as Exhibit B to the application.

We did receive some comments from the U.S. Trustee to the proposed order, which are reflected in the revised order and redline that was delivered to your chambers this morning.

Unless Your Honor has any questions, we request entry of the order.

THE COURT: Very good.

I do not have questions. I appreciate getting the redline in advance, along with the other redlines that were delivered to chambers; that's very helpful.

And I would ask if there are any objections to the debtors' request for an order authorizing the appointment of Stretto as their claims and noticing agent?

(No verbal response)

THE COURT: Very well, in the absence of objection, I will grant the application. In so ruling, I rely upon the declaration submitted with the application, as well as the Court's review of the proposed engagement letter and the application itself, which reveals that it is, indeed,

compliant with the applicable provisions of the Bankruptcy Code, as well as this Court's Local Rules.

The Court is certainly familiar with Stretto and I'm satisfied that they possess both, the resources and the requisite skill to provide the services provided.

This application is granted; the order will issue.

MS. HWANG: Thank you, Your Honor.

Matter 5 is the consolidated creditor matrix motion, which is found at Docket 6. By this motion, the debtors are seeking relief to file a consolidated creditor matrix; omit certain customers from the creditor matrix; file a consolidated list of the debtors' top-30, largest unsecured creditors; redact certain personal identification information for natural persons; establish procedures for notifying parties of the commencement of the cases and the 341 meeting; and waiving the requirement to file a list of and to provide notice directly to equity holders of debtor LL Flooring Holdings, Inc., which are all detailed in the motion.

I'm happy to discuss any of the relief, but the two I wanted to briefly focus on are the ones that Ms. Sierra-Fox raised with the Court. Regarding the relief we're seeking, with respect to the customers, as described in the motion, in the past year, over 550,000 customers have placed orders with the debtors and of those, approximately 52,000 currently have open orders, the majority of which are

less than the priority cap under Section 507(a)(7) of the Bankruptcy Code.

Debtors have email addresses for about 90 percent of those 550,000 customers and there are also 40,000 individuals who are holding vouchers that were issued as part of two settlements, which are discussed in the motion, as well, as in the customer programs motion.

By this motion, the debtors are requesting not to include customers on the creditor matrix to the extent they don't have an open order or have claims below the priority cap under Section 507(a)(7) or hold vouchers, which will be honored in the ordinary course.

The debtors believe the relief is appropriate in light of the cost (indiscernible) with serving hundreds of thousands of customers and we believe the notices will only confuse customers when their rights are not really being affected by these cases.

All of the customers we will be omitting from the matrix, to the extent the relief is granted, will receive notice of commencement by email and physical addresses, to the extent we have it. And they'll also -- it'll be covered in the customer programs motion, but they will also get a separate email from the company regarding these cases.

THE COURT: Very good.

I would ask the Office of the United States

Trustee if the additional representations and record recited by Ms. Hwang are satisfactory to address the concerns that had been raised?

MS. SIERRA-FOX: Your Honor, Rosa Sierra-Fox, on behalf of the U.S. Trustee.

I appreciate the representation. I think one of the things we discussed that I don't think has been addressed, but I don't believe should be an issue in addressing, is we understand the request and agree that sometimes notices, where, otherwise, the parties' rights aren't being affected at this time, don't really make sense and could cause confusion, and, ultimately, I think it's the debtors' risk to take what -- you know, who they include in the matrix in the first place and what consequence that might have.

The issue that I noted when we spoke is, depending on what course the cases take, for example, the customers holding the vouchers might become unsecured claimants if all the stores close and they don't have the ability to use the vouchers. So I think the language or, otherwise, representation that we're looking for is that this isn't necessarily an authorization that in the future they wouldn't be required to get notices by whatever means are prescribed by the Code and whatever the Code mandates; for example, if they do become unsecured claimants, then they need to get

notice of the bar dates and the procedures for filing proofs of claims. Thank you.

THE COURT: Ms. Hwang, are those additional comments satisfactory to the debtor?

MS. HWANG: Yes, Your Honor.

THE COURT: Very well.

I would ask if anyone else wishes to be heard, with respect to the debtors' motion relating to the consolidated creditor matrix, certain redaction, and related relief?

(No verbal response)

THE COURT: Okay. I'm going to grant this motion.

I would note that for what has, for decades, been a kind of routine, procedural motion, this motion is getting more and more nuanced and more and more complex as practice develops. That's not a criticism by any stretch.

This Court, as well as my colleagues around the country, have had experience with concerns with respect to theft of personally identifiable information and there's, as a practical matter, something of a disconnect between the Bankruptcy Rules and the expectations and the structures that were designed at a point where giant stacks of paperwork delivered to the Clerk's Office were effectively unreachable, unless you went to the Clerk's Office and dug through it; now, it is, in fact, much easier to locate this information.

And experience, particularly in recent cases involving the crypto industry, have reflected that there is a material risk of harm to people. It varies from industry to industry, but I'm satisfied that there is concern.

In addition, I note that this is a retail case and retail cases bring their own considerations. They deal with the general public. They deal with the public and maintain records, often going far back into the past.

And it's also a question of what the expectations of those individuals would be. Is there information -- are they reasonably expecting that their information is being circulated or would otherwise be made available on a court docket? That's different from a privacy policy, but it is about how the Court, I think, should look at this kind of a motion.

And I would commend the Office of the United States Trustee, because they have been, I think, careful, deliberate, but also pragmatic in dealing with these issues in various cases. There are concerns with balancing a rule that requires disclosure and accompanying that with an order of redaction. And, again, we've navigated through those issues and we will do so again today.

I'm not going to editorialize further. I think that the United States Trustee has raised a host of issues. Ms. Hwang has carefully explained the circumstances and the

conditions under which the debtor has evaluated both, its filings, as well as its noticing program. I'm satisfied that they are appropriate and warranted, and as the United States Trustee pointed out, if there are further notices or further decisions to be made in the future, the Court's decision today certainly is not going to dispose of those questions and we'll deal with them as they arise.

So, with that, I'm satisfied the motion is appropriate and warranted, and the motion is granted and the order will issue.

MS. HWANG: Thank you, Your Honor.

I will now turn it over to my colleague, Amy Phelps, who is present in the courtroom.

THE COURT: Very good.

Ms. Phelps, welcome.

MS. PHELPS: Thank you, Your Honor.

Good morning, Amy Phelps, Skadden Arps, proposed counsel for the debtors.

Item 6 on today's agenda is the debtors' taxes motion, which was filed at Docket 7. By this motion, the debtors are seeking authority to pay taxes and fees owed to international, federal, state, and local governmental entities and to certain third-party administrators in the ordinary course of business.

As further described in the motion, the debtors'

taxes and fees include income taxes, property taxes, sale and use taxes, foreign taxes, and franchise, regulatory, and business taxes, and miscellaneous fees. Paying these taxes is necessary for the debtors to maintain their business operations. Many federal and state statutes hold directors, officers, and employees responsible for remitting certain taxes and personally liable for failure to do so.

Any claims or litigation relating to such failures would be distracting to the debtors and their directors, officers, and employees, to the detriment of the debtors' restructuring efforts. Further, this relief provided by the motion would help the debtors minimize any interest or penalties that could be charged if the debtors were unable to make the payments.

The debtors believe that they are substantially current on all assessed and undisputed taxes that have come due and payable, prior to the petition date. But the debtors do anticipate that approximately $10 million in accrued, prepetition taxes and fees will become due and payable in the ordinary course of business.

THE COURT: Most of which seem to be sales-and-use taxes; is that right?

MS. PHELPS: That's correct, Your Honor.

$5.5 million of those will be due and payable during the interim period. The debtors seek authority to pay

these amounts in the ordinary course as they become due.

We did receive a few comments from the U.S. Trustee, which are reflected in the redline that was delivered to chambers this morning, Your Honor.

Unless you have any questions, I respectfully request that this relief is granted.

THE COURT: Very good.

I do not have questions.

I would ask if anyone wishes to be heard, with respect to the debtors' taxes and fees motion?

(No verbal response)

THE COURT: Okay. I'm going to grant this application.

And in so ruling, I would note, as Ms. Phelps observed, that the majority of the obligations that are identified are likely either, withholding taxes or sales-and-use taxes. Case law teaches that those are trust fund taxes and while the debtor may be holding them, case law would indicate that those funds are, in fact, not property of the estate.

And as Ms. Phelps noted, there are both, state and federal statutes that provide for personal liability for officers and directors in the absence of prompt remission.

The final observation is that in the absence of timely paying these, nothing good happens. The debtors'

focus is on moving forward with a sale-and-marketing process to try to maximize and preserve value. Ms. Phelps is correct that in the absence of these payments, the risk of audit or regulatory or enforcement activity by the various taxing authorities does promise the risk of a substantial disruption to the debtors' business efforts.

In the absence of objection, and, again, considering Ms. Etlin's declaration on this point, as well as the Court's long experience, I am satisfied that the debtors have carried their burden and I would grant the motion.

I note, further, that the application implicates Bankruptcy Rule 6003 and that it contemplates the payment of certain prepetition obligations within the first few weeks of the case; nevertheless, for the reasons that I have recited and set forth in Ms. Etlin's declaration, I am satisfied that the debtors have carried their burden to demonstrate that in the absence of the relief requested, their reorganization effort would suffer the risk of immediate and irreparable harm.

The motion is granted; the order will issue.

MS. PHELPS: Thank you, Your Honor.

Moving on to Item 7, the utilities motion, which is filed at Docket 8. By this motion, the debtors request entry of an interim order that prohibits utility providers --

THE COURT: Actually, Ms. Phelps, I apologize --

MS. PHELPS: Yes, Your Honor?

THE COURT: -- I meant to make another point.

MS. PHELPS: Yes.

THE COURT: And this will also apply when we touch on the insurance issue, and this is a comment that I'm sure counsel has heard me make before.

I recognize that the amounts as to which interim authority is being granted today are based upon the best calculation of what is likely to come due. Experience teaches that whether it's an insurance bill or a premium that comes in or an invoice for taxes, et cetera, that comes in and is due in real time, I would ask or observe that the debtor, in the intervening period, is welcome to communicate with the Office of the United States Trustee and a committee, if appointed.

What I'd hate to see would be an emergency motion for, you know, an insurance premium or something else. There's a practicality to the relief that's requested and I'm granting it, to the extent that you're identifying the relief specifically. But, again, experience teaches that every once in a while, things will happen in the first few weeks of a bankruptcy case that might not necessarily be anticipated.

If we need emergency motion practice, I will be here, but if something comes in that falls -- and, again, that stakeholders and fiduciaries believe fall within the

ambit of the relief that the Court is granting, it's been my practice that with notice to those parties and approval, then you can go ahead and take care of that. I've just seen too many emergency motions to pay $11,000 and there's no way you people can file a motion for eleven grand.

(Laughter)

THE COURT: So I apologize for the interruption.

The same observation will apply to a couple of the other relatively standard applications that we have, but that's at least how I deal with these matters, okay?

MS. PHELPS: Thank you, Your Honor.

THE COURT: Sure.

MS. PHELPS: We note and appreciate the comments.

So, Item 7, the utilities motion, filed at Docket 8. This motion, the debtors request entry of an interim order that prohibits utility providers from altering, refusing, or discontinuing service to or discriminating against the debtors. This motion also seeks the Court's approval of the proposed form of adequate assurance of payment to the debtors' utility providers and approval of the adequate assurance procedures.

As is further provided in the utilities motion, the debtors use the services of various utility providers in the ordinary course. Each of them provide important, necessary utility services, including electricity, gas,

telecommunications, sewer, water, and waste disposal.

The debtors propose to provide additional adequate assurance of payment by placing within 20 days of the petition date, a cash deposit in an existing, unused, interest-bearing, segregated account in the aggregate amount that is equal to two weeks of the utility services, based on monthly costs of the utility services. The debtors estimate that the adequate assurance deposits will total approximately $302,000.

The debtors submit that this is satisfactory under Section 366 of the Bankruptcy Code as adequate assurance.

For the reasons discussed today and in the motion, this relief requested is necessary to avoid immediate and irreparable harm to the debtors and their estates.

Your Honor, we did, additionally, receive some comments from the U.S. Trustee, as well as counsel to certain of the landlords; this is reflected in the redline that you received in chambers this morning. I'm happy to address any of them.

THE COURT: No, I've seen the changes; again, I appreciate getting the redline in advance and I understood -- I recognize Ms. Sierra-Fox's handwriting, so I don't have any issues with the comments that were made.

MS. PHELPS: Thank you, Your Honor.

So, with that, we respectfully request this relief

is granted.

THE COURT: Very well.

I would ask if anyone wishes to be heard, with respect to the debtors' request for an order, with respect to utilities?

(No verbal response)

THE COURT: Okay. I'm going to grant this application.

In so ruling, I rely on Ms. Etlin's declaration and I'd note that the relief requested is consistent with that, which I and my colleagues have approved on many, many prior occasions. I'm satisfied that the structure that's being proposed by the debtor by the motion strikes an appropriate balance between the debtors' need for an uninterrupted utility service and the utility service providers' entitlement to adequate assurance under Section 366.

The motion is granted; the order will issue.

MS. PHELPS: Thank you, Your Honor.

Agenda Item 8, the insurance motion, filed at Docket 9. By this motion, the debtors seek authority to maintain, extend, renew, supplement, and/or modify insurance policies, as is needed, in their business judgment. The debtors' insurance policies provide them with a variety of coverages, including general liability, cybersecurity

liability, property, crime, Workers' Compensation, and employment practices liability, and various other liabilities and claims. Many of these policies are required by law or contract in order for the debtor to operate their business. And, of course, the U.S. Trustee's Guidelines also require maintenance of the debtors' insurance policies.

The premiums for the debtors' insurance policies for the current coverage period total approximately $7.8 million. The debtors believe that approximately $18,000 will become due and owing in an interim period, but out of an abundance of caution, the debtors seek authority to pay prepetition insurance obligations in a total not to exceed $100,000, absent further order from this Court.

The debtors also maintain 51 surety bonds, which they have issued in various federal, state -- in favor of various federal, state, and industry-regulatory agencies, to guarantee certain obligations that are related to various state licenses and permits. As of the petition date, the annual premiums for these 51 surety bonds total approximately $81,000 in aggregate. As with the debtors' insurance policies, the debtors are required to maintain these surety bonds under certain state laws to lawfully conduct their business and operations in certain jurisdictions.

The debtors seek to honor the surety bond obligations in the ordinary course of business to ensure the

surety bond program remains uninterrupted throughout these cases.

Your Honor, we did share a draft of this with the Office of the United States Trustee. Our updated redline reflects one comment.

And unless Your Honor has any questions, we respectfully request that this relief is granted.

THE COURT: I do not have any questions.

I would ask if anyone wishes to be heard, with respect to the debtors' application for an order relating to its insurance policies?

(No verbal response)

THE COURT: Very well.

I'm going to grant this application. As Ms. Phelps noted, both, the Guidelines of the Office of the United States Trustee, as well as simple prudence require that a company that's operating under the supervision of this Court maintain appropriate and necessary insurance. I've observed in prior cases that this is particularly true in the retail environment, where the general public is essentially invited to come onto the debtors' premises and engage in commerce with the debtor.

And so I am satisfied that the relief requested is appropriate and warranted. I also note that it implicates Bankruptcy Rule 6003 and that certain obligations will be

paid. Prepetition obligations will be paid in the first few weeks of the case; nevertheless, for the reasons stated in Ms. Etlin's declaration, as well as by the Court a few moments ago, I'm satisfied that in the absence of the relief requested, the debtors' reorganization effort would suffer the risk of immediate and irreparable harm.

Ms. Phelps, my comments from a moment ago, with respect to the tax obligations, apply with particular force to this motion. I recall, as a first-year associate, getting a phone call that said, for a large industrial concern, the insurance expires tomorrow -- I'm sorry -- the insurance expires at midnight and it was 2:30 in the afternoon. And they said, What do we do?

And I put them on hold and I asked a second-year associate who said, Pay it.

(Laughter)

THE COURT: So, that was the -- kind of a scarring experience, but it was somebody else's authority, based upon literally 18 months of experience.

So, with that, I will grant the application. And, again, this is, to me, the kind of prototypical thing that comes in by surprise. I intend and expect that the debtor will maintain appropriate and necessary insurance, and you're welcome to coordinate with stakeholders to ensure that that occurs if something unexpected happens, okay?

MS. PHELPS: Thank you, Your Honor.

And with that, I will pass the podium back to my colleague Jamie Brumberger, who will be continuing with Agenda Item 9, virtually.

THE COURT: Very good.

Ms. Brumberger?

MS. BRUMBERGER: Good morning, Your Honor.

Jamie Brumberger of Skadden Arps, proposed counsel to the debtors.

Can you hear me okay?

THE COURT: I sure can.

MS. BRUMBERGER: Perfect. We are moving onto Agenda Item No. 9, which is the debtors' wages motion filed at Docket No. 10. By this motion the debtors are requesting authority to pay certain prepetition employee obligations and continue their compensation and benefits programs in the ordinary course.

As Ms. Laukitis stated earlier, the debtors have almost 2,000 employees who they rely on and who rely on them. In the ordinary course the debtors compensate their employees by payment of wages as well as other forms of compensation like paid time off or PTO, bonuses, and on a case-by-case basis severance. The debtors have also historically implemented non-insider retention programs as they feel necessary for very few employees. There are fewer then 10

employees owed retention bonuses at that time and to reiterate, none of them are insiders.

The debtors provide various benefits to their employees as well including self-insured medical and dental plans, company paid life and accidental death and dismemberment insurance, disability, as well as optional coverage items that employees can elect at their own expense like critical illness coverage.

One other point that we would like to raise is that employees have the opportunity to contribute to a fund used to provide one-time grants to their fellow employees experiencing an unexpected hardship. Employees elect for these amounts to be deducted from their paychecks and the debtors withhold these amounts and later transfer them to a non-debtor non-profit affiliate which then administers the funds, via grants, which are assessed based by a committee of employees.

Similarly to the point Your Honor made earlier with respect to taxes, the debtors believe that these funds are held in trust, but out of an abundance of caution are seeking authority to continue remitting them to the non-profit. Additional programs the debtors seek relief with respect to include LL Academy, the debtors required training platform, which also offers voluntary leadership training courses, and the expense reimbursement program.

Finally, non-employee directors are compensated for their service on the board, including with respect to committees on a quarterly basis. We have discussed the severance program specifically with the United States Trustee and would like to flag, as you will see in the revised interim order that you were provided, we are not seeking authority to pay any severance amounts util entry of the final order and the amount reflected in Paragraph 2 of the interim order and has been revised to take out the $17,000 in severance that was due during the interim period.

I believe that Your Honor was given a redline. If you would like to walk through the other changes, I am more than happy to do so.

THE COURT: No. Thank you for the offer. I have had an opportunity to review the blackline and I don't need to walk through it. I understand the changes and they are certainly fine with me.

MS. BRUMBERGER: Okay. We would just reiterate that the debtors are not seeking to make any payments to insiders, any payments above the priority cap or any payments on account of severance as just addressed.

So, unless Your Honor has any questions, we respectfully request that the relief be granted.

THE COURT: I do not have any questions.

I would ask if anyone else wishes to be heard with

respect to the debtors request for an order authorizing payment of employee wages and benefits.

(No verbal response)

THE COURT: I am going to grant the application. As I have observed many, many times before there is no constituency for whom I am more concerned at the outset of a case then those employees that look to the company for payment of their wages and benefits. Ms. Brumberger has walked through the application which certainly identifies a suite of compensation and benefits that I would expect for a company in this industry. Again, I very much appreciate the engagement of the Office of the United States Trustee in advance to sort through some of the issues.

I note that the application itself, obviously, contemplates the payment of prepetition obligations and the terms of wages and benefits in the first few weeks of the case; therefore, it does implicate Bankruptcy Rule 6003. I am satisfied that the relief requested is appropriate and warranted and I am satisfied, based upon Ms. Etlin's declaration as well as the Court's long experience, that this debtor would suffer the risk of immediate and irreparable harm in the absence of the relief requested.

This motion is granted. The order will issue.

MS. BRUMBERGER: Thank you, Your Honor.

Moving onto Agenda Item No. 10, the debtors'

customer programs motion filed at Docket No. 12. By this motion the debtors are requesting authority to honor certain prepetition obligations to customers and continue certain customer programs in the ordinary course of business. The debtors customers are the lifeblood of their business. They have two types of customers primarily; professional customers are pros like contractors and consumers, some of whom rely on professional contractors and others who are doing their own DIY home renovations.

As Your Honor previously acknowledged, the debtors operate in a highly fragmented market with strong competition from large retailers, so every customer counts. To continue operating the debtors will need to retain their old customers and bring in new ones. In order to do so the debtors will need to have competitive programs to draw customers in and build loyalty. To that end, the debtors have implemented the various customer programs detailed in this motion.

When a customer purchases a product, customers are required to put down approximately 50 percent of the deposit. We will just note that online purchases require payment in full at the time of purchase. In the stores these deposits and the amounts are subject to various other programs. The debtors have sales promotions, promotional pricing, they offer a best price guarantee and they facilitate various financing programs for their professional and consumer

customers, as well as a return policy that allows customers to return eligible products within 90 days.

In addition, the debtors have issued gift cards and in connection with the litigation that was described by Ms. Laukitis earlier there are certain vouchers that customers hold that can be redeemed for the debtors products. The debtors also offer warranties for their products and even for the third-party installations that they offer. Installation warranties are for one year and product warranties range from five years to the life of the product.

I will note that the only outstanding amount that the debtors are requesting to pay in the interim period is approximately $600,000 on account of open warranty claims. You will also see on Exhibit C, as Ms. Hwang mentioned, that the debtors would like to send an email to their customers notifying them of certain policy changes with respect to the deposits and the gift cards to make sure that their customers know that even if there are a few new sales policies the debtors remain committed to providing the excellent service that customers have come to expect from them.

I believe Your Honor has received a draft -- a revised redline.

THE COURT: I do. I have that.

MS. BRUMBERGER: Okay. If there is anything you would like to discuss I would --

THE COURT: No. I have been through the redline. I don’t have any questions about it and I have had an opportunity to review the proposed email that is attached at Exhibit C.

MS. BRUMBERGER: Great. Unless Your Honor has any questions, we respectfully request that the relief be granted.

THE COURT: Very good. I would ask if the United States Trustee wishes to be heard with respect to this application. Ms. Sierra-Fox.

MS. SIERRA-FOX: Rosa Sierra-Fox on behalf of the U.S. Trustee.

Your Honor, we don’t have an objection to this motion, but I did -- the point about emailing the customers, the letter did bring me back to a point on the creditor matrix that I don’t think we explicitly addressed and I understand Your Honor has granted that motion at this point but I think for purposes of a record its worth addressing.

The other request in that motion that relates to the same request in the customer programs motion was the general request to serve creditors by email. So, moving on from who is actually is going to be on the creditor matrix, whoever is on the creditor matrix the debtors have requested to serve them notices in this case and whatnot by email.

The motion describes that it's not only customers

on that list, it's also vendors, former employees, current employees. I had asked the debtors to make a record as to why that deviation from the rules was appropriate and I think its worth, just so the Court understands, how the debtor does its business and why email services is warranted in this case because, otherwise, we would object to that where the record is not made on those points.

THE COURT: I see Ms. Hwang has turned her camera back on. I am happy to hear from either Ms. Hwang or Ms. Brumberger. The United States Trustee has asked for a further record with respect to the noticing process and the fact that the Court has already addressed the creditor matrix motion certainly doesn’t dispose of this question for purposes of right now. I want to make sure everyone is on the same page. As I think Ms. Brumberger noted, this does kind of travel with the noticing regime that the debtor had proposed in their earlier motions.

So, Ms. Hwang, I think it might be you, but I'm happy to hear from anybody that is responsive.

MS. HWANG: Your Honor, for the record again Angeline Hwang on behalf of the debtors.

Just to clarify, the email service was really relating to the customers. So, if they are being omitted from the customer -- the creditor matrix, I have confirmed with Stretto the majority of the creditors that will be on

the matrix, which is somewhere over 11,000, I think somewhere between 11 to 13,000, we do have mailing addresses for. So, they will be certified mail.

There may be a small subset of creditors, customer creditors that are on the matrix that we may not have physical addresses for and those are the only parties that would be affected. I believe the proposed order does say it's to the extent that we don’t have a physical mailing address that we propose to serve via email.

THE COURT: Ms. Hwang, I think Ms. Sierra-Fox's question also went to beyond customers that I think she believe that there may be vendors that are included in this group and whether or not they should be -- are they qualitatively different from the mass of customers that we have discussed and as to which I don’t think there is much controversy.

Ms. Sierra-Fox, did I get that right?

MS. SIERRA-FOX: Yes, Your Honor. That is correct.

THE COURT: Ms. Hwang.

MS. HWANG: So, we confirmed with the company and Stretto that we do have mailing addresses for all of the vendors that would be listed on the creditor matrix, so this shouldn't be an issue.

THE COURT: So, I think what we are getting here

is that the email as to folks that are not in that community of customers they're probably going to get -- they will get an email and they will actually get a hard copy mail. So, it's kind of piling on, but I think I'd be interested in the United States Trustees thoughts on this. I certainly have heard testimony, we have even had the claims agents at times testify, and again it came up in the crypto cases, that there are constituencies that don’t do mail and are very uncomfortable with getting mail, and are much more comfortable with getting email which I have difficulty wrapping my head around but I believe it.

So, that has been, at least, part of the record that I have seen in front of me in other cases and, again, it certainly seems plausible as it relates especially to customers depending on the industry.

MS. SIERRA-FOX: Yes. I think that is what we were looking for. I think that to the extent that the debtors -- well, in the first place, its physically impossible to mail customers information if you don’t have mailing addresses. So, that resolves the issue and that way if noticing by email is the only way to get through to them then I think that resolves the issue.

Furthermore, even if there are mailing addresses, if the expectation, in doing business with this debtor, is to receive email and they've consented to receive email and this

is the usual course of business I think that is part of the record that helps support these types of requests that are our office views as, otherwise, being a deviation from the blackletter, kind of, application of the law or the rules in this case.

THE COURT: Very good. Thank you, Ms. Sierra-Fox.

I would ask if anyone else wishes to be heard with respect to the debtors customer practices and programs motion?

(No verbal response)

THE COURT: Okay. I am going to grant this application. I note that this debtor operates in the retail industry and there are expectations of customers and providers that are associated with running that business. I also note that the debtor is embarking on a sale process where the goal is to preserve and maximize value. The debtor is looking in the first instance for a going concern bid.

As a practical matter, the primary consideration is to minimize disruption and certainly minimize harm to the debtors operations and its relationship with its customers. So, I am satisfied that the relief requested is appropriate and warranted in order to maintain those relationships. I also find that the amounts that are identified are certainly in the range that I would expect in a business of this size and compared to the risk of customer frustration and

annoyance, if their expectations were not met the debtor has, I think, determined credibly that that is a risk that they do not want to take.

In so ruling I rely upon Ms. Etlin's declaration as well as, again, the Court's experience with similar cases. I am satisfied here that the debtors have carried their burden under Bankruptcy Rule 6003 in that in the absence of this relief I do believe that their reorganization effort would suffer the risk of immediate and irreparable harm.

This application is granted. The order will issue.

MS. BRUMBERGER: Thank you, Your Honor.

I will now pass the virtual podium to my colleague, Chambliss Williams.

THE COURT: Very good.

(Pause)

MS. WILLIAMS: Good morning, Your Honor. Sorry about that pause there.

THE COURT: No worries. Good morning and welcome.

MS. WILLIAMS: Good morning. Chambliss Williams on behalf of Skadden Arps for the debtors.

I am going to be presenting the cash management motion which is located at Docket No. 13.

THE COURT: Very good.

MS. WILLIAMS: Your Honor, the relief requested in this motion is critical to allowing the debtors to continue

to maintain business operations in the ordinary course while they seek to pursue a value maximizing transaction during these cases. Interruptions to the debtors ability to receive customer payments and to disburse payments to their critical vendors, employees, and other key parties during the interim period in these cases would be tantamount to a shutdown of the business to the detriment of all parties in interest.

Given the debtors fundamental need to maintain their payment systems through this motion the debtors seek authority to maintain various components of their cash management system including the continued use of existing business forms, the ability to continue intercompany transactions, the ability to continue using regular payment methods and the ability to make ordinary course changes such as opening and closing bank accounts.

To being with, Your Honor, I would like to provide you with a high-level overview of how the debtors' cash management functions and the primary feature that I would note for the debtors cash management system is that it is subject to cash dominion with Bank of America. So, essentially, Your Honor, all of the debtors incoming receipts are swept into an account owned and controlled by Bank of America. Bank of America then, in turn incrementally funds the debtors' operations by transferring money back into one of the debtors' concentration accounts through which the

debtors then (indiscernible) all of their outgoing payments and disbursements including payroll and third-party payments, all outgoing payments.

Next, Your Honor, key to maintaining the cash management system is, obviously, maintaining their existing bank accounts. As Ms. Sierra-Fox previewed, the debtors are not currently fully compliant with Section 345(b); however, I would note that there is only one bank that is not compliant. All of the debtors other existing bank accounts are compliant with Section 345(b) of the Code.

I would like to talk briefly about the one bank that is not currently an authorized depository subject to a UDA agreement and that bank is Truist, Your Honor. The debtors endeavor to select banks that are close to their store locations including banks like Truist.

Your Honor, the debtor has 10 accounts with Truist, which is an FDIC insured institution. Nine of those ten accounts are receipt accounts that are zero balance accounts that are automatically swept daily into the debtors' cash management system and then into the Bank of America owned account. As such, these nine accounts pose little risk of loss to the debtors' stakeholders and are, in fact, automatically routed to Bank of America who is entitled to the funds.

The one remaining Truist account that is not a UDA

account and may maintain a balance at any given time maintains a very low balance at all times, and as of the petition date this account held approximately $61,000. Given this, Your Honor, the debtors believe there is very little risk of loss to the debtors' stakeholders related to maintaining the Truist accounts and through this motion we do seek a 30-day extension of the requirement to be in full compliance with Section 345(b) of the Bankruptcy Code. Your Honor, as Ms. Sierra-Fox noted, we -- she is aware that we are seeking this 30-day extension and we will endeavor during that time to work with Ms. Sierra-Fox to resolve any issues with respect to 345(b).

Next, Your Hoor, I will conclude by just briefly summarizing intercompany transactions. So, in addition to cash dominion, another key feature of the debtors cash management system is that all of the debtors bank accounts are held by a single debtor entity, LL Flooring, Inc. Because LL Flooring, Inc., owns all of the debtors bank accounts, the operation of the cash management system in the ordinary course does not include any debtor-to-debtor transfers. The only intercompany transactions are those made to a single non-member affiliate.

As Ms. Laukitis mentioned in her introduction, the debtors fund the operations of a non-debtor Shanghai affiliate. LL Inc., remits payments to the Shanghai

affiliates bank account to cover payroll, general office expenses and taxes. In turn, the Shanghai affiliate does not become indebted or, otherwise, obligated to make any payments bank to LL, Inc. As such, LL, Inc., doesn't have -- apologies, Your Honor, I should note LL, Inc., is the defined term for LL Flooring, Inc.

THE COURT: Okay.

MS. WILLIAMS: I just wanted to make sure. As such, LL, Inc., doesn't have any intercompany receivables generated through these transactions. Rather, the payments are one-way payments from LL, Inc., to the Shanghai affiliate.

As such, the debtors request the comparatively limited authority as compared to cases in which there are multiple debtors who have bank accounts. To continue making intercompany transactions in the ordinary course the debtors will also maintain -- continue to maintain detailed records of all transactions to ensure only authorized payments are made and prepetition and post-petition payments can be distinguished.

So, unless Your Honor has any questions, we would respectfully request at this time that the relief be granted.

THE COURT: I do not have questions. Again, I appreciate getting the blackline in advance.

I would ask, Ms. Sierra-Fox, did you have anything

to add to Ms. Williams comments?

MS. SIERRA-FOX: No, Your Honor.

THE COURT: Very good. I would ask if anyone else wishes to be heard with respect to the debtors' application for an order with respect to cash management and bank accounts.

(No verbal response)

THE COURT: I am going to grant this motion. I am satisfied that the relief requested is appropriate and warranted. The Court has dealt with many, many retail cases and they have not necessarily complex typically, but certainly voluminous cash management systems because of the number of stores and the number of bank accounts that their operations require.

Ms. Williams has walked through, and the application identifies with particularity, how money moves within this corporate enterprise and, again, the debtors have identified many, many bank accounts that relate to their daily operations around the country. I note also that Ms. Williams identified that there is, at least, one bank as to which there is not a UDA. My understanding is that they will continue to coordinate with the Office of the United States Trustee and presumably with that financial institution and get this sorted out over the next 30 days during the period of the extension. So, I am satisfied that the relief

requested is appropriate and warranted.

The motion is granted and the order will issue.

MS. WILLIAMS: Thank you, Your Honor.

Next, I would like to present the critical vendors motion, which is Agenda Item 12, Docket No. 14.

THE COURT: Very good.

MS. WILLIAMS: Thank you, Your Honor. Through this motion the debtors seek authority to pay prepetition claims of certain parties who are critical to maintain the debtors' business. These parties are collectively referred to in the motion as specified trade claimants. The specific trade claimants includes several categories of vendors and service providers who are fundamental to the debtors supply chain and to the debtors ability to ultimately deliver goods and services to their customers.

The company worked intensively with AlixPartners and other advisors prepetition to determine which of their vendors service providers and other parties were critical for continued operations. These specified trade claimants include the following categories:

First, we have the critical vendors. These are the vendors -- these include vendors who supply hard and soft flooring products, goods used in the debtors retail stores and corporate offices, and IT services necessary to maintain the debtors' website and other systems.

Second, Your Honor, we have the lienholders. The lienholders are also in the group of critical specified trade claimants because the lienholders both enable the debtors merchandise to be transported from vendors to the debtors' warehouses, stores and ultimately to their customers. These parties could assert possessory or other forms of liens on the debtors' merchandise; therefore, blocking the debtors access to their merchandise and their ability to continue making sales and delivering goods to customers.

The lienholders include a few groups including shippers who are parties such as (indiscernible) and common carriers, warehouses and warehousemen, and third-party installers who install the debtors' carpeting and hard flooring at the customer location.

Third, Your Honor, we have import claimants. The debtors import hard flooring materials from foreign vendors. As a result, the debtors are required to pay customs duties, excise taxes and other applications. The debtors predominately pay these customs duties and related fees through third party customs processors, Your Honor.

Finally, Your Honor, we have the 503(b)(9) claimants. Many of the debtors critical vendors would also qualify for payment through Section 503(b)(9) of the Bankruptcy Code; however, the debtors don’t currently anticipate that they are going to pay any parties who are

solely 503(b)(9) claimants but not also a critical specified trade claimant. And as such, the ability to pay these parties would be authorized anyway.

THE COURT: Okay.

MS. WILLIAMS: Your Honor, the debtors seek authority, but not direction to pay the specified trade claimants up to $16.1 million during these cases, which is the debtors' best estimate of the amount necessary to maintain their business. Of the $16.1 million the debtors seek the authority to pay an amount not to exceed $13.675 million on an interim basis.

Your Honor, I would like to note we received a question from Ms. Sierra-Fox while she was on her way to the courthouse about whether these amounts were included within the DIP budget and I would like to confirm that these amounts are included within the debtors' DIP budget.

Finally, Your Honor, one other thing on this motion. We received one additional comment to the order from Ms. Sierra-Fox also while she was on her way to the courthouse. It is a -- it's in Paragraph 6 of the version of the order we submitted to you. The sole change is just that rather than authorizing the debtors in their discretion to recover payments as avoidable prepetition transfers pursuant to 549(a) we changed that to the debtors may seek Court authority to do that.

THE COURT: Okay. I understand. I would ask if anyone wishes to be heard with respect to the debtors' request for an order with respect to critical vendor payments.

(No verbal response)

THE COURT: I am going to grant this application. Obviously, this is a significant sum of money, but that simply is the nature of the debtors business and its relationship with its suppliers. In addition, I would note that Ms. Etlin's declaration goes into some detail about the challenges that this debtor has faced when news, through the filing of an 8-K and I presume other industries sources when news came out to vendors, that the debtor was in financial difficulty, Ms. Etlin's declaration does describe with some specificity that either stop orders were put in or presumably the debtor was put on cash in advance or COD, and other remedies that would adversely affect the debtors liquidity position.

Again, my comments from a moment ago, I think, apply here, this case is postured as a sale case and the goal is to maintain operations and relationships both with vendors and with customers in order to maximize the value of the enterprise being marketed and hopefully sold. I am satisfied that the relief requested here is calculated to accomplish that.

In so ruling I also note that Ms. Etlin's declaration identifies the need for this relief and I am satisfied that the debtors have carried their burden under Bankruptcy Rule 6003 in that in the absence of this relief their reorganization effort would, indeed, suffer the risk of immediate and irreparable harm.

This motion is granted. The order will issue.

MS. WILLIAMS: Thank you so much, Your Honor. With that I will pass over the virtual podium to my colleague, Liz Downing, who is going to be presenting the store closing motion.

THE COURT: Very good.

MS. WILLIAMS: Thank you.

MS. DOWNING: Good morning, Your Honor. Liz Downing of Skadden Arps on behalf of the debtors.

THE COURT: Good morning. Welcome.

MS. DOWNING: Thank you. The next item on the agenda is the debtors' store closing motion. The debtors seek authority, among other things, to continue performing under and to assume an agency agreement with Hilco and to sell inventory and close 94 of their approximately 400 stores.

As Ms. Laukitis noted, the debtors are focused on continuing their comprehensive going concern sale process post-petition, but leading up to the filing, as part of the

debtors broader strategic planning, the debtors identified certain underperforming stores that a going concern buyer would in all likelihood not have any interest in and it could be closed. The store closing sales at these locations are anticipated to be a strong source of short term liquidity and help reduce unnecessary administrative expenses.

The company solicited offers from potential liquidating firms and received multiple bids from well-known companies that conduct store closing sales routinely. The company negotiated a fee deal with Hilco. Hilco will receive two percent of gross proceeds of inventory sold in the stores and 7.5 percent of gross proceeds sold through wholesale channels. I understand Hilco will be syndicating with Gordon Bros. for this deal.

The sale has begun prior to filing and are anticipated to close by the end of September. We received a number of comments from the Office of the United States Trustee and counsel to certain of the landlords, and worked to incorporate as many of those as we could. As Ms. Sierra-Fox noted, we have, at least, one open item. So, I can walk Your Honor through either the broader redline that came across this morning or alternatively just highlight the two points that I think remain open.

THE COURT: We will turn to the redline in a moment.

Mr. Liberi, did you wish to be heard?

MR. LIBERI: Yeah. Your Honor, I want to make sure -- I am going to hand up a redline.

THE COURT: That would be great.

MR. LIBERI: I want to make sure that you have the most current --

THE COURT: Latest and greatest, that sounds fine. I think we will turn to the redline -- thank you, Mr. Liberi. I think we will turn the redline in a moment, but I think I would appreciate at least understanding what the open issue or issues are with the United States Trustee.

MS. DOWNING: Yes, of course. Happy to do that. So, the first one is less of an issue, more of I just need to simply provide a proffer on one point. So, it is for Paragraph (g) of the interim order and that paragraph, I will give you a moment to get there, deals with the personally identifiable information.

THE COURT: Okay.

MS. DOWNING: We would like to proffer the testimony of Holly Etlin in support of the store closing motion. Based on our discussions with the Office of the United States Trustee, we believe the proffer will resolve the U.S. Trustees concern on this point. If called to testify Ms. Etlin would testify as follows:

"The debtors intend to neither sell nor lease

personally identifiable information pursuant to this motion."

At this time, we would like to move the proffer into evidence subject to cross-examination.

THE COURT: That was quite a proffer.

Ms. Sierra-Fox, would you like to cross-examine based upon the proffer?

MS. SIERRA-FOX: No, Your Honor. That satisfied our concern with respect to that.

THE COURT: Very good. Thank you, Ms. Downing.

Thank you, Ms. Etlin.

The second point with the United States Trustee.

MS. DOWNING: So, the second point relates to -- it can be found in Paragraph 50 of the interim order, but it relates to precluding Hilco from bidding on the assets that are the subject of this agency agreement. So, that would mean that currently the 94 stores that are being closed, to the extent in the future something were to happen, right; we pause this liquidation process or we move up a timeline, it takes away some of the flexibility that we have for Hilco to then be able to come in and provide a bid either in the form of a going concern sale bid, right, so they could come forward and act as a stalking horse bidder here or, alternatively, as Ms. Laukitis previewed, there is a point in this case at which, you know, if we do not have a stalking horse bidder then we would be pivoting to a fuller

liquidation.

As part of that we contemplate that we will be going back out to all of the liquidating -- the liquidators to ask for re-bids. So, it introduces some complexity to being able to include the assets that are currently the subject of this agency agreement. I also would note that this agency agreement, similar to how these are typically done, is an accordion agreement. So, while today we are asking for 94 stores, it does give us the ability to add additional stores.

So, I understand Mr. Desgrosseilliers is also in the Court who is representing Hilco and Gordon Bros. in this deal, but I believe the debtors, from our perspective, are strongly in favor of insuring, you know, as much flexibility as possible so that we can be keeping our options open and having Hilco be able to provide a bid in whatever form that may come and not precluding them from doing that which the language that Ms. Sierra-Fox had requested would do.

THE COURT: All right. Can I hear from Ms. Sierra-Fox.

MS. SIERRA-FOX: Yes, Your Honor. Rosa Sierra-Fox on behalf of the U.S. Trustee.

Your Honor, the open issue -- I think there is another more minor related issue, but I can discuss that when I have the opportunity, but I do think that the major open

issue is what Ms. Downing just described, that Paragraph 50 of the redline you received. As written, I guess what that language says is that this order today is not precluding the agent or its respective affiliates from providing additional services to the debtors. That is not the issue. We understand maybe there is going to be a -- I mean, I had at least another case where there is two Hilco affiliates acting in different capacities. That can be evaluated if and when that issue arises.

THE COURT: Okay.

MS. SIERRA-FOX: So, I don’t think they're precluded. I think the issue is what it also isn't precluding is Hilco or any of its respective affiliates from bidding on the debtors' assets in connection with any other future process that may not -- that may or may not be undertaken by the debtors to close the stores.

THE COURT: So, I want to walk through this because I understand and your issues, which I think is a good one, relates to transparency and who is in the room and who can do -- whether or not we have a fair process potentially rolling out. So, if we play this string out there is a term, I think, the liquidation pivot that is used and I think that might be the concept that we are looking at.

As I understand it, and again, Ms. Laukitis, you can correct me if I've got this wrong, but as I understand it

from Ms. Etlin's declaration as well as the papers, the debtor is moving forward, it has in hand a bid for the distribution center, it is looking for a larger going concern bid that might include or might not include that distribution center. At some point in the next few weeks there is a drop dead at which point if there is no offer then the debtor will pivot to a liquidation process and that will occur, I think, by the -- at least as proposed in the milestones, that would occur by the end of August. So, that is just a few weeks out. Do I have that accurate?

Your concern would be that we have got Hilco in right now doing store closings at 90 plus stores, which leaves us with north of 300 stores remaining. And is the concern whether or not Hilco, if we transition to a liquidation pivot and look for someone to come in to do some sort of transaction on a liquidation format for the balance of the industry is your concern that Hilco should -- that Hilco -- is your concern that Hilco could be a participant in that process?

MS. SIERRA-FOX: Yes. To put -- so, yes. The issue is that we are in an order today without -- which is being entered on an interim basis and without the benefit of Hilco's declaration that is required under the case law and there is a provision in here that requires them to file their declaration disclosing connections to parties in interest in

the case seven days before the objection deadline on the motion on a final basis. We are saying today, in this order, that they are not precluded from bidding on these assets without really the benefit of information as to how else they may or may not be connected in this case.

So, there is what I call the multiple hat concern. They are in as liquidator. They want to not be precluded from coming in as a potential bidder on a liquidation basis or I think I heard, and parties can correct me if I'm wrong, even on a going concern basis to come in and bid on the assets. We are not prepared to say that they're not precluded from doing that today.

THE COURT: So, I think the question I have is how do we square this circle for purposes of today because what you are not saying is as a matter of law, having put on this particular hat today to liquidate 90 plus stores, Hilco has made its bed and it can't do anything else, it can't make any other bid, it can't participate going forward. I think Ms. Downing described this as an accordion. I don’t think I had heard that term before, but basically the debtor can choose and add more stores. That is pretty standard.

MS. SIERRA-FOX: Yes. That is not at issue.

THE COURT: That is not at issue. The point is whether or not if Hilco -- if we get to the end of the month and the debtor is in a pivot situation I think your point is

I don’t want them blessed or approved in advance because they may not be eligible or there may be significant concerns with respect to them making a bid. I mean we start with transparency and fairness and second disclosures and the process. So, I get that.

So, my point would be -- and I don’t want to put words in Ms. Downing's mouth or Mr. Desgrosseilliers, but this order should neither bless nor preclude that. If we are in -- to be blunt, if we are in a liquidation scenario, and let’s assume that it is liquidation, that it's not necessarily going concern, this decision has been made in the absence of a going concern bid at least as anticipated in the papers, the debtor will be in a come one come all mood.

There is a limited universe of people that buy this kind of thing. I am not being flip. You know, I care about -- since I don’t get a cut I care only about the process and the integrity of the process. So, you are a hundred percent right.

I guess the question is I want to know if I am missing something because I don’t necessarily -- I don’t have the disclosures, this is a first day hearing, stuff may happen in the future and if stuff happens in the future the Court will deal with it. I think I would like guidance. Again, I don’t want to move the landscape under either Ms. Laukitis or Ms. Downing, but I think that we should be

able to navigate past this for purpose of the relief that we are looking for today.

I see Ms. Laukitis about to stand and I will hear from anybody that wishes to be heard. Ms. Laukitis.

MS. LAUKITIS: Thank you, Your Honor, Lisa Laukitis from Skadden, Arps on behalf of the debtors.

I think Your Honor hit the nail on the head. We are in this case to maximize value no matter what course of action we end up taking. At this point in the case, we received bids, and Hilco's bid to liquidate the 94 stores was the best bid. And that bid is a commission-based bid, but it's not just the commission that matter, it's also the process that they will use to sell the most inventory in the shortest amount of time. So all of that comes together in the debtors' decision to hire Hilco and, should we need additional stores liquidated, we need to have access to Hilco and we've agreed to --

THE COURT: But I think I heard from Ms. Sierra-Fox that process over the next few weeks is fine. So, as the debtor goes through this -- assume that I enter this order today, we'll leave this issue aside, and the debtor identifies tomorrow, the next day, we're doing five more stores, two in New York, two in Michigan, whatever -- I think, as I've read this -- and Ms. Downing can correct me or Mr. Desgrosseilliers -- I don't think there's any restriction

on adding those and the United States Trustee is not worried about that, I think she's worried about the next round of significant activity, not just whether we're adding some stores. Am I missing something?

MS. LAUKITIS: That's right, I understand. No, I understand that to be the issue. And what I just wanted to clarify, and as Ms. Downing said, that the lenders have required us to run a further process if we flip to a more fulsome liquidation, and we cannot afford to have Hilco excluded from that process, you know, because they participate in this early process. We need to have the optionality to choose at that time the best bid for the benefit of all the stakeholders.

THE COURT: I understand. The question I have is, do I need to answer that question today? I am certainly --

MS. LAUKITIS: I don't think so.

THE COURT: -- familiar with Hilco and if I were looking to sell something large across a lot of space by tomorrow, you know, they would certainly be in that mix.

Ms. Sierra-Fox's issue, again, I think she's clarified, is not a they put this hat on and ride or die with that, it is, if there's another transaction, it gets tested, which I think is the way it works.

MS. LAUKITIS: I think we've all agreed that it would be. I just wanted to clarify that for the record.

THE COURT: No, I appreciate the clarity.

Mr. Desgrosseilliers, did you wish to be heard?

MR. DESGROSSEILLIERS: Your Honor, for --

THE COURT: Good morning.

MR. DESGROSSEILLIERS: Good morning, Your Honor, for the record, Mark Desgrosseilliers from Chipman Brown Cicero & Cole.

I just rise briefly to say, first of all, I think the language that's suggested in the order, at least the redline that I'm looking at, does precisely what Your Honor has said today --

THE COURT: Well, it says --

MR. DESGROSSEILLIERS: -- in that there's a clause at the bottom the Court makes no ruling with respect thereto, at the very end of that as I'm reading this blackline here, right?

THE COURT: Yeah, I guess I'm --

MR. DESGROSSEILLIERS: And so --

THE COURT: -- I think it probably lands in the same place. We would need to have a hearing. I think -- actually, Mr. Carter, did you wish to add anything?

Good morning, good to see you --

MR. CARTER: Yeah, good --

THE COURT: -- or good afternoon.

MR. CARTER: Good afternoon, Your Honor, Chris

Carter of Morgan Lewis & Bockius on behalf of Bank of America as the prepetition ABL and ABL agent. Yeah, I just wanted to weigh in a little bit.

So the milestones require, right, that the pivot date, if we end the month without a stalking horse (indiscernible) stalking horse, and we did build in a short process to seek liquidation bids and we did that based on, you know, our appreciation for the Court's concern as to just pivoting without any kind of even short process, so that's why it's there. We -- you know, this is a large company and we would be concerned about precluding today the -- you know, Hilco, the liquidator that is in the company --

THE COURT: Oh, I am emphatically not precluding Hilco today by any stretch. I'm just not answering a question about a transaction that may never occur.

MR. CARTER: Sure. And so I think -- to the language that's already in 51, you know, I think it's -- you know, nothing in this order precludes them from bidding on the assets and --

THE COURT: Actually, you know, if we -- let me ask you a question, if we phrase -- we're going to do a little wordsmithing here -- if we phrase this, instead of neither the agent, et cetera, shall be precluded, instead saying nothing in this order shall operate to preclude, that leaves -- to me, that would be an issue that leaves it fully

open. If it's phrased -- I think what's giving Ms. Sierra-Fox agita is that I'm ordering that they shall not be precluded. And I know that there's a saving clause at the end, but, Ms. Sierra-Fox, I'd like to know what you think.

MS. SIERRA-FOX: Yes, Your Honor, and I think -- ultimately, I don't think this is a today issue. I think my original ask was make it subject to final or -- I don't know, your language as proposed I think would work. I think the concern from our end is, if the disclosures and the hats that are being worn and the connections raise to the level of -- rise to the level of giving our office a concern, if then Hilco were to also come in as a bidder, that this order and anything that's happened in connection with the GOB approval, agency agreement approval, doesn't then preclude us or leave our hands tied when the debtors come in and say the best bidder was Hilco from saying, well, we have an issue with that for these reasons.

THE COURT: So let me just make sure we're all singing on the same hymnal.

MS. SIERRA-FOX: Yes.

THE COURT: So your point would be the fear that a sentence that has -- that's in an order that has my signature that says neither the agent nor its affiliates shall be precluded from providing additional services or bidding that in two weeks' time, when we find out all of these connections

and who's married to whom and everything else and that, as a matter of law, Hilco couldn't be involved in this, that they would turn around and say, ah-ha, but Judge Shannon said we shall not be precluded, right?

MS. SIERRA-FOX: I think that's also part of a concern. And I think that -- I don't know what advantage Hilco may or may not have --

THE COURT: Right. And that goes to my question about --

MS. SIERRA-FOX: -- yeah.

THE COURT: -- I was less concerned or focused on the disclosures --

MS. SIERRA-FOX: Yeah.

THE COURT: -- than on the fairness of the process.

MS. SIERRA-FOX: Right.

THE COURT: And that's what, you know, often a committee will weigh in and say, you know, it's easy for the people looking -- for the limited people in the room to sit around and go, so who around this table is going to win.

MS. SIERRA-FOX: Right.

THE COURT: And, again, I'm not casting aspersions on anybody.

I guess the question I'd like to bounce off of Mr. Desgrosseilliers and you would be, rather than having

that first language, just say nothing in this order shall preclude. And then, you know, the issue, I believe, is then fully reserved. The expectation that Hilco would be involved in this process seems pretty manifest, if it takes that turn, but we haven't made that turn yet. And the United States Trustee I think has raised a legitimate concern about whether I'm sort of blessing something in advance that may never occur.

So, Mr. Desgrosseilliers, I'd like your thoughts.

MR. DESGROSSEILLIERS: Your Honor, again, Mark Desgrosseilliers for the record. I'm happy to share my thoughts.

First of all, I agree with Your Honor, I think that language works --

THE COURT: Okay.

MR. DESGROSSEILLIERS: -- from Hilco's perspective, but, second, I just want to clarify the record here. And Ms. Sierra-Fox suggested some language from another case, which was a different situation for Hilco. Your Honor is aware of all Hilco's affiliates and how sometimes they're involved in different levels of the cap stack, that's not the case here. Hilco is in as the successful bidder to liquidate the 90 stores, that's it in this case. We'll file our disclosures as promptly as possible, but that's just not that situation, you're right,

Your Honor. So I'm fine with that.

THE COURT: I wasn't even -- I confess, I wasn't even focused on this and I didn't know that she had referenced another case. I thought her point was mainly we don't know what we don't know and are we blessing something that may not need --

MR. DESGROSSEILLIERS: Yeah, and it --

THE COURT: -- to be blessed today.

MR. DESGROSSEILLIERS: -- it was not Hilco's intent to bless something that was, you know, some surreptitious blessing that we were getting. It's just not the case here that we're not -- it's not that situation.

THE COURT: Well --

MR. DESGROSSEILLIERS: Sometimes it is and Hilco is still permitted to bid on assets, and that's, you know, with disclosures and all and that's how we do it. But we'll make our disclosures, I think we're comfortable with the language that Your Honor suggested and so, with that language, I think that issue is resolved.

I know Ms. Sierra-Fox had another issue, I just --

THE COURT: Ms. Sierra-Fox, is that language -- you know, subject to you guys wordsmithing it a little bit, is that satisfactory to you?

MS. SIERRA-FOX: Yes, Your Honor --

THE COURT: Okay.

MS. SIERRA-FOX: -- I think that's satisfactory. And I think the colloquy and the record that's been made in our discussions -- now, if there is an issue, and I'm not looking for one, so if there is an issue, then we have enough to resort back to on this point.

THE COURT: Okay.

MS. SIERRA-FOX: And I think the other point -- you know, I learned this from Judge Silverstein, Your Honor, on going-out-of-business orders and sales. I think it's at page -- let me turn to the redline you have, Your Honor.

THE COURT: Sure.

MS. SIERRA-FOX: Okay, it's ordered paragraph 4 on page 5.

THE COURT: Okay.

MS. SIERRA-FOX: It's been my practice now with retail cases that have this structure with the assumption of an agency agreement to, at least for the interim order, not make a pronouncement that the agreement is being assumed pursuant to Section 365 of the Code because I don't think the Code really contemplates a half-assumption or -- I don't really --

THE COURT: Yeah, I've had this discussion before --

MS. SIERRA-FOX: Yeah.

THE COURT: -- and I'm fully confident that you

people can find orders with precisely the structure that I have blessed in the past, but I've also had this discussion and the issue is, in fairness to Hilco and to the debtor, they need confidence that they're not doing something that would be later attacked as an unauthorized post-petition transfer or some sort of *ultra vires* act. But I also don't disagree with the United States Trustee that there is no partial or interim assumption and I don't know exactly what the consequences of that would be, assumption has significant legal effect. And so I'd like to talk about that.

I certainly have no issue with approving and authorizing Hilco to perform as described, but I think I'd like some guidance on the issue of assuming on an interim basis because I have noodled through that. Again, in the absence of objection, I have every confidence that I may have approved it in the past, and it be may largely a distinction without a difference, but I think what I -- to be entirely candid, I'm not -- I'm not certain what the legal consequences of that ruling would be beyond authorizing them to perform with the blessing of the Court.

MS. SIERRA-FOX: Right, Your Honor, and I think that's precisely our concern. I don't know what -- I do know that this whole motion is subject to further approval on a final basis and, as we've discussed in connection with the other issue, there will be, at least from the U.S. Trustee's

perspective, we're going to further evaluate what the connections are and whatnot, and that's pertinent to I guess our question as to whether this should fully assumed on a final basis.

I think that's the concern that we have is that I'm not sure -- and maybe it never comes to fruition ever in any case, but what the legal consequence of assuming something today where it's still subject to final approval. I think that the language I had proposed was the debtors are authorized to act and perform under the agency agreement. And the concern I heard from debtors' counsel, which Your Honor just also voiced, is, well, Hilco needs protection too. I don't have an issue with saying Hilco is authorized to perform and act under the agency agreement if what the parties want is the protection of their acts from now until, you know, we get to this Court on a final basis.

THE COURT: Mr. Desgrosseilliers, bail me out here.

MR. DESGROSSEILLIERS: I think I'm going to bail you out, Your Honor. I think that's what -- what Ms. Sierra-Fox suggested is fine, actually. And I agree with Your Honor, there is kind of an angels on the head of a pin thing about what does it mean to partially assume or interim assume something. What Hilco is looking for, as Your Honor quite correctly guessed, is some protection here because you can

imagine occasionally --

THE COURT: And it is a perfectly reasonable request. I mean, there is no --

MR. DESGROSSEILLIERS: Occasionally, although rarely because Hilco acts professionally, there are issues, right, as Your Honor can imagine with doing certain things --

THE COURT: Sure.

MR. DESGROSSEILLIERS: -- and certain (indiscernible) that cause people consternation, let's say.

(Laughter)

MR. DESGROSSEILLIERS: We want to have the protections of the order and I think what Ms. Sierra-Fox suggested -- the version that I saw, just to be clear, had the debtors being authorized to act, and we just need permission for Hilco to act, and to be protected by the Court's order when we're acting in accordance with the agency agreement and the sale guidelines. That's it, Your Honor.

THE COURT: I'm going to assume the parties can wordsmith that language.

MR. DESGROSSEILLIERS: Yes, we can.

THE COURT: And I think we would probably take out the interim assumption. I think -- I understand the intention, I don't know what the legal effect is. And I actually think the legal effect is probably nothing beyond the fact that I've authorized the performance, and the

suggestion from Ms. Sierra-Fox that the order not simply authorize the debtor, but authorize Hilco to take the actions that are identified and contemplated is probably an elegant addition as well.

MR. DESGROSSEILLIERS: I think that's right, Your Honor. I think it was just a shorthand developed to deal with these very issues and we're content with the language.

THE COURT: All right.

MR. DESGROSSEILLIERS: Thank you, Your Honor.

THE COURT: Does anyone else wish to be heard with respect to the debtors' application as to the Hilco agency agreement?

(No verbal response)

THE COURT: Ms. Downing, I don't want to have cut you off, but I think we've covered a lot of -- oh, Ms. Roglen, good to see you.

MS. ROGLEN: Good afternoon, Your Honor, Laurel Roglen of Ballard Spahr on behalf of certain of the debtors' landlords. In this case, so far we have Brixmor Operating Partnership, Brixton Capital, and Urban Edge Properties, with a total of 19 locations.

We provided the debtors some comments to the store closing procedures order, many of which made it in, but I think one just got missed in the redline --

THE COURT: Okay.

MS. ROGLEN: -- and this should be among the most noncontroversial things we discussed today, but it is in the dispute resolution procedures, which already provided that in the event of a governmental dispute under the liquidation laws affected landlords were going to get notice of that dispute, we just requested that they add in their counsel of record if known, so we will get notice of that as well. And I think that likely just got missed in the last turn.

Otherwise, we are already working with Mr. Desgrosseilliers and his client on our typical form of side letter agreement and we've made a lot of progress. We're not entirely done yet, but we hope to be done shortly. We typically request that signs not go up in our premises until we have the opportunity to enter into our agreement, but my understanding from my discussion with Mr. Desgrosseilliers is the signs are already up, and if there are any problems, we certainly know where to find him to get them remedied and, in the exceedingly unlikely event we don't work it out, we know where to find you.

THE COURT: This is true.

MS. ROGLEN: Thank you, Your Honor.

THE COURT: All right. I assume that those changes are satisfactory to the debtor?

MS. DOWNING: They are.

THE COURT: Very good. Ms. Downing, I think I may

have cut you off, but I wanted to make sure whether or not anyone else wished to be heard with respect to the Hilco proof of claim?

MS. DOWNING: Nothing further from me, Your Honor, on this order.

THE COURT: Okay. We've covered a lot of it, so I'm not going to burden the record with extensive findings or a discussion. The posture of this retail case is clear, it is a complex case, but the debtor has determined to move forward to liquidate and close a significant chunk of its stores, but nothing approaching a majority of them. Hilco, obviously, has done this in the past, and the Court is very familiar with Hilco and the services it provides in the context of bankruptcy proceedings.

I've had an opportunity to review the agency agreement, and I understand that the sales that are identified and contemplated therein are actually already underway, which is kind of the way that things have evolved now and that's fine. We had an interesting colloquy that I think was important where I do believe that the United States Trustee's observation about interim assumption is actually well founded, and it's probably not helpful in the proof of claim, it simply complicates the scope of the relief that's being requested.

But, in sum, I'm satisfied that the relief

requested is appropriate and warranted, and I would be prepared to enter an order that's been revised consistent with the discussions during our colloquy here in the court that would authorize the debtor to enter into and Hilco to perform under the agency agreement, as identified, on an interim basis, and I would look forward to that order being submitted under certification.

Are there an questions?

(No verbal response)

THE COURT: Very well.

MS. DOWNING: Thank you, Your Honor. With that, I'll hand it over to Ms. Elberg, who is there in the courtroom with you, on the DIP financing motion.

THE COURT: Very good.

MS. ELBERG: Good afternoon, Your Honor, Shana Elberg of Skadden, Arps, Slate, Meagher & Flom on behalf of the debtors.

THE COURT: Welcome.

MS. ELBERG: I stand to explain to you how we're going to be paying for all the relief you granted so far today. The next item on the agenda is Number 14, which is the motion to approve DIP financing and use of cash collateral, and it can be found at Docket Number 16. We separately filed the budget and fee letter at Docket Number 37.

THE COURT: I have the fee letter; I can't find the budget up here. Is there another copy of the budget kicking around? I know it's up here somewhere.

MS. ELBERG: Mr. Liberi will bring that up for me. Thank you.

THE COURT: Mr. Liberi, you're getting your steps in today. Thank you, sir.

MS. ELBERG: Okay. Your Honor, the proposed order was negotiation in good faith and at arm's length with our lenders. The debtors believe the proposed terms and conditions of the DIP facility are consistent with their overarching objectives, and are reasonable in the debtors' business judgment. The debtors require immediate access to the DIP facility and their cash collateral so they can continue operating and preserve value while they quickly explore the sale process that you've heard about so far today.

Without this relief, the debtors believe there would be immediate and irreparable harm as they would not be able to pay their necessary expenses, including employee wages, critical vendors, other working capital needs, and the administrative cost of these cases.

At a high level, the DIP facility is in an aggregate principal amount of up to 130 million, which includes a 12 million supplement for issuance of letters of

credit, and also contains certain adjusted borrowing base and over advance provisions that had the effect of basically increasing the debtors' prepetition liquidity.

As Ms. Laukitis stated at the beginning of the case, the petition -- as of the petition date, the prepetition ABL had outstanding about maybe nine million, the additional funding post-petition is currently projected to be about 11 million, and in addition there were 10.6 million of prepetition letters of credit outstanding that are being rolled into the DIP.

So, first, the DIP facility provides for the rolling up of those letters of credit, along with certain prepetition obligations relating to secured bank services. Then, the refinancing of the prepetition ABL facility is proposed to be done through a creeping rollup, which is going to be done on a one-to-one basis so that, as receipts come in, then that amount of prepetition debt is rolled into the DIP, and then what additional amount is needed is advanced as new DIP lending.

THE COURT: Okay.

MS. ELBERG: The rolled portion is subject to the challenge rights that will be for a potential committee under paragraph 35 of the order. And then we are asking at the final hearing and upon the final order that a full rollup be allowed.

Another key --

THE COURT: At the final.

MS. ELBERG: Yes, I'm sorry, Your Honor?

THE COURT: At the final.

MS. ELBERG: At the final, yes.

THE COURT: I understand.

MS. ELBERG: Another key negotiated feature of the DIP are the milestones that you've heard somewhat about today, and they are attached at Exhibit C to the order. Specifically, I wanted to highlight a few of the key milestones.

The first is that the bid procedures order is entered by August 29th, then that a sale approval order, if we get to that point, is entered by September 16th, and a closing of a sale happens by September 30th. The DIP maturity is currently -- the DIP maturity date is October 18th under these milestones.

At this point, I could proceed in a few ways. I could walk through some of the other provisions of the DIP order, which are fairly standard provisions, I can talk about one change that we've talked about with the U.S. Trustee's Office that is not in the redline that was delivered to you this morning, and I can walk through any of the redline that you got this morning.

THE COURT: I got the redline and I have been

through it. Again, I certainly appreciate most of the changes. I would like to know, I wasn't a hundred percent certain, are there open issues with the United States Trustee on the DIP financing?

MS. ELBERG: The only open issue, which is now resolved, is we have one additional change to paragraph 35 of the order, which is approximately page 59, I think, of your blackline --

THE COURT: Okay.

MS. ELBERG: -- or redline you got this morning. And when you get there, I can walk you through --

THE COURT: This is paragraph 35, effect of stipulations?

MS. ELBERG: Yes.

THE COURT: Okay.

MS. ELBERG: So if you go to the defined term challenge period --

THE COURT: Yep.

MS. ELBERG: -- right after that we are adding language that says, "provided that the approval of (A) as part of the challenge deadline is subject to entry of a final order granting such relief." And I believe, with that change, we are resolved with the United States Trustee's Office.

THE COURT: Okay. All right, I understand that --

and, again, the rollup itself is effective on the -- well, the creeping roll starts today.

MS. ELBERG: Correct, with a full rollup of the letters of credit and secured bank obligations.

THE COURT: Okay. Yeah, why don't we walk through the blackline --

MS. ELBERG: Okay.

THE COURT: -- because it's been evolving pretty quickly. I think what I got this morning should be the latest and greatest version, is that right?

MS. ELBERG: Yes, other than this one change --

THE COURT: Right --

MS. ELBERG: -- that we --

THE COURT: -- and I understand that change.

MS. ELBERG: Okay.

THE COURT: You can skip any -- I'm trying to think -- well, you kept it under 70 pages, so kudos to you.

(Laughter)

THE COURT: You can skip any conforming and technical changes. I just want to make sure, again, since it's been moving pretty rapidly since yesterday afternoon. I understand the context -- I've obviously had the chance to review Ms. Gupta's declaration and I understand the circumstances the debtor finds itself in, so I'm really mainly focused just on the terms of the transaction.

Where do we start with substantive?

MS. ELBERG: Let's see. I think page 31. A lot of the changes made at the request of the United States Trustee's Office, just to highlight for you, is --

THE COURT: They track in a bunch of places.

MS. ELBERG: Yeah, where we talk about entry of the final order, we specify granting such relief, so it's clear that is not an automatic approval upon entry of the final order, which I think was the concern of the United States Trustee's Office.

So page 31, paragraph 14 -- and this amendment of the DIP documents -- we just wanted to --

THE COURT: Right, they'll be noticed. Okay.

MS. ELBERG: Yeah, they'll be noticed, and that was at the request -- all these are at the request of the U.S. Trustee except for one, which I'll get to.

On milestones, page 41, paragraph 28, instead of it being condition, it's just clarifying it's an event of default if we --

THE COURT: You know, this is probably a decent time, we should talk about scheduling.

MS. ELBERG: Okay.

THE COURT: And the key date that the parties are talking about, you are proposing the 29th. I am not available on the 29th, but I would be available on the 30th

and I would be prepared to give you that date, subject, obviously, to hearing from anyone today or the United States Trustee. And obviously, if a committee is appointed and wishes to discuss the status and scheduling, then I would expect we'd probably wind up on the phone, as these things do.

But I did see the scheduling, I understand that it's a condition, I'm confident that the parties can live with the 30th; I'm just traveling on that day. And obviously we can work backward a little bit for purposes of noticing, et cetera, but I would be prepared to entertain a bid procedures motion on that day.

MS. ELBERG: Thank you, Your Honor. That certainly works for us. And I see Mr. Carter has popped up on the screen, so I'd ask him to confirm from the lenders that that's okay.

MR. CARTER: Good afternoon, Your Honor, Chris Carter of Morgan Lewis & Bockius on behalf of Bank of America, the DIP ABL agent and prepetition ABL agent.

I'm certainly not going to take that as a request -- a question as to whether to move to the 30th, so we are okay with that. The only thing I'd say is the practical point that, obviously, the dates that follow the 30th are very important to the DIP agent and the DIP lender in terms of, you know, when the bids go out -- are

coming in, the approval of the sale order, and the closing of the sale transaction. So that's all I would say.

THE COURT: No, I appreciate the heads-up, and I think that both the debtor and all parties have been clear that there may be a lot of activity at the end of the month and so be it. And, again, I recognize that this is a reduction of the time typically required under our local rules, which, again, we try to vindicate as much as possible just because the sales are getting and always have been faster and faster.

But Ms. Laukitis noted this at the outset, Ms. Etlin's declaration reflects it, there are situations where I'm not necessarily convinced that a debtor has been fully and thoroughly to the market and engaged in a process. I've seen declarations with, you know, a statement that the debtor has engaged in a fulsome and robust and frothy five-day marketing period for its oil and gas company, that sort of thing. And I'm being a little bit flip, but I take a measure of comfort from, again, the -- from the declaration and the representations that in fact this is a process that has been going on with eyes open for a long time.

And also, to Mr. Carter's point, I certainly understand the lender's thought process, but I'm also intimately familiar with the mechanics of retail bankruptcy proceedings, so I understand what the end of the month means

and the timing. While, again, I'm not necessarily approving anything beyond what I'm being asked to deal with today, I understand the dynamic.

And, again, to be clear, I will hear from a committee and other parties, if and when appointed, as appropriate, but I think the scheduling is appropriate under the circumstances and that the debtor has carried its burden with respect to its request to shorten that time, and we'll proceed with the -- did I give you a time on the 30th?

MS. ELBERG: No.

THE COURT: 10:30 a.m.

MS. ELBERG: Thank you, Your Honor.

In terms of substantive changes to the order you have in front of you, just a couple more to highlight.

On page 43, paragraph 29, just at the request of the U.S. Trustee's Office, given the committee rights to seek an emergency hearing during the remedies notice period.

I next turn to page 60, paragraph 35, also on the challenge period, and that's just if a motion seeking standing is filed, there's an extension of time for two business days for the challenge period there.

THE COURT: Okay.

MS. ELBERG: The last substantive comment, and this was at the request of the landlords and this is on page 65, regarding insurance proceeds, and it's just to make

sure it doesn't impair their rights.

THE COURT: To insurance proceeds for damage?

MS. ELBERG: Yes.

THE COURT: Okay, I do understand that.

MS. ELBERG: And that, unless the U.S. Trustee's Office has anything they want to highlight, I think covers the big, substantive changes in the order.

THE COURT: Okay. Ms. Sierra-Fox, anything further?

MS. SIERRA-FOX: No, Your Honor, the redline resolved our comments on an interim basis.

THE COURT: Okay. I would ask if anyone else wishes to be heard with respect to the debtors' request for post-petition secured financing and use of cash collateral.

Ms. Roglen.

MS. ROGLEN: Good afternoon, Your Honor, Laurel Roglen again, for the record.

We appreciate the addition of our only comment, and our other language that we typically ask for in these orders was already there, which we love to see. And I rise just to note that the budget that was filed is a very consolidated, summary form of budget. We asked some additional questions of the debtors with respect to the sufficiency of funding in the budget for post-petition rent obligations and stub rent. And we're in the initial stages

of gathering that information, although it appears that stub rent for all of the locations is not included in the budget and only stub rent has been included for the locations that are currently liquidating, and it's not clear to us exactly when that's provided for in the budget. But we're going to continue our discussions, of course, with the debtors and the DIP lenders in the hopes that we can reach a resolution before the final but, in the event we do not, you would then be seeing an objection from us and we reserve all of our rights to the final.

I also wanted to speak briefly on the scheduling of the bid procedures. I of course take no issue with the hearing on August 30th. I would just ask that the objection deadline be pushed out further than what was requested in the motion to shorten. I believe they requested an objection deadline on August 22nd and typically when --

THE COURT: Oh, yeah, that's -- yeah --

MS. ROGLEN: -- when we see -- yeah, typically when we see motions to shorten, to the extent possible, we like to preserve -- we like, of course, as the counterparties, we'd like to preserve our ability to the maximum extent possible the time we have to review and, of course, hopefully work out any issues we have with the bidding procedures without having to file an objection. So we would ask for the objection deadline to be set closer to

the hearing.

THE COURT: So their agenda would be due the 28th, we could do that either on the 26th or 27th, I think, because the debtor will need some time -- again, most of the issues that you would be raising are likely addressed as a business matter, so they would need the ability to coordinate with people. Anything more substantive from a committee or other -- U.S. Trustee or other --

MS. SIERRA-FOX: Yes, Your Honor, I --

THE COURT: -- what do you think?

MS. SIERRA-FOX: -- yes, Your Honor, I didn't say anything about this, I fully agree with landlords' counsel's point. I would assume, though, if a committee -- setting whatever deadline we set today, if a committee needs more time, that will -- in the first instance --

THE COURT: Yeah, that --

MS. SIERRA-FOX: -- being a conversation with counsel and, if they need up to the hearing or whatever, as long as Your Honor is okay with it, I would see that as not being precluded at this point.

THE COURT: Yeah, that typically happens. And, again, committees usually aren't shy about calling if they feel like they're not being afforded a fair opportunity.

So that's really the only question I have. Is there a strong feeling one way or the other between Monday

and Tuesday? I think I know where the debtor will land.

(Laughter)

MS. LAUKITIS: Your Honor, I'd prefer --

MS. DOWNING: Your Honor, if I may, Liz Downing --

MS. LAUKITIS: Go ahead, Liz.

MS. DOWNING: Oh, apologies. I can't see you in the courtroom if someone from Skadden --

THE COURT: Yes, Ms. Laukitis was standing up to say Monday sounded really good.

(Laughter)

MS. DOWNING: I would only add that given how our dates are working for the pivot, on Monday the 26th, that is when we identify a stalking horse, Tuesday is when we would file the notice indicating that. It doesn't give a lot of time for parties to be made aware that their objection may be moot and I appreciate people will have to be working on their objections in the meantime, but to the extent we're not proceeding with a bidding procedures hearing, if we can try to save folks the time of finalizing their objections on the Tuesday, it might make sense to wait until Tuesday.

MS. ROGLEN: No objection from me, Your Honor.

(Laughter)

THE COURT: Tuesday it is. And, again, we're being a little bit flip. This -- you know, experience teaches that counsel will communicate productively. I can't

think of the last time I got on the phone on a fight over an objection deadline. And, again, I think Ms. Downing actually hit the nail on the head, open but informal communication will actually give people a lot of guidance about whether or not an objection -- whether or not it's worth the time and energy to put the objection together.

So I don't think that a Tuesday deadline actually does violence to the debtors' expectations. There's going to be a lot moving parts going on and the debtor certainly -- the debtor certainly can, at least consistent with my practice, I'm not exactly sure what our local rules provide, but the debtor is welcome to extend other parties' deadlines as you're having those discussions. Again, I can't think of the last time I struck anybody's late objection. I've been asked a lot, but -- so I think it would make sense to go with the 27th. The debtor will be in communications. And, again, it's evolving rapidly enough that it probably does make sense to not have somebody have to make that submission.

Does that sound fair?

MS. ROGLEN: Thank you, Your Honor.

THE COURT: Ms. Laukitis?

MS. LAUKITIS: Thank you, Your Honor. And I would just reiterate our desire to have things be consensual to every extent possible in this case.

THE COURT: Sure.

MS. LAUKITIS: So I would invite parties to raise any concerns they have with us well in advance of the objection deadline, and we will do our best to accommodate whatever we can reasonably do to obviate the need for objections, if we can.

THE COURT: Okay, I think that makes sense.

I would ask if anyone else wishes to be heard with respect to the debtors' request for an order authorizing secured post-petition financing and use of cash collateral.

(No verbal response)

THE COURT: All right, hearing no response, I am going to grant the application. Again, I would express my appreciation to Ms. Sierra-Fox and others for engaging with the debtor in advance of this first day hearing.

The Court has previously admitted Ms. Gupta's declaration, which lays out the circumstances under which the terms of the DIP financing were negotiated and achieved, and the debtors' exercise in figuring out what its options were and landing on the structure that is before the Court today.

I note further that Ms. Etlin's declaration, while not dealing directly with the DIP financing motion, does provide the evidentiary and factual predicate under which this debtor has commenced its bankruptcy proceedings, and certainly identifies the liquidity crisis that this debtor was enduring leading up to the bankruptcy proceedings.

In the absence of any pending objections, I'm not going to burden the record with extensive findings. Based upon Ms. Gupta's declaration, Ms. Etlin's declaration, and the Court's consideration of the record developed in this, I'm satisfied that the debtors have carried their burden under Bankruptcy Code Section 361, 363, and 364, as well as Bankruptcy Rule 4001, for purposes of obtaining use of cash collateral and secured post-petition financing. Specifically, I would find, based upon Ms. Etlin's declaration in particular, that the debtors' reorganization effort would certainly suffer the risk of immediate and irreparable harm. The debtor does not demonstrate that it has available funds beyond those that would be available under the cash collateral and DIP financing regime I'm being asked to approve, and so I am satisfied that the relief is necessary to avoid immediate and irreparable harm.

The parties are revising the form of order, I would look for that under certification from counsel.

I would ask just one question. I usually ask this with respect to DIP financing. I will deal with review and presumably enter the order as soon as it's here, I just want to make sure we don't have any risk that if it spills over until tomorrow, do we have mainly payroll or anything else?

MS. ELBERG: Your Honor, I was going to ask, if possible, if it could be entered today, so that payroll could

be paid tomorrow? We'll get you the order with the two changes right when we get out of this courtroom. It's changing the milestone in Exhibit C and adding the one language I read into the record, and we'll get that to you right away.

THE COURT: That's just fine.

MS. ELBERG: Okay.

THE COURT: And, again, I always ask that question because I'm always just worried that there's some kind of hiccup. If it makes it over this afternoon, we will keep an eye out for it, and it will be entered. But I would further note that the Court has approved and authorized the debtor to use cash collateral, and has approved and authorized the protections identified to the lender that are laid out with particularity in the form of order.

So we'll get the order entered, but there shouldn't be a hiccup. Okay?

MS. ELBERG: I appreciate it. Thank you, Your Honor.

THE COURT: Sure. Ms. Laukitis, anything --

MR. CARTER: Your Honor, one --

THE COURT: Mr. Carter?

MR. CARTER: Sorry.

THE COURT: Yes.

MR. CARTER: Your Honor ruled, I certainly don't

want to interrupt, but Chris Carter of Morgan Lewis & Bockius on behalf of Bank of America, the DIP ABL agent.

Just -- actually, two things. One, just for some assurance, payroll was prefunded, but there is still urgency given the order entered. So today would be great and we'll close as quickly as possible, but we'll work with the debtors, obviously.

The second thing is just on dates. I don't know if you gave a date for the second day yet.

THE COURT: I have not. So that's -- is that the sale hearing that you -- there's a milestone that talks about a sale hearing, but I think you probably need a date before that just to deal with stuff, retentions and --

MS. ELBERG: I think we actually need it after that because we're shortening notice on the sale hearing to get to the 30th and I believe, wouldn't the final hearing, Chris, need to be the first week in September?

MR. CARTER: Yeah, Your Honor, right. So the 30th is the bid procedures, but I prefer that -- you know, the usual second day and the final DIP hearing, we were thinking the first week of September or second week of September. That was just my -- that's the one that's needed.

THE COURT: I think the easiest thing I could do would be -- can we do September 4 at 11:00 a.m.?

MS. LAUKITIS: Yes, Your Honor, that's fine for

the debtors.

THE COURT: Yeah, that should give you enough time to get, again, for a routine second day, final hearings on the various orders that I've granted interim relief, if there's other stuff going on, but you'll also be in front of me just a week before that. But, you're right, I appreciate the heads-up because the 29th is not enough time for the routine stuff that you'll need.

So, yeah, 11:00 a.m. on the 4th, and then we should be all set.

MS. LAUKITIS: Thank you. And, Your Honor, should we notice those hearings as in person or hybrid, or how would you prefer they be held?

THE COURT: I -- going forward, I think we're in person.

MS. LAUKITIS: Okay. Thank you.

THE COURT: And I'll look forward -- whether we're up on my floor, whether or not your tax dollar has paid for whatever fix they're doing to my courtroom or not, or if I'm in Dorsey's palatial space here, which, if we stop using, will turn into a driving range.

(Laughter)

THE COURT: So, with that, yeah, but they'll be in person --

MS. LAUKITIS: Great.

THE COURT: -- and I think that's consistent.

Is there anything further today?

MS. LAUKITIS: No, that's it, just thank you very much for your time.

THE COURT: Very good. With that, we'll stand in recess. Thank you very much, Counsel.

COUNSEL: Thank you, Your Honor.

(Proceedings concluded at 12:49 p.m.)

## CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.

/s/ William J. Garling August 14, 2024

William J. Garling, CET-543
Certified Court Transcriptionist
For Reliable

/s/ Tracey J. Williams August 14, 2024

Tracey J. Williams, CET-914
Certified Court Transcriptionist
For Reliable

/s/ Mary Zajaczkowski August 14, 2024

Mary Zajaczkowski, CET-531
Certified Court Transcriptionist
For Reliable